Kevin B. McDermott, Esq.  (CB#109182)
17452 Irvine Blvd #200
Tustin, CA 92680
Telephone:  (714) 731-5297
Fax:  (714) 731-5649 warlawyer@aol.com

Douglas L. Applegate, Esq.
(CB# 109155)
dlapplegate@earthlink.com
C/O Kevin B. McDermott

Joseph M. Preis, Esq. (CB#212998)
Becky Hsiao, Esq. (CB#232361)
Pepper Hamilton, LLP
4 Park Plaza, 12th  Floor
Irvine, CA 92614
Telephone:  (949) 567-3500
Fax:  (949) 863-0151
preisj@pepperlaw.com
c/o Kevin B. McDermott

Attorneys for Defendant Jose Luis Nazario, Jr.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE LUIS NAZARIO, JR.,<br><br>Defendant. | Case No.  ED CR 07-127 SGL<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO INVOKE THE COURT'S JURISDICTION OR TO STATE AN OFFENSE** [Federal Rules of Criminal Procedure, Rule 12]<br><br>Judge Stephen G. Larson<br>Date:   4/21/2008<br>Time:  3:00 p.m.<br>Dept.: 1<br>Action Filed: 9/4/07 |

**MOTION TO DISMISS**

**TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO THE UNITED STATES OF AMERICA AND ITS COUNSEL:**

**PLEASE TAKE NOTICE** that on April 21, 2008 at 3:00 p.m. in the courtroom of the Honorable Stephen G. Larson the defendant Jose Luis Nazario, Jr. ("Defendant") will and does move for an order dismissing the indictment in that it fails to invoke the court's jurisdiction or to state an offense, pursuant to Rule 12, Federal Rules of Criminal Procedure.

This motion is supported by the Indictment filed herein and the attached Memorandum of Points and Authorities.

Dated:  March 27, 2008

By:/S/ Douglas L. Applegate

Kevin B. McDermott
Douglas L. Applegate
Joseph M. Preis
Attorneys for Defendant,
JOSE LUIS NAZARIO, JR.

-2-

**MOTION TO DISMISS**

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.    INTRODUCTION.

Defendant Jose Luis Nazario, Jr. is charged by indictment with two counts of killing unknown, unidentified individuals on or about November 9, 2004.  The state of the discovery in this case reveals the following facts germane to this motion:

The backdrop for the allegations is the city of Fallujah, Iraq during Operation Al Fajr, initially known as Operation Phantom Fury.  Conducted on or about November 8 through November 22, 2004, the operation inflicted more than 3,000 insurgent killed in action.  The operation sought to first isolate and then eradicate domestic and foreign insurgents infested within the city limits of Fallujah.

The operation commenced only after extensive efforts by Coalition Forces to encourage non-insurgent residents to leave the city.  That effort caused the mass exodus of tens of thousands of individuals.  At the onset of the operation, the intelligence reports and the general perception among the command and the troops strongly indicated that the vast majority of individuals left behind were insurgents and spoiling for a fight.  In fact, in shaping the battlefield, the City of Fallujah had developed into a "killing ground" without any recognized Iraqi government.  So much so that Multi National Forces in Iraq relaxed the Rules of Engagement ("ROE") in comparison to the rest of the country.  These ROEs had an impact, at the very least, on the sheer number to killings in Fallujah and on the conduct of Coalition Forces, including the United States Marine corps and Iraq Army units which were involved in the operation.

Combat operations commenced on or about November 8, 2004 with an attack upon a train depot on the outskirts of the city.  Hostilities did not end until on or about November 22, 2004 when it was determined that every structure in the city had been searched and cleared.  The bulk of the action was carried out by various elements of the United States Marine Corps.  Defendant Nazario's unit, Third Battalion, First Marine Division, 3/1, was one of the elements.  Through the course

of the operation, this battalion, consisting of approximately 1500 Marines suffered 23 dead and 307 wounded.  Defendant Nazario, a Marine Sergeant at the time, was a squad leader.  Sgt. Nazario fought with his unit for the entire length of the operation and was decorated for valor for his actions during a battle with insurgents known in Marine Corps' lore as "Hell House."  It can be assumed that during this armed conflict, Sgt. Nazario engaged the enemy often and throughout the operation.

## B.   THE CHARGES AGAINST SGT. NAZARIO ARE NON-JUSTICIABLE POLITICAL QUESTIONS.

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986).  "The justiciability of a controversy depends not upon the existence of a federal statute, but upon whether judicial resolution of that controversy would be consonant with the separation of powers principles embodied in the Constitution." Aktepe v. United States, 105 F.3d 1400, 1402 (11th Cir. 1997).  The Supreme Court has clearly identified the elements of a nonjusticiable political question, any one of which may carry a controversy beyond justiciable bounds:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

-4-

1  Baker v. Carr, 369 U.S. 186, 217 (1962); see Goldwater v. Carter, 444 U.S. 996,
2  998 (1979).  A search for one of these elements is the "undisputed starting point in
3  any court's analysis of a purported political question."  Chaser Shipping Corp. v.
4  United States, 649 F. Supp. 736, 737 (S.D.N.Y. 1986), aff'd, 819 F.2d 1129 (2nd
5  Cir. 1987).

6        Any inquiry into whether Sgt. Nazario committed the conduct alleged here
7  will, of necessity, require the court to examine military decisions which are
8  committed to the Executive Branch and for which the Court lacks judicially
9  manageable standards.  The actions giving rise to the charges against Sgt. Nazario
10 occurred during intense combat operations, including almost three weeks of house-
11 to-house fighting meant to remove insurgents from the city of Fallujah.   Every
12 decision, every charge, therefore, must be examined against the backdrop of battle.

13       "[T]he political branches of government are accorded a particularly high
14 degree of deference in the area of military affairs."  Aktepe v. United States, 105
15 F.3d 1400, 1403 (11th Cir. 1997) (citation omitted), cert. denied, 522 U.S. 1045
16 (1998).  "The decisions whether and under what circumstances to employ military
17 force are constitutionally reserved for the executive and legislative branches."
18 Tiffany v. United States, 931 F.2d 271, 277 (4th Cir. 1991); see United States v.
19 Stanley, 483 U.S. 669, 682 (1987); U.S. Const. Art. I, § 8, cl. 11 (giving Congress
20 the power to declare war); U.S. Const. Art. II, § 2, cl. 1 (designating the President
21 as Commander-in-Chief of the Army and Navy).

22       Consequently, federal courts have consistently barred claims pursuant to the
23 political question doctrine "if military decision-making or policy would be a
24 necessary inquiry, inseparable from the claims asserted."  Carmichael v. Kellogg,
25 Brown & Root Servs., Inc., 450 F. Supp. 2d 1373, 1375 (N.D. Ga. 2006); see
26 McMahon v. Presidential Airways, Inc., 460 F. Supp. 2d 1315, 1322 (M.D. Fla.
27 2006) ("Claims arising from war that require a court to evaluate the executive's
28 military strategy, tactical decision-making, or calculated operations are typically

nonjusticiable political questions"); <u>Bentzlin v. Hughes Aircraft</u>, 833 F. Supp. 1486, 1497 (C.D. Cal. 1993) (finding that judicial resolution required an impermissible factual inquiry into military strategy and the orders given to troops). In evaluating the charge of voluntary manslaughter at issue here, however, the court will be forced to examine, at a minimum, the appropriateness of the rules of engagement and the standing orders during the battle of Fallujah – areas clearly committed to the Executive Branch.  <u>See</u> <u>Zuckerbraun v. Gen. Dynamics Corp.</u>, 755 F. Supp. 1134, 1142 (D. Conn. 1990).

According to N.C.I.S. Special Agent Mark O. Fox's affidavit in support of the criminal complaint, on November 9, 2004, Sgt. Nazario and the rest of 3rd Squad were under orders to "move to the center of [Fallujah], clearing the city of insurgents as they advanced."  Fox Aff. at 6(a).  Earlier that morning, 3rd Squad had come under enemy fire and a member of the squad was killed.  <u>Id.</u>  Later that same day, 3rd Squad began taking fire from a nearby house.  <u>Id.</u>  After the fire was suppressed, the squad was ordered to search the house.  <u>Id.</u>  The Marines allegedly detained four military-age males and found AK-47 rifles and ammunition. According to several of the witnesses Fox interviewed, Sgt. Nazario then placed a call on his radio to an unknown Marine.  <u>Id.</u> at 6(b) & 7(b).  The gist of the conversation, as reported in the affidavit, is that Sgt. Nazario was asked whether the individuals 3rd Squad had detained were dead yet, and after replying "negative," Sgt. Nazario was told to "make it happen."  <u>Id.</u>

Given these accusations from the government, it is unavoidable that this case will touch on military decision-making, including Sgt. Nazario's orders at the time of the alleged incident and the rules of engagement surrounding 3rd Squad's actions during combat.  Any inquiry into Sgt. Nazario's conduct that day will, by necessity, include an examination of what 3rd Squad was told by their superior officers concerning the capture of insurgents during the house-to-house fighting in Fallujah on November 9, 2004.  The court, however, cannot reasonably or appropriately

-6-

1   determine the propriety of Sgt. Nazario's actions on the field of battle without an

2   impermissible intrusion into the military powers expressly granted to the Executive

3   by the Constitution.   See Tiffany, 931 F.2d at 277 ("The strategy and tactics

4   employed on the battlefield are clearly not subject to judicial review."); Fisher v.

5   Halliburton, Inc., 454 F. Supp. 2d 637, 641 (S.D. Tex. 2006) (recognizing that

6   "courts have consistently held that issues involving war, and actions taken during

7   war, are beyond judicial competence").

8          In Rappenecker v. United States, for example, the District Court for the

9   Northern District of California held that former crewman of the S.S. Mayaguez

10  were barred by the political question doctrine from bringing an action for personal

11  injuries allegedly suffered during United States military operations.  509 F. Supp.

12  1024, 1028-30 (N.D. Cal. 1980).   The S.S. Mayaguez, a cargo vessel operating

13  under American registry, was seized by Cambodian gunboats on May 12, 1975.  Id.

14  at 1026.  The next day, on May 13, 1975, President Ford ordered the United States

15  Armed Forces to intervene and interdict any movement between the seized ship and

16  the mainland.  Id.  Plaintiffs claimed that they were subsequently injured during

17  engagements between U.S. military aircraft and the boat on which the crew of the

18  S.S. Mayaguez were being held.  Id.

19         The district court found that in "[i]n deciding to undertake the rescue

20  operation the President exercised his authority over the conduct of foreign affairs;

21  in implementing the decision he exercised his powers as commander in chief."  Id.

22  at 1028 (citations omitted).  The court explained that "[t]he responsibility for the

23  use of military forces is clearly committed to the President by the Constitution.

24  There are no standards for [the court] to judge the reasonableness of the President's

25  actions."  Rappenecker, 509 F. Supp. at 1029.  Likewise, a court may not reexamine

26  the *manner* in which military personnel carry out the President's order.  Id. at 1030.

27  As the Rappenecker court found:

28

-7-

1   the same considerations which preclude judicial examination of the

2   decision to act must necessarily bar examination of the manner in

3   which that decision was executed by the President's subordinates.  The

4   textual commitment to the President as commander in chief of

5   authority for military decisions entails that his decisions may be

6   implemented without judicial scrutiny.

7   Id.  This, unfortunately, is exactly what the government is asking the court to do in

8   this case; reexamine the manner in which Sgt. Nazario and 3rd Squad executed

9   their orders to "move to the center of [Fallujah], clearing the city of insurgents as

10  they advanced."  Fox Aff. at 6(a).  While no one is questioning the Executive

11  Branch's authority to order the Marines into Fallujah, any inquiry into the actions

12  of Sgt. Nazario and 3rd Squad will necessarily entail an examination of whether

13  those orders were executed properly.   As the Rappenecker court correctly

14  recognized, however, "courts lack standards with which to judge whether

15  reasonable care was taken to achieve tactical objectives in combat while

16  minimizing injury and loss of life."  Rappenecker, 509 F. Supp. at 1030; see

17  Tiffany, 931 F.2d at 278 ("Not only do courts lack the expertise to evaluate military

18  tactics, but they will often be without knowledge of the facts or standards upon

19  which military decisions have been based.").

20      Nine years after Rappenecker was decided, federal courts in California were

21  again confronted with the issue of whether military actions during combat were

22  nonjusticiable political questions, when on July 3, 1988, the USS Vincennes shot

23  down Iran Air Flight 655 over the Persian Gulf, killing all 290 passengers and crew.

24  Nejad v. United States, 724 F. Supp. 753, 754 (C.D. Cal. 1989).   The USS

25  Vincennes was deployed to the Persian Gulf to protect neutral shipping from the

26  war between Iran and Iraq.  Id.  At the time of the shooting, the USS Vincennes was

27  under fire from Iranian gunboats.  Id.  On July 4, 1988, the day after the incident,

28  the President reported to Congress that an Iranian airliner was shot down by the

-8-

1   USS Vincennes, "which was firing in self defense at what it believed to be a hostile

2   Iranian military aircraft." Id.

3        In Nejad, the District Court for the Central District of California found that

4   the action brought by the families of four of the passengers aboard Flight 655 was

5   nonjusticiable based on the political question doctrine.[1]  724 F. Supp. at 755.  The

6   plaintiffs brought several claims arising out of the shooting, including a claim for

7   wrongful death.  Id.  The district court, however, found it "indubitably clear that

8   plaintiffs' claim calls into question the Navy's decisions and actions in execution of

9   those decisions." Id.  Similarly, the government's accusations here call into

10  question the strategic and tactical decisions to clear Fallujah of insurgents and the

11  actions of 3rd Squad in executing those decisions.  As the Nejad court recognized,

12  there is no way to conduct an inquiry into the conduct of soldiers during combat

13  without an impermissible intrusion into military affairs.  Id.

14       This point was further emphasized in Bentzlin v. Hughes Aircraft Co., 833 F.

15  Supp. 1486 (C.D. Cal. 1993).[2]  In Bentzlin, a group of Marines were killed when

16  the light armored vehicle they were riding in during Operation Desert Storm was

17  struck by a missile fired from a U.S. Air Force A-10 aircraft.  Id. at 1487.  The

18

19       [1] The Ninth Circuit reached a different result on the same facts in Koohi v. United States, 976 F.2d 1328,
    1331 (9th Cir. 1992).  In Koohi, the Ninth Circuit found that the political question doctrine did not preclude the

20  court's review of military decisions made during combat.  Id. at 1331-32.  The Koohi court, however, did not focus
    on this aspect of the case, and even though Koohi was ultimately dismissed on sovereign immunity grounds, it has

21  been persuasively suggested that the Ninth Circuit incorrectly decided the justiciability issue.  See Barbara Burgess
    Hillson, Comment, Koohi v. United States: The Ninth Circuit Leads Federal Jurisdiction into Battle, 28 Ga. L. Rev.
    269, 283-90 (1993).

22

23       [2] Although all of the cases cited in this motion raise the issue of the political question doctrine in the civil
    context, nothing prevents the court from applying it in a criminal case.  The underlying premise remains the same –

24  "[c]laims implicating decisions made by military personnel during combat trigger the political question doctrine
    because those claims require courts to delve into areas unfit for judicial scrutiny."  McMahon v. Presidential

25  Airways, Inc., 460 F. Supp. 2d 1315, 1322 (M.D. Fla. 2006).  Until the enactment of MEJA in 2000, it was
    impossible for Article III courts to even hear criminal cases involving ex-servicemen for conduct committed during

26  combat.  Not surprisingly, therefore, there are no cases applying the political question doctrine to alleged criminal
    conduct during the time of war.  The case law invoking the political question doctrine in claims of wrongful death

27  and personal injury during combat, however, makes the distinction between those claims involving traditional tort
    liability – which are capable of judicial resolution – and those claims that implicate military decision-making during
    combat, which are not.  The same distinction is just as applicable in the criminal context.

28

-9-

**MOTION TO DISMISS**

1   families of the Marines claimed "that a manufacturing defect caused the missile to

2   deviate from its intended target and strike the Marines." <u>Id.</u>  The district court

3   found, however, that in order for plaintiffs to prove their claim of a manufacturing

4   defect, the court would be required to inquire into other possible causes of the

5   friendly fire incident. <u>Id.</u> at 1497.  The court concluded that the "[p]laintiffs' claims

6   necessarily require inquiry into military strategy and, more specifically, orders to

7   A-10 pilots and ground troops.  The Marines' deaths occurred during the war.  The

8   conduct of such affairs are constitutionally committed to the Executive Branch

9   under the President as Commander-in-Chief." <u>Id.</u>

10      <u>Bentzlin</u> illustrates the problem in this case.  The government will likely

11  argue that it is not necessary to inquire into military decision-making or policy in

12  order to prove that Sgt. Nazario's actions on November 9, 2004, constituted

13  voluntary manslaughter.   To prove voluntary manslaughter, however, the

14  government is required to establish that "(1) the defendant inflicted an injury upon

15  another from which he died; and (2) the homicide was committed without

16  justification or excuse."  <u>United States v. Holmes</u>, 632 F.2d 167, 170 (1st Cir.

17  1980); <u>accord</u> <u>United States v. Quintero</u>, 21 F.3d 885, 890 (9th Cir. 1994).  No trier

18  of fact can resolve this issue "without eliminating other variables which necessarily

19  involve political questions." <u>Bentzlin</u>, 833 F. Supp. at 1497.  This will require, at a

20  minimum, an initial determination of whether 1) the individuals detained by the

21  Marines of 3rd Squad were civilians, insurgents, or enemy combatants; 2) whether

22  Sgt. Nazario received an order to kill these individuals; and 3) if such an order was

23  given, who gave it, and was it a lawful order under the Uniform Code of Military

24  Justice?  As in <u>Bentzlin</u>, such questions necessarily require inquiry into military

25  decision-making and are "clearly beyond the competence of the courts to review."

26  <u>Id.</u>

27      It is impossible for a civilian judge or jury to try a case set on a battlefield

28  during war-time without an impermissible intrusion into powers expressly granted

-10-

to the Executive by the Constitution.  Moreover, a court – deficient in military knowledge, lacking vital information upon which to assess the nature of battlefield decisions, and sitting thousands of miles from the field of action – is not equipped to second guess military decision-making or to evaluate the conduct of a soldier during combat.  This Court should dismiss the charges against Sgt. Nazario because any reappraisal of his conduct on November 9, 2004, will require the Court to inquire into military decisions which are committed to the Executive Branch and for which the Court lacks judicially manageable standards.

**C.     THE LAW PRE-MEJA.**

For over 200 years the United States has employed a professional army and for all of that time civilians have provided the army with logistical support. Civilians are involved in virtually every aspect of military life, from providing food service for training bases to engaging in firefights while guarding diplomats.  The problem of American civilians committing crimes while accompanying the military overseas has been a vexing problem for military authorities.  Due to jurisdictional limitations civilian crimes often went unpunished, a result that was frustrating and embarrassing to both the military and Congress.  This frustration eventually led to the creation of MEJA.

The earliest solution to the jurisdictional limitation was to utilize the Uniform Code of Military Justice ("UCMJ") and prosecute civilians via military courts-martial.    However, such use of the UCMJ was banned in <u>U.S. ex rel Toth v. Quarles</u>, 350 U.S. 11 (1955).   The Court held that while Article I of the Constitution allows Congress to subject persons *actually in* the armed service to trial by court-martial, it does not allow Congress to extend that jurisdiction to civilian "ex-soldiers who had severed all relationship with the military and its institutions." <u>Id</u>. at 14.  <u>Reid v. Covert</u>, 354 U.S. 1 (1957), the case that firmly established pre-MEJA law regarding jurisdiction over civilians, was decided 2 years after <u>Toth</u>.  Mrs. Covert was tried and convicted by court-martial for killing her

-11-

husband, a sergeant in the Air Force, while on a military base in England. However, the Court held that Covert could not be constitutionally tried by military authorities.  Id. at 4-5.  This holding was largely based on an interpretation of Article I, § 8, of the Constitution, which empowers Congress to make rules to regulate the "land and naval forces."  This clause allows an exception to the Bill of Rights during the trial of a military member; however, "the power granted does not extend to civilians – even though they may be dependents living with servicemen on a military base . . .[I]t seems inconceivable that Mrs. Covert or Mrs. Smith could have been tried by military authorities as members of the land and naval forces."  Id. at 19-20.  The holding of Reid was clarified and extended in the series of cases that followed.[3]  In summary, the Reid line of cases holds that the Constitution prevents the military from trying, via court-martial, any civilian, regardless of whether that civilian was an employee or dependant of the military, and regardless of whether the alleged crime was a capital offense.

The shift in doctrine that led to the creation of MEJA began with two cases that considered Reid in a different light.  In both United States v. Gatlin, 216 F.3d 207 (2nd Cir. 2000) and United States v. Corey, 232 F.3d 1166 (9th Cir. 2000) the key issue was not whether the military could prosecute a civilian abroad, but instead whether domestic federal courts had jurisdiction to prosecute U.S. citizens for crimes committed while with the military overseas.  In Gatlin, the Second Circuit held that federal courts lacked jurisdiction resulting in Gatlin's escape from charges of sexual abuse of a minor.[4]  Frustrated with this result, the Court directed

---

[3] Kinsella v. U.S., 361 U.S. 234 (1960), held that the prohibition on civilian prosecution by the military extended to prosecution for non-capital offenses.  McElroy v. U.S., 361 U.S. 281 (1960) extended the jurisdictional limitation by holding that application of the UCMJ to non-capital offenses committed by civilian employees stationed overseas was controlled by Kinsella.  Finally, Grisham v. Hagan, 361 U.S. 278 (1960) held that Reid was applicable to capital offenses charged against a civilian employee.

[4] Mr. Gatlin was living in Germany on an Army base with his wife, an Army sergeant.  She was deployed to Bosnia, leaving Gatlin in Germany with his wife's children.  Gatlin sexually abused the children while their mother was deployed and was charged under 18 U.S.C. § 2243, which criminalizes conduct within the special and maritime

(continued...)

-12-

that a copy of the opinion be sent to Congress and Congressional review of this decision became a driving force behind the creation of MEJA.   However, the decision in <u>Gatlin</u> must be contrasted with the result in <u>Corey</u>, where the Ninth Circuit was confronted with the extraterritorial application of the same statute considered in Gatlin.  However, the court came to the opposite conclusion and held that certain foreign locations are within the control of the United States because Congress has always understood criminal jurisdiction to extend to all lands claimed by the United States, which includes military bases abroad.  <u>Id</u>. at 1176.

**D.    THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE APPLICATION OF MEJA TO THIS CASE LEADS TO AN ABSURD RESULT NOT INTENDED BY CONGRESS.**

Congress created MEJA against the backdrop of the <u>Reid</u> line of cases and attempted to create jurisdiction over civilians accompanying the military.  Due to the circuit split, many federal courts were unable to prosecute civilians for crimes committed abroad because domestic jurisdiction was held to end at the water's edge.  MEJA was created to close this loophole by extending domestic jurisdiction over civilians for their conduct while with the military abroad.  MEJA also resolves the issue presented by <u>Toth</u> by creating a mechanism for domestic trials of ex-servicemen for crimes committed while the subject to the UCMJ but who were discharged before prosecution.  However, the most important aspect of MEJA's legislative is history is what it does not show.  The proposed impact of MEJA on active-duty personnel was barely discussed and, more importantly, the idea that MEJA could be used to criminalize actions occurring during combat was never discussed.  This is a striking omission, and shows that the focus and intent of MEJA

_____

(continued...)

jurisdiction of the United States.  The Court held that despite Congress' authority to regulate conduct of its citizens outside the U.S., the actions in this case are limited by the language of the statute.  <u>Id</u>. at 211.

1    was to allow for the prosecution of civilians who commit non-combat crimes, such

2    as larceny, and *not* to criminalize action taken in the heat of battle.

3          Application of MEJA to combat action contradicts the intent of Congress and

4    creates a situation in which civilian courts are asked to second-guess combat

5    decisions. "Literal interpretation of statutes at the expense of the reason of the law

6    and producing absurd consequences or flagrant injustice has frequently been

7    condemned." Sorrells v. United States, 287 U.S. 435, 446 (1932).   While an

8    examination of legislative intent is not routine when the language of a statute is

9    clear, "[o]f course, we do not limit ourselves to the apparent plain meaning of a

10   statute, if doing so leads to absurd or impracticable consequences." Avendano-

11   Ramirez v. Ashcroft, 365 F.3d 813, 816 (9th Cir. 2004) (citing Ore. Natural Res.

12   Council, Inc. v. Kantor, 99 F.3d 334, 339 (9th Cir. 1996).   As far back as the

13   reconstruction era, the Supreme Court has noted that "general terms should be so

14   limited in their application as not to lead to injustice, oppression, or an absurd

15   consequence." United States v. Kirby, 74 U.S. 482, 486 (1869).   This doctrine has

16   been applied in the criminal context to limit the application of the National

17   Prohibition Act to prevent government entrapment:

18         If the requirements of the highest public policy in the maintenance of

19         the integrity of administration would preclude the enforcement of the

20         statute in such circumstances as are present here, the same

21         considerations justify the conclusion that the case lies outside the

22         purview of the act and that its general words should not be construed

23         to demand a proceeding at once inconsistent with that policy and

24         abhorrent to the sense of justice.

25   Sorrells, 287 U.S. 448-49.  In this case, application of the "general terms" of MEJA

26   will lead to a result that is both inconsistent with public policy and "abhorrent to the

27   sense of justice."   One need only review the legislative history of MEJA to

28

-14-

1  determine that Congressional goals are not served by the application of MEJA to

2  combat action.

3       The genesis of MEJA is the Report from the Overseas Jurisdiction Advisory

4  Committee, issued April 18, 1997.  *See* Report of the Advisory Committee on

5  Criminal Law Jurisdiction Over Civilians Accompanying the Armed Forces in

6  Time of Armed Conflict ("Report").   That committee was charged with

7  investigating and solving the jurisdiction loopholes created by the <u>Reid</u> line of

8  cases.  The Committee recommended a two pronged solution: (a) extending court-

9  martial jurisdiction over civilians (a proposal that was ultimately dropped in the

10  Senate); and (b) creating federal criminal jurisdiction in Article III courts over

11  civilians that commit crimes while attached to the military overseas.  The latter

12  recommendation served as the building block for the creation of MEJA.  However,

13  the most notable aspect of the Commissions' report is what was not discussed –

14  jurisdiction over active duty personnel.  Over the 66 pages of the Commissions'

15  report jurisdiction for combat related actions is never mentioned.  Nor is there any

16  discussion of creating jurisdiction over active duty military personnel.  In fact, the

17  only conduct discussed in the Report is the conduct of civilians – either contractors

18  or military dependants – who commit crimes overseas, categories that do not

19  include Mr. Nazario.  *See e.g.* Report at 19 (noting reports of civilian misconduct in

20  Haiti, including possession of alcohol, sexual relations with nationals, and larceny);

21  *Id.* at 8, (recounting the 1979 GAO Report quantifying civilian misconduct

22  accompanying forces overseas).

23       Legislative commentary on the early drafts of MEJA is sparse but

24  informative.  The statement of Roger Pauley, Director of the Department of Justice

25  – Criminal Division, is particularly revealing.  Speaking to the House Judiciary

26  Subcommittee on Crime, Mr. Pauley detailed the history and purpose of MEJA and

27  commented on the inclusion of jurisdiction over active-duty personnel, noting

28  "[t]he reason for this approach is to preserve the option . . . of asserting civilian

-15-

court jurisdiction over an active serviceman in a situation in which, e.g., a murder or robbery was committed jointly by the serviceman and a civilian dependant." 2000 WL 342528 at *3 (F.D.C.H).  Representative Steve Chabot noted, as did the Overseas Committee, that the United States has an interest in prosecuting crimes committed by military personnel, but he further noted that many of crimes "are committed against Americans and American property, [and] our government had an interest in using its laws to punish those who commit these crimes."  *See* 2000 WL 353067 * 4 (F.D.C.H. March 30, 2000).[5]  Implicit in this statement is the focus on non-combat crimes – larceny, burglary, and drunk driving – which all involve crimes against Americans or American property.  The combat actions that provide the basis for this case involve foreign nationals and foreign soil, thus falling beyond MEJA's interest in protecting Americans and American property.

Senate debate took a nearly identical tone, most notably the statements of Senator Leahy, whose comments focused solely on crime by civilians accompanying the armed forces, crimes such as sexual molestation, stabbing of a serviceman or drug trafficking to soldiers, none of which remotely involve combat actions.  *See* S8197, July 1, 1999.  Senator Sessions echoed these thoughts by noting that MEJA would allow the government to prosecute civilians for "even a serious [crime] such as rape. . ."  146 Cong. Rec. S11181-03 (Oct. 26, 2000).  Neither Senator referred to the prosecution of combat action at any time.

Non-Congressional commentary further illuminates the fact that Congress never intended MEJA to apply to a combat situation.  Richard Roesler, reporting for the military magazine *Starts and Stripes*, recounts the comments of Brigadier General James Smith, who noted that MEJA would close a "critical gap" by

---

[5] *See also* Statement of Robert Reed, Office of the General Counsel in the Office of the Secretary of Defense.  Reed stated that "the purpose is to provide recourse under the laws of the United States for crimes committed overseas by civilian employees and others accompanying the armed forces . ."  2000 WL 353067 * 9 (F.D.C.H. March 20, 2000).

**MOTION TO DISMISS**

1   allowing the government to punish civilian misconduct.  The types of incidents

2   detailed by Roesler are all non-combat related and include crimes such as rapes by

3   civilians on bases in Japan and Italy, drug dealing by a military wife in Japan, and a

4   string of 38 car thefts committed by a military-family teenager in Japan.  *See*

5   Richard Roesler, *Civilians in military world often elude prosecution*, STARS AND

6   STRIPES, April 10, 2000; *see also* SCHMITT, CLOSING THE GAP IN CRIMINAL

7   JURISDICTION OVER CIVILIANS ACCOMPANYING THE ARMED FORCES ABROAD, 51

8   CATH. U L REV 55, 77 (noting that two main concerns that led to creation of MEJA

9   were the need to protect the families of military members serving abroad, and to

10  provide equal treatment for civilians and military personnel that commit crimes

11  together).

12       Due to MEJA's brief history, there have been few prosecutions under the

13  Act.  However, the prosecutions that have occurred provide further insight into the

14  purpose of the Act.  Two cases, <u>Arnt</u> and <u>Green</u>, are worth discussion.[6]  In <u>Arnt</u>,

15  MEJA was successfully used to prosecute a woman who fatally stabbed her

16  husband, a Sergeant in the Army.  The Ninth Circuit noted that "Congress enacted

17  MEJA in response to a jurisdictional gap created by host nations' reluctance to

18  prosecute crimes against Americans committed by civilians accompanying the

19  Armed Forces outside the United States."  <u>United States v. Arnt</u>, 474 F.3d 1159,

20  1161 (9th Cir. 2007) (citing H.R.Rep. No 106-778(I) (2000).  MEJA was properly

21  applied in *Arnt* because the crime was against an Americans committed by an

22  American civilian.  This can be contrasted with this case, where the alleged crime

23  was against a foreign national and allegedly committed during combat operations –

24  a far different scenario that that presented by <u>Arnt</u>.

25  _____

26       [6] A third case, <u>Khan</u>, also utilized MEJA.  In <u>Khan</u>, MEJA was applied to prosecute a military contractor for
    possession of child pornography in Iraq.  *See* http://www.usdoj.gov/usao/vae/Pressreleases/05-

27  MayPDFArchive/07/20070525khannr.html (last accessed March 17, 2008).  Again, this is a non-combat related
    application of the Act.

28

-17-

1    Perhaps most interesting is the <u>Green</u> case, where a former solider is charged

2    with crimes arising from a March 12, 2006, incident in Mahmoudiyah, Iraq. The

3    indictment alleges that Green, and others, sexually assaulted a 14-year-old Iraqi girl

4    and then killed the girl, her father, mother, and six-year-old sister.  *See*

5    http://www.usdoj.gov/opa/pr/2006/November /06_crm_748.html  (last accessed

6    March 17, 2008).   The conduct alleged in <u>Green</u>, while committed in a combat

7    zone, was not combat-related conduct.   Green, and his codefendants, were not

8    involved in a battle or tactical operation at the time of the alleged offense, nor were

9    they given orders to interact with, let alone assault, Iraqi citizens.   Despite the

10   heinous nature of the crime in <u>Green</u>, the fact remains that MEJA is still limited by

11   that case to the prosecution of non-combat related actions.

12   When the history and current application of MEJA is examined, the

13   limitations of MEJA's scope and purpose are apparent.  While the "general terms"

14   of MEJA seem to apply MEJA without limitation, the results in this case push the

15   Court to examine the legislative history to prevent "impracticable consequences."

16   When the history is examined and applied to this case the result is a prosecution

17   that is both unintended by the legislature and shocking to the conscience of the

18   judiciary.  It is this absurd result that allows this Court to dismiss the indictment,

19   and to do so in the interest of public policy.

20   As various legislators and commenter's have noted, the goal of MEJA was to

21   provide an avenue for the regulation of civilian conduct overseas.  As the size of the

22   military increased the number of civilian contractors and dependants attached to the

23   military increased as well.  Alongside those increases came an increase in crimes

24   committed   by Americans overseas.   Sadly, the same problems that plague

25   American cities are present on military bases, and drug dealing, theft, assaults and

26   rapes are committed by Americans overseas.  Without MEJA, the perpetrators of

27   these crimes were left unpunished and the application of MEJA to civilians is not

28   an absurd result.

-18-

1    There is an absurd result when MEJA is extended to regulate combat action.
2 The absurdity is present on two levels.   First, because MEJA was intended
3 primarily to regulate civilian conduct, and at its most-expansive to allow the
4 prosecution of ex-serviceman for crimes such as theft and rape, the application of
5 MEJA to combat action is beyond any reasonable interpretation of Congressional
6 intent.   This is seen both in the Report of the Overseas Jurisdiction Advisory
7 Committee, which failed to ever mention prosecution for combat action, and the
8 statements of Senator Leahy and Representative Chabot who both focused their
9 commentary on civilian crimes and listed as exemplars solely non-combat crimes.
10 Second, the application of MEJA to combat action will lead this Court, and others,
11 down a slippery slope.  For a civilian court to determine whether a combat action is
12 a crime, the jury must analyze information beyond the experience of a lay person –
13 combat narratives must be examined, orders questioned, firefights recreated, etc.
14 Even the heinous crime in <u>Green</u> is not analogous to an examination of combat.
15 Despite the horrific crime, brutal rapes occur in major cities in America and are
16 frequently tried before the juries – the issues are not unique simply because the rape
17 occurred in Iraq.  Mr. Nazario's case, on the other hand, is *not* an ordinary charge
18 of manslaughter, which a lay civilian jury could consider.  Instead, this case is an
19 examination of combat action, and to allow the application of MEJA to that
20 circumstance flies in the face of legislative intent and creates a perfect example of
21 the absurd result the Supreme Court has had in mind since <u>Kirby</u>.

22
23
24
25
26
27
28

**MOTION TO DISMISS**

**E.     CONCLUSION.**

Jose Nazario faces Federal felony charges in a context that Congress never intended that evolve from non-justiciable political questions that MEJA cannot overcome.  He respectfully asks that this Court dismiss the indictment that fails to invoke the court's jurisdiction or to state a justiciable offense.

Dated:  March 27, 2008

By:/S Douglas L. Applegate_____
Kevin B. McDermott
Douglas L. Applegate
Joseph M. Preis
Attorneys for Defendant,
JOSE LUIS NAZARIO, JR.

-20-

# TABLE OF CONTENTS

**Page(s)**

A.  INTRODUCTION ..............................................................................................3

B.  THE CHARGES AGAINST SGT. NAZARIO ARE NON-JUSTICIABLE
POLITICAL QUESTIONS ...................................................................................4

C.  THE LAW PRE-MEJA ....................................................................................11

D.  THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE
APPLICATION OF MEJA TO THIS CASE LEADS TO AN ABSURD
RESULT NOT INTENDED BY CONGRESS.....................................................13

E.  CONCLUSION ...............................................................................................20

-i-

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**FEDERAL CASES**

5

Aktepe v. United States, 105 F.3d 1400 (11th Cir. 1997)..........................................................4, 5

6

Avendano-Ramirez v. Ashcroft,
    365 F.3d 813 (9th Cir. 2004).....................................................................................................14

7

Baker v. Carr, 369 U.S. 186 (1962) .........................................................................................5

8

Bentzlin v. Hughes Aircraft, 833 F. Supp. 1486 (C.D. Cal. 1993) ......................................6, 9, 10

9

Carmichael v. Kellogg, Brown & Root Servs., Inc., 450 F. Supp. 2d 1373 (N.D. Ga. 2006)........5

10

Chaser Shipping Corp. v. United States, 649 F. Supp. 736 (S.D.N.Y. 1986), aff'd, 819
    F.2d 1129 (2nd Cir. 1987)..........................................................................................................5

11

Fisher v. Halliburton, Inc., 454 F. Supp. 2d 637 (S.D. Tex. 2006)...........................................7, 8

12

Goldwater v. Carter, 444 U.S. 996 (1979) ...................................................................................5

13

Grisham v. Hagan,
    361 U.S. 278 (1960)................................................................................................................12

14

15

Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221 (1986) .............................................4

16

Kinsella v. U.S.,
    361 U.S. 234 (1960)................................................................................................................12

17

18

Koohi v. United States, 976 F.2d 1328 (9th Cir. 1992) .................................................................9

19

McElroy v. U.S.,
    361 U.S. 281 (1960)................................................................................................................12

20

21

McMahon v. Presidential Airways, Inc., 460 F. Supp. 2d 1315 (M.D. Fla. 2006)....................5, 9

22

Nejad v. United States, 724 F. Supp. 753 (C.D. Cal. 1989)........................................................8, 9

23

Reid v. Covert, 354 U.S. 1 (1957) ...........................................................................11, 12, 13, 15

24

Sorrells v. United States, 287 U.S. 435 (1932) ..........................................................................14

25

Tiffany v. United States, 931 F.2d 271 (4th Cir. 1991) .........................................................5, 7, 8

26

U.S. ex rel Toth v. Quarles, 350 U.S. 11 (1955)...................................................................11, 13

27

United States v. Arnt,  474 F.3d 1159, 1161 (9th Cir. 2007)....................................................17

28

-ii-

**MOTION TO DISMISS**

United States v. Corey, 232 F.3d 1166 (9th Cir. 2000) ............................................ 12, 13

United States v. Gatlin, 216 F.3d 207 (2nd Cir. 2000)............................................ 12, 13

United States v. Holmes, 632 F.2d 167 (1st Cir. 1980) ............................................... 10

United States v. Kirby, 74 U.S. 482 (1869) ............................................................ 14, 19

United States v. Quintero, 21 F.3d 885 (9th Cir. 1994) ............................................... 10

United States v. Stanley, 483 U.S. 669 (1987) ............................................................. 5

Zuckerbraun v. Gen. Dynamics Corp., 755 F. Supp. 1134 (D. Conn. 1990)................................ 6

FEDERAL STATUTES

18 U.S.C. § 2243 ....................................................................................... 12

CONSTITUTIONAL PROVISIONS

Bill of Rights ......................................................................................... 12

U.S. Const. Art. I, § 8, cl. 11........................................................................... 5

U.S. Const. Art. II, § 2, cl. 1 .......................................................................... 5

OTHER AUTHORITIES

Richard Roesler, Civilians in military world often elude prosecution........................................ 17

SCHMITT, CLOSING THE GAP IN CRIMINAL JURISDICTION OVER CIVILIANS ACCOMPANYING
     THE ARMED FORCES ABROAD, 51 CATH. U L REV 55, 77....................................... 17

United States: The Ninth Circuit Leads Federal Jurisdiction into Battle, 28 Ga. L. Rev.
     269, 283-90 (1993)................................................................................ 9

-iii-

# PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF ORANGE             )

     I, the undersigned, say: I am and was at all times mentioned a citizen of the United States and a resident of the County of Orange, over the age of eighteen years and not a party to the within action or proceeding; that my business address is 18301 Von Karmon Ave., Suite 210, Irvine, California 92612, that on March 27, 2008, I served the within:

## NOTICE OF MOTION AND MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO INVOKE THE COURT'S JURISDICTION OR TO STATE AN OFFENSE [Federal Rules of Criminal Procedure, Rule 12]

on all parties in said action, by emailed PDF attachments pursuant to agreement with Assistant United States Attorney JERRY A. BEHNKE, as follows:

JERRY A. BEHNKE (SBN: 180462)
CHARLES J. KOVATS (SBN: 184185)
Assistant United States Attorneys
3880 Lemon Street, Suite 210
Riverside, California 92501
Telephone:  (951) 276-6211
Facsimile:  (951) 276-6202
E-mail:  Jerry.Behnke@usdoj.gov

     I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I certify under penalty of perjury under the laws of the United States and the State of California, that the foregoing is true and correct.
     Executed on Thursday, March 27, 2008, at Irvine, California.

**/S**
Declarant

-iv-

**MOTION TO DISMISS**