THOMAS P. O'BRIEN
United States Attorney
SHERI PYM
Assistant United States Attorney
Chief, Riverside Branch Office
JERRY A. BEHNKE (SBN: 180462)
CHARLES J. KOVATS (SBN: 184185)
Assistant United States Attorneys
3880 Lemon Street, Suite 210
Riverside, California 92501
Telephone: (951) 276-6211
Facsimile: (951) 276-6202
E-mail: Jerry.Behnke@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JOSE LUIS NAZARIO, JR.,<br>Defendant. | No. ED CR 07-127-SGL<br><br><u>OPPOSITION TO MOTION TO DISMISS FOR FAILURE TO INVOKE THE COURT'S JURISDICTION OR TO STATE AN OFFENSE</u><br><br>Hearing Date: April 21, 2008<br>Hearing Time: 2:00 p.m. |

Plaintiff, United States of America, through its counsel of record, Assistant United States Attorneys Jerry A. Behnke and Charles J. Kovats, hereby opposes defendant's motion to dismiss. This opposition is based on the attached points and authorities,

///

///

///

the files and records in this case, and any additional evidence or argument that may be presented at the hearing on the motion.

DATED: April 11, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

SHERI PYM
Assistant United States Attorney
Chief, Riverside Branch Office

/s/

JERRY A. BEHNKE
CHARLES J. KOVATS
Assistant United States Attorneys

Attorneys for Plaintiff
United States of America

# TABLE OF CONTENTS


PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . ii

**POINTS AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . 3

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 3

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 4

A. The "Political Question" Doctrine Does Not Render The Charged Offense Non-Justiciable . . . . . . 4

1. There has been no demonstrable constitutional commitment of the issue to the executive branch . . . . . . . . . . . . . 7

2. There are judicially discoverable and manageable standards for resolving the issue . . . . . . . . . . . . . . 7

3. Resolution will not necessitate policy decisions of a kind clearly for nonjudicial discretion . . . . . . . . . . . 8

4. Judicial resolution of the issue will not result in the Court expressing lack of respect due to the executive branch . . 8

5. There is no need for unquestioning adherence to a political decision already made . . . . . . . . . . . . . . . . . 9

6. There is no danger of embarrassment from multifarious pronouncements by different departments on the same issue . . . . . . . . . . 9

B. Application Of MEJA In The Present Case Does Not Violate Congressional Intent . . . . . . . . . . . . 11

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES


PAGE(S)

FEDERAL CASES:

Baker v. Carr, 369 U.S. 209 (1962) . . . . . . . . . . . . . . . . . 6, 7, 10

Hamdan v. Rumsfeld, 548 U.S. 557 (2006) . . . . . . . . . . . . . . . . . . . . 7

Marbury v. Madison, 1 Cranch 137 (1803) . . . . . . . . . . . . . . . . . . . . 4

Koohi v. United States, 976 F.2d 1328 (9th Cir. 1992) . . . . . . . . . . . . . . 4, 11

United States v. Daas, 198 F.3d 1167 (9th Cir. 1999) . . . . . . . . . . . . . 12, 13

Bentzlin v. Hughes Aircraft Co. 833 F. Supp 1486 (C.D. Cal. 1993) . . . . . . . . . . . . 10

Nejad v. United States, 724 F. Supp 753 (C.D. Cal. 1989) . . . . . . . . . . . . . 10

Rappenecker v. United States, 509 F. Supp 1024 (N.D. Cal. 1980) . . . . . . . . . . . . 10

TREATIES:

Geneva Convention Relative to the Treatment of Prisoners of War, August 12, 1949 6 U.S.T. 3316 . . . . . . . . . . . . . . . . . . . . . . . 5

FEDERAL STATUTES:

Title 18, United States Code:

Section 2441 . . . . . . . . . . . . . . . . . . . . . passim

Section 3161 . . . . . . . . . . . . . . . . . . . . . 3, 12

LEGISLATIVE MATERIALS:

H.R. Rep. No. 104-698 (1996), reprinted in 1996 U.S.C.C.A.N. 2166 . . . . . . . . . . . . . . 13

**POINTS AND AUTHORITIES**

I. INTRODUCTION

Defendant, a former United States Marine, is charged with two counts of voluntary manslaughter in the shooting deaths of detainees captured by defendant's squad on November 9, 2004 in the city of Fallujah, Iraq. Defendant's squad had entered a house and encountered four unarmed males. Defendant and his squad ordered the males to get down on the ground and they complied. After a search of the house revealed several firearms, defendant placed a call over his radio. He then executed one of the detainees and ordered two of his subordinates to execute two of the detainees. Defendant then shot and killed the remaining detainee. At the time of the shooting, the detainees were unarmed and in the custody of defendant's squad.

Defendant has filed a motion to dismiss the indictment on two grounds. First, defendant argues that the trial of this matter will necessarily reach "non-justiciable" political questions. Second, defendant argues that the application of 18 U.S.C. § 3161, et seq. ("MEJA") to the instant matter contravenes Congressional intent.

The government opposes defendant's motion. First, the instant matter deals with a defined criminal violation. Furthermore, the issue before the court is justiciable under the standards set forth by the Supreme Court. Second, on its face, MEJA clearly applies to the instant matter and application of MEJA does not lead to unreasonable results.

II. ARGUMENT

A. The "Political Question" Doctrine Does Not Render The Charged Offense Non-Justiciable

As an initial matter, as defendant concedes, none of the cases he cites addressing the political question doctrine are criminal cases. All are civil suits involving private parties suing each other or private parties suing the government. There appear to be no cases where courts have dismissed a criminal prosecution brought by the United States on the grounds that the prosecution would violate the political question doctrine. Yet, this is the relief defendant seeks in this case.

The political question doctrine was first discussed in Marbury v. Madison, 1 Cranch 137 (1803). In that case, Chief Justice Marshall wrote:

> [T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers who act by his authority, and in conformity with his orders.

Id. at 165-166.

As the Ninth Circuit has explained, the political question doctrine is premised upon separation of powers principals in that it "serves to prevent the federal courts from intruding unduly on certain policy choices and value judgments that are constitutionally committed to Congress or the executive branch." Koohi v. United States, 976 F.2d 1328, 1331 (9th Cir. 1992). These separation of powers principals are not implicated where,

as here, the executive branch has brought the issue to the Court by filing criminal charges under clearly defined criminal statutes and any political policies or questions at issue rest with the executive.

The killings in this case were unlawful because they violated clearly established law of war. Law of armed combat ("LOAC") is derived from several sources including the Hague Regulations of 1907, the Chicago Convention of 1925, and the Geneva Conventions. Lawful handling and treatment of prisoners is set forth in the Geneva Convention Relative to the Treatment of Prisoners of War, August 12, 1949, 6 U.S.T. 3316. Article 13 of that convention states the following, among other things, "Prisoners of war must be humanely treated. Any unlawful act or omission . . . causing death or seriously endangering the health of a prisoner of war . . . is prohibited, and will be regarded as a serious breach of the present Convention." The convention goes on to command that "prisoners of war must at all times be protected." The United States has codified many of the war crimes defined by the international agreements set forth above at 18 U.S.C. § 2441. That statute provides, among other things, that it shall be unlawful to intentionally kill "those placed out of combat by sickness, wounds, <u>detention</u>, or any other cause." 18 U.S.C. § 2441(d)(1)(D)(emphasis added). Furthermore, evidence will show that specific to the military operations in Iraq, effective October 1, 2004, the First Marine Division Detainee Handling and Detention Facility SOP set forth that all detainees

shall be treated humanely and in accordance with the Geneva Conventions.

The evidence will further show that, in the days leading up to defendant’s participation in the Fallujah operation, he and the other members of his squad received training regarding the law of war, including training regarding proper treatment of detainees. All Marines, including defendant, were repeatedly taught that they shall do no harm to detainees and that they have an affirmative duty to protect detainees. The evidence will further show that the Marines had clearly established guidelines concerning the proper treatment and processing of detainees during the operation on November 9, 2004. Because defendant was not acting “in conformity with [the President’s] orders” the political question doctrine is inapplicable.

If the Court determines that defendant’s conduct may give rise to the political question doctrine, the Supreme Court has examined the various categories of legislative and executive actions that have been deemed to fall within the political question doctrine and has set forth a framework within which to analyze whether the present matter is justiciable. See Baker v. Carr 369 U.S. 209, 211-216 (1962)(analyzing application of doctrine in matters involving foreign relations, dates of duration of hostilities, validity of legislative enactments, and status of Indian tribes). The Supreme Court explained that there are several elements that may identify an issue as a political question and that unless one of the identified elements is

"inextricable from the case at bar" there should be no dismissal on political question grounds. Id. at 217. As discussed below, none of the elements identified by the Supreme Court is inextricable from the case at bar.

1. There has been no demonstrable constitutional commitment of the issue to the executive branch

The issue in this case is whether the defendant's act of killing detainees in his custody was unlawful. The lawfulness of U.S. soldiers' handling and treatment of prisoners and detainees, even in times of combat, is not an issue that has been exclusively committed to the executive branch. For instance, Congress has enacted the War Crimes Act of 1996 (codified at 18 U.S.C. § 2441). That statute defines crimes within the jurisdiction of Article III courts for certain acts, including the mistreatment of prisoners, committed by or against United States citizens (including soldiers) in times of war. Additionally, the Supreme Court recently addressed the legality of the executive's treatment of detainees held at Guantanamo Bay. See Hamdan v. Rumsfeld, 548 U.S. 557 (2006). Thus, it is clear that the issue of the lawfulness of shooting and killing a detainee is not an issue that has been demonstrably committed to the executive branch.

2. There are judicially discoverable and manageable standards for resolving the issue

There is no reason to believe that the Court lacks the ability to discover the pertinent facts and resolve the legal

issue surrounding this dispute. Defendant is charged with a common law crime that has been adjudicated by civilian courts for centuries. The legal standards defining the crime are well established. The lawfulness of the killings is measured against the LOAC principles set forth above. Contrary to defendant's claims, there is no reason to believe that this Court is incapable of assessing the lawfulness of defendant's action because of the Courts deficiency in "military knowledge." If the killings are deemed to be unlawful, then pursuant to MEJA the action amounts to homicide –- a clearly defined justiciable crime.

3. <u>Resolution will not necessitate policy decisions of a kind clearly for nonjudicial discretion</u>

As explained above, by treaty, statute, and basic military training, the well established law of war prohibits any mistreatment of detainees. Thus, the Court is not being called upon to make political policy determinations. Congress has clearly stated that the determination of whether actions by an Armed Forces member violates the law of war is a justiciable issue. <u>See</u> 18 U.S.C. § 2441.

4. <u>Judicial resolution of the issue will not result in the Court expressing lack of respect due to the executive branch</u>

There is no reason to believe that by adjudicating this case it will be impossible for the Court express the respect due to the executive branch. Again, the issue before the trier of fact

will center on whether defendant's actions were unlawful. Executive political decisions are not at issue. In fact, the Marines are prosecuting the very same conduct in a case against the other Marine involved in the shooting still subject to UCMJ jurisdiction. Also, this action has been brought by the executive branch through the Department of Justice. Given that the executive branch also believes the defendant's conduct was unlawful, resolution of the issue will not make it impossible for the Court to show due respect to the executive's political decisions.

5. <u>There is no need for unquestioning adherence to a political decision already made</u>

This element is inapplicable in the instant matter. The execution of detainees is not a "political decision" that commands "unquestioning adherence" thereto.

6. <u>There is no danger of embarrassment from multifarious pronouncements by different departments on the same issue</u>

Again, the military has demonstrated its belief that defendant's actions were unlawful and contrary to executive policy through its prosecution of the other Marine involved in the shooting. Thus, this is not a case where there is danger of embarrassment by differing pronouncements on any policy questions.

Defendant argues that his conduct as charged in this case

amounts to a combat activity.[1] Defendant cites several cases involving civil suits for negligence and manufacturing defects related to military combat activities to assert that there exists a blanket prohibition on judicial determination of anything touching upon combat operations. E.g., Bentzlin v. Hughes Aircraft Co., 833 F. Supp 1486 (C.D. Cal. 1993)(suit for negligence and manufacturing defect); Nejad v. United States, 724 F. Supp 753 (C.D. Cal. 1989)(suit for negligence); Rappenecker v. United States, 509 F. Supp 1024 (N.D. Cal. 1980)(suit for negligence and breach of duty). As the Supreme Court has explained, the political question doctrine is not so broad. Even where controversies may involve political issues, "clearly definable criteria for decision may be available. In such case the political question barrier falls away." Baker, 369 U.S. at 214. For instance, the Court explained that in the realm of foreign relations, political questions frequently are involved, "Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Id.

---

[1] By addressing defendant's claim, the government does not concede this point. According to the LOAC, once an enemy is detained, they are no longer engaged in combat. Contrary to defendant's contentions, executing a detained prisoner is not akin to the types of combat activity at issue in the cases cited by defendant. E.g., Bentzlin v. Hughes Aircraft Co., 833 F. Supp 1486 (C.D. Cal. 1993)(U.S. combat aircraft fired missile killing U.S. servicemen in friendly-fire incident during first Gulf war); Nejad v. United States, 724 F. Supp 753 (C.D. Cal. 1989)(U.S. warship shot down civilian jet that it mistook for enemy aircraft during combat operation in Persian Gulf "tanker war"); Rappenecker v. United States, 509 F. Supp 1024 (N.D. Cal. 1980)(civilians injured during military operation to rescue crew of vessel captured by Cambodian military).

at 211. Further, courts "will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power." Id. at 217.

The Ninth Circuit has specifically rejected the contention that all conduct during authorized military operations is beyond judicial review. Koohi, 976 F.2d at 1331. In Koohi, relatives of deceased passengers from an airliner that was shot down by a U.S. Navy warship sought damages for negligence. Id. at 1329-1330. On July 3, 1988, during the undeclared "tanker war" in the Persian Gulf, the Navy cruiser Vincennes engaged in gunfire with Iranian gunboats. Minutes later, a civilian Airbus passenger jet approached the Vincennes. The crew of the Vincennes mistook the liner for an Iranian F-14 and shot the aircraft down. Id. at 1330. The Ninth Circuit held that the suit was not barred by the political question doctrine. The court found that the suit was not "judicially unmanageable" because the conduct occurred during military operations. Id. at 1331. The court concluded that federal courts were competent to determine the merits of the claims and the extent of the relief to which plaintiffs would be entitled. Id. at 1332.

Similarly, in the present case, the Court is fully capable to determine the merits of the allegations. The matter should not be dismissed based on the political question doctrine.

B. Application of MEJA in the Present Case Does Not Violate Congressional Intent

Defendant argues that, because Congress did not specifically

discuss the applicability of the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. § 3261, et seq, to crimes committed by members of the Armed Forces during combat action, application of MEJA in the present case is unlawful.[2] Defendant concedes that application of MEJA to crimes committed by members of the Armed Forces in "non-combat related actions" even where such conduct occurs in a "combat zone" is appropriate. (Motion to Dismiss, p. 18). Thus, defendant draws a very narrow argument claiming only that crimes committed by members of the Armed Forces during combat action, falls beyond the scope of Congressional intent.

However, defendant's claim is without merit. First, the instant matter clearly falls within the scope of MEJA as the language of the statute is unambiguous. The absence of any discussion of combat operations in legislative history does not refute the clear meaning of the language of the statute. Under Ninth Circuit precedent, when analyzing legislative intent, there is no need to look to legislative history where the statute is clear. United States v. Daas, 198 F.3d 1167, 1174 (9th Cir. 1999)("If the statute is ambiguous-and only then-courts may look to its legislative history for evidence of congressional intent.")

The Ninth Circuit has explained that the first step in

---

[2] Again, as discussed above, the government contends that defendant's conduct did not occur during "combat action" because the detainees had been removed from combat. The offense did occur in a "combat zone," but under defendant's own theory, actions in a "combat zone" are chargeable under MEJA.

statutory construction is to look to the plain meaning of the statute itself. Id. The plain meaning of the statute controls and the courts will look no further unless application of the statute would lead to unreasonable or impractical results. Id. Here, because the plain meaning of the statute is clear, there is no need to look to legislative history.

Defendant contends that application of the statute as written leads to an absurd result that is "shocking to the conscience of the judiciary." (Motion to Dismiss, p. 18). Defendant contends that the legislature never intended for a civilian court to hear cases involving crimes arising from combat action. (Motion to Dismiss, p. 19). A brief review of legislative history behind the War Crimes Act and, indeed, the War Crimes Act itself refutes this claim. That Act, codified at 18 U.S.C. § 2441, establishes a Title 18 offense where any person, inside or outside the United States, "commits a war crime." Legislative history of the War Crimes Act clearly establishes that Congress intended the Act to reach war crimes committed by U.S. military members. House Report 104-698 contains a brief discussion acknowledging that military members are subject to courts martial only for as long as they remain in the military. The Report goes on to explain that the Act fills gaps in then-existing law by permitting the prosecution of military members for war crimes "even after discharge." H.R. Rep. No. 104-698, at 7 (1996), reprinted in 1996 U.S.C.C.A.N. 2166, 2172. Against this backdrop, it is clear that civilian

prosecution of a former military member for crimes committed during combat operations is something contemplated and clearly intended by Congress. In light of the War Crimes Act and its legislative history, defendant's claim that the civilian prosecution of the instant matter is "absurd" fails. Contrary to defendant's arguments, what would amount to an "absurd" result would be the dismissal of this case. If that were to occur, then defendant, the squad leader who ordered subordinates to commit these crimes, would go unpunished while his subordinate face court martial for murder.

III. CONCLUSION

Based on the foregoing, the government respectfully requests that the Court deny defendant's motion.