1 | THOMAS P. O'BRIEN
United States Attorney
2 | SHERI PYM
Assistant United States Attorney
3 | Chief, Riverside Branch Office
JERRY A. BEHNKE (SBN: 180462)
4 | CHARLES J. KOVATS (SBN: 184185)
Assistant United States Attorneys
5 |      3880 Lemon Street, Suite 210
       Riverside, California 92501
6 |      Telephone:  (951) 276-6211
       Facsimile:  (951) 276-6202
7 |      E-mail: Jerry.Behnke@usdoj.gov

8 | Attorneys for Plaintiff
UNITED STATES OF AMERICA
9 |

                    UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,      )    No. ED CR 07-127(A)-SGL
                               )
              Plaintiff,        )    GOVERNMENT'S TRIAL MEMORANDUM
                               )
              v.                )    [18 U.S.C. §§ 1112, 3261(a)(2):
                               )    Voluntary Manslaughter; 18
JOSE LUIS NAZARIO, JR.,         )    U.S.C. §§ 113(a)(2),
                               )    3261(a)(2): Assault With A
              Defendant.        )    Dangerous Weapon; 18 U.S.C.
                               )    §§ 924(c)(1)(A)(iii),
                               )    3261(a)(2): Discharging Firearm
                               )    During A Crime Of Violence; 18
                               )    U.S.C. § 2(b): Causing An Act
                               )    To Be Done]
                               )
                               )    Trial Date: August 19, 2008
_____)    Time: 9:30 a.m.

     Plaintiff, United States of America, through its counsel of

record, Assistant United States Attorneys Jerry A. Behnke and

Charles J. Kovats, hereby submits its trial memorandum.

                              I.

                 CASE SCHEDULING MATTERS

     Jury trial is scheduled for August 19, 2008 at 9:30 a.m.

The government estimates that its case-in-chief will last

approximately four days.

## II

### THE INDICTMENT

Defendant is charged in a three-count superseding indictment with violating 18 U.S.C. §§ 1112, 3261(a)(2) (Voluntary Manslaughter); 18 U.S.C. §§ 113(a)(2), 3261(a)(2) (Assault With A Dangerous Weapon); 18 U.S.C. §§ 924(c)(1)(A)(iii), 3261(a)(2) (Discharging Firearm During A Crime Of Violence); and 18 U.S.C. § 2(b) (Causing An Act To Be Done).

A.   Elements of the Offenses

Count one charges defendant with voluntary manslaughter, which has the following elements: first, the defendant unlawfully killed a human being; and second, while in the heat of passion, caused by adequate provocation: (a) the defendant intentionally killed the human being; or (b) the defendant killed the human being recklessly with extreme disregard for human life.  Heat of passion may be provoked by fear, rage, anger or terror. Provocation, in order to be adequate, must be such as might arouse a reasonable and ordinary person to kill.  Ninth Circuit Criminal Jury Instruction No. 8.91 (2003).

Count two charges defendant with assault with a dangerous weapon, which has the following elements: first, the defendant intentionally struck or wounded a human being; second, the defendant acted with the specific intent to do bodily harm to that human being; and third, the defendant used a firearm.  Ninth Circuit Criminal Jury Instruction No. 8.5 (2003).

Count three charges defendant with discharging a firearm

2

during a crime of violence, which has the following elements: first, the defendant committed the crime of voluntary manslaughter as charged in Count One of the First Superseding Indictment or assault with a dangerous weapon as charged in Count Two of the First Superseding Indictment; second, the defendant knowingly discharged a firearm; and third, the defendant discharged the firearm during and in relation to the crime. The defendant discharged a firearm "in relation to the crime" if the discharge of the firearm facilitated or played a role in the crime. Ninth Circuit Criminal Jury Instruction No. 8.65 (2003).

The defendant may be found guilty of voluntary manslaughter or assault with a dangerous weapon as charged in Counts One and Two of the First Superseding Indictment even if the defendant did not personally commit the act or acts constituting the crime but caused its commission. To prove the defendant guilty of causing a crime to be committed, the government must prove the following beyond a reasonable doubt: first, voluntary manslaughter or assault with a dangerous weapon was committed by someone; second, the defendant knowingly and intentionally caused the person to commit voluntary manslaughter or assault with a dangerous weapon; and third, the defendant acted before the crime was completed. Ninth Circuit Criminal Jury Instruction No. 5.1 (2003).

B.   Jurisdictional Matters

While the charged offenses were committed outside the United States, this Court has jurisdiction over the offenses pursuant to 18 U.S.C. § 3261, et seq. Section 3261(a) states in pertinent

part:

> Whoever engages in conduct outside the United States
> that would constitute an offense punishable by imprisonment
> for more than 1 year if the conduct had been engaged in
> within the special maritime and territorial jurisdiction of
> the United States—
>
> (2) while a member of the Armed Forces subject to
> Chapter 47 of Title 10 (the Uniform Code of Military
> Justice),
>
> shall be punished as provided for that offense.

18 U.S.C. § 3238 states that trial of an offense committed outside the jurisdiction of any particular district may be had in the district of the defendant's last known residence.

Here, the government expects to prove that defendant was a member of the United States Marine Corps at the time of the offenses.  Also, because defendant was residing in Riverside County, California, at the time of his arrest in this matter, venue is proper.  Defendant has not challenged venue in the Central District of California.

III

STATEMENT OF FACTS

The government expects to prove at trial the following facts, among others:

Defendant enlisted in the United States Marine Corps on about September 10, 1997.  On November 9, 2004, defendant held the rank of Sergeant and served as a squad leader in 3rd Platoon,

4

1  K Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division.

2  November 9, 2004, was the first day of defendant's involvement in

3  combat operations in the city of Fallujah, Iraq, as part of

4  Operation Phantom Fury.

5  A.    Training and Procedures Regarding Treatment of Detainees

6         Beginning in basic training and continuing up to the

7  beginning of the combat operations on November 9, 2004, defendant

8  had repeatedly received training regarding the lawful treatment

9  of detainees.  Defendant (and all other Marines) were repeatedly

10 taught the nine principles of the law of war,[1] which includes the

11 rule that they must allow the enemy to surrender if the enemy

12 wishes to do so.  Once a person is detained, the Marines must do

13 no harm to that person.

14        Defendant first received this training in institutional

15 training environments, such as basic training ("Boot Camp") and

16 at the School of Infantry, as well as within his unit.  The unit

17

18        [1] The killing of unresisting detainees violates the basic
   tenants of the law of war (also known as law of armed conflict).
19 See United States v. Griffen, 39 C.M.R. 586, 588-589 (1968).  Law
   of war establishes the basic ground rules that all armed forces
20 must follow at all times.  The "rules of engagement" (ROE) are
   directives issued by competent military authority to delineate
21 the circumstances and limitations under which its own forces will
   initiate and/or continue combat engagement with other forces.
22 The ROE may vary depending upon the particular mission and
   operating conditions.  However, the ROE never exceed the
23 limitations imposed by the law of war.  The law of war requires
   that enemy combatants must be allowed to surrender if they wish
24 to do so and, once an enemy surrenders, the capturing forces must
   treat the detainee humanely and must do no harm to the detainee,
25 except in self defense.  As a result, in this case, the
   particular ROE in effect at the time of the offense are
26 irrelevant.  Defendant's squad captured then killed four males
   who had surrendered and were not resisting, which is a clear law
27 of war violation.

28                                    5

training included both classroom instruction and practical
exercises on the law of war and proper detainee handling.  Both
the classroom instruction and practical exercises not only
reinforced defendant's previous instruction on the nine
principles of the law of war and proper detainee handling, but
also included briefings on Iraq-specific operational instructions
regarding these same topics.

During Operation Phantom Fury, the Marines had established
detailed guidelines for the proper handling of detainees.  All
Marine units carried flex ties that were to be used to handcuff
detainees.  Once persons were captured and searched, they were to
be transported to the train station just north of the city, which
served as a base of operation for U.S. forces.  At the train
station, an officer was designated to process the detainees.  On
November 9, the first day of the ground assault, defendant's
battalion captured approximately 25 detainees.  Overall,
throughout the entire battle hundreds of enemy insurgents were
captured and detained.

B.    Defendant's Squad Captures and Summarily Executes Four
      Detainees

On November 8, 2004, defendant's unit was staged just north
of the city.  On the morning of November 9, 2004, the Marines
were transported to the northern portion of the city where they
dismounted and moved south through the city on foot.

After advancing several blocks through the city and
participating in firefights with enemy insurgents, defendant's

1   squad was ordered to search a nearby house.  When the Marines

2   entered the house, they immediately encountered four unarmed

3   males.  As the Marines entered the house, the four males were

4   seated against the wall with their hands raised in the air.

5   Defendant and other Marines stood watch over the detainees and

6   questioned them while other Marines searched the house.  After

7   searches of the house revealed firearms and ammunition, defendant

8   placed a call over his radio.[2]  Following the radio call,

9   defendant executed two of the detainees and ordered two of his

10  subordinates, Ryan Weemer and Jermaine Nelson, to execute two of

11  the detainees.[3]  None of the detainees were armed and none of the

12  detainees resisted defendant or his subordinates in any way.

13      After the shootings, defendant's squad exited the house.

14  One of the Marines who witnessed the incident appeared visibly

15  shaken.  Another Marine who had been outside during the incident

16  went into the house to see what had happened.  Inside the house,

17  he saw four dead male bodies.  Three of the victims had gunshot

18

19          [2]  Witness accounts of the radio call and defendant's

20  statements after the radio call show that defendant reported
    having four males and then was asked, "Are they dead yet?"  The

21  witnesses in the house only heard defendant's side of the radio
    call.  Their account of the radio call is based upon defendant's

22  statements on the radio and his statements to the other Marines
    just after the conversation.  Regardless of whether any hearsay

23  exception may apply to introduction of these statements, the
    radio conversation is not relevant because defendant cannot rely

24  on obedience to orders as a defense to this act.  See United
    States v. Griffen, 39 C.M.R. 586 (1968)(finding obedience to

25  orders is no defense to killing unresisting prisoner).

26          [3]  These two individuals are both currently in the USMC and
    are being prosecuted by military court-martial for their roles in

27  this offense.

28                                  7

wounds to the head and the fourth had gunshot wounds to his chest.  The four victims were left behind and their bodies were never recovered.

C.  <u>Ryan Weemer's Interview With Secret Service</u>

    This offense was first reported by Ryan Weemer during a recorded pre-polygraph interview as part of his application to become a uniformed division officer with the United States Secret Service.  The interview occurred on October 3, 2006, at the St. Louis field office and was conducted by Special Agent (SA) Dezeeuw.  SA Dezeeuw explained to Weemer that the interview would be considered during the application process to determine his suitability for employment.

    During the interview, SA Dezeeuw questioned Weemer about crimes he had committed.  Weemer said that he struggled with things he had done in the military.  SA Dezeeuw told Weemer that he was not concerned with justified acts like self defense.  SA Dezeeuw then explained to Weemer that if someone in law enforcement or the military were to "take somebody down a back alley and shoot them in the back of the head" he would not be able to justify that as that would be a criminal act.  Weemer then stated, "That actually did happen to be honest."

    Weemer then described beginning the foot patrol through Fallujah.  He explained that the Marines were engaged in firefights immediately.  He said that at some point his friend was shot by sniper fire and about 20 minutes later Weemer learned

that he had died.[4]   Thereafter, a Platoon Sergeant ordered Weemer and other Marines to search a nearby house in order to "get their heads back in the game."   To that point, houses had always been empty so Weemer assumed the Sergeant just wanted them to "go through the motions."

Weemer said that upon entering the house they encountered four or five males.   The Marines also found weapons.   Weemer said that his squad leader was there and that they called up to the Platoon Sergeant or Platoon Commander to report the situation. Weemer said they were asked "are they dead yet?"   Weemer said they then just ended up shooting them.   Weemer explained that the killings were not vengeful, but that they had orders to essentially take care of it.

Weemer then elaborated, explaining that they had the males sitting there.   They were unarmed.   Weemer said the Marines argued about it, but they had to move.   Weemer took one and shot him.   He then took his team[5] outside.   Weemer then looked back and saw that other Marines had killed the rest of the detainees.

D.   <u>January 8, 2007 Recorded Telephone Call Between Defendant and Jermaine Nelson</u>

In January 2007, Jermaine Nelson agreed to assist in the investigation of this matter by engaging in recorded telephone conversations with defendant.   During one of these recorded calls

---

[4] Lance Corporal Juan Segura was killed by enemy fire at approximately 9:25 a.m. on November 9, 2004.

[5] Weemer was a fire team leader.   The members of his fire team were in the house when Weemer shot one of the detainees.

on January 8, 2007, defendant and Nelson discussed the killings
at issue in this case.  During the conversation, Nelson asked
defendant how he should respond if asked on a polygraph whether
he ever murdered somebody.  Nelson then discussed the shootings
at issue and asked defendant, "I mean, we had the right orders,
didn't we?"  Defendant responded, "Yeah."  Nelson then asked,
"Who gave us the orders though, nigger?"  Defendant responded, "I
did."  A few lines later, defendant explained further, "That shit
is coming from the Battalion Commanders.  We got to get from
point A to point B and we ain't got time to throw mutherfuckers
on the truck 'cause we moving."  Then, defendant explained, "It
was, you know, a decision we made because it was the outcome
that's the best.  So it was, it was a decision.  You can't play
Monday morning quarterback, bro."

IV.

STIPULATIONS

     The parties have agreed to stipulate to the following
matters:

     1.    Jose Luis Nazario, Jr., entered service in the United
           States Marine Corps on September 10, 1997.

     2.    Jose Luis Nazario, Jr., was a member of the United
           States Marine Corps on November 9, 2004.

     3.    Jose Luis Nazario, Jr., was honorably discharged from
           the United States Marine Corps on October 11, 2005.

     4.    Following his discharge from service on October 11,
           2005, Jose Luis Nazario, Jr., is no longer subject to

10

Chapter 47 of Title 10 (the Uniform Code of Military
Justice).

5.   Venue for trial of the offenses charged in the First
     Superseding Indictment lies within the Central District
     of California.

6.   Foundation for admission of photographs taken by
     photographer Lucian Reed while embedded with Kilo
     Company in Fallujah.[6]

V.

LEGAL AND EVIDENTIARY ISSUES

A.   The Killing of Unresisting Detainees Is Patently Unlawful

In order to ensure compliance with the law of war, the USMC
has implemented Marine Corps Order 3300.4, attached Exhibit 1.
Order 3300.4 is aimed, in part, at ensuring that Marines comply
with the law of war in all armed conflicts.

The law of war includes nine basic principles.  Two of these
basic principles as set forth in Order 3300.4 are:

     (2) Marines do not harm enemy soldiers who surrender.
         Marines disarm them and turn them over to their
         superiors.

     (3) Marines do not torture or kill enemy prisoners of
         war or detainees.

(Exhibit 1, encl. 2, p. 2).  Marines, including defendant, are
taught that violating the law of war dishonors the Marine Corps

---

[6]   The parties reserve the right to object to admission of
photographs on other grounds such as relevance or Rule 403.

and the nation and strengthens the enemy's will to fight.  These
basic principles are stressed through repeated training.

     While this may be the first case in which a District Court
is hearing a case based upon a law of war violation, military
appellate courts have spoken in several such cases, including a
case in which a soldier was charged with executing a detainee
during combat in Vietnam.

     On April 4, 1967, an Army platoon was providing security for
an engineering element in a hostile area in Vietnam.  United
States v. Griffen, 39 C.M.R. 586, 587 (1968).  The platoon
captured a "male of military age" and evacuated him for
interrogation, which revealed that he was an enemy member of the
Viet Cong.  Later, as the platoon prepared to cross a large rice
paddy, soldiers captured a male who had been hiding in a bunker.
Id.  Soldiers also noticed another male who appeared to be
observing the activities of the platoon.  The soldiers attempted
but failed to capture him.  There was concern in the unit because
they had possibly been detected by the enemy and, several months
earlier, an entire platoon had been killed or wounded in that
same location.  Id. at 588.  The platoon commander contacted the
company commander by radio to arrange for air evacuation of a
wounded soldier (the soldier had been wounded during operations
to clear bunkers around the platoon's position).  The precise
conversation was not clear, but the company commander's orders
appeared to have been that the prisoner should be killed.  Id.
After the radio call, the platoon commander gave a direct order

to a subordinate, Griffen, to kill the prisoner.  <u>Id.</u>  Griffen
and another soldier carried out the order by shooting the
prisoner with their M-16 rifles.  <u>Id.</u>

Griffen was convicted of unpremeditated murder.  At trial,
he requested a jury instruction on the defense of obedience to
orders.  The trial court refused.  <u>Id.</u>  On appeal, the court
affirmed.  The panel explained that "the killing of a docile
prisoner taken during military operations is not justifiable."
<u>Id.</u>  The court further explained that, pursuant to the Army's Law
of Land Warfare, a prisoner may not be put to death even where
the prisoner retards the movements of the unit or diminishes the
power of the unit "by necessitating a large guard, or by reason
of their consuming supplies, or because it appears certain that
they will regain their liberty through the impending success of
their forces."  <u>Id.</u> at 589.  The court concluded that the trial
court did not err.  The court found that the order to kill the
prisoner was "so palpably illegal on its face as to admit no
doubt of its unlawfulness."  <u>Id.</u> at 590.

Similarly, in the present case, defendant's squad had
captured and detained four males who surrendered to defendant's
squad as they entered the house.  After securing the males and
searching the house multiple times, defendant ordered the
execution of the detainees.  The unlawfulness of these acts is
clear.  As <u>Griffen</u> instructs, even if the evidence establishes
that defendant was acting pursuant to orders from a superior,
that does not justify his actions nor make the killings lawful.

13

B.   <u>Ryan Weemer's Statement to SA Dezeeuw Is Admissible</u>

Federal Rule of Evidence 807 provides that a hearsay statement is admissible, regardless of whether the declarant is available at trial, if the Court determines (A) the statement is material; (B) the statement is more probative than other evidence reasonably available to the proponent; and © the general purpose of the Rules and the interests of justice are best served by its admission.  Here, the statement by Ryan Weemer about the charged offense is material.  It is reliable because the statement amounts to a criminal confession during a job application with the Secret Service.  This certainly is the type of highly incriminating statement that one would only expect the declarant to make if it was true.  Additionally, unlike some instances where a confession may contain attempts to shift blame to others, Weemer did not name any other participants in the crime and only spoke directly about his own act of shooting the detainee.  While he did reference the fact that other Marines killed the rest, the statement is not an untrustworthy attempt to minimize or shift blame to another.  Lastly, if Weemer is unavailable, this would be the only evidence of his account that is available to the government (and that is not barred from admission by <u>Crawford</u>, discussed below).  Thus, the interests of justice would be served by its admission.

If Weemer is unavailable at trial, then the statement is also admissible under Rule 804(b)(3) as a statement against interest.  As discussed above, the statement was so far against

1   Weemer's interest at the time and under the circumstances of the

2   statement, that a reasonable person in his position would not

3   have made the statement if it were not true.

4       The statement to SA Dezeeuw was not "testimonial" within the

5   meaning of <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).  There,

6   the Supreme Court held that testimonial statements are not

7   admissible against a defendant unless the defendant had a prior

8   opportunity to examine the declarant about the statements,

9   explaining that admission of such testimonial statements violates

10  the Confrontation Clause.  <u>Id.</u> at 68.  However, the Supreme Court

11  also explained that non-testimonial statements are admissible

12  according to standard hearsay rules and are exempted from

13  Confrontation Clause scrutiny.  <u>Id.</u>  The Supreme Court explained

14  that the term testimonial applies, at a minimum: "to prior

15  testimony at a preliminary hearing, before a grand jury, or at a

16  former trial; and to police interrogations."  <u>Id.</u>

17      The Supreme Court later addressed whether all statements to

18  law enforcement officers during 911 calls or at the scene of

19  crimes are "testimonial" for Confrontation Clause purposes.

20  <u>Davis v. Washington</u>, 547 U.S. 813 (2006).  In finding that not

21  all statements to law enforcement officers are testimonial, the

22  Court explained:

23          The text of the Confrontation Clause reflects this focus [on
            testimonial hearsay]. It applies to 'witnesses' against the
24          accused-in other words, those who 'bear testimony.' . . .
            'Testimony,' in turn, is typically 'a solemn declaration or
25          affirmation made for the purpose of establishing or proving
            some fact.' . . .   An <u>accuser</u> who makes a formal statement
26          to government officers bears testimony in a sense that a

27

28                                    15

1  person who makes a casual remark to an acquaintance does
2  not.

3  Id. at 823-824 (citations omitted and emphasis added).  The Court
4  went on to explain what it meant by the term "interrogation" in
5  Crawford, stating "we had immediately in mind (for that was the
6  case before us) interrogations solely directed at establishing
7  the facts of a past crime, in order to identify (or provide
8  evidence to convict) the perpetrator."  Id. at 826.

9       The Ninth Circuit has also explained that not all statements
10 made to law enforcement officers fall within Crawford's
11 proscription.  Rather, the statements must be the result of
12 interrogation aimed at building a criminal case before they will
13 be deemed "testimonial."  See Leavitt v. Arave, 383 F.3d 809, 830
14 n.22 (9th Cir. 2004)(murder victim's statements to police, who
15 arrived in response to her 911 call, that prowler whom she
16 believed to be defendant tried to enter her home did not
17 implicate Confrontation Clause concerns identified in Crawford);
18 see also United States v. Cervantes-Flores, 421 F.3d 825, 833
19 (9th Cir. 2005)(explaining distinction between testimonial and
20 non-testimonial statements exists in Confrontation Clause
21 analysis in part because of "skepticism of government officers
22 preparing evidence against a defendant").  As in Leavitt, the
23 involvement of the government official here (Dezeeuw) was not
24 made "with an eye toward trial" and was not designed to build a
25 criminal case against defendant.  Accordingly, the statements do
26 not raise the potential for prosecutorial abuse underpinning the

27

28                                    16

1  Supreme Court's construction of the Confrontation Clause.

2  <u>Crawford</u>, 541 U.S. at 56, n.7.

3        Weemer's statements to SA Dezeeuw should be admitted.

4  DATED: August 13, 2008          Respectfully submitted,

5                                  THOMAS P. O'BRIEN
                                   United States Attorney
6
                                   SHERI PYM
7                                  Assistant United States Attorney
                                   Chief, Riverside Office
8
                                       /s/
9                                  _____
                                   JERRY A. BEHNKE
10                                 CHARLES J. KOVATS
                                   Assistant United States Attorneys
11
                                       Attorneys for Plaintiff
12                                     United States of America

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                        17