UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | CASE No. ED CR 07-00127 SGL |
| Plaintiff, | ) ) | ORDER GRANTING DEFENDANT'S MOTION IN LIMINE EXCLUDING |
| v. | ) ) | PRIOR STATEMENTS OF RYAN WEEMER |
| JOSE LUIS NAZARIO, JR., | ) ) | |
| Defendant, | ) ) | |
| _____ | ) ) ) | |

**I.**

This matter is before the Court on defendant's motion in limine, filed August 18, 2008, to exclude certain statements elicited from a potential witness as violative of the defendant's Confrontation Clause rights under the Sixth Amendment to the United States Constitution.  The Court has considered defendant's motion, the government's trial brief, the government's opposition to the motion, defendant's reply, and the parties' oral argument on this motion. Additionally, in consideration of this motion, the Court heard testimony on August 18, 2008, from  Special Agent Steve DeZeeuw, formerly (and at the time relevant to this matter) of the United States Secret Service, who elicited the statements at

1    issue.

2         The pertinent statements were made by Ryan Weemer, one of

3    defendant's accomplices in the allegedly unlawful shooting of four or five Iraqis

4    during the Battle of Fallujah in November, 2004.  Weemer made the statements

5    in question on October 3, 2006, during a pre-polygraph interview administered by

6    then-Secret Service Special Agent DeZeeuw in connection with Weemer's

7    application for employment with the United States Secret Service.

8         As revealed from the transcript of the recorded interview and through the

9    in-court testimony of Special Agent DeZeeuw, the interview was a required step

10   in Weemer's employment application process, and was conducted at Secret

11   Service headquarters in St. Louis, Missouri, in what Special Agent DeZeeuw

12   described to Weemer as a "standard interview room[] that [the Secret Service]

13   use[s] for criminals."  SS Tr. at 5.  Special Agent DeZeeuw testified before this

14   Court that prior to beginning the interview, he advised Weemer that he was a

15   Special Agent of the United States Secret Service.  Pursuant to established

16   Secret Service policy, Special Agent DeZeeuw also advised Weemer of his

17   Miranda rights and directed him to sign a Miranda waiver and a

18   consent-to-polygraph form at the start of the interview.  SS Tr. at 3-5.  In doing

19   so, Special Agent DeZeeuw explained that he was not conducting a "criminal

20   interrogation," but that the Secret Service "does require that on every polygraph

21   exam that I conduct whether it is a criminal exam on a counterfeiter or somebody

22   threatening the president or whether it's a screening exam like your own today I

23   do have to advise everyone of their rights."  SS Tr. at 3.

24        Through his own testimony, Special Agent DeZeeuw acknowledged that

25   he structured the interview questions so as to elicit from Weemer information

26   concerning past crimes and other past bad acts that Weemer might be

27   concealing from the Secret Service.  The circumstances of the interview

28   apparently led Weemer to believe that he needed to request permission to leave

the room to use the restroom, a request that Special Agent DeZeeuw deferred until the conclusion of the interview.  SS Tr. at 38.

A careful review of the transcript of the recorded interview reveals Special Agent DeZeeuw's repeated and pronounced emphasis on the importance of Weemer being completely honest, truthful, and forthcoming, and the negative consequences for his employment aspirations if he were dishonest.  Although Weemer was not placed under oath, the importance of honesty, as well as the seriousness with which any dishonesty would be viewed by the Secret Service, was continually reinforced throughout the interview.  The Court's review of the transcript also reveals that Special Agent DeZeeuw is a highly skilled interrogator who proceeded, methodically and professionally, to elicit detailed admissions from Weemer concerning his various ethical and legal transgressions from childhood through the present, including various juvenile incidents of sexual misconduct, theft, and drug use.

Significantly for the present motion, Special Agent DeZeeuw's questioning also elicited from Weemer an account of Weemer's involvement in the shooting of four or five captured, unarmed, and unresisting Iraqis during the Battle of Fallujah, the subject of the indictment against defendant (as well as a pending courts martial against Weemer and alleged accomplice Jermaine Nelson).  SS Tr. at 65-75.  Although Special Agent DeZeeuw's questioning was not comprehensive, it was fairly detailed and elicited inculpatory admissions concerning potential self-defense and necessity defenses.

Indeed, the incriminating nature of Weemer's recorded statements is clear.  He describes a series of events, beginning with an order to "clear a house," something that, in Weemer's assessment, was meant to be a routine task – based on the assumption that the house would be unoccupied – to allow him and his fellow soldiers some time to "get [their] heads back in the game" after one of their own was killed by sniper fire.  The assumption that the house was

3

1  unoccupied was tragically inaccurate, and thus the task was non-routine, and the

2  events giving rise to the current prosecution (and to the pending courts martial)

3  ensued.  In Weemer's words:

4              When we went into this house there happened

5              to be four or five guys in there.  All the doors, the

6              windows were barracked shut; they were blocked

7              from the inside.  And they were in here.  We found

8              weapons in the house, they weren't telling us

9              anything; you know we interrogated them or

10             whatever.  We called up to our Platoon Commander

11             and our Platoon Sargeant and asked what to do.  And

12             actually I was the team leader at the time.

13                                . . . .

14             My squad leader was there as well . . . .  [W]e called

15             up to our Platoon Sargeant--to the Platoon

16             Commander and asked them what to do and their

17             response we got was, are they dead yet.  And we–we

18             reactivated about it you know and it's not anything

19             anyone wants to do.

20  SS. Tr. at 73-74.  When asked specifically by Special Agent DeZeeuw whether

21  they shot the detainees, Weemer responded:  "[W]e had to, yeah."  Id. at 74.

22  Upon further questioning, he elaborated:

23             No, they didn't have weapons.  We just had them

24             sitting where ever and we took–I took one, and I could

25             only–I did one.  One incident I had to–I mean we

26             argued about it and argued about it and we had to

27             move, we had to get out, our unit was moving down

28             the street . . . , and so I took one guy and that was all

1       I could do, I took my team, told the guy outside I

2       couldn't have anything to do with this anymore and I

3       just left.  I came back and they had of course killed

4       the rest of them.

5   Id. at 76 (paragraph structure altered).

6       Following the interview, Special Agent DeZeeuw immediately notified his

7   superiors about Weemer's incriminating statements, who then directed him not to

8   proceed with the polygraph examination (given Weemer's clear unacceptability

9   as a candidate for the Secret Service).   Thereafter, as Special Agent DeZeeuw

10  testified, the superiors contacted the Naval Criminal Investigation Service

11  ("NCIS").  NCIS, in turn, initiated their investigation of the instant case – which

12  has ultimately led to criminal charges against defendant, Weemer, and Nelson –

13  the next day.

14      Counsel for defendant contends that, unless Weemer is available for

15  cross-examination at his trial, the Confrontation Clause of the Sixth Amendment

16  precludes admission of Weemer's interview statements against defendant.  The

17  Court agrees.  Although the Court is firmly convinced of the reliability of the

18  statements in question – they appear voluntarily and knowingly made by Weemer

19  against his self-interest – and their admissibility under various hearsay

20  exceptions set forth in the Federal Rules of Evidence, the Court also finds that

21  they constitute testimonial out-of-court statements and, as such, are subject to

22  the requirements of the Confrontation Clause.

23  **II.**

24      The Sixth Amendment's Confrontation Clause provides that, "[i]n all

25  criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

26  the witnesses against him."  The Supreme Court held in Crawford v. Washington,

27  541 U.S. 40 (2004), that "this bedrock procedural guarantee" bars "admission of

28  testimonial statements of a witness who did not appear at trial unless he was

1  unavailable to testify, and the defendant had a prior opportunity for cross

2  examination.  Id. at 42, 54-54.  The Supreme Court expressly found that the

3  provision applies to "testimonial hearsay" as "its primary object, and

4  interrogations by law enforcement officers fall squarely within that class."  Id. at

5  42, 53-54.

6      Justice Scalia, writing for the majority, explained:

7          [W]e once again reject the view that the Confrontation

8          Clause applies of its own force only to in-court

9          testimony, and that its application to out-of-court

10         statements introduced at trial depends upon "the law

11         of Evidence for the time being." . . .  Leaving the

12         regulation of out-of-court statements to the law of

13         evidence would render the Confrontation Clause

14         powerless to prevent even the most flagrant

15         inquisitorial practices . . . .

16             . . . An off-hand, overheard remark might be

17         unreliable evidence and thus a good candidate for

18         exclusion under hearsay rules, but it bears little

19         resemblance to the civil-law abuses the Confrontation

20         Clause targeted.  On the other hand, *ex parte*

21         examinations might sometimes be admissible under

22         modern hearsay rules, but the Framers certainly

23         would not have condoned them.

24             The text of the Confrontation Clause reflects

25         this focus.  It applies to "witnesses" against the

26         accused – in other words, those who "bear

27         testimony." . . .  "Testimony," in turn, is typically "[a]

28         solemn declaration or affirmation made for the

1    purpose of *establishing or proving some fact.*"  An

2    accuser who makes a formal statement to

3    government officers bears testimony in a sense that a

4    person who makes a casual remark to an

5    acquaintance does not.  The constitutional text, like

6    the history underlying the common-law right of

7    confrontation, thus reflects an especially acute

8    concern with a specific type of out-of-court statement.

9                                    *  *  *  *

10    Statements taken by police officers in the

11    course of interrogations are also testimonial under

12    even a narrow standard.  Police interrogations bear a

13    striking resemblance to examinations by justices of

14    the peace in England.  The statements are not sworn

15    testimony, but the absence of oath was not

16    dispositive.  Cobham's examination was

17    unsworn . . . , yet Raleigh's trial has long been

18    thought a paradigmatic confrontation violation . . . .

19    Under the Marian statutes, witnesses were typically

20    put on oath but suspects were not. . . .  Yet Hawkins

21    and others went out of their way to caution that such

22    unsworn confessions were not admissible against

23    anyone but the confessor.

24    Id. at 51-52 (citations omitted) (emphasis added).

25        In Crawford, the police questioning of suspect Sylvia Crawford elicited

26    from her a statement inculpating Crawford's husband, which statement was later

27    introduced at trial against Crawford's husband, notwithstanding Sylvia Crawford's

28    unavailability due to the husband-wife privilege.  The Court found that the

1    statement, given after a <u>Miranda</u> warning and while in custody at a police station,

2    unquestionably qualified as a testimonial statement in response to police

3    interrogation for purposes of the Confrontation Clause.  <u>Id.</u> at 53.  In the absence

4    of confrontation, the statement should have been excluded.  <u>Id.</u>

5         In <u>Davis v. Washington</u>, 547 U.S. 813 (2006), the Supreme Court

6    reaffirmed the central holding in <u>Crawford</u>.  Again writing for the majority, Justice

7    Scalia observed: "Only [testimonial] statements . . . cause the declarant to be a

8    'witness' within the meaning of the Confrontation Clause. . . .  It is the testimonial

9    character of the statement that separates it from other hearsay that, while subject

10   to traditional limitations upon hearsay evidence, is not subject to the

11   Confrontation Clause."  <u>Id.</u> at 821.  The critical question, then, as in both

12   <u>Crawford</u> and <u>Davis</u>, is whether the statements sought to be introduced in the

13   absence of confrontation are of a "testimonial character" or, stated another way,

14   are the product of an interrogation which "tend[s] to generate testimonial

15   responses."  <u>Id.</u> at 822 n.1.

16        Although the Supreme Court in <u>Crawford</u> left "for another day" the need to

17   spell out a comprehensive definition of a "testimonial statement," they did provide

18   guidance important to this case:

19             Whatever else the term covers, it applies at a

20             minimum to prior testimony at a preliminary hearing,

21             before a grand jury, or to a former trial; *and to police*

22             *interrogations.*  These are the modern practices with

23             closest kinship to the abuses at which the

24             Confrontation Clause was directed.

25   <u>Id.</u> at 68 (emphasis added).

26        In <u>Davis</u>, which combined two separate Confrontation Clause cases (one

27   from Washington (<u>Davis</u>) and the other from Idaho (<u>Hammon</u>)), the Court

28   expanded upon the circumstances in which a police interrogation did or did not

1    produce testimonial statements.

2         In the Washington case, a 911 operator ascertained from Michelle

3    McCottry that she had been assaulted by her former boyfriend who had just fled.

4    In the Idaho case, police responded to a domestic disturbance call at Amy and

5    Herschel Hammon's home; Amy Hammon initially told police that nothing was

6    wrong, but following a later police interview completed and signed a battery

7    affidavit.

8         Beginning with the Washington case, the Supreme Court contrasted the

9    conversation with the 911 operator and the interrogation in Crawford, finding the

10   statements elicited by the 911 operator non-testimonial:

11              When we said in Crawford . . . that

12        "interrogations by law enforcement officers fall

13        squarely within [the] class" of testimonial hearsay, we

14        had immediately in mind (for that was the case before

15        us) interrogations *solely directed at establishing the*

16        *facts of a past crime, in order to identify (or provide*

17        *evidence to convict) the perpetrator.*  The product of

18        such interrogation, whether reduced to a writing

19        signed by the declarant or embedded in the memory

20        (and perhaps notes) of the interrogating officer, is

21        testimonial.  It is, in the terms of the 1828 American

22        dictionary quoted in Crawford, "'[a] solemn declaration

23        or affirmation made for the purpose of establishing or

24        proving some fact.'". . .  A 911 call, on the other hand,

25        and at least the initial interrogation conducted in

26        connection with a 911 call, is ordinarily not designed

27        primarily to "establis[h] or prov[e]" some past fact, *but*

28        *to describe current circumstances requiring police*

1

*assistance.*

2

    The difference between the interrogation in

3

Davis and the one in Crawford is apparent on the face

4

of things.  In Davis, McCottry was speaking about

5

events *as they were actually happening*, rather than

6

"describ[ing] past events." . . .  Sylvia Crawford's

7

interrogation, on the other hand, took place hours

8

after the events she described had occurred.

9

Moreover, any reasonable listener would recognize

10

that McCottry (unlike Sylvia Crawford) was facing an

11

on-going emergency.  Although one *might* call 911 to

12

provide a narrative report of a crime absent any

13

imminent danger, McCottry's call was plainly a call for

14

help against bona fide physical threat.  Third, the

15

nature of what was asked and answered in Davis,

16

again viewed objectively, was such that the elicited

17

statements were necessary to be able to *resolve* the

18

present emergency, rather than simply to learn (as in

19

Crawford) what had happened in the past.  That is

20

true even of the operator's effort to establish the

21

identify of the assailant, so that the dispatched

22

officers might know whether they would be

23

encountering a violent felon. [Citation omitted]  And

24

finally, the difference in the level of formality between

25

the two interviews is striking.  Crawford was

26

responding calmly, at the station house, to a series of

27

questions, with the officer-interrogator taping and

28

making notes of her answers; McCottry's frantic

1
2
3

answers were provided over the phone, in an

environment that was not tranquil, or even (as far as

any reasonable 911 operator could make out) safe.

4  Id. at 826-27 (citations omitted) (first and second emphases added).

5  With respect to McCottry's case, then, the Court readily concluded that her

6  statements to the 911 operator were not testimonial.  Id. at 828.

7  Turning to the Idaho case, Hammon, the Court in Davis found:

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Determining the testimonial or nontestimonial

character of the statements that were the product of

the interrogation in Hammon is a much easier task,

since they were not much different from the

statements we found to be testimonial in Crawford.  It

is entirely clear from the circumstances that the

interrogation was part of an investigation into possibly

criminal past conduct – as, indeed, the testifying

officer expressly acknowledged . . . .  There was no

emergency in progress; the interrogating officer

testified that he had heard no arguments or crashing

and saw no one throw or break anything . . . .  When

the officer questioned Amy [Hammon] for the second

time, and elicited the challenged statements, he was

not seeking to determine (as in Davis) "what is

happening," but rather "what happened."

24  Id. at 829-30.

25  The Supreme Court had no difficulty finding the elicited statements in

26  Hammon to be testimonial, notwithstanding several factors that made the

27  interrogation far less formal than that in Crawford (and, for that matter, than that

28  in the instant case).  Justice Scalia explains:

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

It is true that the <u>Crawford</u> interrogation was more formal [than the one in <u>Hammon</u>].  It followed a <u>Miranda</u> warning, was tape-recorded, and took place at the station house . . . .  *While these features certainly strengthened the statements' testimonial aspect* – made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events – none was essential to the point. . . .  It was formal enough that Amy [Hammon's] interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his "investigat[ion]." . . .  What we called the "striking resemblance" of the <u>Crawford</u> statement to civil-law <u>ex parte</u> examinations . . . is shared by Amy's statement here.  Both declarants were actively separated from the defendant – officers forcibly prevented Hershel [Hammon] from participating in the interrogation.  Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed.  And both took place some time after the events described were over.  Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

<u>Id.</u> at 830 (first emphasis added).

12

**III.**

Here, as in <u>Crawford</u> and in the Idaho case in <u>Davis</u> (that is, <u>Hammon</u>), it is clear to the Court that Weemer's statements are testimonial.  Weemer submitted to a formal, tape-recorded interview by an experienced special agent of the United Secret Service – an interview preceded by Miranda warnings and a consent-to-polygraph form and conducted in a criminal interrogation room at the headquarters of the St. Louis office of the Secret Service.[1]  Throughout his interview,  Weemer answered a series of questions – and thereby making a series of formal statements, affirmations, and denials – in response to purposeful, structured questioning by a federal law enforcement official.  The questions were part of a background investigation into possible past criminal conduct – they were not designed to determine "what is happening"; rather, they were clearly designed to determine "what happened."  The questioning focused on events that had taken place years – in some instances, many years – prior to the interview.  Although not exclusively or even primarily aimed at an on-going criminal prosecution (at least at its beginning), the existence of the Secret Service's standing policy requiring the reading of <u>Miranda</u> rights at the threshold of the interview, and both Special Agent DeZeeuw's and Weemer's resulting understanding that the statements could be used in a criminal prosecution, combined with the other circumstances described above, undoubtedly created an atmosphere in which the statements made were of a testimonial nature; that is, they were the product of an interrogation which, by deliberate design, "tend[ed] to generate testimonial responses."  Moreover, as the interview progressed, and it became abundantly clear that Weemer was not a suitable candidate for the

---

[1]     To be clear, nothing in this opinion should be taken as a criticism of any of the actions undertaken by Special Agent DeZeeuw.  As far as this Court can discern, Special Agent DeZeeuw handled the interrogation, and the aftermath of the interrogation, exactly as a trained, professional law enforcement official should.  His in-court testimony was very credible.

1  United States Secret Service, the interview certainly became more and more

2  directed to potential criminal prosecution as opposed to screening a prospective

3  candidate for employment, a point acknowledged by Special Agent DeZeeuw

4  during his in-court testimony.

5        That such statements constituted the fruit of "interrogations by [a] law

6  enforcement officer[]," and are of the precise sort of testimonial hearsay to which

7  the Confrontation Clause is directed, appears obvious to this Court.  See United

8  States v. Maher, 454 F.3d 13, 21 (1st Cir. 2006) (a statement is testimonial if a

9  reasonable declarant would have the capacity to appreciate that the statement is

10 of the sort typically preserved for prosecutorial use); United States v. Saget, 377

11 F.3d 223, 228 (2d Cir. 2004) (at a minimum, the types of statements considered

12 testimonial under Crawford all involve a declarant's knowing response to

13 structured questioning in an investigative environment or a courtroom setting

14 where the declarant would reasonably expect that his or her responses might be

15 used in future judicial proceedings); United States v. Cromer, 389 F.3d 662,

16 673-74 (6th Cir. 2004) (noting with approval Professor Richard D. Friedman's

17 assessment that "[a] statement made knowingly to authorities that describes

18 criminal activity is almost always testimonial");[2] United States v. Summers, 414

19 F.3d 1287, 1302 (10th Cir. 2005) (determination of what is testimonial centers on

20 reasonable expectations of declarant, which separates the flippant remark,

21 proffered to a casual acquaintance, from the true testimonial statement).

22       The government's broad assessment that only "statements made to law

23 enforcement with the full understanding that the statements *will* be used in

24 investigating and prosecuting a crime [fall] within the scope of the Confrontation

25 Clause" is supported neither by their cited authority nor logic.  Opp. at 3.

26 _____

27       [2]      Even under a more narrow definition proposed by Professor Akhil
   Reed Amar and considered by the Sixth Circuit in Cromer, the Confrontation
28 Clause would be implicated "in the instance of formalized statements," including
   "government-prepared recordings . . . made directly to the authorities."  Id. at 674.

1  (emphasis added).  No one being interviewed by the police ever knows that his

2  or her statements *will* be used in investigating and prosecuting a crime; however,

3  as explained in both Crawford and Davis, where a person makes a statement in

4  response to police questioning that, objectively, he or she knows *might* be used

5  in criminal prosecution (as is certainly the case when one is advised of and

6  waives his or her Miranda rights), such responsive statements, as those in the

7  instant case, are clearly of a testimonial nature.  In Davis, Justice Scalia

8  underscored this point when he spoke of statements being testimonial "when the

9  circumstances objectively indicate that there is no such ongoing emergency, and

10 that the primary purpose of the interrogation is to establis[h] or prove past events

11 *potentially* relevant to later criminal prosecution."  Davis, 547 U.S. at 822

12 (emphasis added).  Moreover, a fair reading of Crawford and Davis leads to the

13 conclusion that, to be testimonial, the statement need not be intended as trial

14 testimony, only that it be a product of an interrogation that "tend[s] to generate

15 testimonial responses."  Id. at 822 n.1.

16      The government's further unsupported contention that "what makes

17 [depositions] testimonial" is the fact that they "are only conducted as a part of

18 ongoing litigation," Opp. at 4 n.2, misapprehends the Supreme Court's direction

19 on how a statement is found to be testimonial – as Davis makes clear, a

20 statement's testimonial nature is established not by it being part of any particular

21 procedure (although certain procedures, including depositions, grand jury

22 proceedings, and trials, given their nature, generally always produce testimonial

23 statements), but by the totality of circumstances in which the statement is made

24 and, as Justice Scalia notes, "in the final analysis [it is] the declarant's

25 statements, not the interrogator's questions, that the Confrontation Clause

26 requires us to evaluate."  Davis, 547 U.S. at 822 n.1.  Where the statements

27 themselves "establish or prove past events potentially relevant to later criminal

28 prosecution," they can fairly be said to possess the testimonial character with

1    which the Sixth Amendment is concerned.  Id. at 822.

2          The government's insistence that the statements are non-testimonial

3    because the purpose of the interview was simply to screen Weemer for

4    employment with the Secret Service is similarly misplaced.  Although true, the

5    argument that this was part of an employment interview with the Secret Service

6    somehow vitiates Confrontation Clause concerns misapprehends the use of the

7    word "purpose" in Justice Scalia's dictionary definition of the word "testimony"

8    provided in Crawford:  To be testimonial, the "solemn declaration or affirmation"

9    must be "made for the purpose of establishing or proving some fact," which is

10   clearly what Weemer's statements, affirmations, and denials are intended to do –

11   they are offered to establish or prove certain facts; specifically, facts related to

12   his having committed or not committed a prior crime or other bad act.  This is,

13   after all, a background investigation into past unlawful acts.  As noted above, that

14   such statements are of the sort that are reasonably understood as being

15   "preserved for prosecutorial use" is made unmistakably clear by the recording of

16   the statements and Special Agent's requirement that Weemer acknowledge and

17   waive his Miranda rights prior to making the statements – Weemer is expressly

18   advised and knowingly acknowledges that the statements he is about to make

19   "can be used against you in a court or other proceeding."  SS Tr. at 3-4.  Such

20   circumstances clearly refute the government's point that the interrogation was

21   made without an "eye toward trial."

22         Similarly, Special Agent DeZeeuw's disclaimer to Weemer that "obviously

23   this is not a criminal interrogation[,] it's an applicant screening exam," SS Tr. at 3,

24   is also true, but it does not change the testimonial nature of the answers given by

25   Weemer nor the fact that, as an "applicant screening exam," its particular

26   purpose was, as Special Agent DeZeeuw explained to the court, to reveal any

27   past crimes or bad acts that Weemer was concealing.  That the focus of the

28   interrogation was on past, potentially criminal acts is revealed in the

government's own characterization of the purpose of the follow-up questions: "Follow up questions were important to determine if certain acts of Weemer were justified or not . . . and to determine how Weemer felt about and perceived the acts." Opposition at 6. Clearly the "acts" referred to were Weemer's past criminal or unethical acts (this is repeatedly borne out by the transcript), and thus his responses to these follow-up questions are testimonial and not, as the government would have it, non-testimonial.

Certainly there is no apparent constitutional concern with the Secret Service using such statements in processing and considering Weemer's employment application to the Secret Service; there is, however, a most serious Confrontational Clause concern when the government seeks to use such statements in a criminal prosecution of anyone other than Weemer himself. Unless Weemer is available for cross-examination by the person against whom such statements are sought to be used, the Confrontation Clause acts as a bar to their use.

Weemer's statements are nothing like those of McCottry, which were made to enable police assistance to meet an ongoing emergency; they are also a far cry from being the sort of "off-hand, overheard remark," "casual remark to an acquaintance," or "flippant remark" that courts have held to be clearly non-testimonial and thus beyond the scope of the Confrontation Clause.  As the Ninth Circuit explained in United States v. Cervantes-Flores, 421 F.3d 825 (9th Cir. 2005), the distinction between testimonial and non-testimonial statements exists in Confrontation Clause analysis precisely because of "skepticism of government officers preparing evidence against a defendant," a skepticism that necessarily arises whenever out-of-court statements are produced in response to interrogation by police or law enforcement officers. Id. at 833.

**IV.**

This Court finds that Special Agent DeZeeuw's formal interview of Weemer was a police interrogation – or, more precisely, a federal law enforcement interrogation – both in form and in substance, one that was designed, through structured law enforcement questioning, to elicit information about Weemer's past crimes and other bad acts.  That it was at the time of the interview directed towards a criminal background investigation for Weemer's application for employment with the Secret Service and not towards defendant's (or Weemer's) later criminal prosecutions alters neither its form or substance.

Notwithstanding their apparent reliability, to admit Weemer's testimonial statements in the criminal prosecution against defendant, without defendant having the opportunity to cross examine Weemer, would run afoul of the Sixth Amendment.   As Justice Scalia counseled in Crawford, "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty.  This is not what the Sixth Amendment prescribes."  541 U.S. at 62.   Thus, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  Id. at 69.

Defendants motion in limine is **GRANTED**:  If Weemer is not available for cross-examination, his statements to the Secret Service are not admissible.

DATED:  August 21, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE