1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                   - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                   - - -

7
    UNITED STATES OF AMERICA,          )
8                                      )
                        Plaintiff,     )
9                                      )
            vs.                        )   No. ED CR 07-00127-SGL
10                                     )
    JOSE LUIS NAZARIO, JR.,            )
11                                     )
                        Defendant.     )   Trial Day 2,
12   _____)   Morning Session

13

14          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

15                Riverside, California

16               Thursday, August 21, 2008

17                    9:22 A.M.

18

19

20

21

22

23            THERESA A. LANZA, CSR, RPR
            Federal Official Court Reporter
24           3470 12th Street, RM. 134
            Riverside, California  92501
25                (951) 274-0844
              WWW.theresalanza.com

```
1   APPEARANCES:

2   On behalf of Plaintiff, United States of America:

3                        United States Attorney's Office
                         By: Jerry Behnke
4                            Charles J. Kovats
                         Assistant United States Attorneys
5                        3880 Lemon Street,
                         Suite 210
6                        Riverside, California 92501
                         (951) 276-6210
7

8   on behalf of Defendant Jose Luis Nazario, Jr.:

9                        Law Offices of Kevin Barry McDermott
                         By:  Kevin Barry McDermott
10                       17452 Irvine Boulevard,
                         Suite 200
11                       Tustin, California 92780
                         (714) 731-5297
12
                         Douglas L. Applegate
13                       18301 Von Karmon
                         suite 210
14                       Irvine, California 92612
                         (888) 583-2266
15
                         Pepper Hamilton LLP
16                       By:  Joseph M. Preis
                         Suite 1200
17                       4 Park Plaza
                         Irvine, California 92614-5955
18                       (949) 567-3500

19                       Law Offices of Vincent J. LaBarbera, Jr.
                         By:  Vincent J. LaBarbera, Jr.
20                       600 West Santa Ana Boulevard,
                         Suite 950
21                       Santa Ana, California 92701
                         (714) 541-9668
22

23  Also present:       Mark Fox, Special Agent

24

25
```

Thursday, August 21, 2008                    Trial Day 2, Morning Session

```
 1                        I N D E X

 2                                                     Page

 3    Opening Statement - Plaintiff.................    16

 4    Opening Statement - Defense..................    25

 5    Testimony....................................    32

 6

 7

 8    PLAINTIFF
      WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
 9    COURTNEY JOHNSON

10    By Mr. Kovats     32                       57
      By Mr. McDermott              51
11

12    PLAINTIFF
      WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
13    DANIEL ANDREW SCHMITT

14    By Mr. Kovats     59
      By Mr. Applegate              77
15

16

17
              EXHIBITS              RECEIVED
18
                 2                     36
19

20

21

22

23

24

25
```

1    Riverside, California; Thursday, August 21, 2008; 9:22 A.M.

2                              -oOo-

3         **THE COURT:**  The Court will call the first matter on

4    calendar, United States of America versus Jose Luis Nazario,

5    Jr., Case Number ED CR 07-00127-SGL.                          00:47

6         Counsel, please state your appearances for the

7    record.

8         **MR. BEHNKE:**  Jerry Behnke and Charles Kovats for the

9    United States.  Also present is Special Agent Fox.

10        **MR. McDERMOTT:**  Kevin McDermott on behalf            00:48

11   of defendant Jose Luis Nazario, along with Joe Price,

12   Douglas Applegate, and Emery Ledger.

13        **THE COURT:**  Good morning, Counsel.

14        A couple of matters.  As I indicated, we are waiting

15   for one juror to show up.  She called me this morning and    00:48

16   indicated she had some trouble with her car, but that she would

17   be in as soon as she could.  She said between 9:00 and 9:30, so

18   I expect her any moment.

19        When we start this morning, once we have the jury in

20   here, the Court plans on reading the following model jury     00:48

21   instructions for the Ninth Circuit:  1.1, duty of jury; 1.2,

22   presumption of innocence and the charge.  I'm not planning on

23   rereading the indictment.  I read that to the jury when we

24   selected them.  They have heard that.  They have heard that

25   it's not evidence, and I'm going to leave that alone for the   00:48

```
 1   time being, unless there's a mutual request for the Court to

 2   reread the indictment.

 3          Mr. Behnke?

 4          MR. BEHNKE:  Not from the Government.

 5          MR. McDERMOTT:  No, sir.                                  00:49

 6          THE COURT:  Very well.

 7          1.3, what is evidence; 1.4, what is not evidence;

 8   1.5, evidence for a limited purpose; 1.6, direct and

 9   circumstantial evidence; 1.7, ruling on objections;

10   1.8, credibility of witnesses; 1.9, conduct of the jury; 1.10  00:49

11   and 1.11 concerning transcripts, their unavailability, and the

12   taking of notes; and then, finally, 1.12, the outline of the

13   jury.

14          That will take me about 10 or 15 minutes to get

15   through those.  Those are the instructions I intend to give,   00:49

16   unless there's a request for any others or if there are any

17   objections to those.

18          Mr. Behnke?

19          MR. BEHNKE:  No, Your Honor.

20          MR. McDERMOTT:  None by defense.                         00:49

21          THE COURT:  Very well.

22          The Court has received, of course, the Motion *in*

23   *Limine* to exclude Ryan Weemer's statements that he made to the

24   Secret Service agent if he does not testify in this trial,

25   pursuant to the confrontation clause.  I have considered the   00:50
```

1    Government's trial brief.  I've received the Government's

2    opposition.  I, of course, took the testimony of the Special

3    Agent in Court on the 18th.  I've received the Government's

4    opposition that was filed at the end of the day yesterday.  And

5    I've also read and considered the reply filed by the defense          00:50

6    this morning.

7         The Court has prepared a detailed written opinion,

8    which I literally just finished up writing a few moments ago.

9    I think Mr. Holmes is copying it as we speak.  The short of it

10   is, the Court is granting the Motion *in Limine* to preclude the      00:50

11   statements.  The opinion will set out its reasons.

12        I am not finished putting in all of the transcript

13   citations, just because I don't have the transcript yet.  And

14   it's because the court reporters have been extraordinarily busy

15   with the Mattel case.  But I know at some point in time, when I       00:51

16   get that, we'll put that in.  I'll formally file the document

17   later today.  But I will provide that.

18        If either side has any questions on the Court's

19   order, I'll take that up before we bring in the jury.  But as

20   soon as Mr. Holmes has copied that, he'll provide that to you;        00:51

21   and then as soon as the jury is ready, we'll bring them out and

22   proceed with the instructions and your opening statements.

23        Any questions at this time?

24        **MR. BEHNKE:**  Yes, Your Honor.  I had one issue that I

25   wanted to raise.                                                      00:51

```
 1              I did talk with defense counsel about this before we
 2   began this morning, and was assured by them that it was a
 3   mistake that would not be repeated, but I still want to bring
 4   it to the Court's attention because I think it is a very
 5   important matter.  And that is that the day before yesterday,        00:51
 6   during jury selection, when we approached side-bar to do the
 7   for-cause challenges of the jurors, it's my understanding that
 8   Captain Grimm, who is the military defense counsel for
 9   Jermaine Nelson -- and as the Court knows, Jermaine Nelson was
10   subpoenaed to be a witness against Defendant Nazario in this        00:52
11   case -- it's my understanding that Captain Grimm approached
12   side-bar with the defendant's defense team.  And the Government
13   is obviously concerned about that, because the Government
14   believes that is a very serious conflict-of-interest issue.  I
15   just wanted to bring that to the Court's attention at this          00:52
16   point.  I'm not sure if anything needs to be done.
17              THE COURT:  Is the Captain present today?
18              MR. McDERMOTT:  He is.
19              THE COURT:  Just so I know who he is.
20         Okay.  Very good.                                             00:52
21              There were a lot of people at side-bar.  I didn't
22   recognize him.  I assumed everyone who was there was either
23   Government counsel or one of the four defense counsel.
24              I appreciate you bringing that to the Court's
25   attention.                                                          00:52
```

1      **MR. BEHNKE:**  For what it's worth, I didn't notice

2  either, with the number of people that we had up there, or I

3  would have said something.

4      **THE COURT:**  I appreciate that.

5      Clearly, when the Court calls for side-bar with          00:53

6  counsel for the parties, I am only calling for side-bar with

7  counsel for the parties, and I expect lawyers to regulate

8  themselves in that regard.  I'm not going to take role call at

9  side-bar.

10     **MR. McDERMOTT:**  It was actually quite innocent.      00:53

11     Captain Grimm and I were co-counsel for a marine

12  captain on the Haditha investigation.  I thought it would be

13  good for him to see how a federal courthouse works, the jury

14  selection process, that sort of thing.  In context of

15  discussing with him the impact or import of any of the        00:53

16  information that he received regarding Client Nelson, that did

17  not occur.

18     **THE COURT:**  Very well.

19     I appreciate you bringing that to the Court's

20  attention, and I trust it won't happen again.               00:53

21     Is there anything further that we can discuss prior

22  to the instructions and opening statements?

23     **MR. BEHNKE:**  I have announced defense position on

24  this morning, but before we begin, I was just going to request

25  that the Court order that witnesses be excluded.            00:54

```
 1          THE COURT:  Very well.

 2          Is there any opposition?

 3          MR. McDERMOTT:  No, sir, there's not.

 4          THE COURT:  That will be the order of the Court:  Any

 5  witnesses will be excluded prior to their testimony.  Once they      00:54

 6  have testified, they may then remain in the courtroom.

 7          MR. McDERMOTT:  The other thing we'd like the Court

 8  to consider is this:  Now that we have a ruling from the Court

 9  as to the Weemer statement, our concern and question at this

10  point is, apparently we have two outstanding orders to compel        00:54

11  from this Court as to Mr. Nelson and Mr. Weemer.

12          THE COURT:  I've ordered both Mr. Nelson and

13  Mr. Weemer to testify.

14          MR. McDERMOTT:  Yes, sir.

15          It's my understanding that the Court and the                  00:54

16  Government will not address their position in the matter until

17  tomorrow morning.  Here's my concern:  Obviously, this would be

18  something that would be fair comment during any opening

19  statement as to who's going to testify and what they'll testify

20  about.                                                               00:55

21          THE COURT:  You're anticipating that the orders are

22  not going to be obeyed, Counsel?

23          MR. McDERMOTT:  I'm not.  But I'd like to have an

24  answer, because -- and I wouldn't claim to have a crystal ball,

25  but for the fact that I obviously have had an opportunity to         00:55
```

1   read what they did during the course of the grand jury

2   proceedings.  So I guess my question to the Court is, until

3   that is resolved, and in light of the Court's ruling as to the

4   Weemer statement, we're wondering whether or not that can be an

5   issue that can be resolved.                                    00:55

6           **THE COURT:**  Let's hear from the Government on that.

7   Let's hear what they intend to do.

8           I mean, your concern is having reference made in

9   opening statement, I gather?

10          **MR. McDERMOTT:**  Yes, sir.                          00:55

11          **THE COURT:**  All right.

12          **MR. BEHNKE:**  As far as opening statement goes,

13  Your Honor, given the previous experience with the two

14  witnesses, I don't believe the Government is going to make any

15  reference to the specific statements obtained from those two   00:55

16  witnesses.

17          Just so the Court is aware of the Government's plan

18  in terms of scheduling, the Government has asked the two

19  witnesses, Nelson and Weemer, to be present first thing

20  tomorrow morning.  Mr. Applegate mentioned to me this morning  00:56

21  that perhaps they would want those witnesses dealt with, at

22  least initially, out of the presence of the jury.  And I

23  thought that the Court may agree with that, if they did request

24  that, so I asked the witnesses to be here at 8:30 tomorrow

25  morning.                                                       00:56

1        **THE COURT:**  Very well.  That's appropriate.

2        We'll take that up later.

3        Do we have counsel for Mr. Nelson and Mr. Weemer in

4    the courtroom?

5        **MR. BEHNKE:**  No.  Their civilian counsel are not          00:56

6    here, Your Honor.  I allowed them to be on call, and they

7    assured me that they would be here tomorrow morning.

8        **THE COURT:**  Very well.

9        Why don't you indicate to them that the Court has

10   requested that they be present at 8:30, so that we can take     00:56

11   that up and we don't spend any jury time going through those

12   issues.

13       **MR. BEHNKE:**  Thank you, Your Honor.

14       **THE COURT:**  Very well.

15       I'm going to take a brief recess, give you an              00:57

16   opportunity to review the Court's order; and when I come back,

17   I'll be coming back with the jury.

18       (Whereupon, jurors enter courtroom.)

19       **THE COURT:**  Welcome, members of the jury.

20       You are now the jury in this case, and I want to take     01:03

21   a few minutes to tell you something about your duties as jurors

22   and to give you some instructions.

23       These are preliminary instructions.  At the end of

24   the trial, I'll give you more detailed instructions.  Those

25   instructions will control your deliberations once you start    01:03

1   deliberating.

2        You should not take anything that I may say or do

3   during this trial as indicating what I think of the evidence or

4   what I think the verdict should be.

5        This is a criminal case brought by the United States   01:04

6   Government.  The Government has made the charges that I set

7   forth to you on Tuesday when I read the indictment.  As I told

8   you then, the indictment is simply the description of the

9   charges made by the Government against the defendant.  It is

10  not evidence of anything.  The defendant has pleaded not guilty   01:04

11  to the charges and is presumed innocent unless and until proved

12  guilty beyond a reasonable doubt.

13       The defendant has the right to remain silent and

14  never have to prove innocence or present any evidence.

15       The evidence you are to consider in deciding what the   01:04

16  facts are in this case consists of the sworn testimony of any

17  witness, the exhibits which are received into evidence, and any

18  facts to which all of the lawyers stipulate.

19       The following things are not evidence and you must

20  not consider them as evidence in deciding the facts of this   01:04

21  case:  Statements and arguments of attorneys; questions and

22  objections of attorneys; testimony that I instruct you to

23  disregard; anything you may see or hear when the court is not

24  in session, even if what you see or hear is done or said by one

25  of the parties or by one of the witnesses.   01:05

1          Some evidence is admitted for a limited purpose only.

2    When I instruct you that an item of evidence has been admitted

3    for a limited purpose, you must consider it only for that

4    purpose and for no other.

5          Evidence may be direct or circumstantial.  Direct          01:05

6    evidence is direct proof of a fact, such as testimony by a

7    witness about what that witness personally saw or heard or did.

8    Circumstantial evidence is indirect evidence; that is, it is

9    proof of one or more facts from which you can find another

10   fact.  You are to consider both direct and circumstantial        01:05

11   evidence.  The law permits you to give equal weight to both,

12   but it is for you to decide how much weight to give to any

13   evidence.

14         There are rules of evidence which control what can be

15   received into evidence.  When a lawyer asks a question or        01:05

16   offers an exhibit into evidence and a lawyer on the other side

17   thinks that it is not permitted by the rules of evidence, that

18   lawyer may object.  If I overrule the objection, the question

19   may be answered or the exhibit received.  If I sustain the

20   objection, the question cannot be answered and the exhibit       01:06

21   cannot be received.  Whenever I sustain an objection to a

22   question, you must ignore the question and must not guess what

23   the answer would have been.

24         Sometimes I may order that evidence be stricken from

25   the record and that you disregard or ignore the evidence.  That  01:06

means that when you are deciding the case, you must not

consider the evidence which I told you to disregard.

Now, in deciding the facts in this case, you may have

to decide which testimony to believe and which testimony not to

believe.  You may believe everything a witness says, or part of

it, or none of it.  In considering the testimony of any

witness, you may take into account the opportunity and ability

of the witness to see or hear or know the things testified to;

the witness's memory; the witness's manner while testifying;

the witness's interest in the outcome of the case and any bias

or prejudice; whether other evidence contradicted the witness's

testimony; the reasonableness of the witness's testimony in

light of all of the evidence; and any other factors that bear

on believability.

The weight of the evidence as to a fact does not

necessarily depend on the number of witnesses who testify.

Now I'll say a few important words about your conduct

as jurors.

First, you are not to discuss this case with anyone,

including your fellow jurors, members of your family, people

involved in the trial, or anyone else, nor are you allowed to

permit others to discuss the case with you.

If anyone approaches you and tries to talk to you

about this case, please let me know about it immediately.

Second, do not read any news stories or articles or

 1   listen to any radio or television reports about the case or

 2   about anyone who has anything to do with it.

 3          Third, do not do any research, such as consulting

 4   dictionaries, searching the Internet, or using other reference

 5   materials; and do not make any investigation about the case on        01:08

 6   your own.

 7          Fourth, if you need to communicate with me, simply

 8   give a signed note to Mr. Holmes, the courtroom deputy, to give

 9   to me.

10          Fifth, do not make up your mind about what the               01:08

11   verdict should be until after you've gone to the jury room to

12   decide the case and you and your fellow jurors have discussed

13   the evidence.  Keep an open mind until then.

14          Now, at the end of the trial, you'll have to make

15   your decision based on what you recall of the evidence.  You         01:08

16   will not have a written transcript of the trial.  I urge you to

17   pay close attention to the testimony as it is given.  Now, if

18   you wish, you may take notes to help you remember what the

19   witnesses said.  If you do take notes, please keep them to

20   yourself until you and your fellow jurors go to the jury room        01:08

21   to decide the case.  Do not let notetaking distract you so that

22   you do not hear other answers by witnesses.  When you leave,

23   your notes should be left here in the courtroom, and they will

24   be kept secure.  Whether or not you take notes, you should rely

25   on your own memory of what was said.  Notes are only to assist       01:09

1   your memory.  You should not be overly influenced by your

2   notes.

3          The next phase of the trial is now going to begin.

4   First, each side may make an opening statement.  An opening

5   statement is not evidence.  It is simply an outline to help you          01:09

6   understand what that party expects the evidence will show.  A

7   party is not required to make an opening statement.  The

8   Government will then present evidence, and counsel for the

9   defendant may cross-examine.  Then the defendant may present

10  evidence, and counsel for the Government may cross-examine.          01:09

11  After all of the evidence has been presented, I will instruct

12  you on the law that applies to the case, and the attorneys will

13  then make closing arguments.  After that, you will go to the

14  jury room to deliberate on your verdict.

15         At this time, I invite counsel for the Government to          01:09

16  make their opening statement.

17          **MR. KOVATS:**  Thank you, Your Honor.

18                  **OPENING STATEMENT - PLAINTIFF**

19          **MR. KOVATS:**  On November 9, 2004, a squad of marines,

20  under the direction of the defendant, was positioned in the          01:10

21  desert outside Fallujah, Iraq.  These marines were part of Kilo

22  Company, 3rd Battalion, 1st Marine Regiment.  They were under

23  orders to move into the city and clear it of insurgents.  You

24  will learn that this operation was called Operation Phantom

25  Fury.  You will also learn that when the marines of Kilo          01:10

Thursday, August 21, 2008                    Trial Day 2, Morning Session

1  Company moved into the city to fight the insurgents, the
2  insurgents proved to be a determined and dangerous enemy.  The
3  fighting was tough; the fighting was brutal.  It was a bloody
4  battle, and many marines were injured.  In fact, one member of
5  the defendant's squad was killed, Lance Corporal Juan Segura.  01:11
6  He was killed about 9:30 in the morning that first day.

7          What you will also learn is, about two hours after
8  Lance Corporal Segura died of his wounds, the defendant and the
9  members of his squad entered a house, and they entered that
10 house because it was what they were doing.  They were going  01:11
11 street to street, house to house, clearing the city of
12 insurgents.  When they went in this house, what they found were
13 four men.  They were sitting on the floor; they were unarmed;
14 they were unresisting; and they had their hands up in a
15 position of surrender.  01:11

16         Rather than take these men prisoner and process them,
17 as the defendant was trained to do, as he was educated to do,
18 and as he was required to do, instead he shot and killed, and
19 had his subordinate marines shoot and kill, these four men.

20         The Government will prove its case by calling marines  01:12
21 that were involved in this action.  You will hear first from
22 former -- not necessarily first, but you'll hear from former
23 Lance Corporal Cory Carlisle.  Cory Carlisle was a subordinate
24 marine to the defendant, and he worked in defendant's squad.
25 And he'll describe the movement of his squad from their assault  01:12

1    positions north of the city of Fallujah into the city itself,

2    through the breach.  And he'll describe the fighting in the

3    streets and the clearing of the houses.  He'll describe for you

4    the death of Juan Segura.  And he'll also describe for you what

5    happened in that house when those four men were killed.         01:12

6            What he'll tell you is, when they got to the house,

7    they attempted to get in the front door, through a front gate,

8    and they couldn't do it; so they had to proceed around the

9    back.  And he will tell you that his team leader, Ryan Weemer,

10   had to kick the door in, and Cory Carlisle was the first one    01:13

11   in, with his weapon at the ready.  And he will describe how he

12   immediately encountered these four men on the floor, with their

13   hands up, unarmed, submissive, docile.  The other marines

14   followed him into the house.  They took control of the

15   situation.                                                       01:13

16           Defendant then ordered Mr. Carlisle and a fellow

17   marine, Lance Corporal James Prentice, to search the house.

18   And they did so.  Mr. Carlisle will talk about his search of

19   the house.  He'll describe how he found one weapon in a room he

20   describes as a rug room and another weapon in a room he         01:13

21   describes as the office.  He found these two weapons and

22   reported that to the defendant, who then advised Carlisle and

23   Prentice to do a second search, a more thorough search.  It was

24   during the second search that he heard a gunshot.  And being

25   the professional marine that he was, he moved toward the        01:14

1    direction of the gunshot and found his team leader,

2    Ryan Weemer, standing over the body of one of the detainees,

3    with his pistol still at the ready.

4          After seeing this, Carlisle and Prentice went to see

5    what defendant was doing.  Defendant had the other three          01:14

6    detainees under his control, with the help of other marines, in

7    another room of the house.

8          Defendant then asked Carlisle and Prentice words to

9    the effect of, Who else wants to help me do these guys; I don't

10   want to do them all myself?                                        01:14

11         Prentice, shook up from the loss of his friend

12   Segura, said, I'll do it.  But Carlisle, the junior marine, but

13   the professional marine, said, No, Prentice, you don't want to

14   be a part of this; let's go.  And he removed him from the

15   scene, and they tried to get out the quickest way they could,      01:15

16   which is the front door.

17         Unfortunately, the front door was still blocked, and

18   they couldn't get out.  So they turned and made their way out

19   the back door, the way they came in.  And as they progressed to

20   the back door, they heard another gunshot.                         01:15

21         Carlisle will testify that he turned his head, saw

22   another detainee on the floor; and in this instance, he saw the

23   defendant taking his weapon from the firing, aimed position to

24   at the ready.

25         His team leader, Ryan Weemer, then joined him and            01:15

1    said, Let's get out of here, post security outside.  And the

2    three of them departed.  Before they left the house, however,

3    they heard two more gunshots.

4            Outside, Carlisle ran into another member of the

5    squad, Lance Corporal Sam Severtsgaard.  And he'll testify that    01:15

6    he heard the gunshots and he saw Lance Corporal Carlisle coming

7    out and he looked ashen; he looked upset.  So he went in to

8    investigate what had made Carlisle so upset.  And he went in

9    the house; the other marines had since left; and he will say

10   that he found four bodies on the floor, three were shot in the    01:16

11   head, one was shot in the chest.

12           He then exited the house, approached Carlisle, and

13   asked him what happened.  And Carlisle said, It wasn't me; I

14   had nothing to do with it.

15           Flash-forward about two years later, word of the    01:16

16   killings approached NCIS.  They opened an investigation.  Along

17   the way, they talked to Jermaine Nelson, a sergeant in the

18   Marine Corps.  At the time, he was a corporal.  He was in the

19   house that day.  Corporal Nelson agrees to cooperate in the

20   investigation, and he makes a recorded telephone call to    01:17

21   defendant.  In making the call, they come up with, like, a back

22   story, to sort of explain the circumstances of the call.  And

23   Nelson explained to the defendant, Hey, I'm thinking about

24   getting out of the Marine Corps.  I want to be a police

25   officer.  But I know if I want to be a police officer, I might    01:17

1   have to take a polygraph, and I'm worried, if they ask me if I

2   ever murdered anybody, what I'm going to say.  Because remember

3   that time in Iraq?

4            Defendant says, Yeah.

5            Remember those four guys?                                01:17

6            Yeah.

7            And the conversation continues on like this.

8            And the defendant says words to the effect of, We did

9   what we had to do.  We didn't have time to put motherfuckers on

10  trucks.                                                           01:17

11           Before we get to the witnesses who describe the

12  event, however, I understand, through voir dire, that some of

13  you have some experience with the military, might have loved

14  ones in the military, might have served yourself; but others

15  don't necessarily have this background or experience.  So we're  01:18

16  going to start our case by putting on a gentleman named

17  Courtney Johnson.  He's a retired marine, he served 20 years,

18  and now he serves in a civilian capacity at the Marine Corps

19  School of Infantry.  And he's going to come on and sort of

20  provide a Marine Corps 101.  He'll talk about the Marine Corps   01:18

21  organization, what a regiment is, what a battalion is, what a

22  company is, what a platoon is, what a squad is, and a little

23  bit about the training that marines go through at boot camp;

24  and when they graduate from boot camp, at the infantry training

25  battalion; and when they graduate from the infantry training     01:18

Thursday, August 21, 2008                  Trial Day 2, Morning Session

1    battalion, at the school of the infantry.  And it's only after

2    they graduate from the School of Infantry that they go to an

3    operational unit, a go-to-war unit, like Kilo Company, 3rd

4    Battalion, 1st Regiment.  They have to negotiate all three of

5    these training sessions before they get to join an operational          01:19

6    unit.

7          He will testify that among all of the other things

8    they learn, they learn a few things that are central to this

9    case.  The first is, they learn the nine principals of the law

10   of war.  And two of those are important here.                            01:19

11         One is, allow people to surrender and do them no

12   harm; and the second is not to kill or torture detainees in

13   their custody.

14         He will also testify that all marines at boot camp,

15   all of the way through all their institutional training,                 01:19

16   through the school of the infantry, are taught how to process

17   detainees.  And you'll learn this as the Five S's and the T.

18   And he will describe what the Five S's and the T are.  And that

19   is, when you get a detainee, you're supposed to search them,

20   segregate them, silence them, safeguard them, and then speed             01:19

21   them to the rear.  And I'll talk a little bit about each of

22   them.  Those are the Five S's.  And the T is to tag the

23   detainees.

24         Some of these, I think, are probably clear to

25   everybody.  Silence them; that makes sense.  Search them; that           01:20

1    makes sense; make sure they don't have a weapon or things of

2    potential intelligence value.  Segregate them to make sure that

3    they're not able to do anything as a collective.  To speed them

4    to the rear means getting them out of your hands, to other

5    people who are better able to provide longer-term care,                    01:20

6    longer-term detention, and also the ability to do an

7    interrogation.  And also to safeguard.  And understand that

8    safeguard isn't just to do no harm.  What safeguard is is an

9    affirmative obligation not to hurt them, and to protect them.

10   It's an affirmative obligation.  And, finally, to tag; write          01:20

11   down the facts and circumstances surrounding the capture of the

12   detainee and anything else that might be appropriate.

13          That's what they were trained to do.  That's what

14   defendant was trained to do.  And he was trained at boot camp,

15   through ITB, through SOI; and he was trained again at the unit.   01:20

16   And you'll hear from several marines that not only provided

17   this training, but participated in this training with the

18   defendant.  And you'll learn that not only are the nine

19   principles of law of war applied again and again and again, and

20   the Five S's are taught again and again and again, you'll also    01:21

21   learn about specific training that Kilo Company, 3rd Battalion

22   went through prior to deployment to Iraq in June of 2004.  They

23   had training at Camp Pendleton.  They had training at George

24   Air Force Base.  They had training at March Air Force Base.

25   They had training in the desert, outside Fallujah, within the     01:21

1  days and week before they rolled in, in support of Operation

2  Phantom Fury.

3          One of these witnesses, Major Daniel Schmitt, will

4  describe the training.  He'll talk about the nine principles of

5  the law of war and the Five S's and the T.  He'll also talk          01:21

6  about the sort of training that steels the marines to go into

7  combat and to succeed, those things that allow them to overcome

8  the stress, the fear, and the fatigue of combat.  He'll talk

9  about these things, and he'll tell you that these things are

10 grounded in the marines' morality and ethics and that these          01:22

11 things are pushed into the marines from the day they enlist and

12 that these things are always important, and they are

13 particularly important when fighting an insurgency like the one

14 in Fallujah.  He will talk about how critical it is for marines

15 to take the moral high ground, to do the right thing, and that       01:22

16 what distinguishes a professional marine from the insurgents in

17 Iraq is their ability to take and hold that moral high ground.

18          He will describe to you how this training is designed

19 to focus marines on realizing this role as professional

20 warriors, and internalizing the marine code of honor, courage,       01:22

21 and commitment, and how that applies to doing the right thing

22 when you have the enemy in your custody; that being a marine

23 meant doing the right thing, even if it's the hard thing, doing

24 the right thing.  Not like the other guys.

25          In the end, you'll learn that every marine is taught         01:23

1    these things.  They are taught to do the right thing.  They are

2    taught honor, courage, and commitment; to stay the course; to

3    do the right thing, even when it's difficult.  They are taught

4    this from boot camp; they are taught this at ITB; they are

5    taught this at the school of the infantry; and they were taught          01:23

6    it again and again and again.

7            You will also learn that on the 9th of November,

8    2004, the defendant did not show courage, honor, and commitment

9    on that day.  He failed to do what he was trained to do, what

10   the Marines educated him to do, what the Marines required him            01:23

11   to do.  It's because of that that at the close of the

12   Government's case, the Government will stand before you again

13   and ask you to show courage, honor, and commitment, ask you to

14   do the hard thing and find defendant guilty for what he did on

15   the 9th of November 2004.                                                01:23

16           THE COURT:  Thank you, Counsel.

17           Is there an opening statement from the defense at

18   this time?

19           MR. McDERMOTT:  There is, Your Honor.

20           THE COURT:  You may proceed.                                     01:24

21           MR. McDERMOTT:  Thank you.

22                    OPENING STATEMENT - DEFENSE

23           MR. McDERMOTT:  Good morning, ladies and gentlemen.

24           This is our opportunity, on behalf of

25   Sergeant Nazario, Jose Nazario, to explain to you what we                01:24

1    believe the evidence will be.  You've heard a rendition of the

2    facts as the Government expects them to be, and I need to

3    highlight for you some of the circumstances which you'll need

4    to learn about during the course of this.

5              Now, I'm sure, when you got your jury notice a month                    01:24

6    ago or a week ago, you groaned.  You knew that your civic

7    responsibility was going to take time out of your life.  But if

8    I was to tell you that this case had some historical

9    importance, I'd probably be understating the circumstances.

10   You have a tremendous responsibility that's going to take place           01:24

11   over the next week.  You're going to have to decide, for the

12   first time by a civilian jury, whether or not conduct in a

13   battlefield was appropriately performed, and whether or not

14   there is sufficient evidence in which to convict a man for

15   events that occurred four years ago in a battlefield.                            01:25

16             You can't understand the circumstances in a vacuum.

17   And I don't expect you to feel the same circumstances under

18   which Jose Nazario went through, but I'm going to try my best,

19   as will my co-counsel, to try to explain to you the

20   circumstances as they occurred and the state of the evidence as           01:25

21   it stands now.

22             You all may recall our president standing on an

23   aircraft carrier saying "Mission Accomplished."  Six months

24   later, four contractors from Blackwater made the mistake of

25   driving through the town of Fallujah, a town of 300,000.  They            01:25

1    were beset by a mob, killed, burned, and then hung from a

2    structure that the marines called the Brooklyn Bridge.

3              Fallujah was a town of 300,000, primarily

4    Sunni-controlled, a tough town; had been from the middle ages.

5    It was known for its smugglers, its trade.  And it was an area          01:26

6    that was increasingly problematic for the Army, who was in

7    there before the Marines, and then the Marines when they took

8    over in the spring of 2004.

9              So tough were the circumstances in that particular

10   town that when the Marines were called in to make an example of        01:26

11   the insurgents who were responsible for the Blackwater murders,

12   the Marines were actually called off because the insurgents

13   were using women and children as shields, and the pictures did

14   not appeal to the world public.

15             So the military backed off, and over the course of           01:26

16   six months, undertook a campaign to convince the civilian

17   populous of Fallujah to leave town.  And over the course of

18   that six months, it's estimated that 275,000 out of 300,000

19   left the city.

20             While the civilians were leaving, every -- for lack          01:27

21   of a better word, every jihad that wanted to fight snuck into

22   the back door of Fallujah.  So, on November 9, 2004, when the

23   marines went in, the overwhelming majority of the people left

24   in Fallujah were spoiling for a fight.  And as you'll learn, if

25   you are looking for a fight, the Marines are the last ones you         01:28

 1    want to call, because they will deliver one to you.

 2              And that's what they were asked to do.

 3              On the morning of November 9, 2004, elements of my

 4    client's battalion knocked holes through some sand berms that

 5    had surrounded the city.  They had tried to control the egress          01:28

 6    and ingress of individuals going in and out of the town, and

 7    they used sand berms to do this.  They entered the town.  And

 8    you're going to hear testimony that there were rules of

 9    engagement carved and handed out before they went in.  And

10    almost immediately, after the onset of the assault, those rules        01:28

11    of engagement were tossed out.  Because one of the things that

12    they learned almost immediately was that the insurgents didn't

13    play fair.  They didn't follow rules.  They didn't have rules.

14    And whatever means, whatever force, whatever decision they

15    decided to do, they had one concept in mind from the very              01:29

16    beginning:  To kill as many marines as possible.

17              My client at the time they opened up the berms was a

18    squad leader.  He was a sergeant of marines and had

19    approximately ten young men underneath him.  He was given this

20    position of authority over these young men because of his             01:29

21    training, his expertise, and his skill.  But it was his first

22    time in combat.  Some of the young men working for him in this

23    squad, this was their second tour.  They had been part of the

24    runup to Baghdad.  They had seen a lot.  They had experienced

25    even more.  And some of these young men will tell you, they           01:29

```
 1   weren't done after Fallujah.  They went back for at least one
 2   more tour.
 3          We have asked a lot of these men.  And throughout the
 4   course of the fight that lasted ten days in Fallujah, these
 5   young men hit not one house, but hundreds.  And, in fact, one    01:30
 6   of the witnesses, Cory Carlisle, will tell you that he was
 7   horribly injured in a home two days later, in which he was used
 8   as the guinea pig for Chechnean insurgents.  He was injured,
 9   and these insurgents knew his marines would come for him.  They
10   would never leave a man behind.                                  01:30
11          Two young men died saving his life.  More were
12   injured taking him out of that house.  And we will tell you,
13   Were there insurgents killed by this squad?  A lot of them.  A
14   lot of them.
15          But what the Government is attempting to make you do      01:31
16   is to decide to convict a man of crimes, to include using a gun
17   in the course of a felony, when they have no physical evidence
18   of the crime.
19          They won't even be able to tell you who the
20   individuals in the home were.  They have no identity of these   01:31
21   individuals.  We have no fingerprints.  We have no DNA.
22   And, in fact, they tried to confirm what these young men had
23   told investigators early on:  We saw things, things happened;
24   they occurred in the fog of war; and we had one model, one
25   creed, going through:  We keep each other alive and we bring    01:32
```

1    each other out.  And the ultimate decision process is, if we

2    see a hostile act or we believe that there's hostile intent, we

3    may pull the trigger to keep ourselves alive and to keep our

4    fellow servicemen alive.

5              That's the primary rule in war.                          01:32

6              And the defense is here to tell you that these acts

7    that the Government claim did not occur as described; that each

8    and every man that was involved with this squad acted in

9    accordance with the rules of law and their understanding of

10   what it was to keep themselves alive throughout this fight.        01:32

11             And now we have the Government standing before you

12   and asking you to perform the ultimate ironic act, to convict a

13   serviceman, to convict a marine for using the instrument that

14   they handed him.  We ask you to hold the Government to its

15   absolute and utmost burden:  Proof beyond a reasonable doubt.      01:33

16   This is not some fanciful doubt.  This is fairly significant.

17   And one of those elements is going to be this:  Have they

18   sufficiently identified for you who it is that these men

19   killed?

20             The evidence will show that the Government tried to      01:33

21   do that.  They sent people into Fallujah.  There will be

22   evidence that they believed that they located the house where

23   this occurred.  And I'm here to tell you that they didn't bring

24   anything back; that they didn't find any evidence that

25   supported the claims being made by the Government.  So what the    01:33

Thursday, August 21, 2008                    Trial Day 2, Morning Session

```
 1   Government is asking you to do is to dictate to every young

 2   man, You better be right, you better be absolutely certain, or

 3   we're going to second-guess your thought process four years

 4   after the fact.

 5          I will ask each and every one of you, please hold off    01:34

 6   on making any kind of assumption, any kind of decision, any

 7   kind of leaning in this case, until you've heard all of the

 8   evidence.  And always bear in mind, my client has no burden

 9   whatsoever in this case.  He doesn't have to present a single

10   shred of evidence, and he has every right to make the          01:34

11   Government prove beyond a reasonable doubt all of the elements

12   of the offense, because that's what he fought for.

13          Thank you.

14          THE COURT:  Thank you, Counsel.

15          The Government may call its first witness.              01:35

16          MR. KOVATS:  Yes, Your Honor.  Thank you.

17          The Government calls Mr. Courtney Johnson.

18          THE CLERK:  Do you solemnly state that the testimony

19   you may give in the cause now pending before this Court shall

20   be the truth, the whole truth, and nothing but the truth, so

21   help you God?

22          THE WITNESS:  I do.

23          THE CLERK:  Please state your full name and spell

24   your last name for the record.

25          THE WITNESS:  My name is Courtney Johnson,              01:36
```

```
 1   J-O-H-N-S-O-N.

 2           THE COURT:   Counsel, you may proceed.

 3                   DIRECT EXAMINATION

 4   BY MR. KOVATS:

 5   Q    Good morning, Mr. Johnson.                        01:36

 6   A    Good morning.

 7   Q    If you could describe for the jury your current

 8   occupation.

 9   A    I'm an instructional systems specialist; also, an

10   international military student officer for the Marine Corps.  01:36

11   Q    What does that mean?

12   A    I'm a curriculum developer.  That means I develop

13   curriculums that is being taught in infantry skills at the

14   School of Infantry.

15   Q    How long have you been doing this?               01:36

16   A    I have been doing it as a civilian for approximately three

17   years; and during my military time, I actually did it for

18   approximately five years, for a total of eight years.

19   Q    For a total of eight years all together?

20   A    That is correct.                                 01:37

21   Q    You're a retired marine?

22   A    I'm a retired marine, served 20 years.

23   Q    If you could briefly describe for the grand jury [sic]

24   your experience with jobs you held in the Marine Corps while

25   you were an active-duty marine.                       01:37
```

1        **THE COURT:**  Just to be clear, this is not the grand

2    jury.  This is the jury.

3        **MR. KOVATS:**  Did I say grand jury?  I apologize,

4    Your Honor.  Thank you.

5        **THE WITNESS:**  I was in the Marine Corps for 20 years.    01:37

6    I served as an infantry man for 20 years.  I was an instructor

7    for most of my career, again at the School of Infantry.  I had

8    two tours there, both of approximately four years each.  And I

9    served as an instructor for infantry skills.  During that time,

10   I did curriculum development, which is a portion or part of     01:37

11   being an instructor; so I make decisions on what is being

12   taught at what level and where it is being taught.

13   BY **MR. KOVATS:**

14   Q    So it's, in some part, your decision what information,

15   what training, gets put before young marines.                  01:38

16   A    That is correct.

17        We use a building-block approach to training; and

18   with my input, during conferences, we make decisions on what is

19   being taught, where it's being taught.

20   Q    So from your position at the School of Infantry, are you   01:38

21   then sort of plugged into what's going on at boot camps and

22   ITB?

23   A    That is correct.

24        I go to conferences each and every year, to basically

25   come to a decision on what is being taught at what level; and   01:38

1   not only at MCRD San Diego during recruit training and at SOI,

2   but as a building-block approach to the marine's career

3   throughout the Marine Corps, because we do utilize advanced

4   courses that we teach at the School of Infantry; so we have a

5   broad base on what is being taught in the Marine Corps for          01:39

6   infantry.

7   Q     Just to clarify, you said "MCRD."

8           Can you explain what that means.

9   A     MCRD is Marine Corps Recruit Depot, and that's in

10  San Diego; that's where recruits are being trained.  Once they     01:39

11  leave from the civilian world, they go to the Recruit Depot,

12  where the Marine Corps is instilled within them.

13  Q     Is that commonly known as boot camp?

14  A     That is called boot camp.

15  Q     And that's the first step into the Marine Corps from the      01:39

16  civilian world.

17  A     That is the first step.

18          **MR. KOVATS:**  Your Honor, at this point, we'd tender

19  Mr. Johnson as an expert in infantry training.

20          **THE COURT:**  Any objection?                              01:40

21          **MR. McDERMOTT:**  No, Your Honor.

22          **THE COURT:**  So designated.

23  **BY MR. KOVATS:**

24  Q     About how long is boot camp?

25  A     Boot camp is approximately 12 weeks.                          01:40

1  Q    And at boot camp, are new recruits taught about the laws

2  of war?

3  A    They are being taught laws of war in boot camp.

4  Q    And what are they taught about the laws of war in boot

5  camp?                                                              01:40

6  A    They are taught specifics as to what they can do and what

7  they cannot do; basically, during war time, what they can do

8  with an EPW, or an enemy prisoner of war; or what can be done

9  to them when they are a POW, a prisoner of war, during that

10 point in time.                                                    01:41

11 Q    And this is one of several subjects, of course, that they

12 are taught at boot camp; is that right?

13 A    This is one of several subjects.

14 Q    And are they also informed about the organizational

15 structure of the Marine Corps?                                    01:41

16 A    They are being taught the organizational structure of the

17 Marine Corps.

18 Q    If you could, Mr. Johnson, take a look at Exhibit Number 2

19 for identification.

20        Do you recognize that?                                    01:41

21 A    Yes, I do.

22 Q    What is that?

23 A    That is the organizational structure for a battalion in

24 the Marine Corps.

25 Q    If you can turn the page.                                    01:41

```
 1              Do you recognize that?
 2   A    Yes, I do.
 3   Q    And what is that?
 4   A    That is the organizational structure for a company in the
 5   Marine Corps.  It's a rifle company, to be exact.          01:42
 6   Q    Would it help to explain your testimony to the jury if you
 7   had this to use?
 8   A    Pardon me?
 9   Q    Would these diagrams help you explain your testimony to
10   the jury?                                                  01:42
11   A    Yes.
12        MR. KOVATS:  Your Honor, the Government would offer
13   Exhibit 2 for identification into evidence.
14        THE COURT:  Any objection?
15        MR. McDERMOTT:  None, Your Honor.                     01:42
16        THE COURT:  It's admitted.
17        You may publish.
18        (Exhibit 2 is received.)
19        MR. KOVATS:  Thank you, Your Honor.
20   BY MR. KOVATS:                                             01:42
21   Q    So it looks like we have a wire diagram there.
22             Is that what that would be called?
23   A    Yes.
24   Q    If you could just describe to the grand jury [sic] what
25   that is.                                                   01:43
```

1    A    Basically showing that the company is at the top of the

2    food chain.  The company is actually commanded by a captain,

3    with approximately six, eight years experience in the

4    Marine Corps.  That's an officer.  And then the head enlisted

5    personnel in that company is a first sergeant, approximately 17    01:43

6    to 18 years of experience in the Marine Corps.

7              Each company is broken down into four platoons.  Each

8    platoon is commanded by a second lieutenant in the

9    Marine Corps, with approximately two years in the Marine Corps;

10   two years in the Marine Corps.  Then the enlisted personnel    01:43

11   that's in charge is a staff sergeant, with approximately seven

12   to eight years in the Marine Corps.

13   Q    Are these platoons further broken down?

14   A    These platoons are further broken down.  Each platoon has

15   four squads.  It is commanded by a squad leader, who is a      01:44

16   sergeant in the Marine Corps.  And then it is broken down into

17   fire teams, who is usually a corporal in the Marine Corps.

18   Q    At boot camp, are the recruits organized into these

19   structures right away?

20   A    No, they are not.                                         01:44

21   Q    How are they organized at boot camp?

22   A    It is based on how many personnel they have to go through.

23   So a company could have up to five to six platoons.  It's much

24   different because based on the large amount of personnel.  And

25   to have an instructor-to-student ratio, which is for safety    01:45

1    reasons, then that's why it is more broad based.  You could

2    have more platoons per company or you could have more companies

3    per battalion.

4    Q    But organizationally, the battalion is at the top; the

5    company is subordinate to that; then platoon; then squad; then        01:45

6    fire team?

7    A    That is correct.

8    Q    And those are the building blocks of the Marine

9    organization?

10   A    Correct.                                                          01:45

11   Q    Now, I want to talk to you about law-of-war training,

12   detainee handling training, that happens for new marines.

13          Where do they get this training?

14   A    Could you say that again.

15   Q    Where do new marines first receive training on the laws of       01:46

16   war and detainee handling?

17   A    The laws of war are first trained or given at Recruit

18   Depot.

19   Q    And what are they taught?

20   A    Again, they are basically taught what they can do and what       01:46

21   they cannot do during war time, based on laws, on regulations;

22   what is called UCMJ; that is basically what regulates or is the

23   justice of the Marine Corps.

24   Q    Is that the Uniform Code of Military Justice?

25   A    That is correct.                                                  01:47

Thursday, August 21, 2008                    Trial Day 2, Morning Session

```
 1   Q     Are marines instructed on the nine principles of the law
 2   of war?
 3   A     Pardon me?
 4   Q     Are marines instructed on the nine principles of the law
 5   of war?                                                           01:47
 6   A     Yes, they are.
 7   Q     Is that also something that's instructed at boot camp?
 8   A     Yes, it is.
 9   Q     And are they instructed later on as well on those same
10   subjects?                                                         01:47
11   A     They are being refreshed later on, and it is also utilized
12   in part of their training that they do, because it encompasses
13   everything.
14   Q     When you said 'used in part of their training,' what does
15   that mean?                                                        01:47
16   A     It is based on performance training.  When they do go out
17   -- say, for instance, they are doing what is a scenario based
18   on tactics -- the instructor brings into play experiences; that
19   deals with the laws of war that they have to utilize to
20   complete that training event.                                     01:48
21   Q     So when you say "training event," this implies it's not in
22   a classroom setting?
23   A     This is in the classroom setting, and it's also in the
24   field setting.
25   Q     So in a classroom setting, there would be an instructor    01:48
```

1  informing the marines about what the law requires; is that

2  right?

3  A    That is correct.

4  Q    What happens in the training environment, or the field

5  setting?                                                            01:48

6  A    The training environment, there are scenarios that are put

7  out there.  For instance, if we're doing an environment where

8  we're taking down a house, or something to that effect, we put

9  into place certain scenarios that a marine has to go through

10 that deals with the laws of war, its ethics, its morals, that      01:48

11 he has to complete to take down that room.

12 Q    I'd like you to turn to Exhibit 3, if you would.

13       Then the first page appears to be a cover, and the

14 second page is a block of training; is that correct?

15 A    Correct.                                                       01:49

16 Q    Do you recognize it?

17 A    Yes, I do.

18 Q    What is it?

19 A    This is a class that is being taught at the School of

20 Infantry on detainee handling.                                      01:49

21       **MR. KOVATS:**  Your Honor, the Government would move to

22 admit Exhibit 3.

23       **THE COURT:**  Any objection?

24       **MR. McDERMOTT:**  Your Honor, we would at this

25 particular time ask for a little more foundation as to --          01:49

1          **THE COURT:**  Sustained.

2          **MR. McDERMOTT:**  Thank you.

3    **BY MR. KOVATS:**

4    Q    Do you recognize the cover?

5    A    Yes.                                                          01:49

6    Q    Do you recognize the course instruction?

7    A    Yes, I do.

8    Q    Where do you recognize this from?

9    A    This is one of the classes that I put together that deals

10   with the detainee handling that we teach at the School of        01:50

11   Infantry.

12   Q    How long has this class been taught?  Or the subject

13   matter contained therein, how long has that been taught?

14   A    This class has been taught ever since I came in the

15   Marine Corps.  As per the naming of the class, it has changed;    01:50

16   this has been changed over the last four years, three to four

17   years.  But the portions of the class, the subject that is in

18   the class that is being taught is still the same.

19   Q    So the substance of the class has been the same since you

20   enlisted in the Marine Corps more than 20 years ago?              01:50

21   A    Yes, it is.

22          **MR. KOVATS:**  Your Honor, the Government would offer

23   Exhibit 3.

24          **MR. McDERMOTT:**  Same objection, Your Honor.  Just a

25   date as to when.                                                  01:51

1          **THE COURT:**  Sustained.

2          **MR. McDERMOTT:**   Thank you.

**BY MR. KOVATS:**

4    Q    Do you have a date on this, Mr. Johnson?  Do you know when

5    this handbook was in circulation?                                    01:51

6    A    This present handbook, just looking at the numbering

7    system that is in it, we incorporated this last year; August

8    last year is when I developed it with that numbering system.

9    Q    Thank you.

10          **MR. KOVATS:**  Your Honor, at this time, the Government    01:51

11   would offer Exhibit 3.

12          **MR. McDERMOTT:**  Objection as to relevancy.

13          **THE COURT:**  Counsel, where are you going with this?

14          **MR. KOVATS:**  Your Honor, this instruction was

15   provided to the defendant and the marines in his unit.  I think   01:52

16   it's fair to describe to the jury what the marines were told

17   throughout their training as it relates to detainee handling.

18          The witness described that this is, in substance, the

19   same class that's been taught throughout the Marine Corps since

20   he's been a marine, more than 20 years ago.                        01:52

21          **THE COURT:**  You're going to need to lay a further

22   foundation for the relevance to this case, Counsel.

23          I'll sustain the objection.

**BY MR. KOVATS:**

25   Q    What are recruits taught about the Five S's?                  01:52

Thursday, August 21, 2008            Trial Day 2, Morning Session

1    A    Going from the start, when it says "search," it is based

2    on three scenarios; it's based on a hasty search, a detailed

3    search, and a strip search.  These are the three main searches

4    that marines do.  It depends on the times, the time that they

5    have to do each of them, and it also depends on who is doing          01:53

6    it.

7    Q    So these Five S's are implemented when someone is captured

8    by the Marines; is that right?

9    A    That is correct.

10   Q    So the first thing they do is a search.                          01:53

11   A    That is correct.

12   Q    And they're taught that there are multiple types of

13   searches.

14   A    That is correct.

15   Q    What are they doing when they're searching a detainee?           01:53

16   A    They are basically -- without going into detail as to how

17   it's done, they are basically looking quickly -- when they're

18   doing a hasty search, they're looking quickly for any

19   information or any weapon system, a weapon that may be on that

20   detainee, to relieve them of it.  But at the same point in           01:53

21   time, as we'll come down later during the steps of searching,

22   whereas all of this stuff is being put together, it is not

23   being taken by that marine from his captive.

24   Q    And after the search, what happens next?

25   A    After the search, then they silence.                            01:54

1    Q     After silence, what happens next?

2    A     Then they segregate.

3    Q     And what does that mean?

4    A     Segregate means that they are just placing them apart so

5    that they cannot talk or conspire to basically get away.                    01:54

6    Q     And after segregate, what comes next?

7    A     Then it's safeguard.

8    Q     What does safeguard require?

9    A     Safeguard is basically using that -- having that detainee,

10   not utilizing him as a shield.  You're going to do -- I'll put         01:54

11   an example of, if there was gas in the area or that unit got

12   gassed, then if that detainee had a gas mask on, we would not

13   just take that gas mask and not give it to him so that he can

14   protect himself.  We would actually give it to him so that he

15   can help himself from getting gas and dying, or anything to            01:55

16   that effect.

17          We do everything within our means to keep that

18   detainee safe.

19   Q    So this just doesn't mean "don't hurt them"; it actually

20   is an affirmative obligation to protect them; is that right?          01:55

21   A    We stand under the rules and regulations of the Geneva

22   Convention, and also under the UCMJ and under orders and

23   directives, not to be inhumane to that person.

24          **THE COURT:**  UCMJ is what?

25          **THE WITNESS:**  Uniform Code of Military Justice.            01:55

**BY MR. KOVATS:**

Q    After safeguard, what's the last S?

A    That is speed.

Q    What does that mean?

A    That means we try to get them back in the rear, to our    01:56

intelligence personnel; that's the marines that are out on the

front line, get them back as quickly as possible, so that they

can put together an intelligence on who is captured, make

determinations, or anything that has to be done back in the

rear.    01:56

Q    Is that because the person detained might be a source of

available intelligence?

A    That is correct.

Q    What's the T stand for?

A    That is tag.    01:56

       All of the gear that is collected from each

individual is being tagged, has been tagged, and it is not

being kept by anyone.

Q    You mentioned before about Geneva Convention.

       Are marines taught that they must allow the enemy to    01:56

surrender if the enemy is inclined to surrender?

A    Yes.  We teach that.

Q    Are they also taught not to harm the enemy that does

surrender?

A    Not to harm them?    01:57

1    Q      Not to harm them.

2    A      Yes, we teach them not to harm them.

3    Q      Not to torture or kill?

4    A      That is under the code of conduct; and also, that is under

5    our leadership traits and principles.  It falls under the UCMJ,          01:57

6    under our orders, and also under our directives.  It falls

7    under several different -- as you see, different orders within

8    the Marine Corps.

9    Q      Now, you mentioned before that there's a class at basic on

10   detainee handling; is that right?                                        01:57

11   A      Correct.

12   Q      And there's a class that also incorporates the nine

13   principles of the law of war; is that right?

14   A      Correct.

15   Q      Can a marine graduate from boot camp without passing the          01:57

16   tests administered in these blocks of instruction?

17   A      They are given written tests on these instructions that

18   are being given.  They cannot graduate without passing these.

19   It's a graduation requirement.  Also, within that, being that

20   you cannot really test -- we try to test everyone on                     01:58

21   performance, and also on written examination, but because

22   there's no way of what is actually going on -- there's no way

23   of actually performing these things, what we do say to those

24   students is that later on, within your career, you will be

25   tested on your ethics, you're ethos, the laws of war, when you           01:58

1    get in that situation.

2    Q    And are they provided opportunities to do that at the

3    School of Infantry through practical exercises?

4    A    Yes, we do.

5    Q    If you could describe a little bit about that.                    01:58

6    A    What we do, again, is go out, and based on scenarios, we

7    put together the training that we give them tactically.  Now we

8    put everything that was being taught -- again, we use a

9    building-block approach to all of our trainings you see here,

10   because we teach them the mental, the ethical portion of it,          01:59

11   prior to them actually going into the tactical decision-making

12   of it, where they have to put everything together.

13            So we would go out there in a situation of taking

14   down -- again, taking down a room, how do you take down a room,

15   what are the scenarios when you go inside a room when there is        01:59

16   -- if there is civilians could be in the room, based on rules

17   of engagement, what do you do.

18   Q    Would a marine graduate from the School of Infantry

19   without mastering the Five S's and the T?

20   A    No, they will not.                                                02:00

21   Q    How about understanding the laws of war?  Would a marine

22   graduate from the School of Infantry without understanding the

23   nine principles of the laws of war?

24   A    They will graduate from -- that is being taught in recruit

25   training.                                                             02:00

1    Q    Okay.

2    A    So that's where that would first take place.  That's where

3    they will be tested on that.  But incorporated into the

4    tactical aspects of the training, which we do at the School of

5    Infantry, they would not graduate if they did not pass that

6    portion of it also.

7              We have what we call performance steps under each and

8    every thing that we do, tactical scenarios that we do.  We have

9    what we call tasks, which is what I do; I develop.  And what we

10   do with those tasks is what we call performance steps on it.

11   Now, each of those wickets -- and that's based on what is being

12   taught before -- they have to hit each and every one of them.

13   Q    So there's a series of steps that the marine needs to

14   demonstrate proficiency in in order to be graded, like,

15   proficient in the task?

16   A    That is correct.

17   Q    These areas we're talking about, detainee handling and the

18   nine principles of the laws of war, are these skills part of

19   the Marine Corps Common Skills Handbook?

20   A    Yes, it is.

21   Q    What is the Marine Corps Common Skills Handbook?

22   A    It is based off a scenario for each and every marine in

23   the Marine Corps.  It doesn't matter if you're going to be an

24   administrative personnel; it doesn't matter if you're going to

25   be in the infantry; these skills are being taught to you to be

02:00

02:00

02:01

02:01

02:01

 1   a full-rounded marine.  Because, as we say in the Marine Corps,

 2   each and every marine is a rifleman, because it doesn't matter

 3   what job you do, you have to go out there at any point in time

 4   and go into any one of these situations.  So we give them the

 5   knowledge that they need to go out there and deal with these                02:02

 6   situations that they come across.

 7   Q    So the Marine Corps Common Skills Handbook contains a

 8   series of tasks or information or requirements that are

 9   universal to every marine.

10   A    That is correct.                                                       02:02

11   Q    Are these baseline skills?

12   A    These are baseline skills.

13        THE COURT:  Counsel, why don't you define that term

14   for your witness.

15   **BY MR. KOVATS:**                                                          02:02

16   Q    Sir, when we talk about a baseline skill, what does that

17   mean?

18   A    The baseline skill, as we look at it, is not going into

19   anything advanced into those topics; because, again, as we say,

20   we use a building-block approach to everything.  So they are                02:03

21   just the theory or the basics of that level of training.

22   Again, as I say, we use a building-block approach; so at their

23   level, it's just the basics.

24   Q    So the Marine Corps Common Skills Handbook just includes

25   the basics.                                                                 02:03

1   A    That is correct.

2   Q    And everybody knows them, whether they are an infantryman

3   or they are someone who works in the dining facility.

4   A    That is correct.

5   Q    Would a squad leader be someone who should know everything          02:03

6   in the Common Skills Handbook?

7   A    Yes.

8           They are being evaluated on this during their time in

9   the battalion.  They go to different -- say, for instance,

10  29 Palms, and they are evaluated on their training; so not only        02:03

11  are they evaluated when they go to schools, they are actually

12  evaluated as a unit then.  That squad leader is being evaluated

13  even for -- whenever he goes -- before he goes overseas.

14  Q    So this training in the common skills is reinforced

15  outside of the institutional training, but also at the unit.           02:04

16  A    That is correct.

17  Q    Would a squad leader be responsible for ensuring that his

18  subordinate marines understand the common skills?

19  A    That is part of his job.  That comes as part of the

20  leadership traits.  That squad leader, or that leader, needs to        02:04

21  know that the marines know their jobs.

22  Q    So when someone is in the position of a squad leader, is

23  it fair to say that they not only have to know this themselves

24  and master it, but they have to ensure that their subordinates

25  know it too?                                                           02:04

1   A    As a leader, you're a teacher; so they will have to know

2   that information to be able to teach it to their marines.

3   Q    Lastly, I want to talk to you about a concept called

4   battlefield ethics.

5            Does that mean anything to you?                     02:05

6   A    Yes.

7   Q    What is battlefield ethics?

8   A    Basically, it's incorporating all that you have been

9   taught as a leader, the laws of war, the code of conduct, the

10  UCMJ, you're incorporating all of those things together and    02:05

11  making sure you're doing what is right.

12           **MR. KOVATS:**  Thank you, Your Honor.

13           **THE COURT:**  Very well.

14           Before the cross-examination, let's take our morning

15  break at this time.                                            02:06

16           (Whereupon, jurors depart courtroom.)

17           (Brief recess taken.)

18           (Whereupon, jurors reenter courtroom.)

19           **THE COURT:**  Counsel, you may proceed with

20  cross-examination.                                             02:24

21                       **CROSS-EXAMINATION**

22  **BY MR. McDERMOTT:**

23  Q    Mr. Johnson, can you indicate for the jury what rank you

24  were when you retired.

25  A    I retired as a staff sergeant; it's an E-6, enlisted E-6.  02:24

```
 1   Q    I also note in the background that they gave us on your

 2   training and experience that you actually earned the Combat

 3   Action Ribbon.

 4   A    Yes, I did.

 5   Q    Did you earn that during the Gulf Storm in '91?          02:24

 6   A    That is correct.

 7   Q    What unit were you in?

 8   A    I was in 29 Palms, and at the 2nd Battalion, 7th Marines.

 9   Q    Did you actually deploy to the Persian Gulf?

10   A    Yes, I did.                                              02:24

11   Q    And in order to earn a Combat Action Ribbon, you actually

12   have to experience combat.

13   A    Yes, sir.

14   Q    And did you, in fact, experience combat in the Persian

15   Gulf?                                                        02:25

16   A    Yes.

17   Q    What kind of combat did your unit experience?

18   A    We were fired upon.

19   Q    And in the country of Iraq, where exactly did this occur?

20   A    This occurred on the Kuwait border.                     02:25

21   Q    And your particular unit was the 2nd Battalion, 7th

22   Marines; is that correct?

23   A    Correct.

24   Q    Did any of that combat that you encountered include

25   house-to-house fighting?                                     02:25
```

1   A      No.

2   Q      I believe at the particular point in time that you earned

3   your Combat Action Ribbon, the individuals that you were up

4   against were, in fact, a regular Iraqi army.

5   A      That is correct.                                              02:25

6   Q      These were men with uniforms on.

7   A      Yes.

8   Q      Helmets and boots that had markings and distinctions that

9   told you that they were the enemy; correct?

10  A      Yes.                                                          02:26

11  Q      And at the time that you had this experience, what rank

12  were you?

13  A      I was a corporal.

14  Q      And as a corporal, were you a fire team leader or a squad

15  leader?                                                              02:26

16  A      I was a squad leader.

17  Q      So you held the same position as Sergeant Nazario did when

18  he went into Fallujah.

19  A      I could not say what position he held.  I don't know him.

20  Q      Let me ask you this:  Were you ever asked by the             02:26

21  Government to personally review any of Jose Nazario's military

22  records to determine when he went through boot camp, when he

23  went through SOI, what training he received during the course

24  of his military career?

25  A      Say that again.                                              02:26

1   Q    Were you asked by the Government to review any of

2   Mr. Nazario's military records to determine what training he

3   received?

4   A    No.  It was --

5   Q    I'm sorry?                                              02:27

6   A    Can I elaborate?

7   Q    Maybe through Government counsel.

8            You were not asked; is that correct?

9   A    No.

10  Q    Are you familiar with the term "CAR," C-A-R?           02:27

11  A    No, I'm not.

12  Q    Would that be the medal that you earned, the Combat Action

13  Ribbon?

14  A    Yes.

15  Q    Is it routinely called CAR by marines?                 02:27

16  A    I called it Combat Action Ribbon.

17  Q    Are you familiar with the term "direct fire"?

18  A    Yes.

19  Q    And what is direct fire?

20  A    Direct fire is -- basically, there's two terms:  Indirect  02:27

21  fire and direct fire.  It is utilized from a weapons system

22  that -- it's like an M-16, a pistol, a rifle; so it hits

23  directly; it's not going over an obstacle or around an

24  obstacle.

25  Q    And indirect fire is what?                             02:28

Thursday, August 21, 2008              Trial Day 2, Morning Session

1    A    Indirect fire is what is utilized -- for instance, a

2    mortar.  It is being shot around an obstacle, over an obstacle,

3    something to that effect.

4    Q    What about "return of fire"?  What does that mean?

5    A    Return of fire?  That's -- if you're shot upon, then you            02:28

6    return fire, then you shoot back.

7    Q    When you were in the Gulf War, is it safe to say that some

8    of the things that you may have taught -- or been taught in

9    school had to be adapted to fit the circumstances?

10   A    Can you say that again.                                            02:28

11   Q    Do you agree that in time of war, sometimes the student

12   handbook goes out the window because the circumstances are very

13   different?

14   A    The basics are the basics.  You utilize everything that is

15   being taught as per ethics, leadership, what is in the UCMJ,           02:29

16   the Geneva Convention.  So nothing is really out of the window.

17   Q    In your SOI training experience that you've had, how much,

18   percentage wise, is devoted to tactics, weapons, and the like,

19   as compared to ethics and law of war?

20   A    It's all combined together.                                       02:29

21   Q    In a classroom environment, can you give us an estimate as

22   to how much time is spent on other topics beyond ethics?

23   A    At what point?

24   Q    SOI.

25   A    At what time period?                                              02:30

1        It depends.

2    Q    How long is SOI?

3    A    SOI is basically -- it depends on -- that's why I'm asking

4    this question, because it depends on what your military

5    occupational specialty is.  Because you have the common skills        02:30

6    portion of training, and if you're going to be an infantryman,

7    you actually have an extended period of time that you do get

8    training; so it actually depends.

9         If you're not an infantryman, you're only taught just

10   from the common skills portion of training.        02:30

11   Q    Did you happen to determine what training skills or

12   schools Sergeant Nazario went through?

13   A    No.

14   Q    At any time in your experience, have you been taught or

15   trained in the term "hostile act/hostile intent"?        02:30

16   A    That is correct.

17   Q    Where did you learn that?

18   A    That was being taught to me at SOI.

19   Q    Can you indicate for the jury what that means.

20   A    Hostile act is basically when you're being -- an        02:31

21   aggression is being shown at you.  Hostile act is when you're

22   basically being fired upon.  Then you return fire.

23        Hostile intent is basically when someone shows an

24   intent to actually do something to you that could be very

25   lethal.        02:31

1    Q    And if, in fact, you observe either conduct being

2    committed toward you, do you have the right to act?

3    A    That is correct.

4    Q    To protect yourself and your troops.

5    A    To protect yourself, to protect national security, to                    02:31

6    protect your troops.

7    Q    And as a squad leader, when you were a squad leader of

8    marines, you taught those principles to your troops, did you

9    not?

10   A    I did.                                                                   02:32

11           **MR. McDERMOTT:**  I have nothing further.  Thank you.

12           **THE COURT:**  Redirect examination?

13                           **REDIRECT EXAMINATION**

14   **BY MR. KOVATS:**

15   Q    If Sergeant Nazario went through SOI at any time in the                  02:32

16   last 20 years, would he have been presented instruction on

17   detainee handling?

18           **MR. McDERMOTT:**  Objection.  Lack of foundation.

19           **THE COURT:**  Lay a foundation.

20   **BY MR. KOVATS:**                                                            02:32

21   Q    As a course manager, have you had access to all of the

22   instruction materials that have been provided to students in,

23   say, the last ten years?

24   A    Yes, I have.

25   Q    During the course of your preparation for this case, have                02:33

1    you looked at those materials?

2    A    Yes, I have.

3    Q    Were you able to find any instruction manuals that have

4    been provided to students that did not include instruction on

5    detainee handling?                                              02:33

6    A    No, I have not.  It has always been taught during that

7    time -- during that time period.  And also, I was -- a question

8    was asked earlier as to whether or not Sergeant Nazario was

9    being taught something that specific time period or about his

10   records.  I do not -- I did not look at his specific records.   02:33

11   However, I --

12           THE COURT:  Sir, just answer the question that's

13   pending.

14           Counsel, your next question.

15           MR. KOVATS:  I think he answered the question.         02:33

16           That's all I had, Your Honor.

17           THE COURT:  Very well.

18           MR. McDERMOTT:  No follow-up.

19           THE COURT:  Sir, you're excused.

20           Government's next witness?                             02:33

21           MR. KOVATS:  Your Honor, the Government calls

22   Major Daniel Schmitt.

23

24

25

```
 1            THE CLERK:  Do you solemnly state that the testimony
 2   you may give in the cause now pending before this court shall
 3   be the truth, the whole truth, and nothing but the truth, so
 4   help you God?
 5            THE WITNESS:  I do.
 6            THE CLERK:  Please state your full name and spell
 7   your last name for the record.
 8            THE WITNESS:  Daniel Andrew Schmitt, S-c-h-m-i-t-t.
 9            THE COURT:  You may proceed, Counsel.
10                        DIRECT EXAMINATION                        02:35
11   BY MR. KOVATS:
12   Q    Sir, what's your present occupation?
13   A    I am an infantry officer of the United States Marines,
14   sir.
15   Q    And where are you currently stationed?                   02:35
16   A    I'm currently stationed at Camp Fallujah, Iraq.
17   Q    And you traveled back from Fallujah, Iraq, to be here.
18   A    Yes, sir.
19   Q    When you leave here today, where are you going?
20   A    When I'm complete with the duty here in the courtroom,   02:35
21   sir, I'll go back to Iraq.
22   Q    And what did you do before you took your present
23   assignment?
24   A    I attended school before taking my present assignment;
25   that was a weigh point.  My official duties prior to that, I  02:35
```

1    conducted the pre-deployment training for the 1st and 2nd

2    Marine Division units going back to Iraq.

3    Q     So you were responsible for the program of instruction

4    that the marines of the 31 received prior to going to Iraq?

5    A     There were 21 battalions that were put through the                  02:36

6    program.  31 was one of the earlier battalions, yes, sir.

7              THE COURT:  Sir, please just slow down a little bit.

8              THE WITNESS:  Yes, sir.

9    BY MR. KOVATS:

10   Q     What was your position at the time you were doing this?            02:36

11   A     I was the officer in charge of a pre-deployment training

12   program that -- it was, essentially, the graduation exercise,

13   or mission rehearsal exercise, the last step before a battalion

14   would deploy to Iraq.

15   Q     How did you find yourself in this position?                         02:36

16   A     I served as an infantry company commander in Iraq, and I

17   was moved to an experimental unit that was tasked by the

18   Commandant of the Marine Corps to experiment with tactics,

19   techniques, procedures to be used in Iraq in pursuit of our

20   goals and objectives militarily.  From there, 1st Marine                  02:36

21   Division Commander General Mattis asked that I be employed with

22   a hand-selected crew of instructors to establish a simulated

23   training environment for the battalions prior to deploying to

24   Iraq.

25   Q     Were you hand-selected for this position?                           02:37

1  A    I was hand-selected based on experience as a company

2  commander.

3  Q    What was your experience as a company commander?

4  A    As a company commander, I had many deployments throughout

5  the world, from the Mediterranean, the Pacific, and to the          02:37

6  Middle East.  I served in combat in both offensive operations

7  at the beginning of Operation Iraqi Freedom and conducted

8  stability and support operations as the insurgency in Iraq

9  gained ground.

10 Q    When were you in Iraq?                                          02:37

11 A    My initial experience as a company commander in Iraq

12 started in Kuwait in January of 2003, and was complete in

13 November of 2004.  I made several experimental deployments back

14 to Iraq between 2004 and 2006.

15 Q    And when you say 'experimental redeployments to Iraq,'          02:38

16 what does that mean?

17 A    That was where I would go to units or particular missions

18 to determine the effectiveness of tactics, techniques, and

19 procedures to be inserted in the training that I was to conduct

20 in Riverside.                                                        02:38

21 Q    When you say 'in Riverside,' where in particular are you

22 talking about?

23 A    Near March Air Force Base; there was an old abandoned

24 housing complex which we rented; it had about 1,500 structures.

25 We turned that into a simulated Iraqi village.                       02:38

1   Q    Was there a name for this operation at the time?

2   A    We called it Matilda Village, named after the 1st Marine

3   Division marching song, the Waltzing Matilda.

4   Q    Okay.

5        And you said that 21 battalions went through this                    02:39

6   program during the time that you were in charge of it.

7   A    That's correct, sir.

8   Q    And 3rd Battalion, 1st Marines was one of these?

9   A    Yes, sir.

10  Q    Do you recall when they went through this training           02:39

11  program?

12  A    May 6th to may 10th of 2004.

13  Q    Do you recall roughly on the continuum of these 21

14  battalions where they were?  Front end?  Middle?  Back end?

15  A    I want to say 31 was about the fifth battalion to go         02:39

16  through; they were in the early end.

17  Q    And if you could, describe for the jury what sort of

18  information -- what sort of experiences were used, what sort of

19  input you had, in creating this training.

20  A    It's actually pretty simple, sir.                            02:39

21       I was called by General Mattis, the commander at the

22  time of all of the marines in Camp Pendleton, the 1st Marine

23  Division; and he sat me down and gave me guidance based on his

24  ethos.  His ethos had a few simple points.  One was, marines

25  will operate as no better friend or no worse enemy based on the  02:40

1    environment; that was a Latin inscription he pulled off of

2    tombs from the Roman empire.  He was quite the historian.

3            The second is from the hippocratic oath.  Marines

4    will do no harm.  When faced with a decision, first, do no

5    harm.                                                        02:40

6            And third was the concept of guardian angels.

7    Understanding that we'll be mixed with civilians on the

8    battlefield and the threat will be nebulous, we'll always have

9    that marine mixed with civilians on the battlefield overwashed

10   by another marine.                                           02:40

11   Q    When you say the threat is 'nebulous,' what does that

12   mean?

13   A    It's a complex environment and it takes engagement with

14   the population to determine exactly what the situation in

15   combat is, particularly when you're faced with an insurgency  02:40

16   that's not a uniformed state enemy.

17   Q    So this is to account for the difference, for example,

18   between what American forces might have seen in the Second

19   World War, where the enemy always wore a uniform, or for the

20   most part, wore uniforms.                                    02:41

21   A    That's correct, sir.  What we term as state-to-state

22   uniformed conflict.

23   Q    Okay.  So in this case, the training was geared to account

24   for the nebulous characteristics of the current conflict in

25   Iraq.                                                        02:41

1   A    Yes, sir.  I think it's helpful to explain.

2         We train to a continuum of force, where at the low

3   end of the continuum, there is nonviolent acts that soldiers

4   and marines can do to assert their will on an opponent, and at

5   the extreme end of the continuum of force is lethal force.  And          02:41

6   we train marines to understand where in that continuum of force

7   they need to reside to be decisive on the battlefield without

8   doing harm to civilians or infrastructure.

9         So in that continuum of force, you have to read and

10  understand the environment and use the tools and skills that              02:42

11  are available to you, because the warrior's creed is 'the least

12  loss of human life, both friendly civilian and enemy, is how a

13  warrior conducts himself on the battlefield.'

14  Q    Did General Mattis also ask you to design the training to

15  include reinforcement of the Marine Corps code of courage,                02:42

16  honor, and commitment?

17  A    Honor, courage, and commitment as our ethical baseline,

18  yes, sir.  His intent to me was very clear, and it's all

19  centered around honor, courage, and commitment.  He discussed

20  in detail how in an insurgency, in any conflict --                        02:42

21         **MR. APPLEGATE:**  Objection.  Hearsay.

22         **THE COURT:**  Sustained.

23         **MR. KOVATS:**  Your Honor, we're offering this to show

24  how this program of instruction was provided to defendant and

25  defendant's unit, and this information --                                 02:43

```
 1              THE COURT:  It's not being introduced for the truth,

 2    Counsel.

 3              MR. KOVATS:  Yes, Your Honor.

 4              THE COURT:  Lay a foundation.

 5    BY MR. KOVATS:                                                      02:43

 6    Q    When coming up with the program of instruction for the

 7    training that 31 was to go through at March Air Force Base, in

 8    addition to what you already described, what other information

 9    did you have at your disposal that affected the training

10    program?                                                           02:43

11    A    I had two pages of intent from General Mattis, as I

12    described, that told of his fighting ethos that I was to

13    execute, that I built my training package around.  And

14    furthermore, I had a set of 15 skills that General Mattis

15    tasked me with creating in the course, so every squad in the      02:44

16    battalions would be exposed to these 15 skills.

17              An example of these skills would start with

18    assaulting a house that is a fortified enemy position.  Another

19    example would be conducting vehicle check points, where we

20    would stop and search cars that hadn't demonstrated any hostile   02:44

21    act or the people hadn't demonstrated any hostile intent, but

22    we had suspicions; so we were operating across the entire

23    spectrum of violence, as I described.

24    Q    With this training at March Air Force Base, if you could,

25    sir, describe the composition and experience of your training     02:44
```

1    team.

2    A    I was the OIC.  Immediately under my station were officers

3    that I selected; most of them had served as platoon commanders

4    of my next subordinate down in my company that was experienced

5    in combat.  Each of those ran what we call a firm base, which         02:45

6    is a base simulated inside an Iraqi population center.  And

7    then underneath them, I had hand-selected sergeants, typically

8    sergeants, some staff sergeants, a little bit more senior,

9    hand-selected from the country of Australia, the Australian

10   Army; from the UK, British Royal Marines; and from across the       02:45

11   Marine Corps, east coast, west coast, and overseas.

12           The reason for this, our target in our training was

13   principally the squad level.  The squad is the unit that's

14   conducting the preponderance of the decisions and the hard

15   decisions in combat, especially in the urban environment in         02:45

16   Iraq; and we well understood, and still understand, and are

17   still operating this way in Iraq, that this is a moral battle.

18   This is a battle that the civil population looks at and says,

19   'They are right, they are good, they are honest, they are on

20   the side of good.'  That population will then support that side     02:46

21   and start giving information, start signing up for their own

22   army, start serving in their own police.

23           We saw that and understand that about insurgencies

24   through our studies.  And the way I was to inject that ethos

25   into the training was by insisting that I get the most talented     02:46

```
 1   sergeants, lieutenants, and captains, and insisting that they

 2   understand that this is a moral fight more than a physical

 3   fight.

 4   Q    So the primary audience for your training is the squad

 5   level.                                                              02:47

 6   A    Yes, sir.

 7   Q    It's squad leaders like Jose Nazario.

 8   A    Yes, sir.

 9   Q    You talked a little bit about the training guidance and

10   the ethos and the principles that General Mattis provided to       02:47

11   you.

12        How did you convey those to people like Jose Nazario

13   during this training?

14   A    Principally, it was through my instructors, because

15   there's no way for me to contact and have the discussion with      02:47

16   every marine in 21 battalions; that's 21,000 marines, roughly.

17   So I had my extension of the ethos through these sergeants and

18   captains.  And in all of our actions, all of our training and

19   simulations, the marines would be faced with lots of decisions.

20   And the core concept wasn't, did they execute a particular         02:47

21   skill right; it was, what was their decision-making process?

22   Because that's the difficult part of our profession.  And we

23   had checks and balances with these instructors that could watch

24   the decision-making process.

25        In particular, an example is something that we had            02:48
```

1  called 'shoot-don't shoot lane.'  We would apply paint

2  projectiles from our rifles, and we would put teams of marines

3  through houses or alleyways or facing demonstrating mobs,

4  things of that nature, and definitely machine gunners shooting

5  at them across the entire continuum of conflict.                    02:48

6          We would have the marines making decisions and

7  executing those decisions, and then we would assess their

8  execution.

9          The way we would do that was, we would inject our

10  evaluation into their chain of command; so their bosses from     02:48

11  levels above are doing the assessment.  Because that's how it

12  will be in combat.  There will be no hand-picked instructor to

13  conduct evaluation of their techniques, procedures, and

14  decisions.

15          So the overarching tone of our training was to expose   02:49

16  as many leaders in the battalion as possible to as many

17  difficult decisions as possible, because we viewed the

18  decision-making ability just like a muscle; the more you work

19  it out, the better it's going to be.

20  Q    You mentioned the 15 skills that General Mattis provided   02:49

21  you that he wanted practiced and trained to a proficient level.

22          How were these things taught?  Were there lectures?

23  Demonstrations?  If you could describe to the jury how this was

24  executed.

25  A    Yes, sir.  It's an age-old military training pedagogy.      02:49

1    It's the basics.  We first start with a lecture that

2    demonstrates the tenet of the period of instruction; It could

3    be on anything, we'd do the same thing.  Then we demonstrate

4    it, have a demonstration for that individual or group that is

5    proficient in the skill.  And then we put the marines in an                02:50

6    environment where they'll conduct practical application.  When

7    they're doing the practical application, we'll evaluate and

8    determine which marines or units need to remediate that skill

9    and start over.

10          Once we're assured that the unit has a percentage of          02:50

11   proficiency or competency in that skill, we'll pass on to the

12   next skill, in a building-block approach.  We call this

13   stacking tasks.  So, for instance, to stack tasks, you will not

14   learn how to assault a fortified enemy position until you've

15   already learned your weapon system, because you need the weapon        02:50

16   system to assault the position.  You will not learn how to

17   conduct a vehicle checkpoint without first learning how to

18   detain individuals safely.

19   Q    Did you teach how to detain people safely and properly?

20   A    Yes, sir.  It was one of the basics, because it's used in         02:51

21   so many skills and so many tasks stack on top of that.

22   Q    So, for example, of those 15 skills, a lot of them might

23   include the requirement to detain people.

24   A    Yes, sir.  For instance, a vehicle checkpoint, a personnel

25   checkpoint, a house search, an assault, a defense; because all        02:51

1    of them may involve civilians, unknown if they're enemy or not,

2    actual enemy, injured enemy.  So across the continuum of

3    violence, that's a skill that's necessary.

4    Q    So if there was a squad leader in 31 during all this

5    training, would they have first received a lecture on detainee        02:51

6    handling?

7    A    Yes, sir.

8    Q    Then what would have happened next?

9    A    Then they would receive a demonstration, with my sergeants

10   conducting a demonstration on certain techniques, different          02:51

11   techniques, for detaining individuals; and then there would be

12   a practical application, where they would practice the skill

13   right there on the scene until they essentially got it.  And

14   then throughout the rest of the training, that skill would pop

15   up in their face.  They may be expected to detain someone.           02:52

16   Because they've already demonstrated proficiency, we can now

17   insert that skill in all environments.

18   Q    And that skill may arise in the examples that you

19   previously provided?

20   A    Yes, sir.                                                        02:52

21   Q    Did this training also emphasize the idea of morality or

22   ethics in combat?

23   A    Yes, sir.  That was the overarching issue through this

24   training.  Just by virtue of the demanding set-up of the

25   training, we had lots of ethical decisions that needed to be         02:52

1   discussed, and even remediated, during the practice, so marines

2   understood the impact of some seemingly innocent actions and

3   how they can affect the greater battlefield environment.

4   Q    If you could describe what you mean by that.  You said

5   'demanding training.'  If you could describe how this was set                    02:53

6   up.  What made it demanding?

7   A    The marines were faced with very -- as complex situations

8   as we can make them.  They would be shouted at from a hidden

9   sniper one second and face an old lady bringing an injured baby

10  to them the next minute, and a car speeding at them.  We made                    02:53

11  it as complex as possible so they would be faced with -- we set

12  the standard that in order to win, we must achieve the moral

13  high ground; we must be the good guys.  And then we trained to

14  show the marines how to be the good guys.  And we showed them

15  -- it's very tough, especially for a bunch of aggressive                         02:53

16  marines, to show them you may be exposed to potential loss; you

17  may have to break cover and be exposed to enemy action; and

18  there's nothing you can do back in the short term.

19          And not doing anything back is often decisive,

20  attaining the moral high ground in an insurgency.  And that's                    02:54

21  very difficult.  So we had to do that through every action we

22  taught.  We tried to gauge the moral compass of the particular

23  unit, talk to their leaders if we felt there was a need for

24  adjustment.

25          And our final recourse -- if we were not comfortable                     02:54

1    before they went to combat with their moral understanding of

2    attaining the moral high ground, being right, and the rules of

3    combat, I would then call General Mattis and recommend the unit

4    be delayed before deploying.

5    Q    Was there a discussion about what makes a marine different      02:54

6    from the insurgents in Iraq?

7    A    Yes, sir, there was.  We caged it like this:  You're a

8    professional warrior, or you're just a brawler or a fighter on

9    the streets.  A professional warrior, by definition, follows a

10   code, as I indicated earlier.  That code is of human life and      02:55

11   the principality of human life.

12           The professional warrior will attain the moral high

13   ground and will be the good guy to the audience.  That's the

14   civilian population on the battlefield and the world stage.  A

15   professional warrior has to make very difficult decisions and      02:55

16   expose himself to danger.  But when he achieves that status and

17   that understanding of a professional, he has a monopoly on

18   violence on the battlefield.  And that monopoly on violence --

19   he has a decision when to apply it and when not, based on his

20   professional understanding of the situation.                        02:55

21           It's a very difficult thing to understand and just

22   talk to you about here, without showing you, in a very complex

23   environment, how a unit can achieve that, through its chain of

24   command, through its training, through its education, through

25   its understanding.  There are so many factors that influence       02:56

1  that.

2  Q    And how did you attempt to allow this unit to achieve that

3  during the training at March Air Force Base?

4  A    By exposing them to as many complexities of the

5  battlefield and giving them the shock absorbers.  Marines go

6  into combat with built-up shock absorbers, we call them.

7  They're physical.  That's physical fitness that allows you to

8  go without sleep and food and carry heavy weights and do the

9  physical things necessary in combat.  There are mental shock

10  absorbers; those are things like the team work, the brotherhood

11  of the warrior; those are things like our code, our morals, and

12  our honor, that everybody is seeing on the world stage.  Those

13  are shock absorbers that enable us to take losses, that enable

14  us to put up with the hardships, the stressors, that enable us

15  to stay focused on doing what's right and doing no harm and

16  still retain a monopoly on violence when needed.

17  Q    Were the marines going through this training put in a

18  position where they might be fatigued or stressed?

19  A    Yes, sir.

20  Q    So the decision-making was practiced under these

21  conditions?

22  A    Yes, sir.  We simulated the effects on the human body

23  through physical rigor.  That's the one thing we can simulate.

24  We can't fake actual losses in the unit in training.  It's

25  obvious.  We can't have the mourning and the sadness.  We can't

02:56

02:56

02:57

02:57

02:57

1   have the effects of the enemy doing damage to the civilian

2   population through bombs and explosives, all of that around

3   them.  But we can make it very physically demanding.  So at

4   least that shock absorber is built up realistically.

5   Q    You mentioned the training.  At some point did it become a      02:58

6   situation where the marines were, like, emotionally deployed to

7   Iraq or some other country?

8   A    That was the gist of the training, sir.  They were done

9   with their individual and collective unit skills.  They would

10  show up to us as a simulated deployment and come into March Air     02:58

11  Force Base, which is where many of them left from to go to

12  Iraq.  They would come across the highway to our training

13  facility, and they would move into simulated company or platoon

14  positions amongst an Iraqi population.

15          We had role players out there acting like an Iraqi          02:58

16  population.  We had real enemy operating like gangs and

17  insurgents.  We had a black market going.  We made it as

18  simulated as our budget, time, and professional capabilities

19  allowed us to.

20  Q    Now, for what period of time were the marines operating in      02:58

21  this simulated environment?

22  A    31, in particular, was a total of seven days.

23  Q    So during this time while they're interacting with the

24  civilian population in this scenario, was training conducted in

25  such a way that there would be cause and effect depending on        02:59

1    the actions of the marines?

2    A    Yes, sir.  If we felt the marines were losing the moral

3    high ground and they were not responding to our injects to the

4    chain of command of that unit -- we really didn't have to do

5    much to the role players.  The role players would get agitated          02:59

6    anyway and would fail to give up information about the enemy

7    hidden amongst their population or even do things against the

8    marine unit.

9    Q    So, for example, if the unit going through the training

10   did something wrong, unethical, immoral, that would then have          02:59

11   an effect down the line?

12   A    Yes, sir.  The environment would become increasingly more

13   hostile to them and more complex.  An example is, we had a

14   marine in training have an accident, what we called a negligent

15   discharge with his weapon, and it happened near a simulated           03:00

16   school house, which then scared the children, all simulated, of

17   course, in our environment, which then put the parents at fear

18   of risk for their children, their children's lives, in the

19   environment, and then the parents would not talk with marines

20   again for about a day and a half in the training environment.         03:00

21   And the unit had to work hard to gain the trust of those

22   parents again to get information about the enemy they were

23   seeking.  That's how complex the cause and effect can be.

24   Q    Why was it important to add the effect component to the

25   training?                                                              03:00

1  A     That's the best feedback a unit gets.

2  Q     Because that's realistic?

3  A     That's as realistic as possible.

4  Q     During the discussion about the training and how it was

5  going to be set up, was there any discussion amongst you and        03:01

6  your staff or General Mattis about the prisoner abuses at

7  Abu Ghraib?

8          **MR. APPLEGATE:**  Objection.  That's irrelevant and

9  also hearsay.

10         **THE COURT:**  It's a yes or no question.                  03:01

11         You may answer it.

12         **THE WITNESS:**  There was, sir; nothing central to our

13  training, though.

14         **THE COURT:**  It was just a yes or no question.

15         You answered yes?                                           03:01

16         **THE WITNESS:**  Yes, sir.

17  **BY MR. KOVATS:**

18  Q    When the training was provided to the marines, was this

19  idea of cause and effect described to them?

20  A    Yes.                                                          03:01

21  Q    Was it also shown to them, by the subsequent consequences,

22  actions that were, perhaps, not moral or ethical?

23  A    Yes, sir.  Throughout what we call the box, the square

24  training area, if there was an incident where, say, a marine

25  harmed a civilian or damaged their property, we would cause the    03:02

1    battalion to conduct a simulated legal investigation like they

2    might in Iraq; that was another tool we used to show the cause

3    and effect.

4            It's very complex to execute.  It's very simple to

5    describe:  You do something good, good things happen.  You          03:02

6    obtain the moral high ground, the enemy has no place to hide.

7    You do something bad, bad things happen and the environment

8    starts to deteriorate on you.

9    Q    Do you recognize Sergeant Nazario?

10   A    I didn't until today, sir.                                     03:03

11   Q    Do you know him?

12   A    I do, sir.  I served as his commander in 1st Battalion,

13   6th Marines, in '97, I believe it was.

14   Q    When he was a subordinate to your command, did he receive

15   training on detainee handling?                                      03:03

16   A    I'm certain that we covered it in our basic skills

17   training, sir.

18   Q    How about the principles of the law of war?

19   A    Yes, sir.  It's an annual requirement.

20           **MR. KOVATS:**  Nothing further.                          03:03

21           **THE COURT:**  Cross-examination.

22           **MR. APPLEGATE:**  Thank you, Your Honor.

23                       **CROSS-EXAMINATION**

24   BY MR. APPLEGATE:

25   Q    Major, you know Sergeant Nazario because you also recall,      03:03

1    do you not, that he was selected as a sniper while he was under

2    your command?

3    A    Yes, sir.

4    Q    And selection as a marine sniper from an infantry unit is

5    a very elite assignment; correct?                                        03:04

6    A    Yes, sir.

7    Q    He would be one of your better marines to be selected as a

8    scout sniper?

9    A    No, sir, not necessarily.

10   Q    Speaking with Sergeant Nazario, when a marine is selected          03:04

11   as a sniper, he's a superior marksman.

12   A    Yes, sir.

13   Q    He has superior discipline because of the nature of what

14   snipers have to do; correct?  Field discipline major?

15   A    Yes, sir.  In general, yes, sir.                                   03:04

16   Q    They have to sit in concealed positions for long periods

17   of time without moving; correct?

18   A    Yes, sir.

19   Q    You can't get up and go to the head -- excuse me, that

20   means go to the restroom -- correct?                                    03:04

21   A    Yes, sir.

22   Q    Under all sorts of environmental conditions; correct?

23   A    Yes, sir.

24   Q    You spoke a lot about -- let me change focus a little

25   bit -- you spoke a lot about General Mattis, and I see that you         03:05

```
 1   served in Operation Iraqi Freedom One, from January 2003 until

 2   your redeployment back to CONUS, continental United States, in

 3   November of 2004; correct?

 4   A    I'd like to correct that, sir.  That was November of 2003.

 5   Q    November of 2003?                                          03:05

 6   A    Yes, sir.

 7   Q    Now, the Marine Corps redeployed after the war phase of

 8   Operation Iraqi Freedom; correct?

 9   A    Yes, sir.

10   Q    During that period of the war, we had an organized army    03:05

11   that was our adversaries; correct?

12   A    And an insurgency, sir.

13   Q    I was going to get to that.

14   A    Yes, sir.

15   Q    Actually, with respect to the insurgencies, you had some   03:05

16   Mujahadeem fighters during the course of the march up to

17   Baghdad; correct?

18   A    Yes, sir.

19   Q    So we had the Iraqi Army that were our adversaries; check?

20   A    Sir.                                                       03:06

21   Q    And then we had the Mujahadeem, who came from all over the

22   Muslim world?

23   A    Yes, sir.

24   Q    In addition to the Iraqis, who were also Mujahadeem.

25        For all of us, could you just describe what               03:06
```

1  Mujahadeem were doing during the war phase of Operation Iraqi

2  Freedom.

3  A    Mujahadeem, or holy warrior, were ostensibly coming into

4  the country or existed in Iraq and were conducting

5  gorilla-style attacks on coalition units.                03:06

6  Q    Sometimes, though, the Mujahadeem would actually bear

7  specific markings; correct?

8  A    Sometimes, sir.

9  Q    Not all of the time?

10 A    No, sir.                                              03:06

11 Q    Now, when they bore specific markings, they were

12 designated combatants; correct?

13 A    Yes, sir.

14 Q    So when you had a designated combatant bearing markings,

15 the Mujahadeem and the Iraqi Army, they're combatants; and   03:07

16 during those type of operations, you do not need anything more

17 than a positive identification that they are enemy to kill

18 them; correct?

19 A    Correct.

20 Q    When we're dealing with insurgents -- and you spent a lot   03:07

21 of time describing this, and I appreciate that, but just for

22 the benefit of the jury, we're dealing with irregular forces

23 that are not designated by any particular marking or uniform;

24 check?

25 A    Sir.                                                  03:07

1   Q     That would mean that if particular units wore a red

2   bandana, that could be a uniform; correct?

3   A     It could be, sir.

4   Q     If it was designated by our command authority,

5   United States.                                                    03:07

6   A     That's it, sir.

7   Q     Or I should say, more correctly, in the multi-national

8   force Iraq command during Operation Iraqi Freedom; right?

9   A     Yes, sir.

10  Q     And once again, you would be able to engage those        03:08

11  individuals that are designated combatants upon positive

12  identification and kill them; right?

13  A     Yes, sir.

14  Q     Now, when you get over into the insurgency area, even if

15  you're still engaged in an active combat environment war, you   03:08

16  have to make other determinations before you can engage

17  insurgent forces; correct?

18  A     Yes.

19  Q     That's when we really get into the area of rules of

20  engagement; right?                                              03:08

21  A     Yes, sir.

22  Q     And that, in part, is both a legal determination as well

23  as directives and orders down our chain of command; right?

24  A     I'm not sure what level of command authority can make

25  those changes, sir.  I know I've never worked at that level.  I  03:08

1    receive them.

2    Q    You receive the rules of engagement from higher

3    headquarters?

4    A    Yes, sir.

5    Q    And given the fact that you've worked in experimental          03:08

6    training commands and been a rifle company commander, you

7    generally would receive your orders from your battalion

8    commander; right?

9    A    Yes, sir.

10   Q    And we've done a little bit of that organizational            03:09

11   education on the part of the jury, which is second nature to

12   any marine, the organization of the Marine Corps; right?

13   A    Yes, sir.

14   Q    So there is a difference in engaging designated combatants

15   in a war environment and enemy insurgents.                          03:09

16   A    There is.

17   Q    You have to go through a different checklist before you

18   can apply deadly force.

19   A    Yes, sir.

20   Q    Now, in getting back -- because I understand -- and you've     03:09

21   done a very good job of explaining what the Marine Corps was

22   doing in training units before they deployed overseas, but you

23   would agree with me that the first role of marine infantry is

24   'to close with and destroy the enemy by fire and maneuver';

25   right?                                                              03:10

```
 1  A     That's in our mission statement.

 2  Q     That's our mission statement.

 3        And we accept different missions as marines and as

 4  marine units, though, and that's what we're facing in Iraq.

 5  Since we walked into Baghdad, there was no longer any active    03:10

 6  government in Iraq; right?

 7  A     Yes, sir.

 8  Q     And they've involved engaging a wide variety of

 9  adversaries; wouldn't you agree with me on that?

10  A     Yes, sir.                                                 03:10

11  Q     There's Al Qaida Iraq; check?

12  A     Yes, sir.

13  Q     We've engaged countless militias in Iraq; right?

14  A     Yes, sir.

15  Q     Sometimes those militias have actually worn what we would 03:10

16  consider a uniform; right?

17  A     Correct, sir.

18  Q     At different periods of operations, where those

19  individuals as militias were declared combatants in different

20  AOs, different areas of operation, in Iraq since 2003, when the 03:10

21  war was supposed to have ended; right?

22  A     I don't know, sir.

23  Q     You haven't been engaged in any of the operations against

24  any of the militias?

25  A     I have, sir.  I have seen militias wear uniforms.  I have  03:11
```

1  not seen the legal process move fast enough to identify them as

2  uniformed enemy.

3  Q     So you still had to use ROE, rules of engagement, in order

4  to engage those units.

5  A     Yes, sir.                                                    03:11

6  Q     And to simplify it, the rules of engagement generally have

7  been, since we rolled in to Baghdad and there was no longer any

8  active Iraqi Army -- we disbanded the Iraqi Army; correct?

9  A     Yes, sir.

10  Q     We had to first, before we would -- we would have to go     03:11

11  through a rule of engagement process, where first we had to

12  positively identify something as a military target; check?

13  A     Those are for the Iraqi Army, sir.  After the Iraqi Army,

14  as a military target, in toto went away, we had to establish

15  two things:  A hostile act or a hostile intent.                  03:12

16  Q     But in a general sense -- and I would agree with you,

17  there was no military targets, but we also -- they had to be a

18  legitimate military target.  In other words, we would have a

19  positive ID that there was a threat, and then we had to

20  determine whether or not there was a hostile intent or a         03:12

21  hostile act; correct?

22  A     There's nothing about military target if someone is

23  attacking you from a taxi cab.

24  Q     That's correct.

25  A     We use hostile act and hostile intent to determine an      03:12

1    orientation of a potential target.

2    Q    Because the insurgents wear no uniform.

3    A    Largely, yes, sir, they do not.

4    Q    So we're right away down to hostile act/hostile intent to

5    determine whether or not we can employ deadly force in Iraq          03:12

6    against anything or anybody.

7    A    Yes, sir.

8    Q    Let me go back to General Mattis.

9         Now, what you were talking about, the time period

10   that you were describing when you were getting your commander's      03:13

11   intent and the training from General Mattis, you were talking

12   about the 1st Marine Division had gone to Iraq under the

13   command of 1st Marine Expeditionary Force when you were in Iraq

14   and serving as an infantry officer, a rifle company commander,

15   fought the war and we had returned to continental United            03:13

16   States, Camp Pendleton, largely; right?

17   A    Yes, sir.

18   Q    Then, 1st Marine Division and 1st Marine Expeditionary

19   Force, we received orders that we were going to be redeploying

20   back to Iraq; right?                                                 03:13

21   A    Yes, sir.

22   Q    Now, do you recall that one of the -- along with the

23   intent of 1st Marine Division redeploying back to Iraq, then,

24   was -- well, let me back up.

25        Were you fortunate enough to be in some of the areas            03:13

| | |
|---|---|
| 1 | during the war where marines took off their Kevlar helmets and |
| 2 | were operating patrols in soft covers in any of the AOs in |
| 3 | Iraq? |
| 4 | A    For a time, sir, yes. |
| 5 | Q    For a short period of time? |
| 6 | A    Very short, sir. |
| 7 | Q    For a very short period of time? |
| 8 | A    Yes. |
| 9 | Q    And are you aware, just being a marine in Southern |
| 10 | California when 1st Marine Division was getting ready to |
| 11 | redeploy back into Iraq, that it was commanding general's |
| 12 | intent of 1st Marine Division, General Mattis, that the marines |
| 13 | were going to pack two sets of utilities when we were going to |
| 14 | redeploy; one set of desert digital camis, which we would wear |
| 15 | in combat in southwest Asia; right? |
| 16 | A    Yes. |
| 17 | Q    And we were also going to pack our green digitals that we |
| 18 | wear in other areas of operation throughout the world; is that |
| 19 | right? |
| 20 | A    Yes, sir. |
| 21 | Q    So every marine was packing two sets of camis when the |
| 22 | 1st Marine Division redeployed back to Iraq. |
| 23 |        Nobody ever got to wear those green camis once the |
| 24 | 1st Marine Division redeployed back into Iraq; right? |
| 25 | A    I don't know, sir. |

03:14
03:14
03:14
03:14
03:15

Thursday, August 21, 2008                    Trial Day 2, Morning Session

1    Q    Because you weren't with them then; you were in the

2    training command.

3    A    Yes, sir.

4    Q    But you were aware that the general wanted to show that we

5    were no longer combatants and we were going to switch uniforms          03:15

6    once we went back and the environment permitted us not to be

7    actively conducting combat operations, but rather, supporting

8    the new Iraqi government; right?

9    A    My understanding of the green was to distinguish ourselves

10   as a new unit coming in, not related to the continuum of                03:15

11   violence.  It was to show, Hey, there was a small erosion of

12   the moral high ground here.  But the Marine Corps had a strong

13   reputation of doing the right thing in southern Iraq, where we

14   did face an insurgency.  And we did degrade the insurgency so

15   we could wear soft covers on the streets.                               03:16

16   Q    For a short period of time.

17   A    For a short period of time.

18   Q    Then we were back in --

19   A    And then we were moved to a new area.

20   Q     Now, getting back to hostile intent and hostile act, did         03:16

21   you do any training at March Air Force Base with respect to --

22   I'm offering this up by way of an example as to the environment

23   that the marines would have to operate when they returned to

24   Iraq -- did you do any training in, let's say, IED placement

25   teams?                                                                  03:16

1   A    Yes, sir.

2   Q   So the marines would be instructed that generally ETP was

3   that the enemy would have three different groups for IED

4   placement; right?

5   A   Whatever trends we were pulling real time from Iraq, we   03:17

6   would simulate.

7   Q   But one of those trends was, they would have one set that

8   would go in at night and do the digging to emplace the

9   explosives; right?

10   A    Yes, sir.   03:17

11   Q   There would be another team that would go in and place the

12   explosives, and maybe they would do the detonation wiring,

13   maybe they wouldn't, depending on how it was going to be

14   charged -- let me back up.

15        The second team would go in and do the emplacement of   03:17

16   the improvised explosives in the hole that was dug by the first

17   team; right?

18   A    Yes, sir.

19   Q   And then there would be a third team, that we might

20   generally refer to as the trigger team, or some other   03:17

21   designation.

22   A    Yes, sir.

23   Q   And that third team would be the insurgents in an

24   overwatch position that would determine --

25        **MR. KOVATS:**  Objection, Your Honor.  Relevance.   03:17

```
 1            THE COURT:  Let's wrap this up, Counsel.
 2            MR. APPLEGATE:  I can.
 3            THE COURT:  You may answer.
 4            THE WITNESS:  Yes, sir.
 5   BY MR. APPLEGATE:
 6   Q    And the third team would command-detonate the IED?
 7   A    Yes, sir.
 8   Q    All three of those teams would be demonstrating hostile
 9   intent by emplacing an IED; correct?
10   A    To who, sir?
11   Q    Any unit rolling down that road.
12   A    No, sir.
13   Q    I had a feeling you might say that in that command.
14            THE COURT:  Counsel, questions.
15   BY MR. APPLEGATE:
16   Q    The question is, who would not be showing any hostile
17   intent of that IED team, those three groups?
18   A    If a marine were to observe someone digging on the side of
19   the road, that marine would have to conduct further
20   investigation to determine hostile intent.  If the marine could
21   determine that was, indeed, a hole for a charge, he now has
22   hostile intent.  If he was wrong, and that individual was
23   digging a body -- to reinter from the side of the road, that
24   marine has just degraded the moral high ground by executing
25   hostile action.
```

03:18
03:18
03:18
03:19
03:19

1    Q    With respect to -- setting aside the moral high ground --

2    I understand that was the intent of your command -- if the

3    marine could confirm that the purpose of that hole was an IED,

4    that was hostile intent.

5    A    Yes, sir.                                                03:20

6    Q    That would justify the use of deadly force.

7    A    Yes, sir.

8    Q    Let's talk briefly about -- before we leave that, that

9    individual that was digging the hole that you confirmed, or

10   that marine confirmed, was, in fact, an IED hole, without going    03:20

11   into all of the small details that we could discuss here, that

12   individual that was digging that hole didn't need to have a

13   weapon; check?

14   A    A shovel is a weapon, sir.

15   Q    Didn't need to have an AK-47.                            03:20

16   A    No, sir.

17   Q    Didn't need to have fragmentation grenades on his person.

18   A    No, sir.

19   Q    Didn't need to have any explosive device on his

20   possession.                                                  03:20

21   A    No, sir.

22   Q    Now, specifically with respect to detainees -- and just so

23   we're clear on this, we talk sometimes in terms of the old term

24   "prisoner of war"; sometimes the term "EPW," enemy prisoner of

25   war; other times we talk in terms of detainees -- and when I   03:21

1    say "we," I'm talking about all of us, civilians, as well as

2    people in the military -- it really makes no difference, as far

3    as actually conducting operations, what you call them; they're

4    someone who has given up the fight; right?

5    A    Yes, sir.                                                    03:21

6    Q    Whether or not they become an enemy prisoner of war or a

7    detainee, that's a determination that's actually made further

8    up the chain of command.

9           Would you agree with me on that, Major?

10   A    No, sir.  We do detain individuals that may never have      03:22

11   even been in the fight.  Because it's more criminal in nature

12   with a hidden insurgency.  Like the guy paying for the

13   individual to dig a hole on the side of the road.  So to say

14   he's given up the fight is not exactly correct.

15   Q    So even though you're a detainee, you may not have          03:22

16   actually given up the fight; that's what you're telling me;

17   correct?

18   A    At the individual level, he's not a detainee until he's

19   secured and cannot fight the marine.  He's still potentially a

20   threat until he's secured, as our training teaches us.  But      03:22

21   mentally, he may be an insurgent.  He may have a bank account

22   still financing an IED sale.

23   Q    Or he may have surrendered, and in his mind, with a holy

24   warrior, or a Mujahadeem, may still have an intent to commit a

25   hostile act if given an opportunity, even though he's            03:23

```
 1   surrendered; correct?

 2   A    That's possible, sir.

 3   Q    And if he has that opportunity -- let me set the stage a

 4   little bit more.

 5        In the middle of a fire fight, where marines are         03:23

 6   engaged in firing their weapons, full range of weapons, worried

 7   about indirect fire, mortars or rockets, there's something that

 8   we commonly refer to in the military, in the Marine Corps, as

 9   the 'fog of war'; correct?

10   A    Yes, sir.                                                 03:23

11   Q    Time gets condensed?

12   A    Yes, sir.

13   Q    You're not sure if you're able to process all of the

14   information that may be available to you in that condensed

15   time; right?                                                  03:24

16   A    Yes, sir.

17   Q    Even though you've been trained -- as you described, it's

18   a muscle reflex -- you can get distracted and not do certain

19   things that your training dictates you should do; correct?

20   A    Yes, sir.                                                03:24

21   Q    All of those things could give someone who surrendered an

22   opportunity to act on the hostile intent that he had when he

23   surrendered, to continue the fight.

24        Would you agree with me on that?

25   A    Yes, sir.                                                03:24
```

1   Q    So the real question is, at the time a United States

2   marine makes the decision to use deadly force, to fire his

3   weapon, is at that instant, that fraction of a second, whether

4   or not he has perceived hostile intent from his target.

5          Would you agree with me on that?                         03:25

6   A    That's exactly what we teach, sir.

7   Q    It's not an easy decision to make when you're in the

8   middle of combat; right?

9   A    Correct, sir; that's why all of the practice.

10  Q    And just to clear up one other thing, because you raised a   03:25

11  very good point, COIN operations, counter-insurgency

12  operations, C-O-I-N, those are some of the most difficult

13  operations that any military ever undertakes; correct?

14  A    I don't know, sir.  It's difficult.

15  Q    It's difficult.                                            03:25

16         **THE COURT:**  Counsel, do you have that much longer?

17  We're at the noon hour.

18         **MR. APPLEGATE:**  I'd prefer to break now and finish

19  the witness after lunch.

20         **THE COURT:**  Ladies and gentlemen, we're going to take   03:26

21  our lunch break from now until 1:30.  I'm going to ask that

22  you're back, ready to go, in advance of 1:30.

23         Please keep in mind the admonition not to discuss

24  this case, not even amongst yourselves.  I have received a

25  report that there may be some news cameras outside the         03:26

```
 1   courthouse.  You are not to interact with anyone from the press

 2   or anybody else.  Simply go about your business, have lunch,

 3   and then return here and be ready to go at 1:30.

 4           Thank you.

 5           (Whereupon, jurors depart courtroom.)                  03:26

 6       THE COURT:  Counsel, just a couple of brief things.

 7           I did provide a copy of the Court's order on the

 8   Motion in Limine.  As I indicated, I literally was printing it

 9   off minutes before I copied it.  I've detected a few errors

10   that I want to make, not in substance, but just grammatical and  03:27

11   typographical.  So I'd ask that you not distribute that beyond

12   yourselves.  It certainly reflects the Court's ruling.  I'll be

13   filing a public copy later this afternoon.

14           Second thing, Mr. Appleton, just be careful not to

15   insert yourself into your questions.                           03:27

16       MR. APPLETON:  I apologize, Your Honor.

17       THE COURT:  Very well.

18           Anything further at this time?

19       MR. BEHNKE:  Does the Court have an idea how late it

20   wants to go today?                                             03:27

21       THE COURT:  4:30 today.

22           Counsel, be back at 1:15, in case there are any

23   issues we need to take up.

24           (Whereupon, morning session was concluded.)

25   / / /
```

1

2                              CERTIFICATE

3

4    I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
5    the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
6    conformance with the regulations of the judicial conference of
     the United States.

7

8    _____        _____
     THERESA A. LANZA, CSR, RPR                          Date
9    Federal Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25