```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                        EASTERN DIVISION

 4                            - - -

 5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                            - - -

 7
    UNITED STATES OF AMERICA,         )
 8                                    )
                         Plaintiff,   )
 9                                    )
              vs.                     )  No. ED CR 07-00127-SGL
10                                    )
    JOSE LUIS NAZARIO, JR.,           )
11                                    )
                         Defendant.   )  Trial Day Four,
12   _____)  Morning Session

13

14           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

15                     Riverside, California

16                   Tuesday, August 26, 2008

17                          9:02 a.m.

18

19

20

21

22

23              THERESA A. LANZA, CSR, RPR
                Federal Official Court Reporter
24               3470 12th Street, RM. 134
                Riverside, California  92501
25                    (951) 274-0844
                   WWW.THERESALANZA.COM
```

```
 1   APPEARANCES:

 2   On behalf of Plaintiff, United States of America:

 3                       United States Attorney's Office
                         By: Jerry Behnke
 4                           Charles J. Kovats
                         Assistant United States Attorneys
 5                       3880 Lemon Street,
                         Suite 210
 6                       Riverside, California 92501
                         (951) 276-6210

 7

 8   on behalf of Defendant Jose Luis Nazario, Jr.:

 9                       Law Offices of Kevin Barry McDermott
                         By:  Kevin Barry McDermott
10                       17452 Irvine Boulevard,
                         Suite 200
11                       Tustin, California 92780
                         (714) 731-5297

12
                         Douglas L. Applegate
13                       18301 Von Karmon
                         suite 210
14                       Irvine, California 92612
                         (888) 583-2266

15
                         Pepper Hamilton LLP
16                       By:  Joseph M. Preis
                         Suite 1200
17                       4 Park Plaza
                         Irvine, California 92614-5955
18                       (949) 567-3500

19                       Law Offices of Vincent J. LaBarbera, Jr.
                         By:  Vincent J. LaBarbera, Jr.
20                       600 West Santa Ana Boulevard,
                         Suite 950
21                       Santa Ana, California 92701
                         (714) 541-9668

22

23   Also present:       Mark Fox, Special Agent

24

25
```

```
 1                         I N D E X

 2                                              Page

 3    Plaintiff Case (cont'd)...........................  10

 4

 5

 6    PLAINTIFF
      WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
 7    CWO PAUL PRITCHARD (cont'd)

 8    By Mr. Kovats       10                    28
      By Mr. McDermott              22
 9

10    PLAINTIFF
      WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
11    CORY CARLISLE

12    By Mr. Behnke       32

13

14

15          EXHIBITS              RECEIVED

16              14                   13
                16                   14
17              18                   79
                27                   83
18              24                   84
                38                   85
19

20

21

22

23

24

25
```

1    Riverside, California; Tuesday, August 26, 2008; 9:02 A.M.

2                              -oOo-

3         **THE CLERK:**  Calling the case of plaintiff, United

4    States of America, versus defendant, Jose Luis Nazario, Jr.,

5    case number ED CR 07-00127-SGL.                                    00:12

6         May we have counsel please come forward and state

7    your appearances for the record.

8         **MR. BEHNKE:**  Jerry Behnke, Charles Kovats for the

9    United States.  Also will be present this morning is

10   Special Agent Fox.                                                 00:12

11        **THE COURT:**  Good morning.

12        **MR. McDERMOTT:**  Kevin McDermott on behalf of

13   defendant Jose Luis Nazario, Jr., along with Douglas Applegate,

14   Joseph Preis, Vincent LaBarbera and Emery Ledger.

15        **THE COURT:**  Good morning to you all.                      00:12

16        I understand from the courtroom deputy there's a

17   matter you wanted to take up outside of the presence of the

18   jury?

19        **MR. BEHNKE:**  Yes, your Honor.  There's one matter

20   related to witness Cory Carlisle who the government does expect    00:12

21   will be called later today.

22        The witness, in his pretrial interviews with NCIS, as

23   well as before the grand jury, Cory Carlisle testified that

24   while he was in the house at the time that the shootings

25   occurred, he was in a room conducting a search, he heard a        00:13

1 gunshot.  After hearing the gunshot, he went to where he heard

2 the gunshot, which was actually coming from the kitchen of the

3 house.  He looked in the kitchen and saw Ryan Weemer standing

4 in the kitchen over one of the detainees who was laying on the

5 floor, and Weemer had his .9 millimeter pistol pointed down      00:13

6 towards the detainee.  When he looked in and saw that, he said

7 that Ryan Weemer looked up at him and said something to the

8 effect of "he went for my gun."

9        The government is moving to exclude that hearsay

10 statement from Ryan Weemer as unreliable, regardless of what     00:13

11 possible exception or theory of relevance the defense may have

12 for it.

13        **THE COURT:**  You plan on calling this witness but you

14 want to exclude that particular statement.

15        **MR. BEHNKE:**  Yes, your Honor.  The government is not   00:14

16 going to elicit it.  The government does, however, anticipate

17 that the defense may on cross-examination ask "isn't it true

18 Ryan Weemer said the following?"

19        **THE COURT:**  And your objection to that is hearsay.

20        **MR. BEHNKE:**  Yes, your Honor.                         00:14

21        **THE COURT:**  I'll hear from the defense.

22        **MR. McDERMOTT:**  Yes, sir.

23        Also I believe there were some statements as to the

24 fact that it was unreliable.  But count one of the --

25        **THE COURT:**  My guess is that went to the hearsay      00:14

1    exception.  It's still basically a hearsay objection.

2              **MR. McDERMOTT:**  Right.

3              Sir, what we'd like to do is direct your attention to

4    count one where it's alleged that my client willfully caused

5    others to kill human beings on that date, for a total of four.          00:14

6    Best case testimonial scenario from the government is that my

7    client shot two; maybe Weemer and Nelson shot maybe one each.

8    His excited utterance at the time of the event is occurring

9    would indicate his state or frame of mind that, in fact, could

10   have been adopted or accepted by Defendant Nazario under the            00:15

11   particular circumstance.

12             This is a statement that occurred absolutely

13   contemporaneous to the event in which my client is accused of

14   willfully causing, and Mr. Weemer's state of mind would, in

15   fact, be admissible as, number one, an excited utterance, and           00:15

16   number two, as we've been honing in on throughout the entire

17   cross-examination of government witnesses so far is the fact

18   that hostile act/hostile intent may, in fact, be an obligation

19   to the government to prove that it didn't occur.

20             In light of the law of war instruction that they have         00:16

21   provided to The Court as far as their suggested or requested

22   instructions, whether or not hostile act/hostile intent

23   occurred in that room is certainly relevant to the underlying

24   issue.  For that, we believe it's not hearsay but certainly

25   something that should be allowed under the hearsay exceptions.          00:16

1     **THE COURT:**  Well, I can understand your argument on

2     excited utterance, state of mind, but it certainly cannot be

3     admitted for the truth of the matter asserted that, in fact,

4     the detainee went for his gun.

5          **MR. McDERMOTT:**  That's correct.                          00:16

6          **THE COURT:**  And the jury would have to be instructed

7     that it is not being offered for the truth of the matter and it

8     is not evidence for the truth of the matter, but it is evidence

9     of Sergeant Weemer's state of mind at the time he made the

10    excited utterance.                                              00:16

11         That is your argument; correct?

12         **MR. McDERMOTT:**  Yes.

13         **THE COURT:**  Mr. Behnke, your response to that?

14         **MR. BEHNKE:**  Yes, your Honor.

15         That is the basis of the government's objection.          00:17

16         The government does agree that if there's evidence

17    that the Marines in the house were acting in self-defense at

18    the time that they shot these individuals, that certainly is

19    relevant.  However, in order for Weemer's statement to be

20    relevant, it is only relevant if it is indeed offered to prove  00:17

21    the truth of the matter, which is that the detainee went for

22    his gun; therefore, the assumption would be he was acting in

23    self defense.  If it's not admitted for that purpose, his state

24    of mind is not relevant.  The statement is only relevant to

25    this case if it is, in fact, true, and it is on that basis that  00:17

1    the government is objecting.

2          Certainly, it would be a different story if

3    Ryan Weemer came in and said "I shot him because he went for my

4    gun."

5          **THE COURT:**  Or if Ryan Weemer was on trial.          00:17

6          **MR. BEHNKE:**  Correct.

7          **THE COURT:**  Then his state of mind would be relevant.

8          **MR. BEHNKE:**  Yes, your Honor.  Absolutely.

9          **THE COURT:**  Counsel makes a good point.

10         You're trying to essentially impute Ryan Weemer's          00:18

11   state of mind onto Sergeant Nazario.  I think that may be

12   improper.

13         **MR. McDERMOTT:**  But when you take a look at the

14   totality of the circumstances under which everything occurred,

15   particularly working as a fire team, the obligation to keep          00:18

16   each other alive, the responsibility of being on the lookout

17   for all of them, having someone in the room basically say

18   "watch out; look at this," that sort of thing goes to the

19   collective intent.

20         **THE COURT:**  But that gets wrapped up in this          00:18

21   reliability issue.  Then you're asking the Court to use the

22   residual exception to hearsay.  And that's where I have to look

23   at reliability and that's where I --

24         **MR. McDERMOTT:**  Reliability doesn't necessarily go to

25   admissibility.  It should only go to the weight of the matter.          00:18

1    And as such, that should be left --

2         **THE COURT:**  Not on the residual hearsay exception,

3    Counsel.  There, the Court does need to consider reliability

4    before allowing it in, because it is hearsay on that.

5         I mean, Mr. Behnke is right, certainly Ryan Weemer          00:19

6    can get up and testify as to what happened.  But it really

7    sounds like you're trying to introduce this for -- for this to

8    be relevant to the defendant in this case, it would have to be

9    admitted for the truth of the matter asserted.

10        **MR. McDERMOTT:**  And again, if my client was only         00:19

11   facing the allegation that he was involved in the killing of

12   two human beings as opposed to four, that would have more legs

13   under the circumstances.  But when the government moved forward

14   to charge him with the deaths of all four individuals, the

15   collective occurrences and comments, frame of mind and          00:19

16   statements of the individuals inside that room would go to the

17   relevance of the collective intent of the fire team.

18        **THE COURT:**  Is the collective intent relevant or the

19   individual intent of Sergeant Nazario?

20        **MR. McDERMOTT:**  Well, it goes to, again, whether or      00:20

21   not the government can make its burden as to whether or not

22   there existed an absolute lack of hostile act/hostile intent in

23   that room.

24        **THE COURT:**  Well, this is not the next witness.  It

25   gives me an opportunity to think about it.  I appreciate both    00:20

1    your arguments.  I'll let you know my decision in advance of

2    Mr. Carlisle's testimony.

3           Anything else we need to take up in advance of the

4    jury coming out?

5           For the government?                                              00:20

6           **MR. BEHNKE:**  No, Your Honor.

7           **MR. McDERMOTT:**  Nothing your Honor.

8           **THE COURT:**  Very well.

9           Court is in recess until 9:30.

10          **THE CLERK:**  Court stands in recess.                           00:20

11          (Whereupon a brief recess was held.)

12          (Whereupon, jurors enter courtroom.)

13          **THE CLERK:**  Sir, would you please state your name for

14   the record.

15          **THE WITNESS:**  Chief Warrant Officer Paul Pritchard.          00:55

16          **THE CLERK:**  Please spell the last name.

17          **THE WITNESS:**  Pritchard, P-R-I-T-C-H-A-R-D.

18          **THE CLERK:**  Thank you, sir.

19          Having been previously sworn in this matter, I remind

20   you that you are still under oath, and I thank you.                     00:55

21          **THE COURT:**  Counsel, you may proceed.

22          **MR. KOVATS:**  Thank you, Your Honor.

23                      **DIRECT EXAMINATION** (cont'd)

24   **BY MR. KOVATS:**

25   Q    When we last broke, you had begun to describe for the jury        00:56

1   the process of detainee handling in 31.

2          If you could, describe for the jury what happened

3   when your marines received detainees from the marines in the

4   field.

5   A    Okay.                                                    00:56

6          We would -- the marines would bring the detainees in,

7   and we would line them up, and my marines, the guard marines,

8   would start searching them, making sure they didn't have any

9   weapons or anything on them, any contraband.  At the same time,

10  I had a marine that would start the processing by utilizing an   00:56

11  interpreter to ask all of the information; name, where they're

12  from, age, tribe, everything that goes on the processing forms.

13         Simultaneously, we would call for the medical

14  officer, the battalion medical officer, or one of his docs to

15  come down and do their processing portion that would go with    00:57

16  our paperwork once we forwarded them to higher, if that was the

17  case.

18         This would all take approximately -- it could be

19  longer, depending on how long the marines took writing

20  statements.  But we would also start that process as well.  The   00:57

21  marines would sit down with me at a table, or one of my

22  noncommissioned officers, and go over the events of the day

23  which caused them to detain these individuals.

24         They would then put those in sworn witness statements

25  that we would take, and then at the same time -- there's many    00:57

1    moving parts -- at the same time, we would let our human

2    exploitation team know that we had these individuals in our

3    custody.  They would come down, and once we were done with that

4    processing portion, the paperwork and the medical examination,

5    then they would go into a room and start questioning them.    00:58

6    Q    What was the importance of the medical exam?

7    A    We just had to document everything.  It's pretty much just

8    like here in the states.  We had to document any cuts, scrapes,

9    bruises, injuries that happened in combat, if that was the

10   case, so that we could keep this documentation with them      00:58

11   wherever they went into the process of being detained.  Just

12   also to -- you know, we didn't want to end up like the Abu

13   Ghraib thing that happened with the Army; that was one of the

14   reasons, part of it.  It was also just procedures.

15   Q    So to establish a sort of a baseline of what the condition  00:58

16   of the detainee was when you received them.

17   A    Absolutely, yes.

18   Q    When you received these detainees, would they generally be

19   zip-tied?

20   A    Yes, they would.  They would come in zip-tied.  We would   00:59

21   like them to come to the front; but we understand, too, being

22   out with the marines on the ground, that it's safer for the

23   marines to zip-tie the detainees' hands behind their back.

24   Zip-ties are pretty much the same thing as handcuffs.

25            But once we received them, we would turn them to the   00:59

1   front so that we could better deal with the things that they

2   needed to do, such as when they had to use the restroom or when

3   they had to eat; so we would put them to the front once we

4   received them, if they were in the back.

5   Q    When you say 'put them to the front,' what do you mean?          00:59

6   A    If their hands -- we would zip-tie them to the front.

7   Q    There's a binder in front of you.  If you could turn to

8   Exhibit Number 14.

9        When you say that a detainee would be zip-tied --

10  there's a picture of a marine there with what appears to be          01:00

11  zip-ties.

12       Do you recognize that?

13  A    Yes; it is zip-ties.

14  Q    And is that what marines would use to restrain detainees

15  when in the field?                                                   01:00

16  A    Yes.

17       **MR. KOVATS:**  Your Honor, I'd like to offer Exhibit 14

18  and publish it to the jury.

19       **MR. McDERMOTT:**  No objection, Your Honor.

20       **THE COURT:**  It's admitted.                                  01:00

21       You may publish.

22       **MR. KOVATS:**  Thank you, Your Honor.

23       (Exhibit 14 received.)

24  **BY MR. KOVATS:**

25  Q    In that same witness binder, could you turn to Exhibits 16      01:00

Tuesday, August 26, 2008                          Trial Day 4, Morning Session

```
 1   and 17.  Would you take a look at those pictures.

 2          What do you see?

 3   A    A detainee zip-tied, with his hands behind his back, with

 4   Iraqi currency on his coat.

 5   Q    And the next picture?  This would be Exhibit 17.          01:01

 6   A    Same thing.  Detainees -- looks like it appears to be

 7   detainees with their hands behind their back and zip-tied.

 8   Q    Do these pictures fairly and accurately depict the

 9   condition of the detainees that you would receive from the

10   marines in the field?                                          01:02

11   A    Yes.  These pictures -- of course, with clothes on, full

12   clothes, yes.

13   Q    The detainees would have their hands restrained to the

14   rear.

15   A    That's correct.                                           01:02

16          MR. KOVATS:  Your Honor, I'd like to offer and

17   publish Exhibits 16 and 17 at this time.

18          THE COURT:  Any objection?

19          MR. McDERMOTT:  No objection to 16, Your Honor.

20          17 appears to be without a foundation from this         01:02

21   particular witness.

22          THE COURT:  16 is admitted, and you may publish.

23          17, you need to lay further foundation, Counsel.

24          (Exhibit 16 is received.)

25   / / /                                                          01:02
```

1   **BY MR. KOVATS:**

2   Q    When you received detainees, were they generally clothed,

3   or were they unclothed?

4   A    We'd see all kinds of dispositions when they came in.

5   Depending on the time of the year, sometimes they would have                01:02

6   the -- the man dress.  Sometimes they would come like this, but

7   not too often.

8            If they did come like this --

9            **MR. McDERMOTT:**  Excuse me, Your Honor.

10           **THE WITNESS:**  -- or they came without clothes, it               01:03

11   was -- a lot of times, they were --

12           **THE COURT:**  One second, sir.

13           **MR. McDERMOTT:**  Sir, the testimony isn't specific as

14   to time.

15           At least as to this particular witness, could we make             01:03

16   this November 2004?

17           **THE COURT:**  Sustained.

18           Clarify time, Counsel.

19           **MR. KOVATS:**  Yes, Your Honor.

20   **BY MR. KOVATS:**                                                          01:03

21   Q    During Operation Phantom Fury, during the Battle of

22   Fallujah, would the detainees at times be delivered to your

23   facility in this state of undress, as depicted in Exhibit 17?

24   A    Maybe once.  Generally not, because it was during the

25   winter.  They would come with no shoes, shoes, one shoe;                   01:03

1  whatever they came with.

2  Q    So the picture in Exhibit 16 is a better depiction of how

3  the detainees you received appeared.

4  A    Yes.

5         MR. KOVATS:  Your Honor, we'd like to publish                    01:04

6  Exhibit 16.

7         THE COURT:  You may.

8         MR. KOVATS:  Thank you, Your Honor.

9  BY MR. KOVATS:

10 Q    Now, you described a little bit at the outset about the           01:04

11 process that these detainees would undergo when brought to your

12 custody, and you mentioned a little bit about the paperwork.

13        Was this the standard form that your marines used in

14 processing detainees in your facility?

15 A    Yes.                                                              01:05

16 Q    Was this used both before and during Operation Phantom

17 Fury?

18 A    Yes.

19 Q    You mentioned that the detainee marines had to provide

20 statements to you.                                                     01:05

21 A    That's correct.

22 Q    What did those statements describe?

23 A    The statements pretty much described the five W's:  Who,

24 what, when, where, and how they detained them.  And we would

25 have them write the events exactly how they occurred that day.        01:05

1   And then we would include any pictures that they brought in,

2   because that was -- prior to doing this, this type of work, we

3   made it known that to prosecute these guys, we had to sometimes

4   paint the picture.  So they would bring in pictures as well,

5   and we would attach those to these packages.                    01:06

6   Q    Was part of the in-processing a gunshot residue or a gun

7   powder residue test?

8   A    Not on every single detainee, but generally, we did,

9   especially when they were detained for firing on coalition

10  forces.  In Fallujah, we used every single one we had until    01:06

11  they were all gone; and so some detainees, we used it on, and

12  some we couldn't.  We had -- I'd say we had at least a thousand

13  to start with, the gun powder residue kits.

14  Q    When the detainees were brought to you, were they fed?

15  A    Prior to coming?                                           01:07

16  Q    No.  When they were brought to you, did you feed them?

17  A    Absolutely, yes.

18  Q    And about how long did they remain in your custody?

19  A    We would keep them -- during Phantom Fury, we would keep

20  them usually a day.  Sometimes they -- we would just get them,  01:07

21  and then, you know, the seven-tons would be there to pick them

22  up already; but generally a day, sometimes two days.

23  Q    When you say "seven-ton," what do you mean by that?

24  A    It's a vehicle that marines use for carrying troops,

25  cargo.                                                          01:07

Q    So using that truck, what would happen with these

detainees once they left your custody?

A    We would turn all of the paperwork and the detainees and

their property, anything that they had on them when they came

in, over to the officer in charge or staff NCO in charge of

this convoy; and then they would take them back to Camp

Fallujah, where the regional detention facility was.  And then

from there, they would go through the same processing all over

again.  And then they would also, at that point, be questioned

by the human exploitation team at that level as well.

Q    You mentioned that you knew the human exploitation team

interviewed these detainees.

       Do you know what happened with the information

obtained from these detainees?

A    Yes.  Once they were done, the officer in charge of the

human exploitation team and I would get together.  He would

debrief me on the things that they found out in the

questioning.  We would then take that information to the

battalion commander or the battalion operations officer and

debrief them.  And then from there, they would decide -- well,

many times there was good intelligence that came out of this

questioning, and we would then, in turn, turn that around to

troops on the ground and possibly find a cache with weapons, a

site where weapons are located, or whatever.  We turned it

around many times where it helped us out in completing our

```
 1   mission.
 2           But then, also, they would decide whether to forward
 3   them up with the information we had on them, forward them up to
 4   higher headquarters or release them at that point.
 5   Q    During the course of your deployment, how many individuals        01:10
 6   were detained by 31?
 7   A    For the entire deployment, we detained --
 8           MR. McDERMOTT:   Objection as to the entire
 9   deployment.
10           Can we limit it to the time frame in the indictment?          01:10
11           MR. KOVATS:   That was my follow-up question.
12           No objection to that, Your Honor.
13           THE COURT:   Overruled.
14           You may answer.
15           THE WITNESS:   Roughly 1,700 detainees.                        01:10
16   BY MR. KOVATS:
17   Q    How many were taken by 31 during Operation Phantom Fury?
18   A    Roughly a thousand.
19   Q    And of that thousand, how many would you consider, to the
20   best of your knowledge, to be civilians?                               01:10
21           MR. McDERMOTT:   Objection.   Lack of foundation.
22           THE COURT:   Sustained.
23           Lay a foundation for this, Counsel.
24   BY MR. KOVATS:
25   Q    When you received a detainee and they were in process,           01:10
```

```
 1   were you able to make a judgment as to sort of what box to put

 2   the detainee in; whether you considered them someone who needed

 3   to be processed further to the rear for interrogation or

 4   whether or not someone was an ordinary civilian who only needed

 5   to be kept off the battlefield?                                      01:11

 6   A    I could.  That wasn't my job to do that, but I could kind

 7   of tell where they were headed and how we were going to process

 8   them, or how we were going to turn -- in what order we were

 9   going to turn them over to the human exploitation team, based

10   off the evidence that was brought in, if any.                        01:11

11          Many were given to us as civilians.

12   Q    So could you make the determination based on the

13   statements that the marines provided you about the

14   circumstances of the detention?

15   A    Yes.                                                            01:11

16   Q    And of those thousand detainees, how many did you

17   understand, based on your review of the statements provided by

18   the marines, were not detained because of their role in the

19   fighting?

20          MR. McDERMOTT:  Objection.  Lack of foundation;              01:12

21   relevance.

22          THE COURT:  Sustained.

23   BY MR. KOVATS:

24   Q    Did you detain any children or women in your facility?

25   A    Yes.                                                            01:12
```

Tuesday, August 26, 2008                    Trial Day 4, Morning Session

```
1   Q    How many?

2   A    I would say around 50.

3   Q    Did you take detainees into your facility the first day of

4   the fight, on the 9th of November?

5   A    Yes.                                                          01:12

6   Q    Do you recall approximately how many?

7   A    Around 30.

8   Q    If a unit brought in more than one detainee from a single

9   incident, say they had gone into a house or they were involved

10  in a fire fight and detained more than one individual, would    01:13

11  the marines, with your assistance, provide, like, a baseline

12  form that they could fill in the blank so that they didn't have

13  to continue rewriting the whole statement over and over again?

14  A    Yes, we did.

15  Q    If you look at Exhibit 13, is that an example of one of     01:13

16  those instances?

17  A    Yes, it is.

18  Q    And on the third and fifth pages of that statement, or

19  those statements -- let's go to the third page first.

20       On the bottom right-hand corner, is that your             01:13

21  signature?

22  A    Yes, it is.

23  Q    And what does that reflect?

24  A    My signature?

25  Q    Yes.                                                         01:14
```

1   A    That I -- by me signing it, it's just saying I'm the

2   officer in charge, signing that I took these sworn witness

3   statements under oath from these marines.

4   Q    Okay.

5           **MR. KOVATS:**  Thank you, Your Honor.                    01:14

6           **THE COURT:**  Cross-examination?

7           **MR. McDERMOTT:**  Thank you, Sir.

8                        **CROSS-EXAMINATION**

9   **BY MR. McDERMOTT:**

10  Q    Officer Pritchard, you indicated for the jury that the   01:14

11  total number of detainees on the first day was 30; is that

12  correct?

13  A    Yes.

14  Q    And that the total number of detainees throughout

15  Phantom Fury was a thousand.                                  01:14

16  A    Yes.

17  Q    Phantom Fury lasted approximately, what, ten days?  How

18  long?

19  A    Three weeks.

20  Q    Three weeks; 21 days.                                     01:14

21           And out of the thousand, are you including the 50

22  children?

23  A    No.

24  Q    So a thousand was what we call 'MAMs,' or military-age

25  males.                                                        01:15

1    A    Yes.

2    Q    Now, the form that you had your troops fill out, this was

3    required for individuals to essentially help them at a later

4    date prove a case against the person that was detained.

5    A    Yes.                                                          01:15

6    Q    What your troops were doing for you was putting together

7    what we would call, like, a CSI report; it was who's involved,

8    what kind of evidence is there to support this person being

9    detained, and perhaps imprisoned, for fighting against our

10   troops; correct?                                                  01:15

11   A    Yes.

12   Q    And when you talk about using gun powder testing, this is

13   one element of preparing a criminal case against the individual

14   being brought in; correct?

15   A    Correct.                                                      01:15

16   Q    Now, when you indicated for us that testing was done for

17   the purpose of determining gun powder, would that have been

18   testing of the hands to find out whether or not this individual

19   was firing a weapon?

20   A    Correct.                                                      01:15

21   Q    And this was done on more than one occasion?

22   A    Yes.

23   Q    During Phantom Fury?

24   A    Yes.

25   Q    Was there a point in time when you actually ran out of       01:16

1    swabs?

2    A    Yes.

3    Q    Now, in the same form, you also have identified on there

4    the names of individuals; correct?

5    A    Yes.                                                      01:16

6    Q    Now, were your troops or was your unit relying

7    specifically on them telling you their name and where they came

8    from, or did these folks actually have any identification

9    cards?

10   A    Many had identification -- most had identification cards.  01:16

11   But then, also, we would, you know, bounce that off of what

12   they're saying their name was.

13   Q    Because, for example, Exhibit 13 that the government is

14   offering actually has a name of an individual in there, does it

15   not?                                                           01:17

16   A    Yes.

17   Q    And it even gives us, also, his place of birth or his

18   residence as Fallujah; correct?

19   A    That's correct.

20   Q    Can you tell the jury what kind of identification cards    01:17

21   were available to individuals living in Iraq at that time.

22   A    They had their old ID cards that they got from their

23   government.  Many had -- well, not until a later date did they

24   start receiving new ID cards.

25   Q    Are you familiar with the acronym BAT, B-A-T?             01:17

1    A    Yes.

2    Q    And what is that exactly?

3    A    BAT is the Biometrics Automated Toolset.  It's what we use

4    to put the detainee -- we put all of this information in there

5    when we receive that detainee.  We put it into the system with            01:17

6    an iris scan of the detainee, fingerprints of the detainee; and

7    all of the personnel -- all of the information that goes with

8    that particular detainee goes in his personal profile, as it

9    were.

10   Q    So there was the capability, after he was detained --                01:18

11        Was this process being used during Phantom Fury?

12   A    Not as much, but we didn't have the time.

13   Q    Didn't have the time.

14        But at least some of the individuals went through

15   that process?                                                             01:18

16   A    Yes.  And if they didn't go through it at our facility,

17   they definitely went through it at the regional detention

18   facility.

19   Q    And again, that is an example of how to process by

20   identification, either through retina scan or by ID card, an             01:18

21   individual that you take in; correct?

22   A    Yes.

23   Q    Now, you made the comment on Direct regarding the manner

24   of dress that you saw as far as the detainees that came to your

25   site.                                                                     01:18

 1          This was wintertime; we're talking November in Iraq;

 2   correct?

 3   A    That's correct.

 4   Q    Now, most of us may not be familiar with winter in Iraq,

 5   but give us a quick thumbnail as to what kind of climates          01:19

 6   you've got in November of 2004.

 7   A    It's pretty cold.  I'd say the temperature is around --

 8   definitely going to be in the 40's every day, but it will get

 9   down to the upper 30's, mid 30's, at night and in the morning

10   hours.                                                             01:19

11   Q    For those of us here, are we talking, like, a high desert

12   type of climate, if we were in Victorville, or someplace like

13   that?

14   A    Yes.  A little colder.

15   Q    So you'd get some sunshine and some warmth during the day,   01:19

16   but definitely, you're not hanging out at the beach; right?

17   A    That's correct.

18   Q    And as a result, a lot of the individuals that were

19   detained actually had layers of clothing on; correct?

20   A    That's correct.                                              01:19

21   Q    During the time that you were running this facility, is it

22   fair to say that on more than one occasion, you ran into a

23   detainee twice?

24   A    Seldom ever.  Maybe, it might have happened once.

25   Q    From your understanding, the people that were processed     01:20

1   through -- for example, on Exhibit 13, would you have expected

2   that individual to be processed and sent to a prison, or some

3   sort of prison facility, to be held until trial?

4   A     For this particular detainee?

5   Q     Yes.                                                          01:20

6   A     I'd have to read through it.

7   Q     Go ahead.

8   A     (Witness reads document.)

9         It could go either way.

10  Q     NSC talks about a positive gun powder test.                  01:21

11        Would that indicate to you the individual had fired a

12  weapon recently?

13  A     Not necessarily.

14  Q     Could it have been weeks prior to coming in there?  Is

15  that your testimony?                                                01:21

16  A     Say that again.

17  Q     Well, did this individual that filled out this form

18  indicate that they suspected this person as being involved in

19  action against the troops?

20  A     Right.                                                        01:21

21        **MR. McDERMOTT:**  I have no further questions.

22  Thank you.

23        **THE COURT:**  Anything further from the Government?

24        **MR. KOVATS:**  Just one point of clarification,

25  Your Honor.                                                        01:22

|   |                                                                              |        |
|---|------------------------------------------------------------------------------|--------|
| 1 | <div align="center">**REDIRECT EXAMINATION**</div>                           |        |

**BY MR. KOVATS:**

Q    You mentioned that maybe once you saw a detainee who had previously been in your facility.

A    Correct.                                                                  `01:22`

Q    Was that during Phantom Fury, or was that before it or after it?

A    I can't say.  Most likely, it was before, because there was so many during -- I couldn't remember all of the faces, but...                                                                     `01:22`

Q    During Phantom Fury, was the city cordoned off?

A    Yes.

        **MR. KOVATS:**  Thank you, Your Honor.

        **THE COURT:**  Anything further?

        **MR. McDERMOTT:**  No thank you.                                      `01:22`

        **THE COURT:**  You're excused, sir.

        Government's next witness?

        **MR. BEHNKE:**  The government calls Cory Carlisle.

        **THE COURT:**  Counsel, let me see you at side-bar for a second.                                                                        `01:22`

        (Whereupon, the following proceedings

        were held at side-bar:)

        **THE COURT:**  I thought I should have my ruling done before you start your direct, just so you know where I'm going.

        I was somewhat going down the wrong track when       `01:28`

1  counsel made the statement "excited utterance" related to state

2  of mind, because I do believe that for state of mind, the state

3  of mind issue is not relevant, because it would be an improper

4  imputation.

5           But when I took at a look at Weinstein's Federal                01:28

6  evidence -- and I don't see any reason why it can't come in for

7  the truth of the matter asserted as an "excited utterance,"

8  putting aside state of mind, because I think the Government

9  even concedes that if it were to come in for the truth of the

10  matter asserted, it would be relevant to the issue of the       01:28

11  circumstances there.

12           The four elements is:  A startling occasion.  This

13  was certainly a startling occasion, by any account.  The case

14  law seems to refer to assaults, batteries, anything like that.

15  Second, a declarant who appears to have had an opportunity to   01:28

16  personally observe the events.  There's no dispute there.

17           The third element is a little more troubling:  A

18  declarant who is under the stress of excitement while making a

19  statement.  And the standard there is the Court needs to be

20  convinced that was, in fact, the case; and that can be revealed  01:28

21  by the declarant's testimony.  So that's what I would consider

22  in terms of foundation for making a ruling on it.

23           And then the fourth element is:  A statement relating

24  to the circumstances of the startling occasion.  And that is

25  not so; so three of the four elements are met.                   01:28

1          The one about whether or not the declarant was under

2     the stress of the excitement when he made the event, is

3     something that will turn on the foundation that is laid for the

4     statement.

5          **MR. McDERMOTT:**  Okay.

6          **THE COURT:**  But otherwise, I can't see any reason to

7     sustain the Government's objection on this point as "excited

8     utterance," but I'll hear further before I make my final

9     ruling.

10         **MR. BEHNKE:**  The Government agrees with the Court's

11    assessment of the elements for an excited utterance.

12    Certainly, that is one of the exceptions to the hearsay rule.

13         The Government's objection, notwithstanding a

14    possible exception of the hearsay rule, as I indicated, is

15    simply the reliability of the statement given everything that

16    we know about --

17         **THE COURT:**  And I understand that argument.  When I

18    first heard it, I was thinking of the residual exception

19    reliability issue.  But I understand that all these hearsay

20    exceptions turn, to a certain extent, on reliability.  The

21    trustworthiness of the excited utterance, the theory behind

22    that, is that because it's an excited utterance, it can be

23    trustworthy.

24         I can certainly see, in a situation like this, a self

25    interest on the part of Weemer to lie and basically say he kind

01:28
01:28
01:28
01:28
01:28

1    of just got caught shooting somebody, and he has an interest to

2    make up a story or a defense.  That, I think, is probably --

3    that goes to the weight of the evidence.  That's what we have a

4    jury to determine; whether or not it's that or -- I mean, I can

5    see this going either way.                                      01:28

6           I can see a jury hearing this and, depending on how

7    the testimony comes out, it could be clear to the jury that

8    this was a lie and then this basically bolsters the

9    Government's case, because it was a cover-up.  Or it could be

10   the truth and it bolsters the Defense case.  But under either   01:28

11   scenario, I think it is admissible under excited utterance.

12   And this is precisely the type of thing that I think is

13   appropriate for a jury to hear and consider.

14          **MR. BEHNKE:**  If the Court does end up deciding -- and

15   I think we'll know after the witness gets through with his      01:28

16   testimony whether the elements of the hearsay exception are

17   met -- if the Court does permit the introduction of the hearsay

18   statement, then the Government does intend, under Rule 806, to

19   impeach the credibility of the hearsay declarant Ryan Weemer.

20          **THE COURT:**  I think that is absolutely appropriate.   01:28

21   That's certainly -- you have a right to do that.  And it's

22   interesting, because the discussion on Weinstein does interact

23   with the whole confrontation clause issue.  And the Defense

24   certainly has a right to keep the witness off the stand for

25   that purpose.  But you can certainly impeach the declarant, and 01:28

```
 1    then defense is free to rehabilitate the declarant.

 2         MR. McDERMOTT:  Yes, sir.  That's fine.  Yes.

 3         THE COURT:  Very well.

 4         Everyone understand?

 5         MR. McDERMOTT:  Yes.                              01:28

 6         MR. BEHNKE:  Yes.

 7         THE COURT:  Very well.

 8         (Whereupon, side-bar proceedings were concluded.)

 9         THE COURT:  You may proceed.

10         THE CLERK:  Do you solemnly state that the testimony  01:28

11    you may give in the cause now pending before this Court shall

12    be the truth, the whole truth, and nothing but the truth, so

13    help you God?

14         THE WITNESS:  Yes.

15         THE CLERK:  Please state your full name and spell

16    your last name for the record.

17         THE WITNESS:  Cory James Carlisle, C-A-R-L-I-S-L-E.

18                   DIRECT EXAMINATION

19    BY MR. BEHNKE:

20    Q    Mr. Carlisle, before we get into the actual questions, I'm  01:28

21    just going to ask a favor of you; and that is that the court

22    reporter in front of you is trying to take down everything

23    that's being said; so to the extent that you can, if you could

24    try to continue leaning forward, speak into the microphone, and

25    speak loudly and clearly, so that everyone can hear you.   01:29
```

```
 1   A     Okay.

 2   Q     Sir, are you a former United States marine?

 3   A     Yes.

 4   Q     When were you in the United States Marine Corps?

 5   A     From September 15, 2003, to March 29, 2006.        01:29

 6   Q     What rank did you attain while you were in the

 7   United States Marine Corps?

 8   A     Lance Corporal.

 9   Q     And how many ranks up is Lance Corporal from the entry

10   level?                                                   01:29

11   A     Three.

12   Q     What did you do after you got out of the Marine Corps?

13   A     I served a mission for the Church of Jesus Christ of

14   Latter Day Saints.

15   Q     And what are you currently doing?                  01:29

16   A     Going to school.

17   Q     As part of your service in the Marine Corps, did you

18   participate in Operation Phantom Fury in November of 2004?

19   A     Yes.

20   Q     During Operation Phantom Fury, were you a member of the  01:30

21   defendant's squad?

22   A     Yes.

23   Q     Prior to actually participating in Phantom Fury, when were

24   you deployed to Iraq?

25   A     June of 2004 -- no -- yeah, June of 2004.          01:30
```

1   Q    Before going to Iraq in June of 2004, did you participate

2   with the rest of your company in training at George Air Force

3   Base and March Air Force Base?

4   A    Yes.

5   Q    Did the training that you went through before going to          01:30

6   Iraq include training regarding the law of war?

7   A    Yes.

8   Q    Did it include training regarding handling and treatment

9   of detainees?

10  A    Yes.                                                             01:31

11  Q    On November 8, 2004, the day before you began your

12  participation in Phantom Fury, where was your unit located?

13  A    We set up just north of the city.

14  Q    When you say "we set up," what do you mean?

15  A    Dug skirmisher trenches, which are basically just holes          01:31

16  that you defend from, just a station there until you attack the

17  city the next day.

18  Q    At that particular time, again November of 2004, what was

19  your job assignment in the Marine Corps?

20  A    I was infantry.  I was a point man for the second fire           01:32

21  team in my squad, which is -- there's 13 men in a squad, so the

22  second fire team is, like, the middle one.

23  Q    You said there were 13 members of the squad?

24  A    That's a full squad.  I believe there was less.  There was

25  about two men less than that; so it would be, like, 11 men.         01:32

1   Q      And who was your squad leader at that time?

2   A      It would be Sergeant Nazario.

3   Q      And you used the term "fire team."

4          What is a fire team?

5   A      It's a four-man marine group inside of a squad.  And the      01:32

6   squad consists of three of those fire teams.

7   Q      And you said that within your fire team, you were the

8   point man.

9          What does that mean?

10  A      Usually in a fire team, there's four members, and one is a    01:32

11  point man; he's usually the front person, first one in -- that

12  kind of -- the first one, generally, into most places.

13         The fire team leader, which is the lead of the four

14  men.  A SAW gunner, which is a squad automatic weapon; it's

15  basically a machine gun.  And then an assistant SAW gunner,        01:33

16  someone that's there to help position the SAW gunner and make

17  sure that he's pointed in the right direction.  So I would be

18  the point man of that group.

19  Q      And the squad that you were in, was that a part of a

20  platoon?                                                           01:33

21  A      Yes.

22  Q      And the platoon that you were in, would that be described

23  as a rifle platoon?

24  A      Yes.

25  Q      What does it mean to say that it was a rifle platoon?       01:33

1   A    That's just -- like, our job description is rifleman; so

2   it would be -- that's basic infantry.

3   Q    And in order to become a rifleman and become a part of a

4   rifle platoon, as you were, did you also have to attend the

5   school of infantry?                                          01:34

6   A    Yes.

7   Q    Where did you go through the school of infantry?

8   A    Camp Pendleton.

9   Q    On November 8, 2004, the day before you went into the

10  city, you said you were camped just north of the city.       01:34

11       Could you please describe for the jury what was

12  happening on that day before you actually went into the city.

13  A    Just basic preparations.  You dig the hole, you post

14  watch; so you'd watch over, make sure nothing happened.  And

15  you just basically wait.  That's basically what I was there    01:34

16  for, waiting and preparing to go into the city the following

17  morning.

18  Q    Was there any shelling or aerial bombardments going on

19  within the city on that day?

20  A    Yes.                                                     01:34

21  Q    What was the purpose of that, if you know?

22  A    Just basically peppering the environment, so when you go

23  in, you have a little less combatants or a little -- people

24  that are less willing to want to fight you, I guess.

25  Q    The next morning, on November 9, 2004, did you and the    01:35

1    rest of your platoon actually go into the city?

2    A    Yes.

3    Q    Approximately what time did you leave your encampment and

4    move towards the city?

5    A    That would be an educated guess.                                01:35

6            It would probably be, like, dusk; so, like, 7:00,

7    8:00; somewhere in there, I would imagine.

8    Q    In the early morning?

9    A    Yes.

10   Q    How did you move to the city from your encampment?             01:35

11   A    Humvees; we were mounted.

12   Q    When you say you were mounted, what do you mean?

13   A    We were in Humvees; so when you're mounted, whether in

14   seven-ton or Humvees, that means you're basically getting a

15   ride.                                                               01:36

16   Q    You're riding in the back of the Humvee.

17   A    Yes.

18   Q    Where did the Humvees take you to in the city?

19   A    They dropped us off once we initially entered the city,

20   some of the basics streets.  That's where we dismounted.  We       01:36

21   got out and started patrolling.

22   Q    Where in relation to the train station did you get out of

23   the Humvees?

24   A    It would have been -- the train station would have been on

25   the north end of the city, so we would have been, probably,        01:36

1    southwest.

2    Q    And after you got out of the Humvees, which direction did

3    you move?

4    A    South.

5    Q    So as you were moving through the city, the train station      01:36

6    would have been behind you.

7    A    Yes.

8    Q    Now, when you got out of the Humvees, what did you do at

9    that point?

10   A    We began patrolling.  If we took fire, then we'd deal with     01:37

11   that.  Basically, just patrol through the city, trying to find

12   any combatants, any insurgents, that kind of thing.

13   Q    When you say you patrolled through the city, did you do

14   that on foot?

15   A    Yes.                                                           01:37

16   Q    If you could explain briefly for the jury, as you and the

17   rest of the men in your unit are patrolling through the city on

18   November 9th, how were you dressed?

19   A    We had full camis; so you're just basically -- your camis.

20   Then you have what we call an LBV, which is a load-bearing         01:37

21   vest, which you have your ammunition, your night vision

22   goggles, any gear that you would need, anything that you would

23   need for grenades, that kind of thing.  And then underneath

24   that, you would have a flak jacket.  And it has SAPI plates

25   inside of it, which is like a ceramic shield that stops           01:38

```
 1   bullets.  So you'd have that armor on, and then you'd have a
 2   kevlar helmet on, basic combat boots.  That's about what you'd
 3   be wearing.
 4   Q    What type of weapon were you carrying?
 5   A    M16A4.                                                        01:38
 6   Q    I'm going to show you what's previously been admitted as
 7   Exhibit 14 for identification.
 8         I'm showing you the portion that I've highlighted.
 9         Do you recognize that weapon?
10   A    Yes.  That's an M16A4.                                        01:39
11   Q    That's the type of weapon you were carrying on
12   November 9th?
13   A    Yes.
14   Q    Were the other members of your squad carrying similar
15   weapons?                                                           01:39
16   A    More or less, excluding, like, the SAW gunner or the fire
17   team leader, which would have been carrying the same weapon
18   with a grenade launcher attached to it.
19   Q    Who was your fire team leader that day?
20   A    It would be, at the time, Corporal Weemer.                    01:39
21   Q    Was that Ryan Weemer?
22   A    Yes.
23   Q    On the morning of November 9, 2004, besides your fire team
24   leader, Ryan Weemer, who else was a part of your fire team?
25   A    It would be Lance Corporal Prentice.                          01:40
```

1    Q    Was that James Prentice?

2    A    Yes.

3    Q    Anyone else in your fire team that morning?

4    A    No.  We were a man short.

5    Q    Now, as your platoon engaged in a patrol through Fallujah          01:40

6    on November 9, 2004, did you also have members of another

7    platoon called the weapons platoon that were also attached to

8    you?

9    A    Yes.

10   Q    What is weapons platoon?                                           01:40

11   A    Generally, there's three platoons in a company, and a

12   platoon generally has about 43 men; and there will be a fourth

13   platoon in that company that's a weapons platoon, that does,

14   like, you know, rocket launchers or machine guns, that kind of

15   stuff.  And so when you go into a combat situation, they get          01:40

16   put with your squad, so you have whatever they have, you have

17   the rocket launchers and the machine guns and that kind of

18   stuff, to aide you in the attack.

19   Q    On the morning of November 9th, when you began your patrol

20   through the city, at some point did your unit start receiving        01:41

21   fire from the enemy?

22   A    Yes.

23   Q    When did that begin?

24   A    Pretty immediately.  I mean, when we got into the city, we

25   took fire pretty immediately.  I mean, it was either pot-shots       01:41

1    or just kind of -- as soon as we got into the city, it pretty

2    much -- I mean, there was fire going on.

3    Q    When you say "pot-shots," what do you mean?

4    A    Generally -- sometimes they don't just, like, fight you;

5    they just kind of, like, take a couple of shots at you and then          01:41

6    run for cover, that kind of thing.

7    Q    When your unit was shot at, did you return fire?

8    A    Yes.

9    Q    Was your unit getting shot at as you were moving south

10   through the streets of the city?                                         01:42

11   A    Yes.  Like, as we were moving.  But sometimes, like, you'd

12   take roads that would go, you know, west or what have you; so

13   as you'd go through the city, yeah, you'd get shot at and you'd

14   return fire, get in a fire fight, that kind of thing.

15   Q    During the early part of the morning of November 9, 2004,          01:42

16   did you participate in any searches of any houses?

17   A    Yes.

18   Q    Do you recall approximately how long into the engagement

19   was the first house that you searched?

20   A    It would have been a couple of hours.  I mean,                      01:43

21   generally -- because what we were supposed to do is --

22   initially, into the city, it was that when you got shot at,

23   from wherever you got shot at, then you were allowed to attack

24   or search that building.  So, generally, we didn't have too

25   much of it, because most of it was street fighting; so we                01:43

```
 1    didn't search for a couple of hours into it.
 2    Q    So as you're moving through the city, you weren't
 3    searching every house you came upon.
 4    A    No.
 5    Q    You would only search houses where you believed enemy was        01:43
 6    located.
 7    A    Yes.
 8    Q    At some point, on the morning of November 9th, was one of
 9    your squad mates shot during fire fight with the enemy?
10    A    Yes.                                                             01:44
11    Q    Do you recall who that was?
12    A    That would be Lance Corporal Segura.
13    Q    Was he a member of your squad?
14    A    Yes.
15    Q    In a different fire team, though.                               01:44
16    A    Yes.
17    Q    Do you remember about what time of the morning that
18    occurred?
19    A    Probably 10:00, I would imagine.
20    Q    Do you recall the incident itself?                              01:44
21    A    Yes.
22    Q    If you could, describe for the jury briefly what happened
23    at approximately 10:00 in the morning.
24    A    Well, we were moving through the streets, we ended up
25    getting shot at.  The first fire team went up, and they started     01:45
```

1   engaging.  It was a cross intersection.  And they were shooting

2   down the street, and they had ended up getting the enemy.  And

3   then at that time, Lance Corporal Segura was shot through the

4   back from behind.  And then we dragged him out of the way, and

5   then casevaced him -- that's just when you take a casualty          01:45

6   collection, you take the casualty and move him back to wherever

7   your casualty is to be collected, which was the train station.

8   So they tried to get him back to the train station after that

9   occurred.

10  Q    So when you say he was casevaced, that means that he was       01:45

11  taken back to the train station, essentially.

12  A    Yes.

13  Q    You said "we" pulled him out of the road.

14  A    Yes.

15  Q    Who was "we" specifically?                                     01:45

16  A    Well, it was the squad.  Generally, Weemer; he pulled him

17  out; he dragged him back.  And I believe Johnson as well.  And

18  they dragged him back to the Humvee.  And then the doc, which

19  is a corpsman, a Navy corpsman, started administering first

20  aid.  They got him in the Humvee, and then they left.              01:46

21  Q    On November 9th, in addition to the weapons platoon

22  individuals we spoke of earlier, did you also have Navy medical

23  personnel assigned to your unit?

24  A    Yes.

25  Q    And one of those Navy medical personnel administered first     01:46

1    aid and then went back to the train station with Lance Corporal

2    Segura.

3    A    Yes.

4    Q    After Lance Corporal Segura was shot, what did the rest of

5    your unit do?                                                                01:46

6    A    We continued moving forward.

7             Well, we ended up, I believe, going back, and we

8    didn't push through that.  We ended up going a different route.

9    But we just kept doing our job, basically.

10   Q    You said you took a different route.                                    01:47

11            Was that to avoid the area where the fire was coming

12   from?

13   A    I'm not sure to the reason.  It's just -- I mean, I wasn't

14   in leadership.  I just basically obeyed orders.

15   Q    You just went where they told you to; correct?                         01:47

16   A    Basically.

17   Q    So your unit continues moving through the city.  At some

18   point after this incident where Lance Corporal Segura was shot,

19   did your unit start taking mortar fire?

20   A    Yes.                                                                    01:47

21   Q    Describe for the jury what you mean when you say

22   mortar fire.

23   A    Mortar fire is an indirect fire, whereas, like, your M16,

24   or any other weapons, are generally, like, a straight shot;

25   whereas mortar fire is a tube that you throw a round in and it              01:47

1    goes up and then comes down; so it's an indirect way of

2    attacking your enemy.  It's a way to either pepper the

3    environment or to get their heads down so that then you can

4    attack.

5    Q    As you're moving through the city, you're on feet;                  01:48

6    correct?

7    A    Yes.

8    Q    Are there any vehicles with your unit?

9    A    I believe there was two Humvees to each squad; so a total

10   of, I believe, six for the platoon.                                      01:48

11   Q    And where was your squad in relation to the other squads

12   of the platoon?

13   A    It depends on the time of day, I believe.

14   Q    When you began receiving mortar fire, do you recall where

15   your squad was in relation to the others?                                01:48

16   A    The mortar fire -- we were actually with the rest of the

17   platoon; we were gathered in an area.  So we were actually with

18   them.

19   Q    The area where you were with the rest of the platoon and

20   the mortar fire begins, how would you characterize that part of          01:48

21   the city?

22   A    How would I describe it?

23   Q    Yes.  As residential?  Commercial?  Industrial?

24        How would you characterize it?

25   A    Pretty residential.  It was like a T-intersection, so               01:49

1    there was just a road and there are houses on either side of

2    the road.

3    Q    How were the houses in that part of the city?

4    A    Generally pretty compact.  There's a lot of people that

5    lived in a very relatively small amount of area.  It probably            01:49

6    wasn't a higher class area, I don't think; but it was pretty

7    compact.

8    Q    Were a lot of the houses in that area more than a single

9    story?

10   A    Yeah.  Generally, it was at least two.                             01:49

11   Q    Were the houses, for the most part, surrounded by block

12   walls?

13   A    Generally.

14   Q    Now, when the mortar fire began, you said your unit was

15   with the rest of the platoon.                                          01:50

16        Do you recall what exactly was going on?

17   A    Well, basically, we weren't sure -- as to my

18   understanding, it was ours, like, we had called in fire on a

19   position or something like that.  But anyway, we knew it was

20   coming, so we got into a house.  We took siege in just a little        01:50

21   house, you know, kind of busted in, cleared out the area, and

22   then waited until the mortars passed.

23   Q    So you said you went into a house to take cover from the

24   mortar fire.

25   A    Yes.                                                              01:50

1   Q    How exactly did you go about entering that house?

2   A    Kicked the door in.

3   Q    And after you kicked the door in, what did you do?

4   A    A basic clearing of the house.  Make sure there's no enemy

5   in there.  That's basically what you do.                          01:50

6   Q    When you say "basic clearing," is there a particular

7   procedure that you went through?

8   A    Yeah.  As per training, like, you go in and you --

9   usually, you're with at least one other man.  You're not

10  supposed to clear a room by yourself; that's not what you're     01:51

11  supposed to do.  So you go in and you search each room

12  tactically, avoiding danger areas, like your doorways and that

13  kind of stuff, eventually to where you get to the rest of the

14  house to make sure there's nobody in there.  But you treat it

15  as if there is someone in there.  You don't just waltz in        01:51

16  there, but you treat it as if there's combatants in there.  So

17  that's how you'd go about it, I guess.

18  Q    Was the house close to where you were before the mortar

19  started to come?

20  A    Yes.                                                        01:51

21  Q    You cleared the house.

22       Did you find anybody in that house?

23  A    No.

24  Q    After you cleared the house, at some point did mortars

25  actually start to fall in your area?                             01:51

1   A     Yes.

2   Q     Were you able to hear it from inside the house?

3   A     Yes.

4   Q     Do you recall approximately how long that lasted?

5   A     Not too long.  I mean, it's interesting when you're in          01:52

6   that situation how time flies.  Things usually go pretty fast;

7   so maybe ten minutes.

8   Q     Do you recall who was in the house with you while the

9   mortars were falling?

10  A     I believe it was Weemer, Prentice, Sergeant Pruitt, and        01:52

11  myself.

12  Q     And who was Sergeant Pruitt?

13  A     He was known as a guide.  He's third in command in the

14  platoon.  There's three people, generally, that are in command

15  of the platoon.  There's a lieutenant, an officer, and there's      01:52

16  two enlisted; a staff sergeant, generally, and he's the platoon

17  sergeant; and then the guide, which is generally a sergeant,

18  upper-level sergeant, and he is third in command.

19  Q     And on the 9th of November, who was your platoon

20  commander?                                                          01:53

21  A     Lieutenant Grapes.

22  Q     Do you recall who the platoon sergeant was?

23  A     Staff Sergeant Chandler.

24  Q     Now, while the mortars were falling and you were taking

25  cover inside the house, would it be fair to say you were            01:53

1    scared?

2    A    Not really.  I mean, we were in a house, so generally --

3    we get mortar fire a lot.  You generally get used to it.  If

4    it's enemy, they're generally bad shots anyway, so the mortars

5    generally don't fall anywhere near you.                        01:53

6    Q    How would you describe the house that you were in in terms

7    of the way it was constructed?

8    A    Cement.  They don't have much wood over there, so they use

9    a lot of cement.  That's really what it is, is a whole lot of

10   cement.                                                        01:53

11   Q    Now, after the mortar fire stopped, what did you do?

12   A    We exited the building.  We found that a lot of the Humvee

13   tires had been blown out because of the mortar fire.  And there

14   were a couple of injuries.

15   Q    So did you actually come back out onto the street after    01:54

16   the mortar fire?

17   A    Yes.

18   Q    Did you see the Humvees with the damage?

19   A    Not that I recall.  I mean, it was kind of like I'd have a

20   job and I'd go about doing it, so I don't really recall, like,  01:54

21   the flattened tires or anything; but that was known.

22   Q    Do you recall the Humvees out on the road?

23   A    Yes.

24   Q    How were the Humvees positioned when you came out of the

25   house after the mortar fire stopped?                           01:54

1  A    Generally, there was a T-intersection, with the bottom

2  part of it going -- heading south.  So there was two Humvees

3  there.  And then there was two Humvees along -- well, four

4  Humvees along this road here, if that makes sense.

5       **MR. BEHNKE:**  Your Honor, may I have the witness step      01:55

6  down to use the butcher paper to help describe for the jury

7  what he's referring to here?

8       **THE COURT:**  Before we get into this, we're going to

9  take a brief morning break at this time, and then we can pick

10  up and we can have that all set up when we come back from the      01:55

11  break, Counsel.

12       **MR. BEHNKE:**  Thank you, Your Honor.

13       (Whereupon jurors depart courtroom.)

14       **THE COURT:**  This jury would like to know an update on

15  the trial estimate remaining at some point in time today; so      01:56

16  just at some point in time, give me your best estimate.

17  Provide that to Mr. Holmes, and we'll pass that along to the

18  jury.

19       We're going to take up the Mattel matter very briefly

20  during the break.  We'll resume with this trial at 11:00.      01:56

21       (Brief recess was taken.)

22       (Whereupon, jurors enter courtroom.)

23       **THE COURT:**  Counsel, you may proceed.

24       Did you want to have the witness step down?

25       **MR. BEHNKE:**  In a few moments.      02:21

1          **THE COURT:**  Very well.

2    **BY MR. BEHNKE:**

3    Q    Before we broke, you were describing the incident when

4    your unit was receiving mortar fire.

5          Do you recall that?                                    02:21

6    A    Yes.

7    Q    At some time that morning, did you also receive word that

8    Juan Segura had died as a result of his injuries?

9    A    Yes.

10   Q    When did that occur?                                    02:21

11   A    Shortly after we arrived at that T-intersection.

12   Q    After arriving at the T-intersection, but before the

13   mortar started to fall?

14   A    I don't recall.

15   Q    You don't recall when in relation to the mortars?       02:21

16   A    Yes.  As far as I remember, I remember them coming in and

17   informing us, but I don't remember whether or not it was before

18   or after the mortar fire.

19         **THE COURT:**  Counsel, I'm afraid this may block the

20   view of this witness from some of the jurors, and the jurors   02:22

21   need to be able to see the witness at all times.  So, Counsel,

22   if you could move that a little farther back.

23         Thank you.

24   **BY MR. BEHNKE:**

25   Q    How did you receive word of Juan Segura's death?         02:22

```
 1   A    I heard it from, I believe, Corporal Johnson.  It was one
 2   of his fire team, actually, when they arrived back where we
 3   were at.
 4   Q    Did the other members of your unit receive the same word?
 5   A    Yes.                                                          02:22
 6   Q    After the mortar fire stopped, I believe you were
 7   describing earlier that there were Humvees parked on the road
 8   outside the house where you had taken cover.
 9   A    Yes.
10   Q    How many Humvees do you remember being out there?            02:23
11   A    Six.
12   Q    And after the mortar fire stopped, was the rest of the
13   platoon in the same general area?
14   A    Yes.
15   Q    So approximately how many marines do you remember being at   02:23
16   that T-intersection?
17   A    Well, all of the marines of our platoon, plus any
18   attachments; like, upward of 40, I'd imagine.
19   Q    Did you say upward of 40?
20   A    Yes.                                                          02:23
21   Q    After the mortar fire stopped, at some point were you and
22   the other members of your unit assigned to search a house?
23   A    Yes.
24   Q    Where was that house in relation to the location where you
25   had taken cover?                                                  02:23
```

1    A    If I have my geography right, it would probably be south;

2    so it would be right across the street from the house that we

3    took cover in.

4    Q    How did you learn that you were supposed to search that

5    house?                                                              02:24

6    A    On order from my fire team leader, Corporal Weemer.

7    Q    Do you recall what specifically he told you?

8    A    Not specifically; just generally, that was the order, that

9    we were going to clear the house across the street.

10   Q    Do you recall how the house appeared that you were going     02:24

11   to search?

12   A    It had a retaining wall around the perimeter.  There was a

13   large gate in the front.  It was a two-story level, with the

14   top story being flat.  That's the way most of the ones in Iraq

15   are, a flat roof with, usually, like, a three- to five-foot      02:24

16   wall around the upstairs.  They generally were made out of

17   cement.

18   Q    How did you and the other marines go about gaining entry

19   to the courtyard of the house?

20   A    Well, we attempted to blow up the door, the front gate;     02:24

21   and so we put C4 on it a couple of times, trying to blow it up,

22   but it didn't open.  Eventually, we found another way in.

23   There was just an open door along the south end of that wall,

24   and so we ended up just getting in through there.

25   Q    When you say "we put C4 on the gate to try to blow it up,"   02:25

1  do you recall who specifically did that?

2  A    That would be the attachments; they're known as

3  assaultmen, 0351.  I'm sure if that makes any sense.  It would

4  be, like, Nelson and -- I don't recall his name -- but anyways,

5  they were both attached to our group, and their job was -- they     02:25

6  had kind of a rudimentary understanding of that, because they

7  weren't, like, combat engineers, which would do that -- that

8  would be what they would be trained for, but they knew what

9  they were doing to the extent of what we needed; so those two

10  weapons platoon marines would go and put C4 on it.  It was the     02:26

11  two weapons platoon marines.

12  Q    Now, one of the weapons platoon marines you mentioned was

13  Nelson.  Was that Jermaine Nelson?

14  A    Yes.

15  Q    And you said you don't recall the name of the other          02:26

16  weapons platoon member that was with you.

17  A    No.

18  Q    After the weapons platoon members tried to blow up the

19  front gate, you said you went around and found another way in.

20         What specifically did you do as you entered through        02:26

21  the gate into the courtyard?

22  A    We entered in through that doorway and we came upon a

23  door, which would have been the back door.  I was point man of

24  the fire team.  And actually, after Segura's death, our fire

25  team was pushed to first fire team, so now second fire team,      02:26

1   which was us, got moved up; and first fire team, since they no

2   longer had a SAW gunner, got pushed to the back as support.

3          So our fire team -- me, Corporal Weemer, and

4   Prentice -- all were the ones that entered the house; so we

5   went in.  Corporal Weemer mule-kicked the door; he stood          02:27

6   backwards and just kicked the door in, and then I was the first

7   one to enter.

8   Q    When you say he "mule-kicked the door," what do you mean

9   by that?  If you could describe for the jury what that means.

10  A    Well, generally, you either stand backwards or forwards,   02:27

11  and you kick the door right around the hinge to try and break

12  whatever joints there are inside so that you open the door,

13  basically.

14  Q    Kicking the door, using the heel of your boot?

15  A    Yes.                                                        02:27

16  Q    Now, as you and the rest of your fire team were entering

17  the courtyard and approaching the house, did you notice any

18  movement or any activity going on inside the house?

19  A    No.

20  Q    After Corporal Weemer kicked the door, did the door open?  02:28

21  A    Yes.

22  Q    What happened after he kicked the door?

23  A    I went in.  Then as I went in -- there's ways to clear a

24  room, and we talked about it a little earlier.  One will

25  usually cross, and the other one will button hook, which was     02:28

```
 1   basically, one will go one way, the other one will go the
 2   other.  And then you clear the immediate danger, like stairways
 3   and corners, that kind of thing, to get out of the doorway,
 4   because the doorway is probably your most dangerous area, just
 5   because if you're someone inside, that's the first place you're        02:28
 6   going to be pointing your weapon.  So you want to get out of
 7   there as soon as possible.
 8           So you get in -- well, in this event, we kicked the
 9   door in, busted through; and there was four Iraqi males lined
10   up, sitting along the wall between two bedroom doors.                  02:28
11   Q    Now, you said that after the door was opened, you were the
12   first one in.
13   A    Yes.
14   Q    When you went into the house, did you have your M16?
15   A    Yes.                                                              02:29
16   Q    How were you holding your M16 as you went into the house?
17   A    Generally, at the ready -- there's two different
18   positions, generally -- or three.  The first one is just
19   relaxed, where you have your weapon -- you know, your hands on
20   the trigger, but it's not really -- there's no threat, so you         02:29
21   just have it there, kind of looking around.  The next one is at
22   the ready, which is more of a 45-degree angle, and you're ready
23   to bring it up.  And then there's at the alert, which is --
24   it's aimed and you're looking down the sights, you're looking
25   down the muzzle, as you're clearing the house.  That means that       02:29
```

```
 1    there's imminent danger.
 2            So, immediately, mine would be at the alert; so as I
 3    was busting through the door, it would be at the alert.
 4    Q    So as you're going through the door, you have your rifle
 5    pointed straight ahead, and you're looking down the sights,      02:30
 6    essentially.
 7    A    Yes.
 8    Q    After you went in, do you know if another member of your
 9    fire team came in behind you?
10    A    Yes.  Corporal Weemer came in behind me, and then so on,    02:30
11    we filed through, with Sergeant Nazario and the two weapons
12    platoon marines.
13    Q    Now, you said earlier that when you first entered the
14    house, you saw four Iraqi males, I believe you described them,
15    sitting along a wall.                                            02:30
16    A    Yes.
17    Q    Approximately how far away from you were they?
18    A    Probably about 10, 15 feet.
19    Q    And when you came through and first saw them, what were
20    they doing?                                                      02:30
21    A    Well, when I first saw them, they were sitting up against
22    the wall, not really, like -- they weren't showing any threat;
23    they were just sitting there, basically, when you come in, of
24    course, hands up in the air, that kind of thing.
25    Q    Did they put their hands up in the air?                     02:31
```

1    A    I specifically don't recall, but that's kind of the action

2    that's, like -- meaning it was docile; it was -- they were kind

3    of, 'Don't hurt us,' that kind of thing.  It wasn't an

4    aggressive movement.

5    Q    Were they moving around at all when you came in?                    02:31

6    A    No.  They were just sitting there.

7    Q    As the rest of the marines filed into the house behind

8    you, what were you doing?

9    A    Well, you continue to clear the house; so, generally, as

10   soon as I get in there and we see these men -- I mean, there's    02:31

11   still a potential chance of there being more men in the house

12   that are not just sitting there, so I was charged to go and

13   search the rest of the house.

14   Q    Did the four men that you saw when you first came into the

15   house make any movements or do anything at all as the other      02:32

16   marines were filing in behind you?

17   A    No.

18   Q    Do you recall whether somebody told you to clear the

19   house, or did you just naturally do that as part of your

20   duties?                                                           02:32

21   A    I don't recall if it was a specific order, but that's

22   what -- you want to make sure that your areas are covered; so

23   that's just what you naturally do.

24   Q    Did the four men that you saw say anything when you came

25   into the house?                                                   02:32

1    A    I'm sure they did, but it would be Arabic, or a strong

2    accent, attempted English.  But I'm not really paying any

3    attention, just treating them as if they were a threat.   In

4    other words, making sure there's always a weapon on them,

5    making sure that when you're clearing the rest of the house      02:32

6    that those men aren't going to go anywhere.

7    Q    Do you recall what the four men that you saw looked like?

8    A    Well, somewhat vaguely.  I mean, as far as -- there was

9    one older gentleman with a beard, and then there were three

10   younger, probably 18 to 25, I would imagine.  The other three   02:33

11   were about in that age range.

12   Q    We've heard the term during the course of these

13   proceedings "military-age males."

14        Are you familiar with that term?

15   A    Yes.

16   Q    Would you characterize these four men as military-age

17   males?

18   A    Yes.

19   Q    Now, besides there being one older and three younger, do

20   you recall how they were dressed at all?                        02:33

21   A    I believe the older gentleman had kind of -- I don't know

22   how to describe it.  Just generally what the Iraqis use.  It's

23   a white, like, turban, and then the white dress kind of thing,

24   where it goes down to the ankles.  It's almost like a button-up

25   shirt, like a polo shirt; but it goes all of the way down to    02:33

```
 1   your ankles.  And then he had sandals on, or something like
 2   that.
 3   Q    Do you recall how the younger men were dressed?
 4   A    Generally, like, sweatpants, T-shirts, that kind of thing;
 5   also sandals; that kind of outfit.                              02:34
 6   Q    After the rest of the marines entered the house, you moved
 7   on to clear the rest of the house.
 8            Did you find any other persons inside the house?
 9   A    No.
10   Q    Approximately how long did it take you to do that initial  02:34
11   clear?
12   A    Relatively quick.  I mean, probably just a couple of
13   minutes.
14   Q    When you did the clear of the house to see if there were
15   any other persons inside the house, were you doing that alone,  02:34
16   or was another marine with you?
17   A    There was another marine with me.
18   Q    Do you recall who that was?
19   A    I believe it was the other weapons platoon marine.
20   Q    As you were moving through the house, checking to see if    02:34
21   there were any other persons in the house, did you at any time
22   notice what was going on with the four Iraqis that you
23   encountered when you first came in?
24   A    Generally not.  Every time I'd come back and inform my
25   fire team leader that the house was clear and there wasn't      02:35
```

1   anybody else there, they would usually charge us to go search

2   or -- I had a job at all times.  So, generally, I left that to

3   the marines.  That's generally how it works, is that you want

4   to make sure that whatever your job is, you do your job and

5   then let them do their job.  Because the fact that -- you know,   02:35

6   if you end up not doing your job right, then that's a point

7   that's not being taken care of; and that leaves kind of, like,

8   a vulnerability in your group.  So that's generally how you're

9   trained, is to make sure that -- you know, I'm here to do my

10  job.                                                              02:35

11  Q    And your first job was to make sure no one else was in the

12  house; correct?

13  A    Correct.

14  Q    And there were no other persons in the house.

15  A    No.                                                          02:35

16  Q    After you did that, you said you reported your findings to

17  someone.

18  A    Yes.

19  Q    Who was that?

20  A    I believe it was my fire team leader.  That's generally --   02:35

21  it's like a chain of command.  You generally inform the next in

22  command that that's what you're doing.  That's kind of the

23  person you go to.  So it would be Corporal Weemer.

24  Q    When you came back and informed Corporal Weemer that there

25  were no other persons in the house, what was he doing?           02:36

1  A    He was conversing with Sergeant Nazario and the weapons

2  platoon.  Like, Nelson was questioning or -- I guess he had

3  kind of a rudimentary understanding of Arabic, so he was kind

4  of questioning them as to what they were there for, what they

5  were doing.                                                    02:36

6  Q    At the time when you came back to report no other persons

7  in the house, what were the four males doing?

8  A    They were still pretty much in the same position as far

9  as -- to my -- I mean, it wasn't -- I wasn't specifically

10  paying attention to what they were doing.  Again, I came down  02:36

11  to report, find out what else I needed to do, and so -- but

12  they were still in the same room, the same main room; and they

13  were still basically along the wall.

14  Q    And you said that you recall Jermaine Nelson attempting to

15  question them.                                                 02:37

16  A    Yes.

17  Q    Do you recall anything that he was saying to them?

18  A    No.

19  Q    But you recall him speaking to the four men.

20  A    Yes.                                                      02:37

21  Q    I believe you said a moment ago that Corporal Weemer and

22  Sergeant Nazario were conversing.

23  A    Yes.  It was kind of like that's the group, while the

24  lower, I guess Prentice and I, or the other weapons platoon

25  marine -- it's kind of like we got the busywork, that kind of  02:37

1   thing, while they figure out what's going on, that kind of

2   stuff.

3   Q    So while you were searching the house, did the three of

4   them remain with the four Iraqis?

5   A    Yes.                                                          02:38

6   Q    When you characterize the four men as Iraqis, do you know

7   for sure what nationality they were?

8   A    It would have been, like, an Arabic nationality.  I

9   obviously don't know, like, as far as their language or accent

10  or dialect; but that's generally what I would peg them as.       02:38

11  Q    So you were making that characterization just based on

12  what you saw of them.

13  A    Yes.

14  Q    After you reported to Corporal Weemer that there were no

15  other persons in the house, what happened at that point?         02:38

16  A    After that, he charged us to start searching the house,

17  search for -- when you're searching, you search for any

18  evidence, like -- generally weapons; but anything that you

19  find, you'd report back, that kind of thing.

20  Q    Did you then go back through the house to do a more          02:38

21  thorough search?

22  A    Yes.

23  Q    Do you recall what part of the house you searched?

24  A    The downstairs, generally.  That's where most everything

25  is.  The upstairs, there's pretty much just rooms; there's       02:39

1    nothing really there.  So it would be -- we'd search the

2    downstairs.  Most stuff was generally, like, in two different

3    rooms that I searched.  One that I'd call the rug room, just

4    because it's a room that they stack all of their bedding and

5    any sort of rugs or pillows and that kind of stuff.  They have        02:39

6    shelves; and on top of the shelves, they would just stack

7    those, like, blankets and pillows and foam.  And then the other

8    room that was pretty thoroughly searched by me and Prentice

9    would have been, like, an office.  It had a safe in there; it

10   had, like, cabinets and a desk, that kind of stuff, in there.         02:39

11   Q    Now, you said you found something in the rug room.

12        What did you find there?

13   A    A weapon, an AK-47.

14   Q    Describe for the jury, if you could, what an AK-47 is.

15   A    They're pretty common.  They generally -- an AK-47 is a          02:40

16   machine gun, very similar to how your M16 would work; that's

17   basically how the AK-47 would work; slightly larger around, but

18   pretty much the same style of weapon.

19   Q    And how many AK-47s did you find in the rug room?

20   A    Just one.                                                        02:40

21   Q    And you said you also found something in what you

22   characterized as an office?

23   A    Yes.  Another weapon.

24   Q    Was that another AK-47?

25   A    Yes.                                                             02:40

1  Q    Other than the two AK-47s, did you find anything else of

2  note?

3  A    No.

4  Q    Were the AK-47s loaded?

5  A    I don't recall.                                              02:40

6  Q    After you found the AK-47s, what did you do?

7  A    Returned them to Corporal Weemer -- or to one of them.  I

8  don't know exactly who I reported it to, but I basically gave

9  them the weapons and continued on with the search.

10 Q    Did you see what they did with the weapons after you gave   02:41

11 them to them?

12 A    No.

13 Q    So after you found the weapons, gave them to

14 Corporal Weemer, you say you went back to do another search.

15 A    Yes.                                                        02:41

16 Q    When you came in to give the weapons to Corporal Weemer,

17 do you recall what was happening with the four males?

18 A    Not specifically, no.

19 Q    Were they still in the same general location?

20 A    Yes.                                                        02:41

21 Q    And were Sergeant Nazario, Jermaine Nelson, and

22 Corporal Weemer still there with them?

23 A    Yes.

24 Q    After you give the weapons to Corporal Weemer, you said

25 you went back to do a further search.                           02:41

1   A     Yes.

2   Q     Where did you go?

3   A     Went back into either of those rooms and just -- more

4   thorough search, you know, go through everything and pull

5   things apart.  The first initial one would be more of a hasty          02:42

6   search, and then the following ones -- and sometimes it's

7   also -- I wouldn't say busywork, but along those lines, meaning

8   that you're just trying to keep yourself busy, trying to make

9   sure that you search it thoroughly, to see if you can find

10  anything else; but basically you're just going over things          02:42

11  again.

12  Q     The rug room and the office, were they both on the

13  downstairs floor?

14  A     Yes.

15  Q     Where were those rooms in relation to the area where the          02:42

16  four men were being watched over?

17  A     Generally, there's a large -- in most of the buildings,

18  there's a large main room that all of the other rooms are

19  accessed to; so that main room -- every other room would go

20  into that room.  So this larger room is where they were -- the          02:42

21  main -- I don't know if you could call it a courtyard or

22  whatever.

23  Q     That's where the four Iraqis were.

24  A     Uh-huh.  Yes.

25  Q     Now, while you were doing this second thorough search, did          02:43

1   anything unusual happen?

2   A    No.

3   Q    What did you do after you did this second, more thorough

4   search?

5   A    Well, it was in the midst of that.  I mean, that was                02:43

6   towards the end, I mean, towards what eventually happened.

7   That's all that I did, was continually search.

8   Q    While you were conducting, or finishing up, at least, the

9   second search that you did, did you hear a gunshot?

10  A    Yes.                                                                 02:43

11  Q    Do you recall where you were when you heard that?

12  A    I believe it was the office.

13  Q    The room where you had found the safe?

14  A    Yes.

15  Q    Prior to hearing the gunshot, did you hear any voices or            02:43

16  conversation or anything like that?

17  A    Yeah.  There was voices and conversation, but, I mean, as

18  far as what they said and what they were doing, I don't know.

19  Q    Before hearing the gunshot, did you hear anything that you

20  thought to be out of the ordinary?                                       02:44

21  A    No.

22  Q    When you heard the gunshot, what did you do?

23  A    I immediately tried to find where the gunshot came from

24  and what happened.

25  Q    And what specifically did you do?                                   02:44

1    A    I left the room that I was in and walked and saw

2    Corporal Weemer in the kitchen with a 9 mm in his hand, and the

3    older gentleman lying on the ground, dead.

4    Q    When you first saw him, what was Corporal Weemer doing

5    with his 9 mm?                                                    02:44

6    A    Nothing specific.  Just bringing it back from a firing

7    position to more of a relaxed position.

8    Q    When you say 9 mm, is that a handgun?

9    A    Yes.

10   Q    Were all of you equipped with 9 mm handguns?               02:45

11   A    No.  There wasn't -- I guess there's not enough to go

12   around.  They kind of left -- there's only a couple in our

13   platoon that were issued the 9 mm.

14   Q    You said that the older male was laying on the floor in

15   front of Corporal Weemer?                                        02:45

16   A    Yes.

17   Q    What, if anything, did you notice about his condition?

18   A    He had a pool of blood behind his head and looked as if he

19   had been shot in the head.

20   Q    When you left the office and went towards the kitchen, did  02:45

21   you notice whether Sergeant Nazario, Jermaine Nelson, and the

22   other Iraqi males were still in that main room?

23   A    No, they were not.

24   Q    Did you see where they had moved to?

25   A    As far as noticing it, I'm sure I did; but, like, as far    02:46

```
 1   as remembering specifically, or thinking about, 'Oh, they're
 2   over there,' I don't remember.  But it was more along the lines
 3   of I saw this, and then that was my immediate attention
 4   afterwards, was to go to the room that Sergeant Nazario and the
 5   other three were in.                                              02:46
 6   Q    After you saw this scene in the kitchen, did you turn to
 7   find where the other marines and the Iraqis were?
 8   A    Yes.
 9   Q    And where were they?
10   A    They were in another room that was directly across from    02:46
11   the office, kind of like a living room area.
12   Q    Why do you characterize it as a living room area?
13   A    In there, there's couches and rugs, and it's more of a
14   guest area, I guess you could say; like, you'd invite people to
15   come and they would sit down and discuss things, I guess.  But  02:46
16   that's kind of like the atmosphere you'd get from it.
17   Q    And when you turned and saw them in the living room area,
18   what was Sergeant Nazario doing?
19   A    He was standing there in front of them, and they had been
20   lined up directly in front of him, with the front of the       02:47
21   building behind them; and he was -- he had his weapon at the
22   ready.
23   Q    And, again, what do you mean when you say 'at the ready'?
24   A    More of like a 45-degree angle, holding it -- not at
25   alert, but just kind of there.                                  02:47
```

1    Q    So pointing down towards the ground?

2    A    Yes.

3    Q    And you said that the three Iraqi males were facing him.

4    A    Yes.

5    Q    Were they standing or sitting?                          02:47

6    A    Standing.

7    Q    Do you recall what the three of them were doing?

8    A    Nothing.  They were just standing there, staring at

9    Sergeant Nazario.

10   Q    Do you recall whether anybody else was in that room?   02:47

11   A    I don't recall.

12   Q    Do you recall where James Prentice was when you were

13   observing this?

14   A    He was with me.  He was just to the side of me.

15   Q    Did you actually go into the living room, or did you look  02:48

16   into the living room from that main room?

17   A    I did not go into the room.  I was just outside the room,

18   looking in.

19   Q    After you looked into the living room and you saw

20   Sergeant Nazario standing in front of the three Iraqi males,   02:48

21   what happened next?

22   A    There was a reference to whether or not Prentice wanted to

23   be involved in shooting them or -- I don't remember the

24   specific words, but along those lines.  And Prentice was

25   considering it just because of the fact that he was really     02:48

1  upset about his good friend, Lance Corporal Segura, that he

2  just found out that had died just earlier.

3  Q    When you say there was reference to that, do you recall

4  who said it?

5  A    Sergeant Nazario?  As far as who said...                    02:49

6  Q    Who asked Prentice whether he wanted to participate?

7  A    Sergeant Nazario.

8  Q    You said that Prentice appeared to you at that point to be

9  upset.

10       Had he voiced his emotions to you, or are you just       02:49

11  assessing the way he physically appeared?

12  A    More along the lines of the way he physically appeared.

13  You could tell that he was a bit distressed about it.  He

14  didn't look -- he was pretty unhappy about it, so...

15  Q    After Sergeant Nazario made that comment to Prentice, what  02:49

16  did you do?

17  A    I turned to Prentice and began to, at least, calm him

18  down.  I don't remember what I said, but along the lines where

19  we both understood that that's not something that we wanted to

20  do.  And so after that, we tried to find an exit, basically.    02:50

21  Q    Did anything unusual happen as you were trying to find an

22  exit?

23  A    Yes.  There was a gunshot.

24  Q    What did you do when you heard that gunshot?

25  A    Initially, there was a gunshot, and we were coming to the   02:50

```
 1   front door, which was locked, and so we were on our way back.
 2   And at the time that we were on our way back, we heard the
 3   gunshot.  And then -- well, then we came to look in, to find
 4   out what happened.
 5   Q    What did you see when you looked in to where the gunshot        02:50
 6   came from?
 7   A    One man was laying on the ground.  Didn't look too far
 8   into it to find out, like, as far as the injury; but he was
 9   obviously dead.  And Sergeant Nazario was returning his weapon
10   to the ready.                                                        02:51
11   Q    What causes you to form the opinion that the Iraqi male
12   was dead?
13   A    The look on the face of the other two and the fact that he
14   was basically laid face up and not moving.
15   Q    Did you see any blood?                                          02:51
16   A    I didn't personally, no.
17   Q    When you said that Sergeant Nazario was returning his
18   weapon to the ready, what exactly did you see him doing with
19   the weapon?
20   A    Just basically -- it would be, like, bringing it back to       02:51
21   the ready; like, it would be at the alert and then at the
22   ready, and then that's where he stayed.
23   Q    When you say "weapon," are you referring to an M16?
24   A    Yes.
25   Q    When you first saw him, the M16 was elevated more, like,       02:51
```

1  at the alert; isn't that correct?

2  A    I didn't actually see him at the alert.  It was more of a

3  glance into the room that saw that his weapon was coming back

4  from an upward position to a lower position.

5  Q    Did he say anything when you saw him at that point?                    02:52

6  A    No.

7  Q    Before you heard that gunshot, did you hear any voices

8  coming from the room where the Iraqis were?

9  A    No.

10 Q    When you saw Sergeant Nazario lowering his M16, you said          02:52

11 you also saw the other two Iraqis still in that room.

12 A    Yes.

13 Q    What were they doing?

14 A    Standing there, still staring at Sergeant Nazario.

15 Q    Were they making any movements at all?                            02:52

16 A    No.

17 Q    Were they saying anything?

18 A    No.  They -- something that you -- something I won't

19 forget is their face.  There was obviously dread.  Obviously,

20 they didn't -- I don't know if you could imagine being put in       02:53

21 that situation.  I think of it myself and I imagine what kind

22 of face I would have.  I guess that's the face that I saw on

23 both of those men.

24 Q    Did they appear scared?

25 A    Yes.                                                             02:53

1   Q     Did they make any attempt to run away?

2   A     No.

3   Q     After you saw that, what did you do?

4   A     As soon as I saw that, I immediately still had the impulse

5   that I wanted to get out of the building, so I walked                02:53

6   further -- we met Corporal Weemer, and we both -- on our way,

7   he decided that he needed to get out of there as well; so we

8   started towards the back door that we came in at originally.

9   So we went back there, and then we heard another gunshot.

10  Q     So you heard another gunshot as you were heading towards        02:53

11  the back door.

12  A     Yes.

13  Q     What did you do when you heard that gunshot?

14  A     Just kept going.

15  Q     You didn't turn back towards that gunshot?                      02:54

16  A     No.

17  Q     After you heard that gunshot, did you actually leave the

18  house?

19  A     As we were leaving the house, we heard a third gunshot;

20  and then that's when we left the house, after that gunshot.          02:54

21  Q     So you heard two additional gunshots while you were still

22  in the house.

23  A     Yes.

24  Q     And then you left the house.

25  A     Yes.                                                            02:54

1   Q    After the second gunshot, as you're leaving the house, did

2   you turn back towards the gunfire?

3   A    No.

4   Q    At that point, were you concerned at all that the marines

5   in the house might need assistance?                                02:54

6   A    No.

7   Q    When you left the house, what did you do?

8   A    I left the house and left the courtyard, and immediately

9   went along the roadway where the Humvees were parked; and there

10  I met Lance Corporal Severtsgaard.                                 02:55

11  Q    Was he a member of your platoon?

12  A    Yes.

13  Q    Was he in your squad?

14  A    No.  He was in second squad.

15  Q    At some point prior to your involvement in Phantom Fury,      02:55

16  were you a member of the same squad as Severtsgaard?

17  A    Yes.  I was in second squad, and then about a month before

18  Fallujah, I got transferred to third squad because they were

19  low on men.

20  Q    So were you friends with Severtsgaard?                        02:55

21  A    Yes.

22  Q    And when you ran into him, what happened?

23  A    As I was talking to him, it wasn't -- I don't remember the

24  exact conversation, but he asked me what had happened, or what

25  went on; and I really didn't have anything to say.  I was still   02:56

```
 1   trying to process what was going on myself.  So I don't
 2   remember saying much to him, but just kind of the feeling of
 3   it, just kind of, like, okay -- I don't know.
 4           My thoughts were in a whirlwind, I suppose.
 5   Q    Now, you said that you also at that time saw that the          02:56
 6   Humvees were still parked on the street.
 7   A    Yes.
 8   Q    Were there other marines in the area?
 9   A    Yes.
10   Q    Do you recall how many you saw out in that area when you       02:56
11   left the house?
12   A    Not specifically how many, but the platoon was still in
13   that T-intersection.
14   Q    After you spoke with Severtsgaard, what did he do?
15   A    I don't recall.  I left Severtsgaard and took position        02:56
16   along the roadway, kind of just posting watch, that kind of
17   thing.
18   Q    Do you recall about how long you remained at that
19   position, posting watch?
20   A    No more than five or ten minutes.                             02:57
21   Q    What happened after five or ten minutes?
22   A    We were charged to take the injured marines and the
23   Humvees with flat fires back to the train station to get new
24   tires on it and to bring those injured to a casualty collection
25   point.                                                             02:57
```

1  Q    When you say "injured marines," who are you referring to?

2  A    There was Doc Borosa, and there was also Lance Corporal

3  Tran.

4  Q    Do you know how they were injured?

5  A    With shrapnel from the mortar rounds.  They weren't          02:57

6  seriously injured, as far as I knew.  Otherwise, they probably

7  would have gotten them out a lot sooner.  But it was just basic

8  shrapnel to -- I believe Tran's was to his legs, and Doc Borosa

9  was also to his legs.

10  Q    So you were tasked with taking them and some Humvees back    02:57

11  up to the train station.

12  A    Yes.

13  Q    Were any other members of your unit assigned to do that

14  with you?

15  A    Yes.  It was my fire team.                                    02:58

16  Q    So that would have been yourself, Ryan Weemer, and

17  James Prentice.

18  A    Yes.

19  Q    How many Humvees did you take back to the train station at

20  that point?                                                        02:58

21  A    I don't specifically recall.

22  Q    How long, approximately, was the ride from where you were

23  located at that T-intersection back to the train station?

24  A    Not too much.  It was the first day of fighting, so we

25  were relatively close to the station; so maybe five or ten        02:58

1   minutes.

2   Q    And why did you go back to the train station?

3   A    That's the casualty collection point.  That's also, like,

4   the offensive headquarters.  So it's basically where the brains

5   of the operations are.  So you go back there, get refueled; any

6   supplies that you may need, that's the place you go; or to drop

7   off casualties.

8   Q    You should have a binder in front of you.  If you could

9   please open the binder to Exhibit 18.

10          Do you recognize the photograph marked as Exhibit 18?

11   A    Yes.

12   Q    What's depicted in this photograph?

13   A    The other weapons platoon marine.

14   Q    Not Jermaine Nelson?

15   A    No.

16   Q    And do you recognize the structure that the weapons

17   platoon member is standing in front of?

18   A    Yes.  The front gate of the building, or the house.

19   Q    The house that we've been talking about, where the four

20   Iraqis were?

21   A    Yes.

22   Q    How do you recognize that as the front gate?

23   A    Just the design, like the light blue.  And also kind of

24   the mangled door hinge just to the left of him.

25          **MR. BEHNKE:**  Your Honor, the government moves

02:58
03:00
03:00
03:00
03:00

| | |
|---|---|
| 1 | Exhibit 18 into evidence. |
| 2 | **MR. McDERMOTT:**  No objection. |
| 3 | **THE COURT:**  It's admitted.  You may publish. |
| 4 | (Exhibit 18 received.) |
| 5 | **BY MR. BEHNKE:** |
| 6 | Q    So the individual in this photograph was the other weapons |
| 7 | platoon member that was with you at the house. |
| 8 | A    Yes. |
| 9 | Q    And the gate that he appears to be standing in the middle |
| 10 | of, that was the front gate of this particular house. |
| 11 | A    Yes. |
| 12 | Q    When you were going through Fallujah during this |
| 13 | operation, was it unusual at all to have marines taking |
| 14 | pictures of things? |
| 15 | A    No. |
| 16 | Q    Did some marines actually have disposable cameras with |
| 17 | them? |
| 18 | A    Yes; some even digital. |
| 19 | Q    In the binder in front of you, please turn to Exhibit 29. |
| 20 | Do you recognize that? |
| 21 | A    Yes. |
| 22 | Q    What is depicted in Exhibit 29? |
| 23 | A    The larger room that enters the rest of the rooms that I |
| 24 | was speaking of, where the four Iraqis were. |
| 25 | Q    In the back middle of this photograph, there appears to be |

03:00

03:01

03:01

03:02

03:02

1    a double door.

2            Do you recognize that?

3    A    Yes.

4    Q    What door is that?

5    A    The door that we came in.                          03:02

6            **MR. BEHNKE:**  Your Honor, the Government moves

7    Exhibit 29 into evidence.

8            **THE COURT:**  Just to be clear, this was not taken on

9    the day -- lay a further foundation, Counsel.

10           **MR. BEHNKE:**  Yes.                            03:03

11   **BY MR. BEHNKE:**

12   Q    Does this photograph appear to have been taken on the day

13   of this incident?

14   A    No.

15   Q    The mats and individuals depicted in this photograph were   03:03

16   not present in the house on the day you went in; correct?

17   A    No.  They weren't there.

18   Q    But does the photograph accurately depict the layout of

19   the house?

20   A    Yes.                                                03:03

21           **MR. BEHNKE:**  The government moves Exhibit 29 into

22   evidence, Your Honor.

23           **MR. McDERMOTT:**  For the obvious -- the four walls

24   fine, but the individuals inside, because it's not

25   contemporaneous, we would object to that.               03:03

1          **THE COURT:**  Overruled.

2          You may publish, with the record being what it is.

3   **BY MR. BEHNKE:**

4   Q    Now, the double doors that you mentioned a moment ago, are

5   those the doors that I'm highlighting with the arrow?          03:04

6   A    Yes.

7   Q    So those are the doors that you first entered the house

8   through.

9   A    Yes.

10  Q    And there appears to be some structure just to the left of   03:04

11  those doors as you're looking at the photograph, or it would be

12  to the right as you entered the house.

13          Do you know what that is?

14  A    Those are the stairs that went upstairs.

15  Q    And does this photograph depict that main room you were      03:05

16  referring to?

17  A    Yes.

18  Q    Looking at this photograph, do you recall where the four

19  Iraqis were seated when you first came in the house?

20  A    As far as my memory serves me, the young lady with the       03:05

21  tangerine or orange shirt, right along that wall right there.

22  Q    The wall on the right side, as you're looking at the

23  photograph?

24  A    Yes.

25  Q    And just to the right of the double doors, there appears     03:05

1    to be another door that I'm highlighting.

2            Do you see that?

3    A    Yes.  That would be the kitchen.

4    Q    In your binder, would you please turn to Exhibit 27.

5            Do you recognize this photograph?                    03:06

6    A    As far as it was previously shown to me.

7    Q    What does this photograph depict?

8    A    A different angle on that same room.

9    Q    Again, the individuals depicted in this photograph were

10   not present on November 9, 2004; correct?                     03:06

11   A    No.

12   Q    But does this photograph fairly and accurately depict how

13   the structure of the room looked?

14   A    Yes.

15           **MR. BEHNKE:**  The government moves Exhibit 27 into    03:07

16   evidence, Your Honor.

17           **THE COURT:**  What about the other items besides the

18   people?  The mats and the pillows and other items, bowls, were

19   they present there?

20           **THE WITNESS:**  No.                                    03:07

21           **MR. BEHNKE:**  Your Honor, just so the record is clear,

22   the government offers this and all of the other photographic

23   exhibits for the purpose of establishing the structure of the

24   residence, not the individuals or furnishings depicted therein.

25           **THE COURT:**  Very well.                              03:07

1         Any objection?

2         **MR. McDERMOTT:**  No objection at that.

3         **THE COURT:**  Very well.

4         It's admitted.  You may publish.

5         (Exhibit 27 received. )                                   03:07

6    **BY MR. BEHNKE:**

7    Q    Exhibit 27 that we're looking at now, does this show that

8    same main room from the opposite direction?

9    A    Yes.

10   Q    Looking at this photograph, where would the four men have    03:07

11   been seated when you first came in the house?

12   A    Between those two doors.

13   Q    On the left side of the photograph?

14   A    Yes.

15   Q    Now, Sir, in your binder, please turn to Exhibit 24.          03:08

16        Do you recognize that photograph?

17   A    Yes.

18   Q    What does this depict?

19   A    The stairs.

20   Q    Are these the stairs that would have been just to your        03:08

21   right as you entered the house?

22   A    Yes.

23   Q    And again, the individuals and items such as -- what

24   appear to be shoes on the stairs, were any of those present on

25   9 November 2004?                                                   03:09

1    A    No.

2    Q    But does this appear to fairly and accurately depict the

3    layout of the stairs?

4    A    Yes.

5            **MR. BEHNKE:**  The government moves Exhibit 24 into                03:09

6    evidence to the same qualifications.

7            **MR. McDERMOTT:**  No objection.

8            **THE COURT:**  It's admitted.  You may publish.

9            (Exhibit 24 received. )

10   **BY MR. BEHNKE:**                                                            03:09

11   Q    Now we're looking at Exhibit 24.

12           These would be the stairs immediately to your right

13   as you entered the house.

14   A    Yes.

15   Q    Please turn to Exhibit 38.                                               03:10

16           Do you recognize this photograph?

17   A    Yes.  The kitchen.

18   Q    Do you recall whether, on November 9, 2004, all of the

19   appliances and other furnishings in this photograph were

20   actually present?                                                            03:10

21   A    Not to my knowledge.  I mean, when I was there, there was

22   still a kitchen.  I'm not sure if all of this was still there

23   when I was there.

24           **MR. BEHNKE:**  The Government moves Exhibit 38 into

25   evidence, Your Honor, same qualifications.                                   03:10

1          **MR. McDERMOTT:**  No objection, Your Honor.

2          **THE COURT:**  It's admitted.

3          You may proceed and publish.

4          (Exhibit 38 is admitted.)

5  **BY MR. BEHNKE:**                                              03:10

6  Q    Exhibit 38 that we're looking at now, a shot of the

7  kitchen, is this essentially the view into the kitchen from the

8  main room?

9  A    Yes.

10  Q    And do you recall, when you saw Ryan Weemer in the        03:11

11  kitchen, standing over the older Iraqi male, approximately how

12  far into the kitchen they were?

13  A    I don't specifically recall.  But as far as what I do

14  remember -- like, I couldn't give you, like, the feet; but

15  probably along the lines of the door that's just on your left,  03:11

16  he would have been standing, probably, three or four feet to

17  the right there; and then the body would have been another

18  three feet, and then the body's feet would be there, the head

19  would be further.

20  Q    In the photograph on the right side, there appears to be  03:11

21  green laminate or tile on the floor.

22          Would they have been as far into the room as that

23  green?

24  A    As far as the Iraqi, yes; the older gentleman would have

25  been probably either -- like, his knees would probably be at   03:11

1   that line, and then his head would be into the green laminate.

2   Q    Where was Ryan Weemer in relation to the Iraqi body?

3   A    He'd have been about three feet to the left of that,

4   standing over him.

5           **THE COURT:**  Counsel, it's the noon hour.  Let's take                03:12

6   our lunch recess now.  We'll return to this matter at 1:30.

7           I'll see the jury at that time.

8           (Whereupon, jurors depart courtroom.)

9           **THE COURT:**  Counsel, are there any matters that we

10  need to take up before we resume at 1:30?                                       03:13

11          **MR. BEHNKE:**  I don't believe so, Your Honor.

12          **THE COURT:**  All right.  I'll see counsel back here at

13  1:30.

14          The Court did receive a note from the jury in the

15  Mattel case indicating that they have reached a unanimous                       03:13

16  verdict.  I sent them to lunch, and they're going to be

17  returning at 1:00 for the reading of that verdict.  That should

18  be done by 1:30, and then we can resume with this trial at

19  1:30.

20          Court is in recess until then.                                          03:13

21          (Whereupon, the morning session concluded.)

22

23

24  / / /

25  / / /

```
 1                        CERTIFICATE

 2

 3  I hereby certify that pursuant to section 753, title 28, united
    states code, the foregoing is a true and correct transcript of
 4  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
 5  conformance with the regulations of the judicial conference of
    the United States.

 6

 7  _____        _____
    THERESA A. LANZA, CSR, RPR                        Date
 8  Federal Official Court Reporter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```