1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4                        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7
   UNITED STATES OF AMERICA,          )
8                                     )
                        Plaintiff,    )
9                                     )
             vs.                      )   No. ED CR 07-00127-SGL
10                                    )
   JOSE LUIS NAZARIO, JR.,            )
11                                    )
                        Defendant.    )   Trial day 5,
12   _____)   Morning Session

13

14           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

15                   Riverside, California

16                 Wednesday, August 27, 2008

17                       8:39 a.m.

18

19

20

21

22

23              THERESA A. LANZA, CSR, RPR
               Federal Official Court Reporter
24               3470 12th Street, RM. 134
                Riverside, California  92501
25                     (951) 274-0844
                  WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2   On behalf of Plaintiff, United States of America:

 3                         United States Attorney's Office
                           By: Jerry Behnke
 4                             Charles J. Kovats
                           Assistant United States Attorneys
 5                         3880 Lemon Street,
                           Suite 210
 6                         Riverside, California 92501
                           (951) 276-6210

 7

 8   on behalf of Defendant Jose Luis Nazario, Jr.:

 9                         Law Offices of Kevin Barry McDermott
                           By:  Kevin Barry McDermott
10                         17452 Irvine Boulevard,
                           Suite 200
11                         Tustin, California 92780
                           (714) 731-5297

12
                           Douglas L. Applegate
13                         18301 Von Karmon
                           suite 210
14                         Irvine, California 92612
                           (888) 583-2266

15
                           Pepper Hamilton LLP
16                         By:  Joseph M. Preis
                           Suite 1200
17                         4 Park Plaza
                           Irvine, California 92614-5955
18                         (949) 567-3500

19                         Law Offices of Vincent J. LaBarbera, Jr.
                           By:  Vincent J. LaBarbera, Jr.
20                         600 West Santa Ana Boulevard,
                           Suite 950
21                         Santa Ana, California 92701
                           (714) 541-9668

22

23   Also present:       Mark Fox, Special Agent

24

25
```

Wednesday, August 27, 2008                          ED CR 07-00127-SGL

```
 1                        I N D E X

 2                                              Page

 3   Plaintiff Case (cont'd).......................  11

 4   Jury Instructions.............................  39

 5   Closing Argument - Plaintiff..................  50

 6   Juror note (from Afternoon session)...........  71

 7

 8   PLAINTIFF
     WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
 9   MARK FOX

10   By Mr. Behnke       11
     By Mr. McDermott              17
11

12

13

14
                 EXHIBITS          RECEIVED
15
                   Tape                9
16

17

18

19

20

21

22

23

24

25
```

```
 1    Riverside, California; Wednesday, August 27, 2008; 8:39 A.M.

 2                             -oOo-

 3         (Proceedings held outside the presence of the jury:)

 4         THE COURT:  Appearances from counsel, please.

 5         MR. McDERMOTT:  Kevin McDermott, Douglas Applegate,       00:00

 6    Joseph Preis, and Vincent LaBarbera for the defendant, Jose

 7    Luis Nazario, Jr.

 8         MR. BEHNKE:  Jerry Behnke and Charles Kovats for the

 9    United States; also present is Special Agent Fox.

10         THE COURT:  We're on calendar this morning to take up    00:00

11    the motion to exclude the Nelson pretext conversation

12    audiotapes.  I've received and reviewed the motion filed

13    overnight by the defense, and I have received the government's

14    trial brief regarding the admissibility of the telephone call

15    between Nelson and Defendant.                                  00:00

16         Is there anything further from counsel that's not set

17    forth in their papers at this time?

18         From the government?

19         MR. BEHNKE:  No, Your Honor.  Other than although it

20    was mentioned in court yesterday, and I did spell this out in  00:00

21    the government's brief, but to the extent that the Court agrees

22    with the government's legal analysis regarding the effect of

23    the statements and their admissibility, the government did not

24    propose any limiting instruction for the reason that if the

25    Court does deem that the statements are admissible, I think the 00:00
```

1   decision really rests with the defense as to whether they would

2   want any kind of limiting instruction given to the jury.  And

3   the reason for that is that I could see potentially the defense

4   not wanting that for fear of highlighting, somehow, Nelson's

5   statements.                                                    00:01

6           So rather than propose a limiting instruction, I

7   thought I would leave it to the defense, if that's a decision

8   that they made.

9           **THE COURT:**  Thank you, Counsel.

10          **MR. BEHNKE:**  Also, just getting back to what was   00:01

11  discussed yesterday, just to address the point of the

12  timeliness of this, I went back and I pulled the Motion *in*

13  *Limine* and the letter from the defense in response to the

14  government's motion issues, and they did raise in their letter

15  in response the Crawford issue regarding this telephone call.  00:01

16          **THE COURT:**  I recall that.  I looked at that myself.

17  That's my recollection as well.

18          Thank you, Counsel.

19          Mr. McDermott?

20      **MR. McDERMOTT:**  Sir, I don't know that we had the      00:01

21  excerpt that they are using.

22          **THE COURT:**  It's of no moment.  I'll fully consider

23  it and I'm reconsidering the entire brief in light of the

24  filing yesterday.

25          **MR. McDERMOTT:**  Thank you.                         00:02

1         And in response to the comments of the government, we

2    would certainly want an instruction, if the Court was going to

3    go to the direction of offering it, we would want it

4    highlighted with the jury that nothing Nelson has to say, in

5    any way, shape or form, can be taken for the truth of the          00:02

6    matter asserted and only for the limited purpose of context in

7    whatever manner it might be apparent in the recording itself.

8    Because as we highlight -- and this may be a separate 403

9    issue -- whether or not this recording in any way, in and of

10   itself, provides enough information and evidence about time and   00:02

11   place as to what the two men on the tape were talking about.

12         **THE COURT:**  Very good.

13         **MR. McDERMOTT:**  Thank you.

14         **THE COURT:**  Counsel, I appreciate your arguments, and

15   you do as good a job as anybody could in arguing the Crawford     00:02

16   analysis.  But I think the case law is quite strong on this

17   point, that this is a permissible introduction of a

18   nontestifying declarant to provide context to the conversation.

19         There is the Third Circuit case, which is almost

20   directly on point, that is offered by the government, but a       00:03

21   number of the Ninth Circuit cases that I referred to in the

22   defense brief and a number of the cases that the Court has

23   looked at that are cited by neither side clearly indicate that

24   this type of context is permissible.  Although, it is something

25   which should, in my view, as the defense requests, be            00:03

1    accompanied by a clear instruction to the jury that the only

2    part of the conversation, or the part of the conversation that

3    the jury should consider for the truth of the matter is the

4    statements by the defendant, Mr. Nazario, and not the

5    statements by Mr. Nelson.  The statements by Nelson are simply        00:03

6    being offered to provide context or to make sense of the

7    statements being made by Sergeant Nazario.  And that is the

8    instruction that I propose to give to the jury.

9           Otherwise, I do find that the -- I have read the

10   transcript.  I believe it is irrelevant.  I believe the              00:04

11   relevance of it outweighs the 403 concerns set forth by the

12   defense, and so I am going to deem that admissible.  It is not

13   the sort of testimonial statement as Sergeant Weemer's

14   statement was that the court excluded.  The Nelson portion of

15   it is -- whether you characterize it as testimonial or non-          00:04

16   testimonial, it is certainly provided for the non hearsay

17   purpose of providing context, and I believe the case law

18   clearly supports that; so the motion is denied.

19          I will give the instruction at the time or right in

20   advance of the tape being played; so when we get to that point,      00:04

21   after an appropriate foundation is laid, assuming that an

22   appropriate foundation is laid, and the government seeks to

23   introduce it, at that time the Court will provide the

24   instruction.

25          Is there anything further from the government on              00:05

1   this?

2           **MR. BEHNKE:**  No, Your Honor.

3           **THE COURT:**  Defense?

4           **MR. McDERMOTT:**  Sir, just real quickly.

5           The transcript was redacted in certain portions;          00:05

6   obviously, and cut down quite a bit.  The issue that we had at

7   side-bar yesterday relative to the order -- because this

8   transcript, at least in its present state, talks about

9   Lieutenant Grapes and an order being received from battalion

10  commanders, that sort of thing -- I'm wondering if the          00:05

11  government, based upon the Court's earlier ruling on how far we

12  can go with this order from higher above, can be included or

13  kept in this particular transcript?

14          **THE COURT:**  The Court really didn't make a ruling in

15  terms of the order issued.  I sustained an objection to the     00:05

16  question and we moved on.

17          It's not clear to me whether it was -- your argument

18  basically is because that's evidence of first degree

19  premeditated murder, that it has no place in a voluntary

20  manslaughter trial.  I'm not sure if I'm following that         00:06

21  analysis.  I could certainly see, arguably, evidence of heat of

22  passion being insufficient in a first-degree murder trial, but

23  this is, to a certain extent, a lesser offense.

24          If there's evidence that he was involved in a greater

25  offense but the government has chosen to charge the lesser      00:06

```
 1   offense -- I really don't see the prejudice or the problem

 2   here, Counsel.

 3         MR. McDERMOTT:  All right.

 4         Just the comment, for the record, is having to do

 5   with because they did charge it as a heat-of-passion defense,     00:06

 6   allowing evidence on an issue perhaps relating to a higher or

 7   more serious crime should not be admitted.  And I'll leave it

 8   at that, Your Honor.

 9         THE COURT:  Okay.

10         Mr. Behnke, do you wish to respond any further?           00:06

11         MR. BEHNKE:  No, Your Honor.

12         THE COURT:  Very well.  The tape is admitted.

13         (Exhibit "Tape" is received.)

14         THE COURT:  If there's nothing else on the criminal

15   matter, I'll take the Mattel matter up at this time.            00:07

16         MR. BEHNKE:  Is our jury coming in at 9:30?

17         THE COURT:  Yes.

18         I'll devote the next 45 minutes to Mattel and then

19   we'll get on with the trial.

20         (Recess taken in this case.)                              00:07

21         (Jurors enter courtroom.)

22         THE CLERK:  Calling the case of plaintiff, United

23   States of America, versus defendant, Jose Luis Nazario, Jr.,

24   case number ED CR 07-00127-SGL.

25         May we have counsel please come forward and state         00:54
```

 1    your appearances for the record.

 2          **MR. BEHNKE:**  Jerry Behnke, Charles Kovats for the

 3    United States.  Also present is Special Agent Fox.

 4          **THE COURT:**  Good morning, Counsel.

 5          **MR. McDERMOTT:**  Kevin McDermott for the defendant            00:54

 6    Jose Luis Nazario, Jr., along with Joseph Preis,

 7    Vincent LaBarbera, Douglas Applegate and Emery Ledger.

 8          **THE COURT:**  Good morning to you all.

 9          And good morning, members of the jury.

10          The Court has been navigating a couple of cases, as            00:54

11    I'm sure you've figured out, but the other trial now is

12    completely over and we are now devoted to wrapping this case

13    up.

14          As I think Mr. Holmes communicated to you yesterday,

15    we anticipate that this matter will be in your hands to decide       00:55

16    some time tomorrow; so we're right on track in terms of getting

17    this resolved this week.

18          So with that, the government may call its next

19    witness.

20          **MR. BEHNKE:**  The government calls Mark Fox.                00:55

21          **THE CLERK:**  Do you solemnly state that the testimony

22    you may give in the cause now pending before this court shall

23    be the truth, the whole truth, and nothing but the truth, so

24    help you God.

25          **THE WITNESS:**  Yes, I do.

Wednesday, August 27, 2008                          ED CR 07-00127-SGL

1          **THE CLERK:**  Please state your full name and spell

2     your last name for the record.

3          **THE WITNESS:**  Mark Fox, F-o-x.

4          **THE COURT:**  Counsel may proceed.

5                    **DIRECT EXAMINATION**                          00:56

6     **BY MR. BEHNKE:**

7     Q    Sir, by whom are you employed?

8     A    By N.C.I.S., the Naval Criminal Investigative Service.

9     Q    What do you with the Naval Criminal Investigative Service?

10    A    I'm a special agent.                                     00:56

11    Q    For how long have you been a special agent with the

12    N.C.I.S.?

13    A    For 26 years.

14    Q    If you would, please explain for the jury what it is

15    N.C.I.S. does as an agency.                                   00:56

16    A    Every executive department within the federal government

17    employs special agents, criminal investigators.  N.C.I.S. is

18    that agency for the Department of the Navy, which of course

19    includes the Marine Corps.  We have a worldwide mission, agents

20    stationed both in the United States and overseas, and we're    00:56

21    responsible for executing the Department of the Navy's felony

22    criminal investigative counter-intelligence and counter-

23    espionage missions.

24    Q    As a Special Agent with N.C.I.S., what are your duties?

25    A    To conduct felony criminal investigations.               00:57

1   Q    As part of your duties as a special agent with N.C.I.S.,

2   were you charged with conducting the investigation of this

3   matter?

4   A    Yes, I was.

5   Q    And when did you begin your investigation into this                00:57

6   matter?

7   A    16 October, 2006.

8   Q    As part of your investigation into this case, in January

9   of 2007, did Jermaine Nelson agree to assist with your

10  investigation by making a recorded telephone call?                      00:57

11  A    Yes, he did.

12  Q    And to whom was that recorded telephone call made?

13  A    To the defendant.

14  Q    On what date did the telephone call occur?

15  A    8th of January, 2007.                                              00:57

16  Q    When Jermaine Nelson agreed to make the telephone call,

17  did he do so voluntarily?

18  A    Absolutely.

19            MR. McDERMOTT:  Objection.  Hearsay.

20            THE COURT:  Rephrase, Counsel.                                00:58

21  BY MR. BEHNKE:

22  Q    Did you make any threats or promises to Jermaine Nelson in

23  order to convince him to make the telephone call?

24  A    No.  Of course not.

25  Q    You said the telephone call took place on January 8th.            00:58

1    A     Yes, sir.

2    Q     2007?

3    A     Correct.

4    Q     During the telephone call itself, did you listen in on the

5    telephone call?                                                                00:58

6    A     Yes, I did.  I was present.

7    Q     So were you able to hear both sides of the conversation as

8    the telephone call took place?

9    A     No.  I could hear Sergeant Nelson's side of the

10   conversation.  I could not hear the defendant's.                               00:58

11   Q     As the telephone conversation was taking place, were you

12   recording it?

13   A     Yes, I was.

14   Q     If you would, please, I believe you have a red well with

15   folders in front of you.  If you would please open that to         00:59

16   number 46.

17            **THE COURT:**  Counsel, what is this?

18            **MR. BEHNKE:**  Exhibit 46 is the actual CD.

19            **THE COURT:**  Very well.

20            **THE WITNESS:**  Yes, sir.                                           00:59

21   **BY MR. BEHNKE:**

22   Q     Do you recognize Exhibit 46?

23   A     I do.  This is an excerpt of the audio recording of the

24   telephone call between Sergeant Nelson and the defendant on the

25   8th of January, 2007.                                                          00:59

1    Q    And how do you recognize the exhibit?

2    A    It bears my initials and my badge number.

3    Q    Have you listened to Exhibit 46?

4    A    Yes, I have.

5    Q    If you would please also turn to Exhibit 46-A in the          00:59

6    binder in front of you.

7    A    Yes, sir.

8    Q    Do you recognize Exhibit 46-A?

9    A    Yes, I do.

10   Q    What is 46-A?                                                 01:00

11   A    It's a transcript of this audio recording.

12   Q    Have you compared Exhibit 46-A to Exhibit 46 to check for

13   accuracy?

14   A    I have, yes, sir.

15   Q    In your opinion, is the transcript an accurate              01:00

16   transcription of the portion of the call contained on

17   Exhibit 46?

18   A    Yes, it is.

19           **MR. BEHNKE:**  Your Honor, the Government moves

20   Exhibits 46 and 46-A into evidence.                             01:00

21           **MR. McDERMOTT:**  Without adding more to the earlier

22   objections, nothing further.

23           **THE COURT:**  Nothing further?

24           **MR. McDERMOTT:**  That's correct.

25           **THE COURT:**  I need to be clear at side-bar.          01:00

```
 1              (Side-bar proceedings as follows:)

 2         THE COURT:  Just for the record, the objection is the

 3    motion you submitted this morning?

 4         MR. McDERMOTT:  Correct; nothing else to add.

 5         THE COURT:  Very well.  On that basis, it's          01:02

 6    overruled.

 7         MR. BEHNKE:  Thank you.

 8              (Side-bar proceedings concluded.)

 9    BY MR. BEHNKE:

10    Q    When Jermaine Nelson placed this telephone call on    01:02

11    January 8th, did you instruct him to attempt to engage

12    defendant in conversation about this incident?

13    A    Yes, I did.

14    Q    Did you instruct Jermaine Nelson to do so by engaging in

15    conversation with the defendant regarding polygraph          01:02

16    examinations as part of the application process to become a law

17    enforcement officer?

18    A    Yes.  At the time the defendant was a police officer.

19    Sergeant Nelson called him under the pretext that he was

20    getting out of the Marine Corps, was interested in persuing a  01:02

21    job in law enforcement, and wanted to talk about the screening

22    process; the screening process obviously included a polygraph

23    examination.

24    Q    You just used the term "pretext."  What do you mean by

25    that?                                                        01:03
```

Wednesday, August 27, 2008                    ED CR 07-00127-SGL

1   A    It was the cover for action; the reason for his calling.

2   Obviously, Sergeant Nelson wasn't applying for a law

3   enforcement position.  He was cooperating with my

4   investigation.

5   Q    And is the topic of the polygraph examination process, was          01:03

6   that the nature of the conversation taking place where

7   Exhibit 46 begins?

8   A    Yes, it was.

9         **MR. BEHNKE:**  Your Honor, I also have multiple copies

10  of Exhibit 46-A.  May I distribute those to the jurors to                 01:03

11  assist them?

12        **THE COURT:**  You may.

13        Before you do that, let me instruct the jury.

14        You're being provided transcripts to assist you in

15  listening to the tape recorded conversation.  The actual                  01:03

16  evidence is the tape-recorded conversation itself.  Not the

17  transcript.  The transcript is just an aid to help you follow

18  along; so listen carefully to the tape itself.  That's the

19  evidence.  Not the transcript.

20        With that in mind, Counsel, you may proceed and                      01:04

21  distribute the transcripts, provided that defense counsel has

22  had a chance to review it.

23        Mr. McDermott, have you had a chance to review it?

24        **MR. McDERMOTT:**  Yes, sir.

25        **THE COURT:**  Very well.  You may proceed.                         01:04

1           **MR. BEHNKE:**   Thank you, Your Honor.

2           (Jurors are handed transcript. )

3           **MR. BEHNKE:**   We will now play Exhibit 46 for

4    identification.

5           (Audio tape is played. )                        01:05

6    BY MR. BEHNKE:

7    Q    Agent Fox, during the conversation after Exhibit 46 just

8    ended, did the conversation from that point on move on to other

9    topics?

10   A    Yes, it did.                                       01:09

11   Q    Now, at any time during the entire telephone call that

12   took place on January 8, 2007, at any time did the defendant

13   ask for clarification regarding which four persons

14   Jermaine Nelson was talking about?

15   A    No, he didn't.                                     01:10

16   Q    Did he ever ask for any clarification about which incident

17   he was talking about?

18   A    No, he didn't.

19          **MR. BEHNKE:**   Thank you.

20          I have nothing further.                          01:10

21          **THE COURT:**   Cross-examination?

22          **MR. McDERMOTT:**   Briefly.

23                      **CROSS-EXAMINATION**

24   BY MR. McDERMOTT:

25   Q    Sergeant Nelson, what ethnicity is he?             01:10

Wednesday, August 27, 2008                          ED CR 07-00127-SGL

1   A    He's African American male.

2          **MR. McDERMOTT:**  Thank you, Sir.

3          Nothing further.

4    **THE COURT:**  Very well.

5          Anything further from the government?                    01:10

6    **MR. BEHNKE:**  No, Your Honor.  Thank you.

7    **THE COURT:**  You're excused, sir.  Thank you.

8          The government's next witness?

9    **MR. BEHNKE:**  The government rests, Your Honor.

10   **THE COURT:**  Very well.                                    01:10

11         Defense?

12         **MR. McDERMOTT:**  Sir, the defense rests at this time.

13   **THE COURT:**  Very well.

14         Members of the jury, we're going to take a break at

15   this time.  You're going to be moved to the jury room.        01:11

16         (WHEREUPON JURORS DEPART COURTROOM.)

17         **MR. BEHNKE:**  Your Honor, the jurors are taking the

18   transcripts with them.

19         **THE COURT:**  Don't worry.  Mr. Holmes is collecting

20   them.  He's been around for awhile.                           01:11

21         Very well, Counsel.

22         This ended a little quicker than I thought, but

23   that's always fine.

24         The jury instruction issue.  I don't have any

25   objections from the defense; is that correct?                 01:11

1    **MR. McDERMOTT:**  No, Your Honor.  We actually have a

2    Rule 29 motion of acquittal; that will have direct impact in

3    bearing upon the jury instructions.

4         **THE COURT:**  Fair enough.  Let me take up that motion

5    and then we'll take up the issue of jury instructions.              01:12

6         **MR. McDERMOTT:**  It was contemporaneously filed.

7         **THE COURT:**  Mr. Holmes is collecting all of the

8    transcripts and they will be returned to the government.

9         Counsel, you may approach, if you would.

10        (Brief pause. )                                                01:12

11        **THE COURT:**  The Court has had a chance to peruse the

12   motion, Counsel.  I'll now hear from you.

13        **MR. McDERMOTT:**  Sir, obviously this is not something

14   that in the next 15 or 20 minutes all parties are going to

15   handle.  I believe it was something that The Court may have had    01:14

16   an opportunity to realize that it might be an issue later on

17   when we were dealing with the bill of particulars and the

18   indication that there was no evidence at all from a physical

19   standpoint.  But we have completely researched the issue under

20   the model rules of the Ninth Circuit as to what elements of the    01:14

21   offense the government must prove, and in the model rules it

22   discusses the fact that there's a name or an identity of a

23   victim or victims either to support manslaughter or murder

24   charges.

25        We have done an exhaustive and thorough research, we          01:14

1  believe, of American jurisprudence relative to the issue of no

2  bodies and no identity at all.

3          There isn't a reported decision that we can find,

4  with the exception of several military court of appeal

5  decisions from the 1950's.  Clearly, what it boils down to, it        01:14

6  is a double jeopardy due process issue for the government to

7  prosecute an individual for murder or manslaughter without

8  identifying the individual who was the victim.

9          The evidence in this case, the best evidence for the

10 government has Mr. Severtsgaard discussing them as being 20 to        01:15

11 29, all in that age group; you have some saying we got one

12 older; we got three younger; we have various descriptions of

13 address and location in the building.  But at no time do we

14 have the identity of the victim.  Established old case law

15 discusses that fact, and the Ninth Circuit rules, Ninth Circuit       01:15

16 model instructions, adopt that approach.  It specifically

17 addresses, number one, it needs to be a human being, obviously,

18 and number two, that there is an identity by name of the

19 victim.  Because at that point in time, as we indicate in the

20 body of the brief here, that it would violate the                     01:16

21 Fifth Amendment rights of Jose Nazario to allow a conviction to

22 stand if, in fact, there is not identity of a victim.

23          I think a complete reading of the briefs sufficiently

24 addresses all of the issues we raised under the circumstance

25 and provides all of the case law on that particular topic.           01:16

1            In light of the fact that we have no identifying

2    scars, no identify marks, no tattoos, no discussion in that

3    shape or fashion, even in light of the fact that battle space

4    had the ability, as Warrant Officer Pritchard identified, the

5    ability to use the ID cards and other methods and means to          01:17

6    identify locals in the Fallujah area.  We have none of that

7    evidence before this court.

8            So not only does this -- this, first and foremost, is

9    a motion to acquit, and on an ancillary basis, it also

10   addresses how do we approach the jury instructions to the jury     01:17

11   when the Ninth Circuit clearly says "name of victim."  It just

12   doesn't say "human being" or "a human being."  It says "name of

13   victim."

14           We don't have that here, sir.

15           **THE COURT:**  Very well.  Thank you, Counsel.             01:17

16           **MR. BEHNKE:**  Yes, Your Honor, very briefly.

17           I have not had a chance yet, obviously, to read the

18   particular cases cited by the defense in their brief, but the

19   government would refer the Court back to the homicide statutes

20   itself.  The homicide statutes, 10012, 1111, make it unlawful      01:17

21   for anyone to commit the unlawful killing of a human being.

22   Congress did not define the law as the unlawful killing of a

23   known human being or the unlawful killing of an identified

24   victim or the unlawful killing of an identified human being.

25   They simply criminalized the unlawful killing of a human being.    01:18

 1           And while the Ninth Circuit model instruction does

 2     have a block in it, "name of victim" -- and I wasn't a part of

 3     the drafting of those instructions, but in almost every other

 4     case, at least that I know of other than this one, fortunately

 5     you are able to identify the victim and so the victim is                  01:18

 6     typically named in the indictment.

 7           And if you have a multiple homicide such as this,

 8     where victims are named, it makes sense that you're going to

 9     tell the jury, "if you find that the defendant unlawfully

10     killed X, he's guilty."                                                   01:18

11           The statute itself, as I said, requires that the

12     government prove that the defendant killed a human being.  And

13     the government has met that burden in this case.

14           I'll read the cases cited by the defense and address

15     that later, if the Court wishes, but I think it's important              01:19

16     also to just maintain a common sense approach to this issue as

17     well.  Defense is arguing that this is hindering their ability

18     to plead double jeopardy in the future.  I strongly disagree.

19     Based on the details and the facts that have been elicited in

20     this trial, I don't think that the defendant is hindered at all          01:19

21     from pleading double jeopardy in the future if someone tries to

22     re prosecute him for these same crimes.

23           The only thing that's missing is the names of the

24     individuals inside that house, but the facts and circumstances

25     of the killing were made abundantly clear.  The Defendant's              01:19

1    ability to defend himself has not been hampered by the lack of

2    a name tag on the victims.

3            And also, adopting the Defendant's position regarding

4    this issue would allow potentially a defendant who effectively

5    disposes of a body from avoiding prosecution for a homicide, or

6    from a defendant who happens to pick his victim well from

7    avoiding prosecution for a homicide.

8            Let me give the Court a hypothetical.

9            Officials find buried in a defendant's yard human

10   remains, and there's evidence from the human remains that they

11   can tell that whoever that person was was shot.  And the

12   defendant then confesses and says, "Yeah, a few years ago I

13   picked up a runaway and I murdered her and I buried her in the

14   yard."  And try as they might, the government is unable to go

15   back and identify who the remains belong to.

16           Should that defendant avoid prosecution because the

17   government was unable to put a name on the remains?

18           I don't think so.  And I don't think that's what the

19   law commands as defined in the United States Code, which,

20   again, criminalizes the unlawful killing of a human being.  And

21   again, I come back to the point I initially made, which is, if

22   congress wanted to have a requirement that the government put a

23   name on the victim, they easily would have written it into the

24   statute.  An identified human being, a known human being, a

25   known victim; some words to that effect.  But they left it

 1   extremely vague.  "Unlawful killing of a human being."

 2        **THE COURT:**   Thank you, Counsel.

 3        Is there anything further from the defense?

 4        **MR. McDERMOTT:**   Sir, just the thought that you can

 5   take back in chambers very quickly.                          01:21

 6        Any description of a murder situation involving the

 7   discovery of bones begs the question:  You have at least

 8   physical evidence of the crime.  And we've actually reviewed

 9   the reported decision of law as to whether or not there's been

10   a circumstance in which remains or something of that nature was   01:22

11   done.  You may recall John Wayne Casey's situation in Illinois.

12   All the reported decisions that talked about the hypothetical

13   that the government gave, the physical evidence gave them the

14   ability to go out and identify eventually who the bones

15   belonged to.                                                01:22

16        And if you read the California Supreme Court decision

17   of Scott, which was the first one that addressed the lack of a

18   body, it's a classic example of putting on circumstantial

19   evidence as to the identity of the victim murdered.  You don't

20   need a body, but you do need the identity in that particular   01:22

21   circumstance.

22        And as to the converse argument that the government

23   offered, you don't have identity, but you've got bones.  You

24   don't have a reported decision anywhere in the country, or any

25   place else, that supports that.                             01:22

1          **THE COURT:**  Let me ask you this, Counsel, because the

2    Court has not had the benefit of reading all of these cases,

3    and I certainly will do so.  This is an important issue.  But

4    you cite a number of cases for the proposition that it is well

5    settled in both military and civil law that failure to

6    establish identity by name or other description of a victim is

7    fatal error.

8          In that context what does identity mean?  Because

9    certainly it does not mean name, because there are other ways

10   of describing the victim short of name implied in that

11   sentence.

12         **MR. McDERMOTT:**  It did.  And in that particular

13   decision, the only appellate decision that refers to that is

14   there was actually a body and there was a forensic autopsy;

15   there was an issue as to whether or not they could identify the

16   individual by name.  They didn't plead it by name.  But the

17   proof that came out during the trial was, we had physical

18   evidence; we had support to show that it was a homicide based

19   on the physical evidence; and the individual was somebody that

20   anecdotally, during the course of the evidence taken in trial,

21   that they could name.  It wasn't specifically identified in the

22   pleading as to who it was, but through the course of

23   development of the evidence in the case, there was sufficient

24   identity.

25         **THE COURT:**  Is there any definition of sufficient

1 identity that you have found, in a non nominal way?

2   **MR. McDERMOTT:**  It's a difficult amorphous process.

3 But what it boils down to is being able to be certain that the

4 individual you're being prosecuted of cannot be in any way

5 confused with anyone else.  And even in the body issue case, as 01:24

6 they were talking about; marks, scars, tattoos, that sort of

7 thing -- which was the reason we brought that issue up, because

8 it specifically addressed some of the cases that we have in the

9 brief.

10   So if the government basically says 'we've got four 01:24

11 Iraqis of indeterminate age, indeterminate dress, in the middle

12 of a city filled with indeterminate age, indeterminate dress,

13 MAMS, military age males,' then they have done a completely

14 improbable, impossible hurdle for the double jeopardy defense

15 and right that the defendant has. 01:25

16   **THE COURT:**  Let me just be a little more charitable

17 and think out loud here for a second.

18   What we have here is -- because under Rule 29, I have

19 to consider the evidence most favorable to the government in

20 deciding this; correct? 01:25

21   **MR. McDERMOTT:**  Yes.

22   **THE COURT:**  All right.  So we have our four

23 individuals who have been identified as having been killed by

24 at least two witnesses, and the evidence there is that one

25 witness saw brain matter spread out and blood and that he 01:25

1  appeared dead, and these are people who know a dead body when

2  they see one, based on their experience and training; so there

3  are four dead bodies that were killed in the morning of

4  November 9th, 2004, in Fallujah, in a home that has been

5  identified as the material and the physical structure of the          01:25

6  home.

7           There may be more, but that's what immediately comes

8  to mind.

9           I guess my initial reaction is that it does strike --

10  it would be very difficult for the government, for military          01:26

11  authorities or anybody else, to prosecute Sergeant Nazario for

12  killing those four people in that home on that morning in

13  Fallujah in 2004.

14           Is there a reason why that is not sufficient

15  identification, non-nominal identification, for purposes of the      01:26

16  cases that you have read?

17           Again, I have not had a chance to read them, but --

18           **MR. McDERMOTT:**  Well, when you take it in the context

19  most favorable to the government, even in the best case

20  scenario, there is an eyewitness statement to the effect that        01:26

21  they observed point blank --

22           **THE COURT:**  That is true; what we have is someone

23  seeing the bodies very shortly after the --

24           **MR. McDERMOTT:**  And bear in mind, Severtsgaard, on

25  his cross-examination, you have to admit that in his first           01:26

1   N.C.I.S. statement, he thought there might have been five or

2   six bodies.

3          **THE COURT:**  But then again, that's impeachment.

4   We're looking at the evidence most favorable to the government

5   for purposes of --                                              01:27

6          **MR. McDERMOTT:**  But what it boils down to is what the

7   evidence that the government has elicited in this case is maybe

8   one in his 50's, nothing particularly descriptive, maybe three

9   younger, nothing particularly descriptive about any of those.

10  Even by their own witnesses, you got one that says they were    01:27

11  all 20 through 29.  Their own witnesses discussed different

12  types of dress; some with shorts; some with NIKE outfits.

13         The government hasn't identified with any

14  particularity required under the case law and the Constitution

15  sufficient to sustain a conviction in a case like this.         01:27

16         **THE COURT:**  Thank you, Counsel.

17         Anything further?

18         **MR. McDERMOTT:**  No, sir.

19         **MR. BEHNKE:**  I did have a couple of points,

20  Your Honor.                                                     01:28

21         The first is, what I don't think is appropriate in

22  the argument that's being made is I think that what the defense

23  is doing is they are conflating a sufficiency of the pleadings

24  argument with an element of the offense argument.

25         Again, it comes back to what does the statute           01:28

1  require?  The statute requires the Government to prove that

2  human beings were killed.

3         What the defense is arguing now is a sufficiency of

4  the indictment argument when they are making their double

5  jeopardy claims and the Fifth Amendment claims that they make      01:28

6  in their motion.  And frankly, I don't know if the Court

7  recalls, but we litigated this.

8         **THE COURT:**  We did, with a bill of particulars.

9         **MR. BEHNKE:**  And the other point that I wanted to

10 make is, I also believe that even as to the arguments they are     01:29

11 making, that should only go to count one, the homicide count.

12 I don't think there's any case authority -- and I'll check

13 these to see if maybe there are -- that say that in order to

14 establish an assault charge, or any other crime for that

15 matter, that you have to identify a victim.                        01:29

16         In fact, I am aware of fraud cases and other types of

17 charges where courts have specifically held that you don't need

18 to identify a victim.

19         **THE COURT:**  Very well, Counsel.

20         I don't think this is clear enough under the Rule 29       01:29

21 statute for the Court to rule on this at this juncture.  I

22 think I need to take this motion under submission; invite the

23 Government an opportunity to file a written opposition; and

24 then consider this after the Court has had a chance to read

25 these cases and carefully consider this matter; so we'll           01:30

1    proceed in the interim.

2         In addition to the objection concerning the one jury

3    instruction on the name, are there any other jury instructions

4    to the jury instructions that have been proposed?

5         **MR. McDERMOTT:**  This goes hand in hand with what          01:30

6    exactly will the Judge, the Court, instruct the jury on.

7         **THE COURT:**  I understand that.

8         With the exception of this objection -- because I

9    understand that affects -- you've already explained how it

10   affects the naming of the victim.                               01:30

11        **MR. McDERMOTT:**  It does.

12        **THE COURT:**  Besides that, is there any objection to

13   the instructions proposed?

14        **MR. McDERMOTT:**  No, sir.  That's it.

15        **THE COURT:**  From the Government?                        01:30

16        **MR. BEHNKE:**  I've been looking for it this morning

17   and I'll find it and write something up before we come back

18   again.  The only other request the Government was going to make

19   was, I believe there's a Ninth Circuit model instruction that

20   tells the jurors not to speculate as to what may or may not     01:30

21   have come of the other persons involved.  There's been evidence

22   that Ryan Weemer and possibly Jermaine Nelson were involved.

23        **THE COURT:**  You should get that instruction to the

24   Court shortly.  I'm planning to go back and wrap up the

25   instructions and instruct this jury in about 20 minutes.        01:31

1          **MR. BEHNKE:**  I understand, Your Honor.

2          **THE COURT:**  This all came to a close quicker than I

3    thought as well, but we're going to move forward.

4          **MR. BEHNKE:**  And that's the only additional

5    instruction.                                                          01:31

6          **THE COURT:**  Very well.  You might want to get that to

7    the Court as soon as you can.  I'm going to take a recess and

8    work up the instructions, and we'll reconvene probably in about

9    half an hour, but both sides should prepare for closings this

10   morning and early this afternoon.                                     01:31

11          We're in recess.

12          **THE CLERK:**  Court stands in recess.

13          (Brief recess taken.)

14          **THE CLERK:**  Calling the case of plaintiff, United

15   States of America, versus defendant, Jose Luis Nazario, Jr.,

16   Case Number ED CR 07-00127-SGL, outside the presence of the

17   jury.

18          **THE COURT:**  We're back on the record.

19          Counsel, the Court has reviewed the instructions and

20   is prepared to give the instructions that were requested          02:03

21   without objecting to.  I am going to overrule the one objection

22   made by the defense.  I'll take that up further when the Court

23   takes up the motion.

24          As far as additional instructions, the Court

25   proposes -- well, is there anything additional?                   02:03

1     **MR. BEHNKE:**  No, Your Honor.  I found the instruction

2   I was thinking of, and the wording of the instruction seems to

3   strike the government as being more of a defense instruction;

4   and so if they're not requesting it, the government is not

5   requesting it.                                                     02:04

6          **THE COURT:**  Very well.

7          Are there any further instructions or requests from

8   the defense?

9          **MR. McDERMOTT:**  Well, the Court, as I understand it,

10  is going to give the instruction offered by the government that   02:04

11  it must just merely be a human being.

12         **THE COURT:**  I'm going to give the instruction that's

13  proposed by the government, that is correct; and I understand

14  your objection to that.  I overrule the objection as to the

15  instruction.                                                       02:04

16         **MR. McDERMOTT:**  All right.

17         **THE COURT:**  Specifically, though, I think what

18  addresses your objection in the instruction is the line that

19  "the first element the jury must find is that the defendant

20  unlawfully killed a human being, with all of you agreeing on a    02:04

21  particular human being who you find was killed."

22         So for purposes of the jury verdict, the jury must

23  unanimously find that a particular human being was killed,

24  which implies in it the sufficient indicia that a particular

25  human being, as opposed to any human being, was, in fact,          02:05

 1   killed.  I am not ruling, however, on the motion.  That is

 2   separate and apart, and that has been taken under submission.

 3           Do you understand, Mr. McDermott?

 4           **MR. McDERMOTT:**  I do, sir.

 5           **THE COURT:**  Very well.                                02:05

 6           Defense had previously indicated they had no other

 7   objections to the instructions proffered by the government;

 8   and, therefore, the Court proceeds on that assumption.

 9           In addition to those instructions, I'm planning to

10   read the following, all from the model jury instructions of the   02:05

11   Ninth Circuit.  I will indicate them at this time.  The

12   government should take careful note of this, because during the

13   lunch hour, government counsel will be responsible for

14   preparing a complete clean set of the jury instructions.

15           I plan to send a copy back to the jury; and, of         02:05

16   course, defense will have a chance to review that before it's

17   submitted.

18           These are the instructions that I plan to read when I

19   call the jury back out:

20           Beginning with 3.1, duties of jury to find facts and    02:06

21   follow law; 3.2, charge against the defendant is not evidence;

22   presumption of evidence, innocence and burden of proof; 3.3,

23   defendant's decision not to testify; 3.5, reasonable doubt

24   defined; 3.6, what is evidence; 3.7, what is not evidence; 3.8,

25   direct and circumstantial evidence; 3.9, credibility of         02:06

1    witnesses.  And those are the preliminary instructions.

2            I think that an instruction is appropriate --

3    actually, two instructions are appropriate, given

4    Special Agent Fox's testimony, and this is relating to the

5    defendant's statement and the use of an informant in that          02:06

6    conversation.  The two instructions that I have in mind -- and

7    I'll hear, once I'm done with all of these, any concerns --

8    would be 4.1, statements by defendant, and 4.13, government's

9    use of an undercover agent or an informant.

10           4.1, I would intend to give entirely as it is            02:07

11   written.  Specifically, "You have heard testimony that the

12   defendant made a statement.  It is for you to decide, one,

13   whether the defendant made the statement; and, two, if so, how

14   much weight to give to it.  In making those decisions, you

15   should consider all of the evidence about the statement,          02:07

16   including the circumstances under which the defendant may have

17   made it."

18           I also believe that the 4.13 instruction is

19   appropriate as modified.  What I intend to read is, "You have

20   heard statements from an informant who was involved in the        02:07

21   government's investigation in this case.  Law enforcement

22   officials are not precluded from engaging in stealth and

23   deception, such as the use of informants, in order to apprehend

24   persons engaged in criminal activities."  I would delete the

25   next line and go, "The government may utilize a broad range of    02:08

1    schemes and ploys to ferret out criminal activity."

2         I think 4.1 is a statement that makes it clear that

3    it's up to the jury to decide what, if any, weight is to be

4    afforded the statement; and 4.13 makes it clear that the use of

5    a ploy or a scheme, as was utilized in this case, is not                    02:08

6    improper.

7         I then would give the substantive instructions

8    proposed by the government and not objected to, with that one

9    exception, by the defense; and then I would wrap this up by

10   giving the following instructions:                                          02:08

11        7.1, duty to deliberate; 7.2, consideration of

12   evidence; 7.3, use of notes; 7.4, jury consideration of

13   punishment; 7.5, the verdict form.  And I should note here, I'm

14   planning to give a general verdict form, which the government

15   will also prepare during the lunch hour, which will simply have            02:09

16   the three counts and a place for the jury to find guilty or not

17   guilty.  7.6, communication with the Court.

18        Those are the instructions that I'm proposing to give

19   in their entirety.  I'll hear first from the government and

20   then from the defense as to any further objections, other than            02:09

21   the one already noted.

22        Mr. Behnke?

23        **MR. BEHNKE:**  Nothing from the government, Your Honor.

24        **MR. McDERMOTT:**  Sir, were you planning on

25   incorporating anything as to the context issue of Nelson's                02:09

```
 1   statement?
 2           THE COURT:  Nothing further than I already proposed
 3   here.
 4           What do you have in mind?
 5           MR. McDERMOTT:  No, no.                                    02:09
 6           Did you, in fact, give an instruction?  I don't
 7   recall.  Was there an instruction given before they heard it or
 8   after it as to the context only and not for the truth of the
 9   matter asserted?
10           THE COURT:  That's a good point.  And that can be         02:09
11   incorporated -- that needs to be given as well.  And I can give
12   that right along with 4.13.
13           MR. McDERMOTT:  Please.
14           THE COURT:  I meant to do that, actually, when they
15   heard it; but it's certainly appropriate to give it now.         02:10
16           Thank you, Counsel, for reminding me about that.
17           MR. McDERMOTT:  Other than that, Your Honor, we can't
18   think of anything else that we'd want to offer.
19           THE COURT:  Very well.
20           So Sergeant Nelson's statements were not admitted for     02:10
21   the truth of the matter asserted, only for context.
22           Sergeant Nazario's statements are admitted for the
23   truth of the matter asserted, and it is up to the jury to
24   determine what, if any, weight to give to those statements.
25           MR. BEHNKE:  Would it be possible to get the Court's      02:11
```

 1  notes on that, so I don't make a mistake transcribing them.

 2          **THE COURT:**  I will.  I will write that out and give

 3  that to counsel during the lunch hour.

 4          Anything further on the jury instructions?

 5          **MR. McDERMOTT:**  Yes, sir.  And this may be the only          02:11

 6  premise on that, and I don't believe the government will

 7  object.  We had testimony from Mr. Prentice that was his prior

 8  sworn testimony at the grand jury.  Obviously, the context of

 9  that testimony is different than just something from a prior

10  statement or what somebody said to an individual.  That          02:11

11  actually is evidence that can be offered for the truth of the

12  matter asserted because of the context in which it was

13  obtained.

14          Now, if the government doesn't intend to cut me off

15  at the knee caps during the argument that, Hey, you can't          02:12

16  consider that for the truth of the matter asserted -- -

17          **THE COURT:**  I can't imagine that being the case.

18          **MR. BEHNKE:**  No, Your Honor.  The government does

19  agree that the statement given to the grand jury does appear to

20  be inconsistent with what he said at trial, and since it was          02:12

21  grand jury testimony, it falls squarely in the rule.

22          **MR. McDERMOTT:**  Thank you.  That's fine.

23          **THE COURT:**  So you're not then requesting anything

24  further?

25          **MR. McDERMOTT:**  No.  Thank you.          02:12

```
 1              THE COURT:  Very well.

 2          All right.  How long does government anticipate with

 3   its closing argument?

 4          MR. BEHNKE:  The government would anticipate its

 5   opening and closing argument lasting approximately 45 minutes;      02:12

 6   no longer than an hour, for sure.

 7              THE COURT:  Again, the defense does not need to

 8   answer this question, but if they would, just for court

 9   management purposes.

10          MR. McDERMOTT:  We're talking about the same time           02:12

11   frame.

12              THE COURT:  Very well.

13          I don't want to rush this, and I don't want the jury

14   hearing this on a hungry stomach, so I think we'll have the

15   government's opening before lunch; I'll give the instructions      02:13

16   and the government's opening before lunch.  We'll have a

17   one-hour break for lunch, during which time the government can

18   prepare the jury instructions and the verdict form.  And then

19   after lunch, we'll hear the defense closing argument and then

20   the government's rebuttal.                                         02:13

21          Sound fair?

22          MR. BEHNKE:  Yes, Your Honor.

23          MR. McDERMOTT:  That's fine.

24              THE COURT:  That's what we'll do, then.

25          Let's bring the jury in.                                    02:13
```

1          (Whereupon, jurors enter courtroom.)

2                    **JURY INSTRUCTIONS**

3          **THE COURT:**  Members of the jury, now that you have

4   heard all of the evidence in this case, it is my duty to

5   instruct you on the law which applies to this case.  A copy of          02:16

6   these instructions will be available in the jury room for you

7   to consult.

8          It is your duty to find the facts from all of the

9   evidence in this case.  To those facts, you will apply the law

10  as I give it to you.  You must follow the law as I give it to          02:16

11  you whether you agree with it or not, and you must not be

12  influenced by any personal likes or dislikes, opinions,

13  prejudices, or sympathy.  That means that you must decide this

14  case solely on the evidence before you.  You will recall that

15  you took an oath promising to do so at the beginning of this          02:17

16  case.

17         In following my instructions, you must follow all of

18  them and not single out some and ignore others.  They are all

19  equally important.  You must not read into these instructions

20  or into anything that the Court may have said or done any          02:17

21  suggestion as to what verdict you should return.  That is

22  entirely up to you.

23         The indictment, as I mentioned before, is not

24  evidence.  The defendant has pleaded not guilty to the charges.

25  The defendant is presumed to be innocent and does not have to          02:17

1    testify or present any evidence to prove innocence.  The

2    government has the burden of proving every element of the

3    charges beyond a reasonable doubt.

4           A defendant in a criminal case has a constitutional

5    right not to testify.  No presumption of guilt may be raised          02:17

6    and no inference of any kind may be drawn from the fact that

7    the defendant did not testify.

8           Proof beyond a reasonable doubt is proof that leaves

9    you firmly convinced that the defendant is guilty.  It is not

10   required that the government prove guilt beyond all possible          02:18

11   doubt.  A reasonable doubt is a doubt based upon reason and

12   common sense and is not based purely on speculation.  It may

13   arise from a careful and impartial consideration of all of the

14   evidence or from lack of evidence.

15          If after a careful and impartial consideration of all          02:18

16   of the evidence you are not convinced beyond a reasonable doubt

17   that the defendant is guilty, it is your duty to find the

18   defendant not guilty.

19          On the other hand, if after a careful and impartial

20   consideration of all of the evidence you are convinced beyond a       02:18

21   reasonable doubt that the defendant is guilty, it is your duty

22   to find the defendant guilty.

23          As I mentioned before, the evidence from which you

24   are to decide what the facts are consist of the sworn testimony

25   of any witness, the exhibits which have been received into           02:18

1    evidence, and any facts to which all of the lawyers have

2    stipulated.

3            In reaching your verdict, you may consider only the

4    testimony and exhibits received into evidence.  Certain things

5    are not evidence, and you may not consider them in deciding          02:19

6    what the facts are.  I will once more list them for you.

7            One:  Arguments and statements by lawyers are not

8    evidence.  The lawyers are not witnesses.  What they have said

9    in their opening statements, what they will say in their

10   closing arguments and at all other times is intended to help        02:19

11   you interpret the evidence; but it is not evidence.

12           If the facts as you remember them differ from the way

13   the lawyers state them, your memory of them controls.

14           Two:  Questions and objections by lawyers are not

15   evidence.  Attorneys have a duty to their clients to object         02:19

16   when they believe a question is improper under the rules of

17   evidence.  You should not be influenced by the question, the

18   objection, or the Court's ruling on it.

19           Three:  Testimony that has been excluded or stricken

20   or that you have been instructed to disregard is not evidence       02:19

21   and must not be considered.  In addition, some testimony and

22   exhibits have been received only for a limited purpose.  Where

23   I've given a limiting instruction, you must follow it.

24           Four:  Anything you may have seen or heard when the

25   court was not in session is not evidence.  You are to decide        02:20

1    the case solely on the evidence received at trial.

2            Evidence may be direct or circumstantial.  Direct

3    evidence is direct proof of a fact, such as testimony of an

4    eyewitness.  Circumstantial evidence is indirect evidence; that

5    is, proof of a chain of facts from which you could find that          02:20

6    another fact exists, even though it has not been proven

7    directly.

8            You are to consider both kinds of evidence.  The law

9    permits you to give equal weight to both, but it is for you to

10   decide how much weight to give to any evidence.                       02:20

11           In deciding the facts of this case, you may have to

12   decide which testimony to believe and which testimony not to

13   believe.  You may believe everything a witness says, or part of

14   it, or none of it.  In considering the testimony of any

15   witness, you may take into account, one, the opportunity and          02:21

16   ability of the witness to see or hear or know the things

17   testified to; two, the witness's memory; three, the witness's

18   manner while testifying; four, the witness's interest in the

19   outcome of the case and any bias or prejudice; five, whether

20   other evidence contradicted the witness's testimony; six, the         02:21

21   reasonableness of the witness's testimony in light of all of

22   the evidence; and, seven, any other factors that bear on

23   believability.

24           The weight of the evidence as to a fact does not

25   necessarily depend on the number of witnesses who testify.            02:21

1          You have heard testimony that the defendant made a

2     statement.  It is for you to decide, one, whether the defendant

3     made the statement that was in the telephone conversation, and,

4     two, if so, how much weight to give to it.  In making those

5     decisions, you should consider all of the evidence about the          02:21

6     statement, including the circumstances under which the

7     defendant may have made it.

8          You have heard statements from an informant,

9     Sergeant Nelson, who was involved in the government's

10    investigation in this case.  Law enforcement officials are not          02:22

11    precluded from engaging in stealth and deception, such as the

12    use of informants, in order to apprehend persons engaged in

13    criminal activities.  The government may utilize a broad range

14    of schemes and ploys to ferret out criminal activity.

15         Now, Sergeant Nelson's statements, his part of the          02:22

16    telephone conversation, were not admitted for the truth of the

17    matter asserted in those statements, only for context of the

18    telephone conversation.

19         Sergeant Nazario's statements in the telephone

20    conversation are admitted for the truth of the matter asserted.          02:22

21    It is, of course, up to the jury to give what weight, if any,

22    to those statements.

23         The conduct of warfare is regulated by law.  The law

24    protects persons not actually engaged in combat and limits the

25    circumstances under which their lives may be taken.  Persons          02:23

 1  detained or captured by the opposing force, regardless of their

 2  loyalties, political views, or prior acts, have the right to be

 3  treated humanely.  Summary execution of unresisting detainees

 4  or prisoners is forbidden by law.  I, therefore, instruct you

 5  as a matter of law that if unresisting human beings were killed          02:23

 6  in Fallujah, Iraq, as charged in Count 1 of the first

 7  superseding indictment, while in the effective custody and

 8  control of our military forces, their deaths cannot be

 9  considered justified and the act of killing them, as well as

10  any order to do so, would be unlawful.                                   02:23

11       The defendant is charged in Count 1 of the first

12  superseding indictment with voluntary manslaughter, in

13  violation of Sections 1112 and 3261(a)(2) of Title 18 of the

14  United States Code.  In order for the defendant to be found

15  guilty of that charge, the government must prove each of the             02:24

16  following elements beyond a reasonable doubt:

17       First, that the defendant unlawfully killed a human

18  being, with all of you agreeing on a particular human being who

19  you find was killed;

20       Second, while in the heat of passion, caused by                    02:24

21  adequate provocation, A, the defendant intentionally killed a

22  human being, or, B, the defendant killed a human being

23  recklessly, with extreme disregard for human life;

24       Third, the killing occurred in Fallujah, Iraq;

25       And, fourth, at the time of the defense, the                       02:24

defendant was a member of the armed forces, subject to

Chapter 47 of Title 10, the Uniform Code of Military Justice.

Heat of passion may be provoked by fear, rage, anger,

or terror.  Provocation, in order to be adequate, must be such

as might arouse a reasonable and ordinary person to kill.                02:24

The defendant is charged in Count 2 of the first

superseding indictment with assault with a dangerous weapon, in

violation of Sections 113(a)(3) and 3261(a)(2) of Title 18 of

the United States Code.  In order for the defendant to be

guilty of that charge, the government must prove each of the            02:25

following elements beyond a reasonable doubt:

First, the defendant intentionally struck or wounded

a human being, with all of you agreeing on a particular human

being who you find was struck or wounded;

Second, the defendant acted with the specific intent             02:25

to do bodily harm to that human being;

Third, the defendant used a firearm;

Fourth, the assault occurred in Fallujah, Iraq;

And, fifth, at the time of the offense, the defendant

was a member of the armed forces, subject to Chapter 47 of             02:25

Title 10, the Uniform Code of Military Justice.

The defendant is charged in Count 3 of the first

superseding indictment with discharging a firearm during a

crime of violence, in violation of Sections 924(c)(1)(a)(3) and

3261(a)(2) of Title 18 of the United States Code.  In order for        02:26

1    the defendant to be guilty of that charge, the government must

2    prove each of the following elements beyond a reasonable doubt:

3         First, the defendant committed the crime of voluntary

4    manslaughter, as charged in Count 1 of the first superseding

5    indictment, or assault with a dangerous weapon, as charged in          02:26

6    Count 2 of the first superseding indictment, with all of you

7    agreeing on a particular crime you find that defendant

8    committed;

9         Second, the defendant knowingly discharged a firearm;

10         Third, the defendant discharged the firearm during          02:26

11    and in relation to the crime;

12         Fourth, the offense occurred in Fallujah, Iraq;

13         And, fifth, at the time of the offense, the defendant

14    was a member of the armed forces, subject to Chapter 47 of

15    Title 10, the Uniform Code of Military Justice.          02:26

16         The defendant discharged a firearm in relation to the

17    crime if the discharge of the firearm facilitated or played a

18    role in the crime.

19         The defendant may be found guilty of voluntary

20    manslaughter, the first charge, or assault with a dangerous          02:27

21    weapon, as charged in the second count of the first superseding

22    indictment, even if the defendant did not personally commit the

23    act or acts constituting the crime but caused its commission.

24         To prove the defendant guilty of causing a crime to

25    be committed, the government must prove beyond a reasonable          02:27

1    doubt that, first, voluntary manslaughter or assault with a

2    dangerous weapon was committed by someone; second, the

3    defendant knowingly and intentionally caused the person to

4    commit voluntary manslaughter or assault with a dangerous

5    weapon; and, third, the defendant acted before the crime was          02:27

6    completed.

7         It is not enough that the defendant merely associated

8    with the persons committing the crime or unknowingly or

9    unintentionally did things that were helpful to the person or

10   was present at the scene of the crime.  The evidence must show       02:27

11   beyond a reasonable doubt that the defendant acted with the

12   knowledge and intention of causing that person to commit

13   voluntary manslaughter or assault with a dangerous weapon.  The

14   government is not required to prove precisely who committed the

15   crime that defendant caused.                                          02:28

16        An act is done knowingly if the defendant is aware of

17   the fact and does not act through ignorance, mistake, or

18   accident.  The government is not required to prove that

19   defendant knew his acts were unlawful.  You may consider

20   evidence of the defendant's words, acts, or omissions, along         02:28

21   with all of the other evidence in deciding whether the

22   defendant acted knowingly.

23        When you begin your deliberations, you should elect

24   one member of the jury as your foreperson.  That person will

25   preside over the deliberations and speak for you here in court.      02:28

1    You will then discuss the case with your fellow jurors to reach

2    agreement, if you can do so.  Your verdict, whether guilty or

3    not guilty, must be unanimous.

4          Each of you must decide the case for yourself, but

5    you should do so only after you have considered all of the

6    evidence, discussed it fully with the other jurors, and

7    listened to the views of your fellow jurors.

8          Do not be afraid to change your opinion if the

9    discussion persuades you that you should, but do not come to a

10   decision simply because other jurors think it is right.  It is

11   important that you attempt to reach a unanimous verdict, but,

12   of course, only if each of you can do so after having made your

13   own conscientious decision.  Do not change an honest belief

14   about the weight and effect of the evidence simply to reach a

15   verdict.

16         Your verdict must be based solely on the evidence and

17   on the law as I have given it to you in these instructions;

18   however, nothing that I have said or done is intended to

19   suggest what your verdict should be; that is entirely for you

20   to decide.

21         Now, I know that some of you have taken notes during

22   the trial.  Whether or not you took notes, you should rely on

23   your own memory of what was said.  Notes are only to assist

24   your memory.  You should not be overly influenced by the notes.

25         The punishment provided by law for this crime is for

1    the Court to decide.  You may not consider punishment in

2    deciding whether the government has proven its case against the

3    defendant beyond a reasonable doubt.

4         A verdict form has been prepared for you.  It will

5    have the three counts and a place for you to write "guilty" or    02:30

6    "not guilty."  After you have reached unanimous agreement on a

7    verdict, your foreperson will fill in the form that has been

8    given to you, sign and date it, and advise the bailiff that you

9    are ready to return to the courtroom.

10         If it becomes necessary during your deliberations to    02:30

11   communicate with me, you may send a note through the bailiff,

12   signed by your foreperson or by one or more members of the

13   jury.  No member of the jury should ever attempt to communicate

14   with me except by a signed writing.  And I will respond to the

15   jury concerning the case only in writing or here in open court.    02:30

16         If you send out a question, I will consult with the

17   lawyers before answering it, which may take some time.  You may

18   continue your deliberations while waiting for the answer to any

19   question.  Remember that you are not to tell anyone, including

20   me, how the jury stands, numerically or otherwise, on the    02:31

21   question of guilt of the defendant until after you have reached

22   a unanimous verdict or have been discharged.

23         At this time, we're going to swear in the bailiff,

24   who is going to be keeping you together from this point

25   forward.  We will then hear the closing argument from the    02:31

```
 1   government.  We will then break for lunch.  You'll be having

 2   your lunch together as a jury today.  You will then be returned

 3   to the courtroom by the bailiff.  We will hear the closing

 4   argument from the defense, and then the government's rebuttal.

 5   After that, the case will be in your hands to decide.            02:31

 6           At this time, Mr. Holmes, let us swear in the

 7   bailiff.

 8           THE CLERK:  We would invite both bailiffs to come

 9   forward at this time.

10           Please raise your right hand.

11           State your respective names for the record, please.

12           BAILIFF JOHNSON:  Richard Johnson.

13           BAILIFF GARRETT:  Major Garrett.

14           (Clerk gives oath to bailiffs.)

15           BAILIFF JOHNSON:  I do.                                  02:32

16           BAILIFF GARRETT:  I do.

17           THE COURT:  Thank you.

18           We will now hear the closing argument from government

19   counsel.

20           Mr. Behnke, you may proceed.                            02:32

21           MR. BEHNKE:  Thank you, Your Honor.

22               CLOSING ARGUMENT - PLAINTIFF

23           MR. BEHNKE:  Good morning, ladies and gentlemen.  I'd

24   like to begin by thanking you for your time and attention

25   during the course of these proceedings over the last week and a  02:32
```

Wednesday, August 27, 2008                          ED CR 07-00127-SGL

1    half or so.  I know both sides, the government and the

2    defendant, appreciate your time and attention in fulfilling

3    your duties as jurors in this case.

4           As the Court just explained to you, we've come to

5    that point in the case now when the parties have a chance to          02:32

6    argue to you regarding how we believe the evidence establishes

7    the defendant's guilt, or, in the case of the defendant, they

8    will argue to you how they believe the evidence does not

9    establish the defendant's guilt.

10           It is now almost the time in the case when you are           02:33

11   going to take on an active role in this case.  Up until this

12   point, you've been sitting and attentively listening to all of

13   the evidence that has come from that witness stand.  When we

14   finish arguing our cases, you will retire to deliberate and

15   then you'll take on your active role in this case, in             02:33

16   evaluating the evidence, deciding what happened on the 9th of

17   November, 2004.  And once you decide what happened on the 9th

18   of November, 2004, it is your duty to determine whether or not

19   those acts are a crime as the Court has instructed you.

20           In fulfilling your duties as jurors, it's important        02:33

21   to keep in mind some very important principles related very

22   closely to the instructions the Court just gave you.

23           In our system of criminal justice here in the

24   United States, there's this idea that justice is blind.  This

25   is the centerpiece of our system of criminal justice:  Justice      02:34

1    is blind.

2            What that means is that justice in our criminal

3    justice system does not care who the victim is or who the

4    defendant is.  What's at issue is what happened, what did the

5    accused do, and did what the accused do amount to a criminal

6    act?

7            Our justice system does not care who the victim is,

8    where the victim comes from, nor where the defendant comes

9    from.  We're focusing on one act, one event, and deciding

10   whether what happened on that occasion was wrong.

11           At the beginning of the case -- and the Court touched

12   upon it in the instructions; I'll explain a little more now --

13   there's been discussion about the fact that although this is an

14   event that occurred while defendant was overseas, serving with

15   the United States military, it is being prosecuted here in the

16   United States in this district court.  The Court gave you some

17   instructions that were included in the elements of the offense

18   that explained legally why that is the case.  Essentially, the

19   law says that if an individual, while in the service of our

20   armed forces overseas, commits a criminal act, they are liable

21   for that criminal act in this court, in the district court.

22           In order to establish that, the government has to

23   prove that at the time of the offense, the defendant was a

24   member of the armed forces overseas and that the defendant is

25   now no longer subject to military jurisdiction.

1          You'll recall earlier in the case I read to you some

2    stipulations of the parties, where the parties have stipulated

3    to those facts.  The parties have stipulated to the fact of

4    defendant's military service on November 9, 2004; and the

5    parties have stipulated to the fact that he is no longer                    02:36

6    subject to the Uniform Code of Military Justice, which means

7    military courts have no jurisdiction over him.

8          Under the law, that places him in the jurisdiction of

9    this court.

10         The law does not allow an individual who serves in             02:36

11   the military to escape prosecution merely based on the fact

12   that they have left military service.

13         Your duty as jurors is to apply and follow the law as

14   it is written, as the Court has instructed you.  It is not your

15   duty to decide whether the law is a good law or a bad law.  You          02:37

16   may fully disagree with the law as Congress has written it and

17   as the Court has instructed you.  But even if you fully

18   disagree with that law, it is your duty as jurors to enforce

19   it.  No matter how hard that might be for you to do, that is

20   your sworn duty as jurors in this case.                                    02:37

21         Now, during jury selection and proceeding through

22   this case, there have been discussions of many different

23   things; and I want to spend a few moments to explain to you

24   what the government believes this case is not about.

25         This case is not about the war in Iraq.  This case is          02:37

not about whether or not you as jurors are for or against the

war, whether or not you support or do not support our armed

forces; that is not what this case is about.

This case is about the actions of one man and the

marines under his command during a few minutes' time on

November 9, 2004; that is what this case is about.

The case is not about whether the defendant himself

is a good person or a bad person.  As we all know, sometimes

good people do the wrong thing.  Again, this case is simply

about what happened in that house on November 9, 2004.

Now, you've heard testimony during this case

regarding the circumstances that the defendant and all of the

other members of the Marine Corps were under while they were in

Iraq, and specifically on the morning of November 9, 2004, when

they went through Fallujah up to this house.

You heard testimony about the very difficult

circumstances they were operating under.  They had a very hard

job to do, no doubt.  But our military, the United States Armed

Forces, are the best in the world.  They are the best in the

world at what they do, not just because they have the best

guns, not just because they have the best technology, but they

are the best at what they do, they are the best at overcoming

these types of circumstances, because they are trained to be

ethical, to maintain the moral high ground, and to do the right

thing at all costs.

1          You heard from Major Schmitt.  Even if a marine, a

2    soldier, a member of our armed forces, has to give up their

3    life because it's the right thing, that is what they're trained

4    to do.  And as far as the rigors of combat, as horrible as

5    combat is, you heard a lot of testimony from Major Schmitt and          02:40

6    other witnesses about the training that our marines go through

7    to prepare for that.

8          While combat is horrible, while they were under very

9    difficult circumstances on this particular morning, that is

10   exactly what they had been trained to handle; they were          02:40

11   prepared for it.  You heard the phrase from Major Schmitt, that

12   "shock absorbers" was the term that he used to talk about how

13   the marines are prepared to deal with the stress, to deal with

14   the trauma and think clearly; and most importantly, do the

15   right thing.          02:41

16         Our military is a great military.  These marines that

17   went into Fallujah on November 9, 2004, were extremely well

18   prepared for what they faced.

19         Now, before we get into actually discussing the facts

20   of the case, there's one other instruction that the Court gave          02:41

21   you that I want to touch on.  You've heard it several times.

22   You may hear it additional times before you retire to

23   deliberate.  And that is about what you are allowed to consider

24   in your deliberations.

25         Some very important things you're not allowed to          02:41

1    consider in your deliberations, the judge instructed you,

2    include speculation, bias, prejudice.

3         Getting back to what we talked about in jury

4    selection, no matter how you might feel about these issues, no

5    matter how you might feel about the war, about the military,          02:42

6    your bias and prejudice cannot guide your decision in this

7    case.  You have to be guided by the evidence that came from the

8    witness stand.  You have to evaluate the witnesses you heard

9    from and decide the facts based on that.

10        You're also not permitted to consider the statements          02:42

11   of counsel.  As the Court instructed you several times, what we

12   attorneys say during the course of this case is not evidence.

13   And that's very important for you to keep in mind, because

14   while we are allowed to explain to you how we view the case, to

15   help guide you through the evidence, our statements are not          02:43

16   evidence.

17        I bring this up because you may recall, for instance,

18   that while he's not required to do so, defense did opt to give

19   an opening statement in this case.  During the course of that

20   opening statement, there were a couple of representations made          02:43

21   that the government does not believe were borne out by the

22   facts.

23        First, I believe there was a statement made that

24   'when we go into combat, the rules get tossed out the window,'

25   or something to that effect.  It is important for you to          02:43

remember, those statements are not evidence, because I believe

that if you go back and review the evidence that did come from

that witness stand, you'll recall that is exactly opposite of

what the evidence was.

Major Schmitt explained to you in great detail, 02:43

Captain Vaughn explained to you in great detail, how the rules

are extremely important when our military goes to war.

Major Schmitt talked extensively about part of

winning the war, particularly part of winning this war that is

being fought now, includes our military maintaining the moral 02:44

high ground, doing the right thing, following the laws of war.

As difficult as it may be, as difficult as it may be

to do that, given the enemy that our military is facing, they

are required to do it, not just for the sake of the enemy, but

you heard extensive testimony that they are required to follow 02:44

the rules for the sake of the mission, for the sake of the

other marines.

Capturing and taking prisoner detainees on the

battlefield isn't something our marines do just because some

lawyers somewhere wrote a law saying you have to do that, but 02:45

they do it because it's the right thing to do.  They do it

because it benefits the mission.

You heard testimony about intelligence that can

sometimes be obtained from people that are captured on the

battlefield.  Information such as weapon caches and other such 02:45

 1   information can be obtained from these people that might save

 2   lives down the road.

 3          There are very important reasons that our military

 4   abides by these very strict rules.

 5          And your duty, ladies and gentlemen, is that if you          02:45

 6   find that the defendant did not abide by those rules on the 9th

 7   of November, 2004, no matter how well he might have fought on

 8   other days, no matter how many days he spent in battle as a

 9   United States Marine, if he violated the law of war, as the

10   government has alleged, on that day, you have a duty to find          02:46

11   him guilty.

12          Now, in deciding whether or not the defendant is

13   guilty, you have to take the facts that you heard from the

14   witness stand and weigh them against the law.  And the law in

15   this case are the elements of the offenses that the Court          02:46

16   explained to you.

17          In this particular case, the elements of the

18   offenses, for your purposes, I believe, are relatively simple

19   and straightforward.  I believe the issue that you are going to

20   have to decide at the end of this case simply boils down to the          02:46

21   question, as the Court explained:  Were these individuals

22   resisting or not?  Which comes back to the discussions that

23   we've been having about the marines' ability to defend

24   themselves if they are attacked or threatened.  That's what

25   this case boils down to.          02:47

1       But before you get there, I want to touch for a

2   minute on the elements, just to make sure you understand them.

3       The first charge in the indictment, voluntary

4   manslaughter, is "the unlawful killing of a human being while

5   under heat of passion."

6       What that means is that the defendant unlawfully

7   killed a human being while under some form of provocation.

8   Some provocation, some circumstances, provoked him to commit

9   the act of intentionally taking a life, and the circumstances

10  are such that they might provoke a reasonable person in his

11  position to kill.

12      In this case, the government believes that the

13  evidence has established those circumstances.

14      This occurred in the middle of combat in Fallujah,

15  Iraq.  The testimony established a great deal of stress that

16  these men may have been under.  And the government believes

17  that if you find the defendant did intentionally take the life

18  of those detainees, or caused his marines to do so, that the

19  evidence is such that that would amount to a heat of passion

20  killing, as opposed to some other form of homicide.

21      Count 2 charges assault with a dangerous weapon.

22  Essentially what this charge is is that the defendant

23  intentionally assaulted a human being with a dangerous weapon

24  with the intent to do bodily harm.

25      This charge could become important -- I mean, it is

1   important.  All of the charges are important; but, certainly,

2   if you find that the defendant committed manslaughter by

3   unlawfully killing these individuals, then he also, at the same

4   time, has assaulted them with intent to do bodily harm.

5           On the other hand, there may be argument from the          02:49

6   defense regarding the sufficiency of evidence of the death of

7   the detainees, and I'll get to that in a moment.  But if you

8   find, for instance, that the government has not proven that the

9   detainees died as a result of their injuries, you could still

10  find the defendant guilty of Count 2, assault.                   02:49

11          Count 3 charges the defendant with discharging a

12  firearm during the commission of one of the first two crimes.

13          Another instruction that the Court gave you on the

14  elements of the offenses is what we refer to as a unanimity

15  instruction.  You may recall, when he was reading the elements   02:50

16  to you, at the conclusion of each one of these charges, he said

17  words to the effect of, for instance, on the manslaughter

18  charge, "with each of you unanimously agreeing as to a

19  particular human being who was killed."

20          That's very important for you to keep in mind.            02:50

21          You, the jury, have to unanimously agree on the

22  verdict.  All 12 of you have to unanimously agree.

23          In this particular case, the charge includes an

24  allegation of four deaths.  What you are not permitted to do is

25  to return a verdict of guilty if six of you, for instance, find  02:50

1    that the defendant is responsible for unlawfully killing the

2    detainee that was in the kitchen and six of you find that he

3    unlawfully killed one of the other detainees.  You can't then

4    say, Okay, well, six and six equals 12; he's guilty.  You all

5    have to agree on a particular human being who was killed.         02:51

6              Unanimous verdict.

7              As I said, it's important for you to understand the

8    instructions, but I think at the end of the day, the

9    application of the instructions themselves is relatively

10   simple.  The big task for you is to decide whether the killing   02:51

11   was unlawful, which comes down to the issue of:  Were the

12   detainees resisting or not?

13             The Court instructed you that if you find that the

14   defendant killed or caused a killing of unresisting detainees

15   that were in their custody and control, that's an unlawful       02:51

16   killing, even in war.

17             The government believes that its evidence has

18   established beyond a reasonable doubt that is exactly what

19   happened.

20             As you go through the evidence, look carefully at all   02:52

21   of the evidence.  Look at each piece of evidence, each

22   witness's testimony, as a piece of a puzzle.  The question is,

23   after you put all of the pieces of the puzzle together, is

24   there a clear, beyond-a-reasonable-doubt picture of guilt?

25             It's not about whether any individual piece of the      02:52

1   puzzle amounts to proof beyond a reasonable doubt, but all of

2   the evidence taken together.

3          In this case, you heard testimony from a couple of

4   the marines in the defendant's units who were in the house when

5   this happened.  Cory Carlisle was the first.                    02:52

6          Cory Carlisle told a very compelling story about what

7   he saw.  When you compare what he saw and heard to what

8   Prentice says he saw and heard, you'll see that they match up

9   in many important respects.  But focusing just on what

10  Cory Carlisle told you about, there's some very important       02:53

11  things in his testimony.

12         First, he explained to you on multiple occasions that

13  when he saw the four individuals inside that house, they were

14  not resisting; they didn't do anything threatening.  And

15  between Cory Carlisle's testimony about what he saw after he     02:53

16  entered the house and proceeded to do his duties in the house,

17  and what James Prentice saw when he came in the house, the

18  government believes the evidence has clearly established that

19  the four persons in the house had given up, had surrendered.

20  If they were in the fight at some point that morning, they were 02:54

21  not in the fight when these marines came through the door.

22         When Cory Carlisle entered that house, as the point

23  man, the first person through the door, he was confronted by

24  these four individuals.  He did not pull the trigger, he did

25  not shoot them, because they were not doing anything            02:54

1    threatening.

2            The marines, with all of the gear on that you heard

3    described, their M16s, they come into the house.  The four men

4    remain seated on the ground.  Marines point their weapons at

5    the four men.  The four men remain seated on the ground.                02:54

6            Cory Carlisle and James Prentice did a search of the

7    house.  There were no other persons in the house.  They did

8    find -- Cory Carlisle told you he found a couple of AK-47s.

9    That's important to the extent that you recall where he said he

10   found the AK-47s.  The AK-47s were in different rooms.  One of         02:55

11   the AK-47s was, he said, buried in between rugs in the rug

12   room.  The weapons were not readily accessible to the four men

13   inside that house.

14           Even if those men had been fighting marines earlier

15   in the day, even if those four men were fighting marines              02:55

16   moments before the defendant's unit came in that house, when

17   they surrendered and gave up the fight, they were no longer

18   good targets.

19           You heard testimony from Cory Carlisle and

20   James Prentice that before they went into the house, one of the       02:56

21   weapons platoon members put explosive charges on the gate and

22   blew up the gate in order to try to get into the courtyard.

23   You heard testimony that there was an entire platoon of marines

24   in all of their vehicles parked on the street, right outside

25   the house.                                                            02:56

1          The government believes you can infer from all of

2     that evidence that the four men inside the house knew the

3     marines were coming.  The marines, in all likelihood, didn't

4     surprise them; they knew they were coming.  When the marines

5     came through that door, the four men inside that house were not          02:56

6     giving them a fight.  The four men inside that house gave up.

7     Even if they were fighting earlier in the day, they gave up.

8          Cory Carlisle told you that after finding the AK-47s,

9     he gave them to Ryan Weemer, and then he resumed doing searches

10    in the office and in the rug room and other parts of the house.          02:57

11         He explained to you how he heard a gunshot and that

12    he ran to the kitchen where he heard the gunshot coming from,

13    and he saw Ryan Weemer with his 9mm handgun drawn, standing

14    over the body of one of the four men.  He didn't hear anything

15    before the shot.  No commotion.  No yelling.  He heard the          02:57

16    shot.  He ran to where he heard the shot.

17         None of the other marines in the house ran to the

18    kitchen, as one might expect them to do if Ryan Weemer was in

19    trouble.  Cory Carlisle was the only one.  He's in a side room,

20    hears a shot, runs out to the gunfire.  And that's what he          02:58

21    sees.

22         He then explained to you that he heard a gunshot from

23    another side room and saw the defendant standing in that room

24    with his M16 rifle, and the defendant was standing over the

25    body of one of the other four men.          02:58

1          Again, it's important to know, what are the other

2     marines doing?

3          Everybody is standing there.

4          And it's also extremely important for you to recall

5     and note, what were the remaining two men doing?          02:58

6          In the words of Cory Carlisle, they were standing

7     there, doing nothing, right next to the person that the

8     defendant had just shot.  They were doing nothing.  In fact, as

9     Cory Carlisle described them, they were standing there with a

10    look of dread.  They were terrified.  The two other people that   02:59

11    they were in that house with had just been shot.  They weren't

12    resisting.  They didn't try to run away.  They stood there,

13    scared.

14         Cory Carlisle and James Prentice then start to leave

15    the house.  Their fire team leader, Ryan Weemer, tells them to   02:59

16    post outside.  They turn to leave.  A couple more gunshots.

17    Again, no shouting, no commotion.  Nothing to indicate any

18    struggle or any fight going on.  Just gunshots.

19         And nothing to cause the marines concern enough to

20    even look back, or to even go back for fear that their fellow   03:00

21    marines might be in trouble.  You heard him explain that it was

22    routine for them, in combat, to call out threats.  Nothing like

23    that occurred inside this house.  Because there was no threat.

24         James Prentice told you many of the same facts that

25    Cory Carlisle did, with a couple of very important additions.   03:00

1          James Prentice said that the entire time this was

2     occurring, he was in the main room.  One of the things that he

3     told you was that after the defendant took one of the males

4     into the side room, he heard a gunshot, and then the defendant

5     came back and said something to the effect of, 'Who else wants          03:00

6     to help me do these guys?  I don't want to do them all myself.'

7          And you also heard from James Prentice and

8     Cory Carlisle that Prentice was at least contemplating, if he

9     didn't actually, volunteer.  You also heard him describe -- I

10    believe it was brought out on cross-examination -- how upset he          03:01

11    was in that house, because his friend, Juan Segura, had been

12    killed earlier that morning.

13         But Cory Carlisle knew better, and told him, 'You

14    don't want to be involved.'  And James Prentice told you that

15    right after he started to volunteer to help, that his fire team          03:01

16    leader told him "no," grabbed him and Carlisle, and told the

17    two of them to go outside.

18         If the men inside that house were a threat to the

19    marines, the fire team leader of Cory Carlisle and

20    James Prentice would not have sent them outside.                         03:02

21         The other facts that James Prentice gave us were that

22    he actually saw -- although he doesn't remember exactly how

23    they did it, he saw Ryan Weemer and then the defendant take one

24    of the men into different rooms to shoot them.  He told you

25    that he saw Ryan Weemer take one of them down to the kitchen.            03:02

1   As they went into the kitchen, he heard gunfire; and then

2   Ryan Weemer came back and joined the rest of the group.  And

3   then the defendant took one of the men into a side room; and

4   there was gunfire, and the defendant came back.  And that's

5   when he made the statement, 'Who else wants to help?'                    03:02

6           This was not an act of self-defense.  This was an

7   execution.

8           In this case, you're not just limited to the

9   testimony of Carlisle and Prentice.  You also heard important

10  statements from the defendant's own mouth about why this         03:03

11  happened.  You heard the tape of the call made by

12  Jermaine Nelson to the defendant.  And you may be thinking at

13  this point, That was kind of vague.  And the defense may argue

14  that it was extremely vague.  But I urge you to think carefully

15  about what was said in that telephone call.  There were some    03:03

16  very important things that were not said, specifically

17  Jermaine Nelson brings it up by asking the defendant, 'Remember

18  that time we was in that house with those four guys.'

19          And then they have the conversation that ensues.

20          Defendant never sought clarification, 'What four         03:04

21  guys?  What time are you talking about?'

22          Couple that with the testimony that you heard from

23  Carlisle and Prentice that although they searched a lot of

24  houses when they were in Fallujah on the 9th of November, for

25  instance, this was the first time they encountered anybody in    03:04

1    these houses.  And you didn't hear any testimony, despite all

2    of the houses they searched, about another time when they

3    encountered four guys.

4            And one would expect, in a conversational situation

5    like that -- if there was ambiguity, you would expect the other        03:04

6    person to clarify.  One trial lawyer says to the other trial

7    lawyer, 'Hey, remember that time we were in court?  What time

8    when I was in court?  What are you talking about?'

9            That didn't happen here.

10           There was one time that these marines encountered          03:05

11   four individuals and then shot and killed the four individuals

12   unlawfully.  The defendant knew exactly what Nelson was talking

13   about.  And it was further explained by the later statements in

14   the telephone call, when the defendant explains why they did

15   what they did.  His very words were, 'We didn't have time to        03:05

16   throw motherfuckers on the truck because we're moving.'

17           It was inconvenient to deal with those four men in

18   that house.  Not just inconvenient; the government would

19   concede, it might have been very difficult to deal with those

20   four men in that house.  It was combat.  They were in the          03:06

21   middle of a fight that had been going all morning.  But that

22   does not excuse it.  They were required to do their duty and do

23   the right thing.

24           You heard testimony from Warrant Officer Pritchard

25   that other marines that day were doing the right thing.  I         03:06

1  believe he told you on the first day of the fight, as bad as it

2  was, 30 prisoners were brought back to the train station, the

3  way they were supposed to be.  And he told you about the many

4  more prisoners that were captured and brought back to the train

5  station during the rest of the battle of Fallujah.                     03:06

6          It might have been hard for the marines to process

7  those prisoners, flex-tie them, take them to the rear, do what

8  they needed to do with them.  But no matter how hard it was,

9  that was their obligation.  The fact that our armed forces

10  conducts themselves that way on the battlefield no matter how          03:07

11  hard it is is what makes them the best fighting force in the

12  world.  They do the right thing, no matter what the cost.

13          The defendant failed to live up to that on

14  November 9th.  He committed an act that was criminal.  And if

15  you, ladies and gentlemen, reach the conclusion, after weighing       03:07

16  and considering all of the evidence, that the evidence has

17  established beyond a reasonable doubt that those men were not

18  resisting and that the killings were not justified, you have a

19  duty to find the defendant guilty.  No matter how hard that

20  might be, you have a duty to do the right thing.                      03:08

21          Thank you, Your Honor.

22          **THE COURT:**  Thank you.

23          At this time, we're going to break for lunch.  We'll

24  return at 1:00 for closing argument from the defense.  The jury

25  will be held together at lunch by the bailiff.  I'll see you          03:08

1    back here at 1:00.

2              (Whereupon, jurors depart courtroom.)

3              **THE COURT:**  I'm going to provide government counsel

4    with some notes that I made, in terms of the instructions, just

5    to have them.                                                         03:09

6              It's 3.1, 3.2, 3.3, 3.5, 3.6, 3.7, 3.8, 3.9, 4.1,

7    4.13 as modified to include the instruction concerning

8    Sergeant Nelson's statements.  Then the proposed instructions,

9    the substantive instructions, 7.1, 7.2, 7.3, 7.4, 7.5, and 7.6.

10             And then I wrote out, as best I could, the              03:10

11   instruction that I gave.  What I'm going to do is, I'm going to

12   give this to government counsel.  Defense counsel should take a

13   look at it; and government counsel, during the lunch break,

14   will type up a final version of this, the verdict form, and

15   provide it to defense counsel and then to the Court.             03:10

16             I'll leave this here for you.

17             Is there anything further?

18             **MR. BEHNKE:**  No, Your Honor.

19             **MR. McDERMOTT:**  No, sir.

20             **THE COURT:**  Very well.  I'll see you at 1:00.       03:10

21             (Conclusion of Morning Session.)

22             (**Afternoon Session produced under**

23             **separate cover by Reporter Mark Schweitzer.**)

24             (The following proceedings were held

25             **after** the afternoon session concluded:)            07:46

1          **THE CLERK:**  Calling the case of plaintiff, United

2    States of America, versus defendant, Jose Luis Nazario, Jr.,

3    case number ED CR 07-00127-SGL.

4          May we have counsel please come forward and state

5    your appearances for the record.                              07:50

6          **MR. BEHNKE:**  Jerry Behnke and Charles Kovats for the

7    United States.  Also present is Special Agent Fox.

8          **MR. McDERMOTT:**  Kevin McDermott appearing for Jose

9    Luis Nazario, Jr., along with Douglas Applegate and Joseph

10   Preis.                                                        07:50

11         **THE COURT:**  The Court has received the following

12   note, it's note number one.  It reads as follows:

13         "The jury would like to dismiss for the day now and

14   return at 9:00 a.m. Thursday morning.  We would also like a CD

15   player in the jury room.  We would also like to see Defense    07:50

16   Exhibit A."

17         The Court has permitted the jury to retire for the

18   day, so they have left and they will be back tomorrow morning

19   at 9:00.  As far as the CD player, I'm reluctant to send the CD

20   player into the jury room.  The Court's normal practice on this 07:50

21   is if there's a video tape or a CD to be played, have the jury

22   come into the courtroom here, play the CD for them, they will

23   have the benefit of the transcript in front of them, and then

24   they will return back to the jury room.

25         Also, something just to indicate what came out of the    07:51

1    jury room.  Apparently, Mr. Holmes was not able to retrieve all

2    of the transcripts.  One of the transcripts was provided to the

3    bailiff.  I thought we had collected all of the transcripts as

4    the jury was going back in.  But if the parties want the Court

5    to make some inquiry of the jury when they come out tomorrow          07:51

6    morning, I will.  If you don't, I won't.

7           Mr. Behnke?

8        **MR. BEHNKE:**  I was just going to ask if at any point

9    the Court knows whether anyone has asked the jurors if all of

10   the transcripts have been given back or not?                          07:51

11       **THE COURT:**  I believe that no one has asked.

12           I assume as Mr. Holmes was collecting them one by one

13   at the side door here that they all had been collected.  But

14   apparently someone must have folded it up and stuck it in their

15   papers or something and brought it into the jury room.                07:52

16           If you wish me to conduct the question of the jury at

17   this point, I will.  If you don't, I won't.

18           What are the government's thoughts?

19       **MR. BEHNKE:**  I don't think it could hurt, I guess,

20   just to make sure that all of the transcripts have been               07:52

21   collected back so that there isn't a transcript sitting around

22   in the jury room.

23       **THE COURT:**  And perhaps at the same time I can

24   explain to them that the evidence is what they hear from the

25   tape and not the transcript itself.  I'd already given that          07:52

1   instruction to the jury, and I have every reason and confidence

2   to believe that the jury is following that instruction.  That's

3   underscored by the fact that they are asking for the CD and

4   that they returned the transcript; so I really don't think this

5   is anything of any significance, but I just wanted to bring it          07:52

6   to counsel's attention.

7           I will ask then if all have been returned, as we had

8   assumed; and that the transcript is not evidence, only what is

9   on the tape is evidence.

10          Let me ask the defense the same question:  Do you              07:53

11  want me to ask anything further of the jury?

12          **MR. McDERMOTT:**  No, sir.

13          What I would ask, the issue about defense Exhibit A.

14          **THE COURT:**  We'll get to that.

15          Defense Exhibit A, as I understand it, was never              07:53

16  moved into evidence.

17          **MR. McDERMOTT:**  It wasn't, Sir.  It was just a

18  document to refresh a witness's memory, and it was not offered

19  as evidence.

20          **THE COURT:**  So what I would propose responding to --      07:53

21  there's no point in -- they know they were dismissed for the

22  day.

23          "The tape will be played for you in the courtroom in

24  the morning.  Defense Exhibit A was not introduced into

25  evidence; it was only used to refresh a witness's              07:54

Wednesday, August 27, 2008                          ED CR 07-00127-SGL

```
 1   recollection."

 2           Any objection from the government?

 3           MR. BEHNKE:  No, Your Honor.

 4           THE COURT:  The defense?

 5           MR. McDERMOTT:  No, sir.                          07:54

 6           THE COURT:  Very well.  That's the Court's response,

 7   then.  Let me write this out.

 8           (Brief pause.)

 9           THE COURT:  I will provide this to Mr. Holmes; he'll

10   make a copy of the note and provide it to each counsel.  And  07:55

11   then we'll do that at 9:00 tomorrow morning, we'll convene and

12   we will bring the jury out here.  I'll first ask them the

13   questions about the transcript; make sure that they understand

14   that listening to the tape is the evidence and not the

15   transcript; the transcript is only to assist them in listening 07:56

16   to the tape.  Then I will also confirm that all transcripts

17   have been recovered.  I think that will be it.

18           Anything else?

19           MR. BEHNKE:  No, Your Honor.  Thank you.

20           THE COURT:  I'll see you tomorrow morning at 9:00.   07:56

21           The government will bring in the means to play the

22   tape; correct?

23           MR. BEHNKE:  Yes, your Honor.

24           THE CLERK:  Court stands in recess.

25           (Whereupon, Trial Day 5 is concluded.)
```

1

2

3

4                                    CERTIFICATE

5

6    I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
7    the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
8    conformance with the regulations of the judicial conference of
     the United States.

9

10   _____          _____
     THERESA A. LANZA, CSR, RPR                          Date
11   Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25