1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7

UNITED STATES OF AMERICA,          )

8                                   )

                    Plaintiff,     )

9                                   )

          vs.                       )   No. ED CR 07-00127-SGL

10                                  )

JOSE LUIS NAZARIO, JR.,             )

11                                  )

                    Defendant.  )   Trial Day 1,

12    _____)   Morning Session

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

15                 Riverside, California

16               Tuesday, August 19, 2008

17                    9:07 A.M.

18

19

20

21

22

23           THERESA A. LANZA, CSR, RPR
          Federal Official Court Reporter
24          3470 12th Street, RM. 134
          Riverside, California  92501
25             (951) 274-0844
             www.theresalanza.com

```
 1  APPEARANCES:

 2  On behalf of Plaintiff, United States of America:

 3                          United States Attorney's Office
                            By:  Jerry Behnke
 4                               Charles J. Kovats
                            Assistant United States Attorneys
 5                          3880 Lemon Street,
                            Suite 210
 6                          Riverside, California 92501
                            (951) 276-6210

 7

 8  On behalf of Defendant Jose Luis Nazario, Jr.:

 9                          Law Offices of Kevin Barry McDermott
                            By:  Kevin Barry McDermott
10                          17452 Irvine Boulevard,
                            Suite 200
11                          Tustin, California 92780
                            (714) 731-5297

12                          Douglas L. Applegate
13                          18301 Von Karmon
                            suite 210
14                          Irvine, California 92612
                            (888) 583-2266

15                          Pepper Hamilton LLP
16                          By:  Joseph M. Preis
                            Suite 1200
17                          4 Park Plaza
                            Irvine, California 92614-5955
18                          (949) 567-3500

19                          Law Offices of Vincent J. LaBarbera, Jr.
                            By:  Vincent J. LaBarbera, Jr.
20                          600 West Santa Ana Boulevard,
                            Suite 950
21                          Santa Ana, California 92701
                            (714) 541-9668

22

23  Also present:       Mark Fox, Special Agent

24

25
```

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1                        I N D E X

2                                                        Page

3      Proceedings......................................   4

4      Jury Voir Dire...................................  31

5      Secret Service Examination.......................  69

6
WITNESS          DIRECT      CROSS      REDIRECT       RECROSS

7      **STEVEN J. DEZEEUW**

8      By Mr. Behnke      69
       By Mr. McDermott               78
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      Riverside, California; Tuesday, August 19, 2008; 9:07 A.M.

2                            -oOo-

3           (Proceedings held outside the presence of the jury:)

4           **THE CLERK:**  Calling the matter of the United States

5    of America versus the defendant, Jose Luis Nazario, Jr., case      09:07

6    number ED CR 07-127.

7           May we have counsel please come forward and state

8    your appearances for the record.

9           **MR. BEHNKE:**  Jerry Behnke and Charles Kovats for the

10   United States; also present is case agent Special Agent            09:08

11   Mark Fox.

12          **MR. McDERMOTT:**  Kevin McDermott for Mr. Nazario; also

13   Mr. Applegate, Mr. Preis, and Mr. LaBarbera.

14          **THE COURT:**  Good morning to you all.

15          The jurors are being processed downstairs so we have        09:08

16   a few moments before we are going to be bringing the jury panel

17   up for selection.  The Court has shared with counsel this

18   morning the proposed questions that I'm going to ask of each of

19   the jurors during the voir dire process.  I received no

20   objections from the defense.  I received one suggestion from       09:08

21   the government to add a line on the media exposure, which the

22   Court has added.  I trust there's no other objections from

23   either side, just for the record?

24          **MR. BEHNKE:**  No, Your Honor.

25          **MR. McDERMOTT:**  No, Sir.                                 09:08

1          THE COURT:  Very well.

2          Those will be the questions.  And I think Mr. Holmes

3  has -- What was the number we agreed to bring in?

4          THE CLERK:  54.

5          THE COURT:  We're going to start with 54, and bring          09:08

6  in 54.  We had summoned 120; there are 20 or so upstairs with

7  Judge Parada right now going through the excusal process.  We

8  should have this set up.  We're going to put 54 on my left side

9  of the courtroom.  I'm hoping we're going to be able to get our

10  14 from that 54, but I'm going to begin by questioning the 54          09:18

11  and have counsel question the 54.  We do have an additional 40

12  or so that will be available downstairs if we need to go to

13  that, but I'm hopeful that's not the case.

14          I'll have a pretty good sense, after half of the

15  panel are questioned and we see who are removed for cause.          09:18

16          In the meantime, I wanted to take up this issue which

17  I have spent most of last evening dealing with myself, and that

18  is the issue of Sergeant Weemer's interview with the Secret

19  Service.  I received the Defendant's motion in limine on this

20  yesterday.  I received the Government's trial brief last week.          09:25

21  To be honest, I didn't focus on it too much when I received the

22  government's trial brief and it wasn't the issue highlighted in

23  the government's motion in limine.

24          As I understand it, you were initially focused on the

25  interview with the NCIS with Mr. Weemer, and the Court ruled on          09:25

 1   that.

 2          **MR. BEHNKE:**   The motion in limine, there was a

 3   discussion concerning some statements that Weemer had made to

 4   other witnesses.

 5          **THE COURT:**  Carlisle and --                              09:25

 6          **MR. BEHNKE:**   Yes, Your Honor.   The anticipation was

 7   that regardless of whether Weemer actually testified in these

 8   proceedings, the government was going to try to elicit those

 9   other statements as well.   As the Court is aware, this has been

10   a disputed issue in terms of how the evidence is going to come   09:35

11   out.

12          **THE COURT:**   I understand.

13          **MR. BEHNKE:**   So now, as we discussed yesterday in

14   anticipation, the witness may not actually come and testify,

15   and the government is raising this issue.                        09:35

16          **THE COURT:**   I appreciate the frustrated position to

17   be had when a person will not comply with a court order to

18   testify.   However, I need to consider the Weemer interview with

19   the Secret Service.

20          This is a complicated issue, complicated in fact by      09:35

21   the Supreme Court's reluctance to define the parameters or

22   contours of what is testimonial and what is nontestimonial.

23   They do provide a minimum.   At a minimum, testimony includes

24   depositions; grand jury testimony; preliminary hearing

25   testimony; and, they say, police interrogations, custodial      09:35

1    interrogations specifically; so that's at one end.

2            Then clearly at the other end we have, as different

3    courts have characterized it, 'flippant remarks to an

4    acquaintance,' statements that are clearly outside of the

5    paramaters of any police or prosecutorial examination.                    09:35

6            So the question that I have before me is where does

7    this fall?  Does this fall within the testimonial Rubric or

8    does it fall within the nontestimonial Rubric?  And what I did

9    last night is I came up with a list of factors of my own here

10   as to why it might be noncustodial or nontestimonial and why it    09:35

11   should be viewed as custodial or testimonial.  I'd like to hear

12   further argument after the Court goes through its factors.

13           The three factors which I think suggest this is

14   nontestimonial is, first of all, as I understand it -- and this

15   is all based on my understanding, so if my understanding is not   09:35

16   correct, I'll leave it to counsel to correct me -- is that

17   Sergeant Weemer voluntarily appeared before the Secret Service

18   of St. Louis for an employment interview and that this was in

19   the context of an employment interview.  Second, he was not

20   placed under oath.  And third, the interview was not part of a    09:35

21   criminal investigation.

22           A lot of the cases talk about whether or not an

23   interview was done with an eye towards trial or whether it is

24   designed to build a case, a criminal case.

25           On the other side of the ledger with respect to           09:35

 1   whether it was a voluntary appearance, I have the factor that

 2   it does appear to have taken place in what I think can be

 3   fairly described as a quasi-custodial setting.  Mr. Weemer is

 4   advised that the interview is being done in a room that is

 5   normally used for criminal interrogation; he at least          09:35

 6   subjectively understood that he needed to ask and, in fact, was

 7   denied permission to leave the room to use the restroom until a

 8   time that was deemed appropriate by the Secret Service agent.

 9   There was the use of what I think can only be fairly described

10   as structured questioning and rather sophisticated             09:35

11   interrogation techniques.

12        I mean, the Court has had the benefit of 18 years of

13   seeing interviews and agents conducting interviews and reading

14   reports; and the way the questions were asked, the psychology

15   of the questioning such that it was clearly being done by a    09:39

16   professional -- and I mean that as a compliment to the Secret

17   Service agent who conducted the interview -- it was a very

18   well-conducted interview.  But it was a very professional

19   interrogation in that respect.

20        With respect to not being placed under oath, I have       09:39

21   to balance that with the emphatic emphasis -- that's redundant,

22   but the repeated and emphatic nature of the special agent's

23   reminding of the interviewee of the importance of honesty.  I

24   mean, this was really -- I first read the government's excerpt

25   that they planned to use, which was provided actually by the   09:43

1    defense, and then I sat and read the entire interview, and I

2    don't think it's an exaggeration to say that a substantial

3    portion of the interview repeatedly was devoted to emphasizing

4    to Mr. Weemer that he had to tell the truth; that there would

5    be adverse consequences if he did not tell the truth; that the          09:43

6    most important thing was telling the truth and uncovering and

7    then revealing -- and that was not only done overtly, through

8    statements to that effect, but also by example.  So when he

9    came forward and revealed some rather embarrassing moments in

10   his past, he was always assured that the agent understood that          09:43

11   that was not a big deal and that the important thing was just

12   to keep telling the truth; all leading up to this climactic

13   moment when there were the questions concerning the incident

14   over in Fallujah.

15          I also have -- it's not placed under oath but it was            09:43

16   a polygraph setting and the whole thing was being recorded,

17   which comes as close to being placed under oath as a witness as

18   you can without actually having an oath administered.

19          To a certain extent, I thought that -- in court here,

20   I put people under oath every day.  What took place in this             09:43

21   interview was almost more effective in terms of ensuring that

22   you would have truthful testimony than placing someone under

23   oath.

24          The final issue is, is it part of a criminal

25   investigation?  Ostensibly, it's not.  But the first thing I           09:43

1   was struck with from reading the transcript was the very first

2   thing that is done is that the witness is given his Miranda

3   warnings.  Even before he is given his consent to polygraph

4   warnings, he's given his Miranda warnings, placing the witness

5   on notice that anything that he says can be used in court.      09:43

6   He's advised of his right to an attorney, which certainly

7   suggests that the testimony or the statements can be used in a

8   criminal case.  The design of the questions were clearly

9   designed to elicit or expose criminality.

10          That's a legitimate purpose, of course, for a          09:43

11  Secret Service screening application, but it also serves as a

12  dual purpose of exposing criminality in a very, as I indicated,

13  structured interrogation.

14          I can't pass over the circumstantial concern raised

15  by the defense, the temporal nexus between interrogation on one  09:43

16  day and the formal opening of this criminal investigation the

17  very next day.  Perhaps that's a complete coincidence.  I

18  certainly don't have any evidence before me outside of the

19  temporal nexus, but it's the type of thing that raises one's

20  eyebrows.                                                        09:43

21          So for all of those reasons, this strikes the Court

22  as something which is much closer to a police interrogation

23  than it is to a flippant remark to an acquaintance.

24          There's not all that much case law on this.

25          The government cites to this Leavitt vs. Array, and      09:43

1   there's footnote 22 here, where Crawford is discussed.  Of

2   course, Leavitt came out before Crawford.  Actually, Crawford

3   came out between the oral argument in Leavitt and the Court

4   issued its opinion; so the Court's comments on it in a footnote

5   without resolving the ex post facto application, because they          09:43

6   say at the end of the day that the victim's statements, the

7   spontaneous utterances that were made to the 9-1-1 operator,

8   are simply not close to the police interrogations that Crawford

9   applies to, and they cite two factors.

10          They say in footnote 22 "We do not think that Ellen's      09:43

11  statements to the police she called to her home fall within the

12  compass of these examples," referring to the examples of grand

13  jury testimony, former trial, preliminary hearing, and police

14  interrogations, which are the examples that Crawford uses.

15  "First," they say, "Ellen, not the police, initiated the            09:43

16  interaction."

17          And of course that's true here.  Weemer, not the

18  Secret Service, initiated the interaction.

19          The second factor they cite is she was in no way

20  being interrogated by them, but instead sought their help in       09:43

21  ending a frightening intrusion into her home.

22          I can't fairly say that about that transcript that I

23  read last night.  It is clear that the Secret Service was

24  interrogating Weemer; ostensibly, of course, for an interview

25  or a job application, but serving the dual purpose of a police      09:43

1    interrogation.

2            There are two points where it really struck me that

3    this is more than simply an interrogation.  When the Special

4    Agent is questioning Weemer about the incident, he does a very

5    effective job of neutralizing two criminal defenses; self                09:43

6    defense and necessity.  He addresses the issue of self defense

7    by making it clear that this was not a firefight and that this

8    was separate and apart from the firefight incident.  And he

9    also addresses the defense of necessity by asking him about

10   other incidents and other examples of where captured Iraqis             09:43

11   were, in fact, taken back and held prisoner and transported.

12   He very effectively does that.  He definitely uses a kind of a

13   buddy-type psychology in terms of going through this very

14   difficult part of the interrogation.  It's not the arm's length

15   question-and-answer that we're used to seeing in a                       09:43

16   polygraph-type test.  He expressed his understanding

17   repeatedly; he expressed his empathy about the fog of war.

18           This is classic -- and again, I don't mean this in a

19   derogatory sense, because this is very effective police

20   interrogation -- this is what we expect our police officers and          09:43

21   our Secret Service agents and our FBI agents to do when they

22   are interrogating.  But I don't know how I can read a

23   transcript like I did last night and come to the conclusion

24   that this is not a police interrogation.

25           So those are my tentative thoughts on this.                      09:43

1        I don't have a direct response from the government

2   other than what was set forth in their trial brief; so, out of

3   fairness, I should indicate my tentative and invite the

4   government to respond either now or if they want to respond at

5   the end of the day today.  If they want to prepare a brief and

6   submit something to the Court in response to the motion in

7   limine that was just filed yesterday, I think that would be

8   appropriate.

9        That's my sense.

10       I have not gotten quite through all of the cases.

11  There are a few more cases that I wanted to look up, but I've

12  read all of the cases that the government cited to:  Davis,

13  Crawford, Leavitt; and there was one other, Cervantes.

14       Cervantes talks about the concern of having the

15  skepticism of the government officer in one of these

16  interrogations.  And that's exactly what you had in this

17  interrogation.  This was a very highly-trained professional

18  Secret Service agent approaching this interview, like I say,

19  exactly as you would expect a trained interrogator to approach

20  it.

21       Again, nothing derogatory.  It is what it is.  It was

22  a police interrogation.  And under the Sixth Amendment, we

23  don't have ex-parte testimonies used in this fashion because of

24  the risk of abuse.  I think it's pretty clear.

25       But, again, I have not given the government an

1    opportunity to fully respond.

2              So Mr. Behnke, I'll let you respond now.

3         **MR. BEHNKE:**  Thank you, Your Honor.

4              Just a couple of points.

5              First, I appreciate the Court's offer for additional    09:44

6    time, and I think that would be prudent here.  For one reason,

7    Special Agent DeZeeuw arrived last night, so he is now here and

8    available.  And since the Court raised one of the concerns

9    being the temporal relationship between this interview and the

10   opening of the NCIS investigation, we spoke to Special Agent    09:44

11   DeZeeuw and it's not coincidental.  I think if we asked him

12   about it, what happened here is this information came out in

13   the polygraph.  And pursuant to his procedures, he reported the

14   results of the polygraph to his supervisors and someone higher

15   up the food chain in Secret Service thought that this    09:44

16   potentially revealed criminal conduct.  That was then referred

17   to NCIS from someone in Secret Service.  The NCIS, when they

18   received report of this, opened an investigation.

19        **THE COURT:**  I appreciate that.

20        **MR. BEHNKE:**  Special Agent DeZeeuw wasn't somehow    09:44

21   luring Ryan Weemer into a polygraph interview for the purpose

22   of building an NCIS case against Sergeant Nazario.

23        **THE COURT:**  But once he heard what was going on, he

24   recognized it for what it was and made the appropriate

25   referral.    09:44

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1          **MR. BEHNKE:**  Yes.  That's correct, Your Honor.

2          **THE COURT:**  Okay.

3          And I didn't realize whether he was here or not, but

4   I think it would be helpful to have his testimony, because I

5   would like to explore that with him myself and yourself as well

6   before I make certain assumptions.  All I have before me right

7   now is this transcript, and I don't want to read anything into

8   it that's not accurate.  At the same time, I want to make sure

9   the defense has an opportunity to elicit from it anything that

10  might exist.

11         Another question that I would have for him is with

12  respect to this policy on having the Miranda Rights read;

13  that's something which struck me as curious.

14         **MR. BEHNKE:**  And we can certainly ask him about that,

15  but I believe he indicated to us last night that that's how he

16  begins all of his polygraph interviews.  Because I think the

17  expectation is that in doing the polygraph, whether it's an

18  admission that when you were 15 years old, you committed a

19  shoplift, or something more serious --

20         **THE COURT:**  It may be used for a criminal

21  prosecution.

22         **MR. BEHNKE:**  Yes.  That's correct, Your Honor.  The

23  person doing the polygraph has to understand they are not

24  giving the polygraph under immunity.

25         A lot of what the Court was stressing in its

1    tentative ruling seems to the Government to be counter-

2    intuitive, to some extent.  The Court was essentially making

3    the argument that all of the factors that indicate the

4    reliability of the statement mitigate against its

5    admissibility.

6           **THE COURT:**  Yes.

7           The hearsay arguments the defense made, I think, with

8    all due respect, are poor.  There's no question this is a

9    reliable statement.  This is true.  It's a statement against

10    self-interest which is a deeply long-rooted principle of a

11    hearsay exception.  There's no question that this blows right

12    through any hearsay concern whatsoever for those reasons.

13           But the confrontation clause is not trumped by

14    hearsay rules, and the Supreme Court has expressly addressed

15    that issue in Crawford.

16           **MR. BEHNKE:**  I agree with that, Your Honor.

17           **THE COURT:**  You can't bootstrap reliability into,

18    'Well, it's true; therefore...'  That was the classic problem

19    with the inquisition; that was the classic problem in England

20    in the Sir Walter Raleigh case; that is at the core of the

21    Sixth Amendment confrontation clause.

22           **MR. BEHNKE:**  I understand that, and I'm not arguing

23    that because it's true, we can somehow trump the Sixth

24    Amendment.  I'm simply pointing out that the fact that the

25    statement appears to be true does not make it testimonial.

09:44
09:44
09:44
09:44
09:44

1          **THE COURT:**  No, no.  And that's not the point of it

2     at all.  It was the way in which -- it's the inquisitorial

3     nature of the interrogation by a government officer with, I

4     think, an eye towards a prosecution.  And I think to a certain

5     extent, that's the point of the Miranda warning, is that it may

6     not be an eye towards a particular prosecution, but the entire

7     interrogation is being done with at least one eye -- not

8     necessarily both eyes, but at least one eye on a possible

9     prosecution.

10          Not every preliminary hearing ends in a trial.  Not

11     every police interrogation or custodial interrogation ends in a

12     prosecution.  And not every Secret Service interview where

13     Miranda Rights are read or where consent to a polygraph is

14     given ends in an investigation.  But all of those have the

15     common theme or element that they are structured in such a way

16     as to -- that is one of the purposes of those interviews and

17     those proceedings.  It makes it much more like the type of

18     thing that the Supreme Court says is a Sixth Amendment

19     violation, as opposed to the type of thing that the Supreme

20     Court says is not.

21          Even the language you cited in your brief when you

22     defined those four examples the Supreme Court used, that's what

23     they were describing, at a minimum, to be a clear

24     confrontational testimonial-type case.  That was not a maximum.

25     Or, if it's not one of those four, the analysis ends.

09:44
09:44
09:44
09:44
09:44

1          **MR. BEHNKE:**  Right.  I agree with that.

2          And the Court, I think, is absolutely correct, this

3     was, in some form, certainly a very skilled

4     question-and-answer; it was a very skilled Q and A conducted by

5     an agent very effectively.  But the Government believes                09:44

6     Crawford is not implicated because of the purpose of the

7     interrogation.

8          As the Supreme Court pointed out in Davis, that what

9     the Court had in mind when it made this reference to police

10    interrogation was interrogation solely directed at establishing        09:44

11    the facts of a past crime in order to identify or provide

12    evidence to convict the perpetrator, solely with that purpose.

13    That is a police interrogation.

14         **THE COURT:**  Your emphasis on the word "solely"

15    there -- Davis also goes on to distinguish between any kind of         09:44

16    any formal statement to police versus a casual remark.  Davis

17    is where you get that dichotomy between formal statements on

18    the one hand and casual remarks on the other.

19         **MR. BEHNKE:**  This is why I cited to the Leavitt case

20    as well.  Recognizing that there may be some dual purpose in          09:44

21    the statement, I think that's why Leavitt is very instructive.

22    Certainly, when someone makes a telephone call to 9-1-1, the

23    9-1-1 operator's primary purpose is to get aid to the

24    individual.  Or in Leavitt, I believe it was officers

25    responding to the house in response to a 9-1-1 call.                  09:44

1   Certainly, as the Court pointed out, that is the primary

2   purpose is providing aid, addressing the emergency at hand.

3          But the 9-1-1 operators, the police that respond, are

4   trained and certainly do have also in their mind this idea of

5   collecting evidence for a crime.  9-1-1 operators do it; police   09:44

6   responding out there do it.  And while the primary purpose is

7   to render aid, as in Leavitt, certainly when officers respond

8   to a 9-1-1 call for a prowler, they also in their minds are

9   thinking of the potential case that's going to be developed.

10         **THE COURT:**  You know, that's probably true, but   09:44

11  that's not what the Ninth Circuit says.  The Ninth Circuit says

12  "she was in no way being interrogated by them, but instead

13  sought their help in ending a frightening intrusion into her

14  home."

15         They did not focus on that aspect at all.  They   09:44

16  simply viewed it as a call for help.

17         **MR. BEHNKE:**  In the Leavitt case when the officers

18  respond, there was no question-and-answer from the police to

19  her at all.  I'm sure there was.  The Court just didn't

20  characterize it as an interrogation.   09:44

21         **THE COURT:**  They didn't.  They didn't focus on that.

22  Unfortunately, this is a footnote.  And it's Judges Kaczynski,

23  Fernandez and Reimer, they took the position that they needed

24  to get to this issue.

25         **MR. BEHNKE:**  I think they viewed this as one extreme   09:44

1    in the two extremes you listed, and so they didn't deal with it

2    at length.

3          THE COURT:  Right.

4          MR. BEHNKE:   The Government agrees that this is a

5    situation where we're in-between the two extremes.  But the          09:44

6    Government believes that this certainly falls on the side of

7    not implicating Crawford.  Because while the agent was

8    skillfully questioning Ryan Weemer, he certainly brought out a

9    lot of embarrassing and incriminating facts from Weemer during

10   the course of this interrogation.  He was doing it for the          09:44

11   purpose of evaluating whether this individual is a suitable

12   candidate for employment with the Secret Service.  He wasn't

13   doing it for the purpose of building a criminal case against

14   Ryan Weemer.

15         THE COURT:  You know what my sense is, counsel -- and          09:44

16   perhaps we can explore this with the special agent -- my sense

17   is that you're absolutely right up to a certain point.  Once he

18   knew what was going on here, his whole approach in the

19   interrogation shifted.  He's a smart agent.  He knows what was

20   going on.  When he heard what Weemer admitted to, there was no      09:44

21   way in the world this guy was going to be guarding the

22   President of the United States.  And all of a sudden he shifted

23   gears, as a trained agent is going to do, and he asked all of

24   the right questions that you would expect a sophisticated agent

25   to ask.                                                             09:44

1      **MR. BEHNKE:**  And the Court may ultimately determine

2  that.  But at some point, even under the Court's own analysis,

3  if the Court adopts that finding here, there would have to be a

4  shift.  There's a shift from a standard pre-polygraph

5  employment interview to an interrogation.  And if the Court                    09:44

6  wants to adopt that analysis, then I think the next thing that

7  has to happen is to identify when that shift occurred.  Because

8  if that's how the Court feels about this interview, then

9  certainly, some of the statements should come in.

10         For instance, when Weemer makes the first statement          09:44

11  about "I struggle with some things that I did in the military,"

12  and then DeZeeuw throws out a hypothetical:  "What are you

13  talking about?  Are you talking about a firefight where you

14  killed somebody, or are you talking about this other situation

15  where somebody gets shot in the back of the head?"  And then     09:44

16  Weemer says, "Actually that did happen, to be perfectly

17  honest," and then Weemer starts to talk.  And then there's more

18  question and more answer.

19         If the Court wants to adopt that analysis, I mean, I

20  think the next thing we need to do then is to identify when     09:44

21  that shift occurred.

22      **THE COURT:**  I think we need to have the special agent

23  come in and I need to examine him.  I think that's the next

24  logical step here.  But I do want to give the defense an

25  opportunity to address the Court's tentative as well.           09:44

```
 1          MR. McDERMOTT:   Judge, what the Government is asking

 2    you to do is to take the test that applies from Crawford and

 3    Davis and now Giles, and turn it from an objective test into a

 4    subjective test.  Really, what we're talking about is what is

 5    in the objective frame of mind of the police officer conducting      09:44

 6    the interview.

 7          If I hypothetically am not thinking about this being

 8    anything more than a pre-employment interview as opposed to

 9    kicking this thing over to a criminal investigation, then we

10    have to get into the subjective thoughts of the officer              09:44

11    conducting it.  I don't believe we should be going down that

12    slippery slope.

13          The factors that the Court has pointed out are

14    particularly telling.  The fact that there was Miranda being

15    read and the three factors that the Court originally noted, I'd      09:44

16    like to address those; and we can get some of these answers

17    from the agent.

18          Clearly, Mr. Weemer volunteered for this polygraph.

19          THE COURT:  Right.

20          MR. McDERMOTT:  But certainly this polygraph was a             09:44

21    prerequisite to employment.  So it's a voluntary arm twist.

22    You have to do it in order to get the job.  Period.

23          Whether or not this was under oath, I don't

24    necessarily see that as being much of a factor when you

25    consider the number of interrogations that take place every day     09:44
```

 1   in custodial lockup without the oath.  I don't think you'll see

 2   many admissions and confessions made by suspects under oath.

 3   They are never that circumstance.  They are more formulated to

 4   "Here's your rights; you have the right to remain silent; lets

 5   go ahead and talk about what you can tell me."                    09:44

 6         **THE COURT:**  One of the factors the Courts seem to

 7   look at -- and here I'm looking at somebody outside of the

 8   Ninth Circuit, the other circuit cases you just cited -- is how

 9   close is something to a formal statement versus an informal

10   remark.  The informal remarks are not testimonial, whereas       09:44

11   formal statements are.

12         Certainly, what are the indicia of formality?

13         An oath is one of them.  And I suppose that's why I

14   cited that factor as weighing against finding it as a formal

15   statement.  Admittedly though, there are other indicia here of   09:44

16   formality.

17         **MR. McDERMOTT:**  Recordings.

18         **THE COURT:**  The recorded nature of it; the Miranda

19   warnings; the consent form; the structure.  There are other

20   indicia that would suggest --                                    09:44

21         **MR. McDERMOTT:**  And the indication that Weemer was

22   not free to leave when he wanted to; that he had to ask

23   permission to get up and go, even to use the restroom.  There

24   were certain limitations on his ability to pick up and go.

25         Also, I would venture a guess -- because I think the       09:44

1    Supreme Court has instructed us upon this -- assuming

2    hypothetically it had nothing to do with the polygraph

3    examination but had everything to do with some sort of civil

4    deposition.  And the only different factor we had here was

5    Mr. Weemer was put under oath, and he testified truthfully          09:44

6    about circumstances relating to some matter that the civil

7    attorneys thought important.

8           Now, would, in fact, that document, that deposition

9    transcript, then be useable against third parties without the

10   opportunity to confront?                                           09:44

11          And I believe that may be the kind of circumstances

12   that the Supreme Court was talking about:  Prior testimony,

13   prior hearings.

14          Although we don't have the oath --

15          **THE COURT:**  Well, that's part of the question.          09:44

16          The Supreme Court, I don't really see them spelling

17   this out anywhere, whether or not the prior proceeding or the

18   occasion for the formal statement, how close of a nexus or a

19   relationship does it have to have to the actual criminal

20   prosecution in which the government wants to use the statement.    09:44

21          **MR. McDERMOTT:**  Clearly, if, in fact, we had a prior

22   trial --

23          **THE COURT:**  In an unrelated --

24          **MR. McDERMOTT:**  -- clearly, I think the Supreme Court

25   has addressed this.  When we look at some of the circumstances     09:44

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1   that Justice Scalia points to from a historical context,

2   witnesses that were examined totally unrelated to the present

3   circumstances, and that testimony allowed in without being

4   confronted, that is irrespective of intent of the testimony and

5   where it came from.                                          09:44

6         The only question that the Court has to answer is,

7   Does the government intend to use this testimony against

8   Jose Nazario for the truth of the matter asserted?  And the

9   only answer that you can give for that is 'yes.'

10        Now, how it got started, what the genesis of it may    09:44

11  be, is frankly irrelevant.  The fact of the matter is that it's

12  going to be used against my client.  And whether it was started

13  as a result of Agent DeZeeuw having in his mind to investigate

14  whether or not misconduct occurred over in Iraq or whether he

15  and Agent Fox may have had a conversation beforehand because    09:44

16  they were thinking about doing this investigation -- we can't

17  get into the subjective aspects of why an investigation or why

18  an interview took place.

19        What we really need to determine is was this

20  custodial in nature?  Was it, in fact, something that was       09:44

21  recorded?  Was there a rights advisement, and was it something

22  that ultimately turned into something that would ultimately be

23  used against, at the very minimum, Mr. Weemer?

24        Because if, for some reason, the government could

25  tell us that this statement couldn't be used against           09:44

1    Mr. Weemer, then maybe it's certainly noncustodial, certainly

2    noninterrogative in nature.  But I think it's probably going to

3    be used against him.  And as such, because we've never had the

4    opportunity to confront Mr. Weemer, this particular statement

5    certainly should not be used against Mr. Nazario.                09:44

6              **THE COURT:**  I think the next thing, counsel -- and I

7    don't mean to be dismissive of your hearsay objections, but I

8    really don't find that there's --

9              **MR. McDERMOTT:**  I agree, Judge.  You won't get much

10   of an argument from us.                                          09:44

11             **THE COURT:**  Fair enough.

12             **MR. McDERMOTT:**  Clearly, we certainly highlighted the

13   language in Giles.  We can make hearsay exceptions all we want,

14   it's still the confrontation.

15             **THE COURT:**  I agree that the hearsay exception does    09:44

16   not trump the Sixth Amendment.  But as far as the hearsay, it

17   clearly comes in on hearsay.

18             I think the next step is to have the Secret Service

19   agent testify.  So Mr. Behnke, whenever you can arrange for

20   that, let the Court know when we can do that.  The Court will    09:44

21   be happy to do that during lunch.  I'd be happy to do that at

22   the end of the day today or first thing tomorrow morning.  The

23   sooner we cross this bridge -- I'm sure the government has an

24   interest in knowing as soon as possible whether or not and to

25   what extent this testimony is going to come in; so the sooner    09:44

1    that you can get the agent here and on the stand, the sooner

2    the Court will be in a position to resolve this question.

3            **MR. BEHNKE:**   We can have the agent here as soon as

4    the Court wants to have him here.  He's in town and is just

5    waiting for a call.                                                09:44

6            **THE COURT:**   Let's do this during the lunch hour,

7    then.

8            We'll take lunch at noon; lets say at 12:30, we'll

9    have the hearing with the special agent and go from there.

10           I do recognize you just received this motion             09:44

11   yesterday.

12           **MR. BEHNKE:**   It will be enough time to get the agent

13   here.  If we could just get a couple of minutes to call him and

14   let him know he needs to be here.

15           **THE COURT:**   Say that again.                          09:44

16           **MR. BEHNKE:**   We can have the agent here at lunch

17   time.  If we could just get a few minutes to call him and tell

18   him.

19           **THE COURT:**   I'm going to take a recess right now and

20   Mr. Holmes will let us know when the jury is ready to come up.   09:44

21           So we're in recess until then.

22           (Whereupon a recess was held.)

23           **THE CLERK:**   Calling calendar item one, case number ED

24   CR 07-00127-SGL, United States versus Jose Luis Nazario, Jr.

25           May we have counsel please come forward and state        10:58

1     your appearances for the record.

2          MR. BEHNKE:   Jerry Behnke, Charles Kovats, for the

3     United States.  Also present at counsel table is NCIS Special

4     Agent Mark Fox.

5          MR. McDERMOTT:   Kevin McDermott appearing on behalf          10:59

6     of Jose Luis Nazario, Jr.  Also co-counsel Joseph Preis,

7     Douglas Applegate, and Vincent LaBarbera.

8          THE COURT:   Counsel, good morning.

9          THE CLERK:   With the Court's permission, I would ask

10    the panel that's seated in the courtroom to please stand for      10:59

11    the oath and raise your right hand.

12          (Clerk gives oath to prospective jurors.)

13          THE COURT:   Good morning, ladies and gentlemen.

14          I appreciate your service.  This morning we're going

15    to be engaging in a jury selection this morning for a criminal    10:59

16    trial.  We are going to be selecting twelve jurors and two

17    alternates to sit in a trial that is expected to last about two

18    weeks; this week and next week.  The Court is going to engage

19    in the process known as voir dire.

20          For those who have served previously on juries,             11:00

21    you're probably familiar with this process; it's a process by

22    which we attempt to secure a fair and impartial jury.

23          You have just taken an oath by the courtroom deputy

24    to answer truthfully the questions that I, and later the

25    attorneys, are going to be posing to you.  The purpose of these   11:00

1   questions is to make sure that whoever ends up serving on this

2   panel is going to be fair to both sides; is going to make their

3   decision in this case based on the evidence, the testimony, the

4   exhibits that are admitted into court; and who will apply the

5   law as the Court gives it.                                          11:00

6         If you cannot do that, you cannot serve on this jury.

7         I will be asking you a number of questions.  The

8   lawyers will be asking you a number of questions.  We will do

9   our best to make sure that we elicit any information that might

10  go to the issue of whether or not you could be a fair and        11:01

11  impartial juror.  But at the end of the day, I need to rely on

12  your good faith as citizens.  If there is something that we do

13  not ask, if there is something that we miss, that you believe

14  might be relevant to the issue of whether or not you could be a

15  fair and impartial juror -- maybe it might be a physical thing,  11:01

16  maybe a mental impression or a belief that you have, it could

17  be anything -- please let us know.  Don't wait for a certain

18  question or the right question to be asked.  It is incumbent

19  upon you to volunteer any information that you believe might be

20  relevant to this process.                                        11:01

21        It's critical that we have a jury and jurors that are

22  going to be just as fair to the government, to the U.S.

23  attorneys' office, as they are to the defendant and the defense

24  counsel; that's what we're trying to achieve here.

25        Each of you have a series of questions which I'll be      11:02

1    going over in a few moments.  Before we get to those questions,

2    I'm going to invite counsel to make a very brief opening

3    statement, not longer than three or four minutes, to give some

4    context as to what this case is about so that, hopefully, the

5    questions that we ask might make sense to you and get you          11:02

6    thinking about issues with respect to this case.

7           The first question I'm going to ask all of you as a

8    group is whether or not any of you know me, my courtroom

9    deputy, Mr. Holmes, or any of the lawyers in this case.  Then

10   I'll be asking you questions about the case itself.               11:03

11          So to begin, my name is Stephen Larson.  I'm a U.S.

12   District Judge.  I'll be the judge for this trial.  My

13   courtroom deputy is James Holmes, and he will be the courtroom

14   deputy for this trial.

15          Now, counsel, if you would each individually              11:03

16   introduce yourself to the jury.

17          **MR. BEHNKE:**  Good morning, ladies and gentlemen.

18          My name is Jerry Behnke, and I'm an assistant United

19   States attorney and I represent the United States in this

20   matter.                                                          11:03

21          **MR. KOVATS:**  I'm Charles Kovats and I'm, as well, an

22   assistant United States attorney and I also represent the

23   government in this case.

24          **MR. FOX:**  My name is Mark Fox.  I'm a special agent

25   with NCIS, Naval Criminal Investigative Service.                 11:03

1       **THE COURT:**  And, Counsel, if you would introduce your

2  clients and then yourselves, each individually.

3       **MR. McDERMOTT:**  Thank you.

4       Good morning.  My name is Kevin McDermott.  I'm

5  counsel for Jose Luis Nazario, Jr., standing there with the          11:03

6  blue suit.

7       **THE COURT:**  Thank you.

8       **MR. PREIS:**  Good morning.  My name is Joe Preis, and

9  I also represent Jose Nazario.

10       **MR. APPLEGATE:**  Good morning, ladies and gentlemen.        11:04

11  My name is Douglas Applegate and I too represent

12  Sergeant Nazario.

13       **MR. LaBARBERA:**  My name is Vincent LaBarbera, and I

14  also represent Mr. Nazario.

15                     **JURY VOIR DIRE**                                11:04

16       **THE COURT:**  Does anybody in the room here recognize

17  me, the courtroom deputy, any of the lawyers, the special agent

18  or the defendant?

19       I should also add to that my able court reporter,

20  Theresa Lanza.                                                       11:04

21       I think there's a man in the front row --

22       **PROSPECTIVE JUROR:**  I just recognize the defendant

23  from today's paper.

24       **THE COURT:**  Okay.  We'll be getting to that question

25  as well.

1        **PROSPECTIVE JUROR:**  Your Honor, you look familiar to

2   me.  My son went to St. Joseph's Elementary in Upland.  I don't

3   know if that has anything to do with this.  I may know you from

4   there.

5        **THE COURT:**  Very well.                                     11:05

6        **PROSPECTIVE JUROR:**  I'm a waitress for a steakhouse,

7   and that's where I know some of these lawyers from.

8        **THE COURT:**  You've seen them come into the

9   restaurant?

10        **PROSPECTIVE JUROR:**  Yes.                                  11:05

11        **THE COURT:**  Very well.

12        Anybody else recognize anybody?

13        **PROSPECTIVE JUROR:**  I recognize the defendant's name

14   from the news from this morning.

15        **THE COURT:**  I should have said this at the outset.        11:05

16        Be sure to just state your name before you give an

17   answer to the question.

18        **PROSPECTIVE JUROR:**  My name is Curt Foreman.

19        **THE COURT:**  Very well.

20        Anybody else?                                                 11:05

21        **PROSPECTIVE JUROR:**  I'm Maria Thomas.

22        I recognize him from the newspaper this morning.

23        **THE COURT:**  Is there anybody else in the back of the

24   courtroom there?

25        Mr. Holmes, if you could just circle around for the          11:06

---

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1    record so we could get the names of the individuals who made

2    the statements.  The lady in the front?

3              **PROSPECTIVE JUROR:**  My name is Sabrina Perez.

4              **THE COURT:**  And you're the waitress who has seen some

5    of the government attorneys?                                    11:06

6              **PROSPECTIVE JUROR:**  Yes.

7              **THE COURT:**  Very well.

8              **PROSPECTIVE JUROR:**  Jose Rodartin.

9              **THE COURT:**  Very well.

10             **PROSPECTIVE JUROR:**  Richard Orr.                  11:06

11             **THE COURT:**  Very well; that's juror number one.

12             Did somebody else want to say something?

13             **PROSPECTIVE JUROR:**  Glenn Voorheis.

14             I just recognized the defendant from the newspaper

15   also this morning.                                             11:06

16             **THE COURT:**  Very well.  All right.

17             No other hands being raised.

18             What we're now going to do is I'm going to ask

19   counsel for the government and counsel for the defendant to

20   each set forth or state their witness list.  These are         11:07

21   witnesses that they may call.  These witness lists are also

22   longer than the actual number of witnesses that are actually

23   called in the trial; they are overinclusive as opposed to

24   underinclusive.  And it may be that a name might sound familiar

25   to you and you may have to ask some questions to see if it's    11:07

```
 1   the same person that you know.  But if you think you recognize

 2   any of these names, please raise your hand.

 3          And the defense does not need to disclose any

 4   witnesses at this point; that will be entirely up to them.

 5          Counsel.                                              11:07

 6          MR. BEHNKE:  Yes, Your Honor.  The possible witnesses

 7   on behalf of the government are as follows:

 8          Mark Albo; Cory Carlisle; Steven Dezeeuw; Mark Fox;

 9   Pedro Garcia; Timothy Jent; Courtney Johnson; Robert Miller;

10   Jermaine Nelson; James Prentice; Paul Pritchard; Daniel       11:08

11   Schmitt; Samuel Severtsgaard; Jonathan Vaughn; and Ryan Weemer.

12          THE COURT:  Does anybody recognize any of those

13   names?

14          The Court sees no hands.

15          This is a criminal case.  As you'll be instructed     11:08

16   several times, the government bears the burden of proving

17   beyond any reasonable doubt the defendant's guilt, and the

18   defendant has no obligation to present a case; he is presumed

19   innocent until and unless proven guilty.  It's for that reason

20   that the defendant does not need to submit any names at this  11:08

21   point in time.

22          Counsel, if there are any names that you wish to

23   announce, you may; or you may reserve that until the defense

24   case.

25          MR. McDERMOTT:  Sir, we would ask to reserve it,      11:09
```

1   please.

2            **THE COURT:**  Very well.  Thank you, Counsel.

3            All right.  At this time I'm going to be asking for

4   counsel for both sides to make a brief statement as to what

5   this case is about.  Another instruction that you'll hear          11:09

6   several times throughout this trial is that any statements made

7   by lawyers are not evidence.  The only evidence that will help

8   you to decide the case is based on the testimony and the

9   exhibits that the Court admits into evidence.  The statements

10  of lawyers are only to help guide you through that evidence;        11:09

11  they are not evidence themselves; so keep that in mind.

12           As indicated, the big test this morning is to make

13  sure we have a jury that is totally impartial.  After hearing

14  the statements of the lawyers, you should not favor one side or

15  the other, because you have heard absolutely no evidence           11:09

16  whatsoever.  You're simply being told what the case is about to

17  provide some context to the questions that I'm going to be

18  asking you.

19           So with that in mind, Mr. Behnke or Mr. Kovats, I

20  invite you to make a brief statement to the jury.                  11:10

21           **MR. KOVATS:**  Thank you, Your Honor.

22           The government's evidence will show that on the 9th

23  of November, 2004, marines of Kilo Company, 3rd Battalion,

24  First Marine Regiment, the defendant's unit, were deployed in

25  assault positions outside of Fallujah, Iraq.  This unit was        11:10

1    deployed in support of Operation Iraqi Freedom.  These marines

2    had the mission to enter Fallujah and clear the city of

3    insurgents.

4         This mission was called Operation Phantom Furry, but

5    it was also known by its Arabic name, Operation al-Fajr.  And          11:10

6    you'll hear that when the marines entered the city on the

7    morning of the 9th of November, 2004, the fighting was fierce

8    and it was bloody.  The insurgents were a determined and

9    dangerous enemy, and casualties were inflicted on both sides.

10   In fact, marines in the Defendant's squad were injured, and, in        11:11

11   fact, one was fatally injured on that day.  The fighting went

12   street by street, house by house.  And again, it was a fierce

13   fight.

14        You will learn that when the marines and the

15   Defendant's squad entered a particular house, they encountered         11:11

16   four men; they were unarmed and unresisting.  When the marines

17   entered the house, these men were sitting on the floor and they

18   had their hands raised.  They did not resist.  They did not

19   fight.  They were not armed.

20        Instead of taking these men prisoner and detaining                11:11

21   them and processing them to the rear -- as the Defendant was

22   educated to do, as he was trained to do, as he was required to

23   do -- instead, he shot and killed and ordered members of his

24   squad to shoot and kill these four unarmed, unresisting males.

25        These are the facts of the government's case.                     11:12

1          Thank you.

2          **THE COURT:**   Thank you, Counsel.

3          **MR. McDERMOTT:**   Thank you, Judge.

4          Ladies and gentlemen, the statements that were made

5   by counsel for the government and myself, as the Judge has          11:12

6   indicated to you, are not evidence.  But the statements that

7   occur now are intended to give you some guidance on how to

8   answer the questions that will come to you in the next few

9   minutes.

10          Fifteen hundred men from 3rd Battalion, First Marine          11:12

11   Division, to include my client, walked into the city of

12   Fallujah on November 9th, 2004.  Less than 1,000 came out after

13   this battle.  A third of the battalion suffered casualties in

14   some shape or form.

15          Now, what the government is going to offer as          11:13

16   evidence in this particular case is that my client participated

17   in the killing of insurgents at a particular location some time

18   during this fight.  What the government will also be burdened

19   to prove to you is that a killing actually took place and

20   whether or not there's any evidence that it occurred at all.          11:13

21   Because, as you will learn during the course of this trial,

22   these young men fought door to door, house to house, street to

23   street; this kind of fighting we have not seen since Vietnam.

24          You're going to be asked whether or not the

25   government has proven beyond a reasonable doubt -- my client          11:13

1    has no burden to prove anything to you whatsoever other than to

2    indicate to you that he fought gallantly.  And no marines kill

3    prisoners of war.

4          In the next four or five days, you're going to hear

5    testimony from young men who served with my client, and you're          11:14

6    going to hear testimony of people who trained my client.  But

7    at no point in time will you ever hear anybody tell you who was

8    killed exactly and where they were killed exactly.

9          And will we have any forensic or CSI evidence in this

10   case?  Not a shred.  You're going to be asked in this case to          11:14

11   decide the fate of a man based on recollections of the young

12   men who went through battle.  Not one day's battle but ten to

13   fifteen.

14         You will find in this case a heavy burden of

15   responsibility.  You're not just deciding Jose Nazario's fate,          11:14

16   but many others as well.

17         Thank you.

18         **THE COURT:**  Thank you, Counsel.

19         The charging document in this case is called an

20   indictment.  It was returned by a federal grand jury.  The          11:15

21   indictment, like the statements of the attorneys, is not

22   evidence, it is simply an allegation, but it frames the

23   allegation, the charges, that are being brought in this

24   particular case.

25         At this time I'm going to ask counsel for the          11:15

1    government to read the indictment.

2         **MR. BEHNKE:**  In running down here this morning, Your

3    Honor, I didn't grab the folder with the indictment.

4         **THE COURT:**  Does defense counsel, by chance, have a

5    copy of the indictment?                                        11:16

6         **MR. McDERMOTT:**  No, Sir.

7         **MR. BEHNKE:**  My office is in the building; it will

8    take me two minutes, tops, to run upstairs and get it.

9         **THE COURT:**  We'll proceed with that momentarily.

10        We'll go over the Court's questions while you're          11:16

11   running that down.

12        Again, all of this -- the indictment, the charging

13   documents, these brief opening statements -- is simply to give

14   you some context for these questions.  The 14 questions that

15   the Court is going to be asking you to respond to when it comes 11:16

16   to your turn -- we're literally going to go through each one of

17   you, and we'll be asking and answering these 14 questions.

18        First, start by giving your name, and be sure to

19   speak clearly into the microphone so the court reporter can

20   hear it, because everything that is being stated here in court  11:17

21   is being written down.

22        The second question is what is your occupation and

23   educational background.  If you are retired, indicate what your

24   occupation was.  If you're unemployed, indicate that you are

25   not employed and what your previous occupation was.  And then   11:17

1    your educational background.  And by educational background,

2    whether you graduated from high school, attended college,

3    graduated from college, what degree you might have, or area of

4    study.

5              The fourth question is what is your marital status.          11:17

6              Then, your spouse or significant other's occupation;

7    so whether you're married, divorced, or single.  And if you are

8    married or if you have a significant other, what is your

9    husband or wife's occupation or your significant other's

10   occupation.                                                           11:18

11             The fifth question is how many children do you have;

12   that is just asking for a number of children.  And then, what

13   are the ages and occupations of your adult children.  We

14   certainly don't need to reveal the ages of your non-adult

15   children, anyone under age 18; we're just asking for a number.        11:18

16   Anyone over 18, we're asking for their age and what they do.

17             The sixth question, do you have any other adults

18   living in your household; if so, what are their ages and

19   occupations.  If you have any in-laws or parents or

20   grandparents or friends, anyone of an adult age, any grown              11:18

21   children, what are their ages and occupations.

22             The seventh question is have you ever served on a

23   jury?

24             That's a yes or no question.  If you answer 'yes,'

25   was it a criminal or a civil or both; maybe you've served on           11:18

1    criminal and civil cases.  And finally, did you reach a

2    verdict.  Do not reveal what the verdict was.  So you might

3    say, 'Yes, I served on a criminal jury, and we reached a

4    verdict.'  Don't tell me that 'we reached a verdict of

5    acquittal' or that 'we found the defendant guilty.'  Simply let    11:19

6    me know whether or not a verdict was reached.  The same thing

7    in a civil case.  'Yes, we returned a verdict,' or 'No, we did

8    not.'  But don't indicate whose side the verdict was for.

9          The eighth question, a couple of you have already

10   touched upon this.  I'll simply ask that you elaborate when you    11:19

11   get to this question:  Have you read, seen, or heard anything

12   about this case in the media?

13         If the answer to that is 'yes,' how much coverage

14   have you seen or heard?  Was it simply a picture in this

15   morning's newspaper, like some of you have indicated?  Have you    11:19

16   seen several articles or news reports?  Anything on the

17   Internet?  Have you read them?  Have you just looked at them?

18   Try to give us a feel for how much coverage you've seen or

19   heard.

20         And most importantly, will you be able to set aside    11:20

21   anything that you may have read, seen, or heard and decide this

22   case based on the evidence presented at this trial, together

23   with the instructions provided by the Court.

24         We don't expect anyone to live in a vacuum; what we

25   do expect is people to be able to set aside what they might    11:20

1   have heard or seen and simply decide based on the evidence

2   presented.

3           The next question, number nine:  Have you or anyone

4   close to you ever served in the United States Armed Services;

5   Army, Air Force, Marines, Navy, Coast Guard, Merchant Marines.    11:21

6   What was the person's rank and assignment.  And this is anyone

7   in your family; yourself, anyone who would be close to you, a

8   close friend or associate.

9           Is there anything about that relationship or service,

10  your relationship with that person, or your own experience in    11:21

11  the service, that would make it difficult for you to sit as a

12  juror in this case and be a fair and impartial juror to both

13  the government and the defendant?

14          The tenth question:  Do you have any beliefs or

15  opinions about the military, about the rules of war, rules of    11:21

16  engagement, or specifically about the war in Iraq, that would

17  make it difficult for you to fairly evaluate the evidence in

18  this case and be a fair and impartial juror to both the

19  government and the defendant?

20          This is a question that really calls for you to look     11:21

21  inside yourself.  I would anticipate that as American citizens,

22  that you have views on the war in Iraq, that you would have

23  views on the military; so it's not a question of finding a jury

24  that does not have any views or thoughts.  It's a question of

25  whether or not you can take whatever thoughts or beliefs or      11:22

1   views you have and set them aside and decide the case based on

2   the evidence and the law as I instruct it.  That's the critical

3   question.

4           We want to hear about any beliefs or opinions that

5   you have as well.                                                    11:22

6           The eleventh question:  Would you have any difficulty

7   sitting in judgment of actions by a member of the United States

8   Armed Services during combat?

9           As you've heard from both sets of attorneys, the

10  alleged criminal act in this case is alleged to have taken         11:22

11  place during actual combat, and I need to know if any of you

12  would have any difficulty sitting in judgment of a member, a

13  then-active member, of the U.S. Armed Services during combat.

14          12:  Have you or anyone close to you ever been

15  involved with law enforcement or the criminal justice system?      11:23

16  Is there anything about that relationship or that incident or

17  that involvement that would make it difficult for you to sit as

18  a juror in this case and be a fair and impartial juror to both

19  the government and the defendant?

20          Question 13:  Have you ever been arrested for an           11:23

21  offense?  If so, what offense?

22          Now, if you don't want to say what it was, if you

23  have been arrested for an offense and you don't want to

24  disclose that publicly, simply indicate that you want to speak

25  to the Court at side-bar, and I'll invite you and the lawyers      11:23

1    over and we'll have a discussion on the record but not in

2    public hearing.  Then I'll be asking you, is there anything

3    about that experience that would make it difficult for you to

4    sit as a juror in this case and to be a fair and impartial

5    juror to both the government and the defendant?                    11:24

6            And finally is the catchall; this is the one I

7    alluded to earlier.  I could spend all day asking you

8    questions, probably all week asking you questions, and I may

9    not ask that right question about whether or not you could

10   serve as a juror and be a fair and impartial juror.               11:24

11           If there's something about the case, if there's

12   something about anything that you are seeing or observing, that

13   causes you to believe that you couldn't be fair in this case,

14   please let us know.  Now is the time to do it.  Not after

15   you've been selected as a juror and not after you've gone        11:24

16   through this process and we've excused everybody else.

17           If there's something physical, if there's a physical

18   impairment that you think might prevent you from sitting as a

19   fair juror; if you're hard of hearing or if your language

20   skills are not at a point that you think that you could be a      11:24

21   fair juror and hear the evidence and truly evaluate it; if you

22   have something else going on in your life that would be a

23   distraction that would cause you to divert your attention from

24   the serious matter that we have at hand here; anything along

25   those lines.  Like I say, the list is potentially endless, so I   11:25

1   really need to rely upon you to let me know if there's anything

2   at all.

3          So those are the questions that the Court is going to

4   be giving to you.  As further background, I am going to ask

5   counsel at this point to read the indictment.  I believe you          11:25

6   have a copy.

7          **MR. KOVATS:**  (Unintelligible.)

8          **THE COURT:**  You don't have a copy.

9          All right.  We're going to proceed with the

10  questioning without the benefit of that at this point.                11:25

11         Let me begin with juror number one.

12         And I'll leave it to you to go through and answer

13  these questions.  I may interrupt you to ask for some follow-

14  ups in the middle.  If I do that, just answer that question and

15  then go back to the laundry list here.                                11:26

16         Sir.

17         **PROSPECTIVE JUROR:**  My name is Richard Orr.  I'm an

18  environmental geologist, and I have a Master's degree in

19  geoscience.  I live in Riverside, California, on Glacier Drive.

20  I am single, and my girlfriend is a dental assistant.  I have         11:26

21  no children; nobody living in my household.

22         I've never served on a jury.

23         I saw the newspaper article this morning, and I heard

24  of this case two or three years ago without too much -- I did

25  read the article this morning.  I didn't really delve into it        11:26

1    over the period of time that I have heard about this case.

2          **THE COURT:**  Would you be able to make a decision

3    based just on the evidence and the testimony in this case and

4    put aside anything that you might have heard about it?

5          **PROSPECTIVE JUROR:**  Yes; the media affects would not    11:27

6    affect my decision.

7          **THE COURT:**  You don't have any views right now as to

8    guilt or innocence or anything like that?

9          **PROSPECTIVE JUROR:**  No.

10          My parents both served in the U.S. Armed Forces.  My    11:27

11   mother was an Army lieutenant during World War II, and my

12   father was a Navy officer, I believe a lieutenant, during World

13   War II.  Those are mostly the only military contacts I have in

14   my life.

15          I'm against the war in Iraq.  I have deep feelings    11:28

16   about the war in Iraq and that we should not be there.  I don't

17   know that it would affect my judgment in this case, though;

18   it's about the war and not about the people in the war.

19          I would not have any difficulty sitting in judgment

20   of a U.S. armed service person or their actions during combat,    11:28

21   although I cannot see myself in that position or visualize the

22   decisions they have to make.

23          No, I have not been involved in any kind of law

24   enforcement or criminal justice system, nor anybody close to

25   me, and I don't believe there would be anything other than my    11:29

1    concern about the war that would affect my judgment in this

2    case.

3         **THE COURT:**  And do you believe that you could put

4    that concern about the war aside in determining the merits,

5    guilt or innocence, in this case?                                11:29

6         **PROSPECTIVE JUROR:**  I think for the merits of this

7    case, I could.  It's the war itself that is the only backdrop

8    that has an influence on my judgment.

9         **THE COURT:**  Very well.

10        Would it influence your judgment in deciding this         11:29

11   case?

12        **PROSPECTIVE JUROR:**  No.  I don't believe so.  But I

13   just wanted to mention the backdrop that I have concerning the

14   war in general.

15        **THE COURT:**  Very good, Sir.  Thank you.               11:29

16        Ms. Martinez.

17        **PROSPECTIVE JUROR:**  Cynthia Martinez.  I'm unemployed

18   at the moment; I've always worked retail sales.  I graduated

19   high school.  I live in Colton.  I'm married.  My husband works

20   for Raytheon in San Diego.  We have two children; my daughter   11:30

21   is 25 and my son is 29.  She's going to school to be -- sign

22   language, American sign language; and he's a silk-screener and

23   a freelance artist.  Both my children live at home; my son with

24   his wife; and she works with autistic children.

25        I served on a jury several years ago before I was         11:30

1    married, I believe it was a civil case, and we did not reach a

2    verdict.  And I have not seen this case in the media or heard

3    of it at all.

4            My father was in the Army during World War II, and I

5    have uncles that also served.  I have a nephew-in-law that is          11:31

6    currently in the Army also, and he has served in Iraq; I think

7    he's done three tours.

8            My beliefs, my opinions on the military are that I

9    also don't believe we should be there, and it is a great strain

10   and difficulty on our young men and women.                             11:31

11       THE COURT:  Do you think you'd be able to set those

12   beliefs aside in deciding this case?

13       PROSPECTIVE JUROR:  I believe so, because my nephews

14   never really talked about what they did over there or what they

15   are doing.  It's just what I see in the news and hear; so,             11:32

16   yeah, I think I could set it aside.

17       THE COURT:  Would there be anything about the fact

18   that your nephew was in Iraq that might get you thinking and

19   trying to put your nephew in place of, say, the Defendant or

20   somebody else, another witness?  Or would you be able to               11:32

21   separate that, do you think?

22       PROSPECTIVE JUROR:  No.  I think I would have a

23   tendency to think of what he's been through and going through;

24   because he's not out yet, he might do another tour; so I would

25   worry about him, and that would be on my mind.                         11:32

```
 1          THE COURT:  Do you think those worries would cause
 2   you to favor one side or another, or do you think you could be
 3   fair to both the government and the Defendant?
 4          PROSPECTIVE JUROR:  Well, I'd like to think I'm a
 5   fair person, and I'd like to see both sides of the issues of          11:32
 6   everything, so...
 7          THE COURT:  Thank you, Ma'am.
 8          The next question is:  Do you have any difficulty
 9   sitting in judgment of the actions by a member of the United
10   States Armed Services during combat?                                  11:33
11          PROSPECTIVE JUROR:  Well, I kind of -- I have a
12   tendency to sympathize more for the people in the military
13   service because of what they are going through and the stress
14   and the everyday fighting and everything they have to deal with
15   over there; it's, you know, it's hard.                               11:33
16          I don't know if I answered your question or not.
17          THE COURT:  You're doing just fine.
18          There's no right or wrong answers to any of these
19   questions.  All we're looking for is the truth.  We need to
20   know how you honestly feel.  There's no right or wrong.             11:33
21          PROSPECTIVE JUROR:  Okay.
22          The next question:  No, I have not been involved with
23   law enforcement or criminal justice.
24          I don't know if this pertains, but I do have a nephew
25   that was killed by the Riverside Police a few years ago.           11:34
```

1          **THE COURT:**  That's the type of question that I might

2    not have thought to ask, and it's important that you volunteer

3    information like that.

4          Anything about that experience -- and I'm sorry to

5    hear that -- is there anything about that experience that might          11:34

6    affect how you would view a criminal trial or the criminal

7    justice system or law enforcement in general?

8          **PROSPECTIVE JUROR:**  No, I don't think so.  No.

9          I've never been arrested.  There's no reason why I

10   cannot serve on a jury and be a fair and impartial juror.          11:34

11         **THE COURT:**  Very good.  Thank you, Ma'am.

12         Mr. Sanchez.

13         **PROSPECTIVE JUROR:**  My name is Carlos Sanchez.

14         I work in a warehouse at Patton State Hospital.  I

15   live in San Bernardino.  I'm married; I have three children.          11:35

16   My wife is a home health aide.  And there are no other adults

17   in my household.

18         I have served on a jury; it was a civil and we did

19   reach a verdict.

20         No, I have not heard or seen anything about this          11:35

21   case.  I don't have anybody in the military that's close to me.

22         I don't have any opinions as to, you know, rules of

23   war or any of that.  The answer to 11 would be no also.

24         I have nobody close to me in law enforcement, and I

25   had a cite arrest by the Department of Fish and Game.  We were          11:36

1    out hunting, and one of us, me, forgot to unload his rifle as

2    we moved to the next location, and I was cite arrested for

3    carrying a loaded rifle in my vehicle.  They didn't physically

4    take me away; I just paid a fine.

5              **THE COURT:**  Anything about that experience that might          11:36

6    affect how you would view law enforcement or the criminal

7    justice system?

8              **PROSPECTIVE JUROR:**  No.

9              I don't think there's any reason that I cannot be

10   fair and impartial.                                                         11:36

11             **THE COURT:**  Very good.  Thank you, Mr. Sanchez.

12             Mr. Santos.

13             **PROSPECTIVE JUROR:**  My name is Robert Santos.  I'm a

14   finance analyst.  I have a degree in finance.  I live out in

15   Rancho Cucamonga.  I'm married.  My wife is a consultant for a             11:36

16   wireless company.  I have one child; she's not an adult.  We

17   don't have any other adults living with us in the household.

18             I have served on a jury before; it was a civil case,

19   and we did reach a verdict.  I have not read, seen, or heard

20   anything about this case.                                                   11:37

21             I don't have anyone close to me in the United States

22   Armed Forces.  I don't have any belief one way or the other

23   with respect to the military rules of war or the war in Iraq

24   that would make it difficult for me to be an impartial juror.

25             I would not have any difficulty sitting in judgment             11:37

1   of the actions of a member of the U.S. Armed Forces during

2   combat.

3           Neither I nor anyone close to me has ever been

4   involved with law enforcement or the criminal justice system.

5   I've never been arrested for an offense.  And I can't see why          11:37

6   it would be difficult for me to serve as a fair and impartial

7   juror on this case.

8           **THE COURT:**  Mr. Alvarez.

9           **PROSPECTIVE JUROR:**  My name is Scott Alvarez.  I'm a

10  student at U.C. Davis.  I currently live at home in Corona,           11:38

11  California; and I go back to Davis in a couple of weeks.

12          I work at the A.S.C.D. post office, which is just the

13  on-campus post office.

14          **THE COURT:**  When does your school year start?

15          **PROSPECTIVE JUROR:**  September 27th or something, but       11:38

16  the move-in date for my house is two weeks from today.

17          **THE COURT:**  Okay.

18          **PROSPECTIVE JUROR:**  Like I said, I have no children,

19  and I live at home; so I live with my mom and dad.  They are

20  both 52 now.  My dad is a property manager, and my mom is            11:38

21  unemployed; and then also my younger brother who's 18 and is

22  going to go to RCC in the fall.

23          I have never served on a jury.  I have not seen

24  anything or heard about anything in the media.  I am really

25  close to my best friend; I've known her all my life, and she is      11:39

1    in the Naval Academy right now.  And I'm personally against the

2    war in Iraq.

3           And rules of war, could you clarify upon that a

4    little bit?

5           **THE COURT:**  Well, the question is basically aimed           11:39

6    towards if you have an understanding about the rules of war or

7    rules of engagement, if you have any strong feelings about

8    those.  I want to make sure that any feelings that you have are

9    kept outside of the deliberative process in the jury.  It's

10   fine, like I say, to have opinions about the war in Iraq or           11:40

11   even about the rules of engagement or the rules of war, but

12   those opinions cannot be brought in to the jury process.  You

13   need to decide the case not on your understanding, for example,

14   of the rules of war but on the instructions that are provided

15   by the Court.                                                         11:40

16          Do you think you could do that?

17          **PROSPECTIVE JUROR:**  I'm not sure if I would be able

18   to do that.  I think a lot of me is judged by my feelings and

19   my thoughts and stuff; so that might be hard for me to do.  But

20   I would try my best if I had to.                                      11:40

21          Also, it might be difficult for me to sit in

22   judgment, just because I'm driven by my thoughts and my

23   feelings, and stuff like that; so it might also get in the

24   place of my --

25          **THE COURT:**  Would you be willing to follow the             11:40

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1    Court's instructions?

2           **PROSPECTIVE JUROR:**  I would be willing to.  I would

3    definitely be willing to.

4           **THE COURT:**  Would you be willing to listen to the

5    evidence before making a decision?                                    11:40

6           **PROSPECTIVE JUROR:**  Yeah, I would be.

7           **THE COURT:**  Do you think you could be fair to both

8    sides?

9           **PROSPECTIVE JUROR:**  I'd like to think I would be

10   fair.                                                                 11:41

11          **THE COURT:**  Do you think you would be fair?

12          I know it's hard to answer these questions, but do

13   you think you would be fair?

14          **PROSPECTIVE JUROR:**  Not really.

15          **THE COURT:**  Do you think you would favor one side    11:41

16   over the other?

17          **PROSPECTIVE JUROR:**  I think I would.

18          My dad was recently charged with a DUI, so that was a

19   year ago, and then he was in jail for the night for that.

20          I've never been arrested.  And number 14 has already    11:41

21   been answered, sort of.

22          **THE COURT:**  Very well.  Thank you.

23          Mr. Voorheis.

24          **PROSPECTIVE JUROR:**  My name is Glenn Voorheis.  I'm

25   an inspector with Southern California Edison.  Some college    11:41

1    background.  I live in Corona.  I'm married.  My spouse is a

2    marketing director.  We have three children; I have a 21-year

3    old who's a student.  No other adults in the household.

4            Never served on a jury.

5            And I just basically kind of glanced at the paper                    11:42

6    this morning; that was about all I saw about this case.

7            Number nine:  My son, his best friends are over in

8    Iraq right now; one is a graduate from West Point and a platoon

9    leader over there; the other one is in the marines over there.

10           Yeah, I am against the war in Iraq.  At first, I                     11:42

11   thought, yeah, let's go over and blow them all up.  But I'm

12   just tired of hearing about our young people dying every day.

13           Number 11:  I don't know if that would affect me or

14   not.  I might take sides on that.

15       **THE COURT:**  When you say 'take sides,' in what sense?                11:43

16       **PROSPECTIVE JUROR:**  You know, I mean more towards the

17   gentleman; you know, the Defendant there.

18           Number 12, is a no.

19           Number 13, I had a DUI about 20 years ago.  I don't

20   know if that means anything.                                                11:44

21       **THE COURT:**  Nothing about that experience that would

22   affect how you view --

23       **PROSPECTIVE JUROR:**  No; just kind of a bad deal.

24           I'm not sure if I could be fair or not, based on

25   what's going on over there every day.  And I sure wouldn't want           11:44

1  the Defendant to be my son's best friend sitting over there.

2          **THE COURT:**  We'll follow up on that.

3          Ms. Sanders?

4          **PROSPECTIVE JUROR:**  My name is Gloria Sanders.  I'm a

5  retired shipping supervisor.  I am a high school graduate.  I          11:44

6  live in Victorville, California.  I'm married and my husband is

7  a member of the operating engineers and runs an asphalt plant.

8  I have two children; ages 41 and 42; one is a weighmaster and

9  the other is a pipe fitter.

10          'No' to number six.          11:45

11          I have served on two juries and did reach a verdict

12  in both.

13          I heard something on the media a couple of weeks ago.

14  Whether it was this case or not -- it sounded similar, about

15  some marines in a similar situation out of Camp Pendleton.          11:45

16  That's about all I remember from that.

17          My father served in the Navy in World War II.  I had

18  an ex-husband who was a sergeant in the Air Force and was an MP

19  in the Air Force.

20          I don't believe we need to be over in Iraq.  I think          11:45

21  there's too many young kids getting killed, and for what?

22          I don't know if I would have difficulty; I'd have to

23  listen to both sides, each person.

24          **THE COURT:**  Ms. Sanders, do you think you could do

25  that?  Sit back and wait before you make any decision and          11:46

1    listen to both sides?

2         **PROSPECTIVE JUROR:**  Yes, I could do that.  I could

3    sit back and listen to both.  I don't know if I want to hear

4    any blood and guts type of thing.

5         Right now my heart is beating 90 miles an hour.          11:46

6         'No' to number 12.  'No' to number 13.

7         I think I could be fair and impartial.

8         The only thing I have in concern, that might be very

9    trivial, but in two weeks from today, we have vacation

10   reservations for a wedding anniversary, and I need to be done  11:46

11   by then.

12        **THE COURT:**  Thank you, Ma'am.

13        Ms. Perkins.

14        **PROSPECTIVE JUROR:**  My name is Kasundra Perkins.

15        My occupation is I'm a job coach at the Goodwill.  I       11:46

16   have a Bachelor's degree in sociology.  I live in

17   San Bernardino.  Not married.  Single.  Have no children.  And

18   I live with my mother and my stepfather.  My mother is 48 and

19   my stepfather is 39.

20        I never served on a jury.  I've never heard or seen       11:47

21   this case ever.  My aunt has served in Kuwait, but that's all I

22   know.  I don't have any beliefs on the military; mostly I just

23   want them to come back.

24        In judgment, it would be more -- I would have to hear

25   enough evidence to make that judgment.  I've never been        11:47

1    involved in law enforcement and never been arrested.  And I

2    believe I would be fair and impartial as a juror.

3              THE COURT:  So you believe you would make decisions

4    based on the evidence you heard, regardless of whatever beliefs

5    you might have?                                                    11:48

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Let's come to the front row, the next

8    juror:  Ms. Contreras.

9              PROSPECTIVE JUROR:  My name is Luz Contreras.  I work

10   at Taco Bell and I have a certificate for a medical assistant.    11:48

11   I live in Perris, California.  I am married and my husband is

12   in Mexico right now.  We have two children.  I live with my

13   parents right now; my mother is 62, she's unemployed; and my

14   father is 52, and he works and measures windows.  And my

15   brother also lives with us and he works at PayCo.                 11:48

16             I've never served on a jury.  I've never heard

17   anything about this in the media.  I don't know anyone that has

18   served in the U.S. Army.  In my opinion of the war, I don't

19   think we should be over there.  I don't think I would have

20   difficulty sitting in judgment of actions by any of the          11:49

21   members.

22             I've never been in law enforcement and I've never

23   been arrested.  And I think I can serve as a fair and impartial

24   juror.

25             THE COURT:  You think you could be fair?               11:49

1          **PROSPECTIVE JUROR:**  Yes.

2          **THE COURT:**  Thank you, Ma'am.

3          **PROSPECTIVE JUROR:**  Diana Pyle.

4          I'm currently retired.  Mostly recently as a

5     bereavement ministry coordinator of a large Catholic parish in          11:49

6     Florida.  I'm very involved in the same thing as a volunteer at

7     our parish here in Victorville.  I have a B.A. in home

8     economics, which I did work in that field for a while; so I

9     have a second life.

10          I live in Victorville.  I'm married.  My husband is          11:50

11     supposed to be retired, but he's just become the interim CEO

12     for the High Desert Chapter of the American Red Cross.

13          We have three boys and their families; 47, 44, and

14     42.  Our oldest is a design electrical engineer for Square D;

15     our middle son is a manager for a restaurant in Illinois; and          11:50

16     our youngest son is a bank manager and commercial loan officer

17     for a bank in Redlands.  No other adults in our household.

18          I've never gotten past jury selection.  I did see one

19     little one-or two-inch blurb, it must have been on the

20     Internet, about just the factual statement that this case was          11:51

21     going to happen.

22          We have one of our grandson's now who has just

23     entered the marines; he is now in training at Fort Leonard

24     Wood; and, of course, the prospects for us are a little bit

25     scary.  He's just received an automatic promotion as Lance          11:51

1    Corporal.

2           I think I could be fair and impartial, but it's a

3    very difficult case.  I do not really know the military rules

4    of war or anything of that.  I don't understand all that, and I

5    really am torn about the war in Iraq.  Initially, I don't think

6    we had a choice; and once we got there, I think we're stuck; so

7    I guess it's a necessary evil.

8           **THE COURT:**  Could you put aside those views and your

9    feelings and base your verdict on the law and the evidence, the

10   factual evidence, that you hear from the witnesses and the

11   exhibits?

12          **PROSPECTIVE JUROR:**  I believe I could.

13          **THE COURT:**  Thank you, Ma'am.

14          **PROSPECTIVE JUROR:**  I would not have any difficulty

15   sitting in judgment; it's always hard to judge anyone; but I

16   guess my only conflict would be a civil case of a military --

17          **THE COURT:**  You mean a civilian --

18          **PROSPECTIVE JUROR:**  -- a civilian trial of a military

19   case.

20          **THE COURT:**  And any objections that you have, legal

21   objections of that nature, would you be able to set them aside

22   and follow the Court's instructions?

23          **PROSPECTIVE JUROR:**  I believe I could.

24          **THE COURT:**  All right.

25          **PROSPECTIVE JUROR:**  No one close to me in law

11:52

11:52

11:52

11:52

11:53

1    enforcement.  I've never been arrested.  And other than finding

2    it just physically difficult to commute from Victorville, no

3    other real reason.

4              **THE COURT:**  Very well.  Thank you, Ma'am.

5         Ms. King.                                                     11:53

6         **PROSPECTIVE JUROR:**  My name is Robin King.  I'm a

7    licensed vocational nurse; I work the night shift at Patton

8    State Hospital.  I have a bachelor of science degree in human

9    services.  I live in Corona.  I'm divorced.  I have three

10   children; 35, and she is a mechanical design engineer; 32,       11:53

11   she's a social worker; and 26, he's a production assistant for

12   the movies.  I don't have any other adults living in my house.

13        I've never served on a jury.  I have not seen or

14   heard anything about this case.

15        I have a brother who was in the military years ago,         11:54

16   but I have not seen him in a while either.

17        I have my own beliefs and opinions on the military

18   and the war in Iraq, but it won't have anything to do with my

19   sitting on this case.

20        I don't believe I'll have any difficulty sitting in         11:54

21   judgment of any actions of the armed services.  No one close to

22   me nor have I ever been arrested or had any involvement with

23   law enforcement or the criminal justice system.  And I don't

24   have any reason why I cannot serve.

25             **THE COURT:**  Do you think you could be fair to both  11:54

1    sides?

2              PROSPECTIVE JUROR:  Yes, sir.

3              THE COURT:  Thank you, Ma'am.

4              Ms. Carlos.

5              PROSPECTIVE JUROR:  My name is Maria Socorro Carlos.          11:54

6         My occupation is a customer service supervisor for

7    Eastern Municipal Water.  I live in Nuevo, California.  I am

8    married; my husband works for the United States Postal Service.

9    We have three children; my eldest is 19, attending this fall

10   his second year of college, UCR.  I don't have any other adults          11:55

11   living in my household.

12        I have served on a jury a couple of years back, a

13   civil trial, and we did reach a verdict.

14        I have not heard anything about this case in the

15   media.  I have two brothers-in-law that are a lot older than I,          11:55

16   who, I think in the 70's, served in the United States Army.

17   I'm not aware of what their positions were.

18        I have personal beliefs about the military.  I don't

19   feel that I would have a problem being fair in this trial.

20        'No' to number 11.  'No' to number 12.          11:56

21        I've never been arrested.

22        And 14, 'no.'

23             THE COURT:  Thank you, Ma'am.

24             PROSPECTIVE JUROR:  My name is Anthony Debenedetto.

25   I am self-employed as a financial analyst.  I have a little          11:56

```
 1  college background.  I live in Rancho Cucamonga.  I'm single

 2  and I don't have any children.  I still live with my father

 3  who's 62.  I have never served on a jury before.  I've never

 4  heard anything about this case.

 5          THE COURT:  What does your father do?                     11:56

 6          PROSPECTIVE JUROR:  He's an assistant director for

 7  sales for Stater Brothers' markets.

 8          Both my grandfathers served in the marines, both

 9  sergeants.  I have two friends that are in marine recon right

10  now; one that came home injured from the war.                    11:57

11          At this time I do have some beliefs and everything on

12  the rules of war and the Iraq war.  And, truthfully, I do have

13  a little hesitation on being judgmental for both sides.

14          THE COURT:  It's one thing to have a little

15  hesitation; that's probably normal on certain levels.  But what 11:57

16  I would need you to do is to consider it thoughtfully and --

17  could you put whatever hesitation or thoughts you might have

18  aside and be able to make a decision that was based on the

19  evidence and be fair to both the government and fair to the

20  Defendant?                                                       11:57

21          PROSPECTIVE JUROR:  At this time, no, Your Honor.

22          THE COURT:  Why do you say that?

23          PROSPECTIVE JUROR:  My friend that had come home from

24  the war, he's told me a few stories, and I have my own opinions

25  and things about the war and the men that are out there helping 11:57
```

1    us.

2            **THE COURT:**  Do you think those stories might

3    influence you?

4            **PROSPECTIVE JUROR:**  Yes.

5            **THE COURT:**  Thank you, Sir.                          11:58

6            Ms. Wicken.

7            **PROSPECTIVE JUROR:**  My name is Ingrid Wicken.  I

8    teach physical education at Riverside Community College in

9    Moreno Valley.  I have a bachelor's degree and a master's

10   degree in physical education from Cal Poly, Pomona.          11:58

11           I live in Norco.  I'm single and don't have any

12   children.  I have two other adults living in my household; two

13   friends; one is retired, and she's 64; the other is disabled,

14   and she's 53.

15           I've never served on a jury.                          11:58

16           I read the paper every day, so I've seen headlines

17   and I have not read anything in detail about this case, so I

18   just know basic minimum.

19           My nephew served in the Navy during Desert Storm.  I

20   believe he was a private.  I disagree with the war in Iraq, but  11:58

21   I have great respect for the men and women who serve in any

22   military capacity.  I don't think I'd have any difficulty

23   sitting in judgment, and I would be impartial and fair.

24           I have a few friends who are Highway Patrol officers

25   or were Highway Patrol officers, and that would not affect any  11:59

```
 1   opinion in this case.

 2           I've never been arrested.

 3           And I think I could be fair and impartial.

 4       THE COURT:   Thank you, Ma'am.

 5       Ms. Black.                                              11:59

 6       PROSPECTIVE JUROR:   Shirley Black.  I work as a

 7   custodian for Riverside County.  I live in Perris, California.

 8   I'm single, but I have my boyfriend; he's retired.  That's it.

 9           I have two children; a daughter, 29; a son, 28.  My

10   daughter is a housewife; my son works at Carnival.  I don't     11:59

11   have no other adults.

12           No, I'm not on a jury.  I've never seen this case in

13   the media.  I don't think we should be over there.  I have

14   three uncles in the military.  I don't remember what their

15   ranks were.                                                    12:00

16           I don't know about that one.

17           I don't have any beliefs.

18       THE COURT:   Which one are you referring to when you

19   say you don't know about that one?

20       PROSPECTIVE JUROR:   Number ten:  Any beliefs or          12:00

21   opinions about the military.  I don't know anything about the

22   rules of war or the war in Iraq.

23           I don't think we should be over there.

24       THE COURT:   The question is whether you believe your

25   beliefs would affect your ability to sit in fair judgment of   12:00
```

1    this case?

2           **PROSPECTIVE JUROR:**  Probably, yes.

3           **THE COURT:**  You think you would favor one side or the

4    other without hearing the evidence?

5           **PROSPECTIVE JUROR:**  Probably.                          12:00

6           My daughter was in jail for nine months, so I have

7    been involved in the justice system.  I've never been arrested

8    myself.

9           Fair and impartial?  I don't think so.

10          **THE COURT:**  Thank you, Ma'am.                          12:01

11          **PROSPECTIVE JUROR:**  My name is Jose Rodarte.

12          I'm a loss prevention safety manager for Coco's and

13   Carrow's Restaurants.  I have a two-year degree in the

14   administration of justice.  I live in Upland, California.  I'm

15   married.  I have three children; ages 3, 8, and 17.              12:01

16          I've served on a civil case as an alternate, and

17   there was a verdict reached.

18          I've seen just minor bits of information on this

19   case, maybe, some time back, I'd say over a year.  I can't

20   remember the specific details, though.                          12:02

21          I am an ex-member of the U.S. military, I served

22   during the first Gulf War stateside.

23          I do have some strong beliefs about the military and

24   the rules of engagement, but I can be fair and impartial.

25          **THE COURT:**  Having been in the military, you've       12:02

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1    received training and instruction, no doubt.  Can you put

2    whatever training and instruction that you previously received

3    aside and not have that dictate your views in this case?

4         PROSPECTIVE JUROR:  It would be very difficult, Your

5    Honor, especially judging someone that's received that same          12:02

6    military training and who I feel we've shared something

7    similar, you know, serving in the military; so it would be

8    difficult.  But I'd try to be as fair as possible listening to

9    the information that's provided to me.

10        THE COURT:  Thank you, Sir.                                      12:03

11        I trust you have involvement with law enforcement?

12        PROSPECTIVE JUROR:  Yes, Your Honor.  I investigate

13   internal theft and fraud for our company, and I do have to

14   offer testimony in court dealing with these cases and such.

15        I also have a brother-in-law who has served as a                12:03

16   sheriff's deputy for 13 years, and a very close friend of mine

17   who's a public defender in Riverside County.

18        THE COURT:  Anything about those relationships or

19   those experiences that might affect how you would view the

20   government, the defendant, the process, anything?                     12:03

21        PROSPECTIVE JUROR:  No.  I would listen to the case

22   and the facts and make my mind up from those facts.  I do have

23   a misdemeanor arrest in 1986, I had just turned 18, for driving

24   a vehicle without the owner's consent, or joyriding.  I served

25   two years probation and then the case was dropped after serving      12:04

```
 1   the probation.
 2            THE COURT:  Nothing about that experience that would
 3   affect your views here?
 4            PROSPECTIVE JUROR:  Absolutely not.
 5            And I can be fair and impartial.                          12:04
 6            THE COURT:  Very good.
 7            Thank you very much.
 8            We're going to take our break for lunch now.  It's a
 9   few minutes after the lunch hour.  I'm going to ask you to
10   carefully look where you're seated right now, because this is     12:04
11   exactly where I want you to be seated at 1:30; so you'll have
12   an hour and a half.  Get a good bearing as to where you are,
13   and we'll resume with this process at 1:30 sharp.
14            Before you leave, do not discuss this case, do not
15   discuss anything that happened this morning, with any of your     12:04
16   panel members or anybody else.  Just find something else to
17   talk about.  And we'll see you back here at 1:30.
18            Counsel, I'll see you at 12:30.
19            (Whereupon prospective jurors depart courtroom.)
20            (Whereupon a recess was held.)                           12:06
21            THE CLERK:  Recalling the case of U.S.A. versus
22   Jose Luis Nazario.
23            May we have counsel please come forward and state
24   your appearances for the record.
25            MR. BEHNKE:  Jerry Behnke, Charles Kovats, for the       12:39
```

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

```
 1  United States; also present is Special Agent Fox.
 2          MR. McDERMOTT:  Kevin McDermott appearing for
 3  Mr. Nazario, along with Mr. Preis and Mr. Applegate.
 4          THE COURT:  Good afternoon.
 5          We're on the record outside of the presence of the          12:39
 6  jury.  The Court wanted to afford government counsel the
 7  opportunity to call the Special Agent for the Secret Service as
 8  a witness and to provide any additional argument to the Court,
 9  if it wishes to do so.
10          MR. BEHNKE:  Thank you, Your Honor.                          12:39
11          At this point, in furtherance of the hearing,
12  government calls Special Agent Steve DeZeeuw.
13          THE CLERK:  Do you solemnly state that the testimony
14  you may give in the cause now pending before this court shall
15  be the truth, the whole truth, and nothing but the truth, so
16  help you God?
17          THE WITNESS:  Yes.
18          THE CLERK:  Please state your full name and spell
19  your last name for the record.
20          THE WITNESS:  Steven J. DeZeeuw, D-e-Z-e-e-u-w.             12:41
21                      DIRECT EXAMINATION
22  BY MR. BEHNKE:
23  Q    Sir, are you a Special Agent?
24  A    I am.
25  Q    What agency are you with now?                                  12:42
```

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1    A    I'm currently with the Office of Criminal Investigations

2    for the Food and Drug Administration.

3    Q    Prior to that were you a Special Agent with the United

4    States Secret Service?

5    A    Yes.                                                          12:42

6    Q    For how long were you a Special Agent with the Secret

7    Service?

8    A    For 15 years.

9    Q    On October 3, 2006, as part of your duties as a Special

10   Agent, did you conduct a pre-polygraph examination of an          12:42

11   applicant named Ryan Weemer?

12   A    Yes.

13   Q    Prior to that date, had you received any special education

14   or training through the Secret Service in conducting these

15   applicant pre-polygraph interviews?                               12:42

16   A    Yes.

17   Q    Was that actually one of your job duties in the Secret

18   Service, to conduct pre-polygraph interviews such as this?

19   A    Yes.

20   Q    For how long had you been conducting pre-polygraph           12:43

21   interviews before October 3 of 2006?

22   A    Approximately six-and-a-half years, perhaps seven.

23   Q    And is it fair to say that you had -- not you personally,

24   but the Secret Service -- had a standard procedure in place for

25   conducting all applicants' pre-polygraph interviews?             12:43

1    A     Yes.

2    Q     Were applicant pre-polygraph interviews conducted in the

3    same manner as a suspect interview in a criminal investigation?

4    A     The format of the test is somewhat different.

5    Q     What do you mean when you say 'the format is somewhat                    12:43

6    different'?

7    A     In a criminal polygraph examination, there's a specific

8    issue at hand whether the person that I'm testing was or was

9    not involved in the crime that we believe they may have

10   committed; so the test is structured to determine that.  It's       12:44

11   called the single-issue test.  There's a specific issue test.

12          In a pre-employment polygraph screening examination,

13   a broader set of questions is asked to determine whether

14   there's information that the applicant may not be disclosing to

15   the Secret Service that could help the Secret Service hiring         12:44

16   authorities determine their suitability for hiring with the

17   Secret Service.

18   Q     The interview that is at issue in this case was an

19   interview that you did of Ryan Weemer before he actually was

20   connected to a polygraph machine; is that correct?                  12:44

21   A     That's correct.  We would determine it to be the pre-test

22   portion of the polygraph examination.

23   Q     And when you're doing the pre-test portion of the

24   polygraph examination, what is the purpose of that?  What are

25   you exploring in that test?                                         12:44

```
 1   A     There are several purposes; one is to afford the applicant
 2   the opportunity to present any additional information that they
 3   had not previously presented to the Secret Service or on their
 4   application forms.  There are a number of application forms.
 5   Another part of the pre-test is to develop -- there's a
 6   polygraph term called the 'psychological set' and in forming
 7   the applicant's psychological set, it's trying to focus their
 8   mentality on the issues that are important.  It's also trying
 9   to help them to focus on whether particular questions should be
10   of concern to them because they are not disclosing everything
11   to the Secret Service, or whether to put them at ease to those
12   questions because they are providing all of the information
13   that the Secret Service would need to know.
14   Q     In establishing this psychological base line, if you will,
15   for the upcoming polygraph examination, if the applicant were
16   to reveal something to you that they thought was important,
17   would you ask follow-up questions?
18   A     Yes.
19   Q     And what is the purpose of asking follow-up questions?
20   A     There would be two purposes.  Again, one would be to
21   gather additional information for the Secret Service that could
22   be used by authorities in determining their suitability for
23   hiring by Secret Service authorities in headquarters.  Another
24   portion would be, again, to help the applicant that if the test
25   continues into the questioning phase where they are attached to
```

12:45

12:45

12:45

12:46

12:46

73

1    the equipment, that they can either be at ease with a question

2    that I'm asking about a particular issue, or, whether they

3    realize that they have not disclosed everything accurately to

4    the Secret Service, then in that case they would not be at ease

5    and it would cause a response on the test.                          12:46

6    Q    In this particular case before beginning the pre-polygraph

7    examination, you had Ryan Weemer sign an "advice of rights"

8    form; correct?

9    A    Yes.

10   Q    What was the purpose for doing that?                           12:47

11   A    That's standard policy of the Secret Service on all

12   polygraph examinations that are administered.  Whether it's a

13   criminal test or an applicant screening test, the examinee

14   signs an "advice of rights" form, as well as a polygraph

15   consent form.                                                       12:47

16   Q    In this particular case, in reviewing the transcript of

17   your interview -- and have you had a chance to review the

18   transcript yourself?

19   A    Yes, I have.

20   Q    When Ryan Weemer first brought up the fact that he            12:47

21   struggled with some things that he did in the military, and

22   then he began speaking about some incident that occurred in

23   Iraq, you started asking him follow-up questions.

24        Do you recall that question-and-answer?

25   A    Yes.                                                           12:48

1    Q    What were you seeking to elicit from him when you started

2    asking the follow-up questions in that area?

3    A    Again, additional information.  As a polygraph examiner,

4    we don't determine whether a person does or does not go further

5    in the hiring process; we're just gathering information that          12:48

6    the headquarters personnel can use; so the questions were to

7    gather additional information that could be used for that

8    purpose.

9             Again, if the test were to have gone on further,

10   those questions would help the examinee -- in this case,             12:48

11   Ryan Weemer -- to either feel comfortable that he had provided

12   the answers accurately and completely to the Secret Service,

13   or, again, whether he realized that he did not provide the

14   information completely or accurately and therefore it would

15   have perhaps caused reactions on the test.                           12:48

16   Q    And during your interview with Ryan Weemer, I forget what

17   the exact question and answer was, but you gave him a

18   hypothetical of a justified act -- killing in a firefight, I

19   believe, was your hypothetical -- as opposed to a criminal act;

20   and your hypothetical was shooting an unarmed person in the          12:49

21   head.  And Ryan Weemer responded, 'Well, that actually did

22   happen, to be honest.'

23             You then asked some follow-up questions.

24             What was the purpose for you asking follow-up

25   questions in response to that?                                       12:49

1  A     To gather complete information that I could present in my

2  report to headquarters so that headquarters could make an

3  accurate determination on whether he was suitable or not for

4  hiring.

5  Q     Would whether any killing or shooting of persons in Iraq     12:49

6  have been legally justified have any bearing on the Secret

7  Service's determination as to whether he was a suitable

8  candidate?

9  A     Could you restate that?

10  Q     If the shooting or killing that Ryan Weemer first          12:49

11  referenced in his interview turned out to be a justified act,

12  is that something that would have been relevant for Secret

13  Service in deciding whether he was a suitable candidate?

14  A     In my opinion, yes, it would have been relevant, because

15  if it would have been justified, it would have been part of him  12:50

16  performing his official duties and would not have been wrong,

17  so to speak.

18  Q     And in anticipation of the fact that Ryan Weemer's next

19  step in the process would have been to take the actual

20  polygraph examination, was it also important for you to try to   12:50

21  establish whether Ryan Weemer, the applicant, in his own mind,

22  believed that this was justified or not?

23  A     Yes.

24  Q     Because that would affect how he performed on the

25  polygraph; correct?                                              12:50

1   A    Yes.

2   Q    At some point during the interview, I believe there was an

3   instance where Ryan Weemer said something about needing to go

4   to the restroom, and he was told to wait.

5          Do you recall that?                                    12:50

6   A    I can't recall specifically, but I believe that he did

7   mention that he needed to go to the restroom.  I believe I

8   asked him if he needed to go right away, and he said -- to my

9   recollection, he may have said 'I can wait just a bit.'  Or I

10  may have afforded him a chance right at that time, if it was a   12:51

11  good stopping time.

12  Q    What do you mean by a 'good stopping time'?

13  A    Well, if I'm in the middle of a pre-test examination and

14  we're talking about a significant issue, or if I know in my

15  mind from my experience from conducting previous pre-test        12:51

16  examinations that I would be at the end of the pre-test

17  examination portion in a couple of minutes, I may have asked

18  him to just wait a couple of minutes; then that would have been

19  a more suitable time for him to step out and we would not have

20  broken the train of thought, so to speak.                        12:51

21  Q    Was he free to terminate the interview and leave, if he

22  chose to?

23  A    Yes.

24  Q    Before conducting the interview of Ryan Weemer on

25  October 3, 2006, had you had any communication with anybody       12:52

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1    from NCIS about Ryan Weemer?

2    A    No.

3    Q    After you finished with your interview of Ryan Weemer,

4    what did you do with the information that you received from

5    him?                                                          12:52

6    A    I stepped out of the polygraph examination room and I

7    presented the information to both the Special Agent in charge

8    of the St. Louis field office of the Secret Service where this

9    examination was conducted, and the assistant Special Agent in

10   charge of that office; and they called headquarters with that   12:52

11   information.

12   Q    And when you stepped out of the room and presented the

13   information to these individuals, what did Ryan Weemer do?

14        Did he leave or was he still there?

15   A    I can't remember if that's the point in time that he used   12:52

16   the restroom and was waiting in the lobby of the Secret Service

17   office, or he may have still been waiting in the examination

18   room.  I can't specifically remember; it was one of those two,

19   though.

20   Q    At some point that day, did he leave the Secret Service    12:52

21   office?

22   A    He did.  After I presented that information to the Special

23   Agent in charge and after the Special Agent in charge called

24   headquarters, it was determined that there would not be further

25   testing that day, and then I did go back into the polygraph    12:53

1    examination room or the lobby, one of those two, and told

2    Mr. Weemer that in light of the additional information that was

3    gathered, that it would have to be examined by officials at

4    headquarters before there would be any further testing as far

5    as the polygraph portion of his application process with the          12:53

6    Secret Service was concerned.

7    Q    So if nothing had been revealed during the pre-polygraph

8    interview, could he have gone on and done the actual polygraph

9    examination that same day?

10   A    Yes.  And even if information is revealed in a polygraph        12:54

11   examination, if it's determined to not be significant or not be

12   serious, or in the case of an act that would seem serious if it

13   would be justified -- for example, a police officer that might

14   be involved in a shooting and killing somebody but it was

15   completely justified -- that person still would likely continue       12:54

16   in the polygraph process that day.

17            **MR. BEHNKE:**  Thank you.

18            No further questions, Your Honor.

19            **THE COURT:**  Very well.

20            Cross-examination.                                            12:54

21                      **CROSS-EXAMINATION**

22   BY MR. McDERMOTT:

23   Q    Agent, during your employment at Secret Service, were you

24   guided by a set of regulations or rules, booklets, pamphlets,

25   as to how to conduct a polygraph of someone who was looking for       12:54

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session

1    employment with Secret Service?

2    A    Yes.

3    Q    Can you indicate for us what kind of manuals, reports,

4    anything like that, that you relied upon as a polygrapher in

5    preparing a report?                                              12:55

6    A    In preparing a report?

7    Q    Conducting polygraphs.

8    A    Okay.  Yes.  The Secret Service has a polygraph manual

9    that incorporates Secret Service policies as well as generally

10   accepted policies provided by the Department of Defense          12:55

11   Polygraph Institute, which at that time was the name of the

12   federal institution where nearly all federal polygraph

13   examiners go for training.

14   Q    Do these manuals or guidelines that you rely upon dictate

15   whether or not an applicant must undergo a polygraph             12:55

16   examination?

17   A    I can't specifically recall.

18   Q    Do you recall whether or not these manuals or regulations

19   that you rely upon specifically require the advisement of

20   rights prior to taking a polygraph?                              12:55

21   A    Yes, they do.

22   Q    You indicated that there is a philosophical or a

23   theoretical difference between taking a criminal interview for

24   a polygraph as opposed to one for employment.  But do both

25   circumstances get a rights advisement form?                      12:56

1    A    Yes.

2    Q    And do those forms differ in any material way as to the

3    rights that you are advising them of?

4    A    No.

5    Q    So the polygraph advisement that Mr. Weemer received is        12:56

6    akin to or similar to any advisement that you would give a

7    criminal suspect.

8    A    Correct.

9    Q    Now, at the conclusion of conducting polygraphs -- strike

10   that.  Lets go back to your regulations and rules again.          12:56

11          Is there anything that you're aware of as far as

12   policy that dictates what you do as a polygrapher when you

13   uncover misconduct?

14   A    I can't specifically recall, but we are to -- I can't

15   specifically recall whether it's written or whether it is oral    12:57

16   direction, but if it's information that the polygraph examiner

17   deems to be quite significant, then we are to provide that

18   information to the boss of the office where we're conducting

19   the examination and call our polygraph supervisors in

20   headquarters with that information.                               12:57

21   Q    Suffice to say, would this not be the first time in which

22   you had an applicant reveal misconduct that you reported?

23   A    It was not the first time.

24   Q    In fact, at least as to the way you were trained and your

25   understanding of the regulations, if you uncovered misconduct,   12:57

```
1   you were obligated to report it.

2   A    We're obligated to report all misconduct that we conduct

3   that is significant.  If it's minor misconduct, we're not

4   obligated to call headquarters or report it immediately to the

5   boss of the office.                                          12:57

6   Q    I recognize that you're now working with what I believe

7   you said was CID for the Food and Drug Administration.

8   A    It's the Office of Criminal Investigations.

9   Q    Are you a licensed peace officer?

10  A    I am.                                                   12:58

11  Q    And where did you receive your licensing from?

12  A    I received it from the Federal Law Enforcement Training

13  Center and then I continued with further specific training from

14  the Secret Service as well as from the Food and Drug

15  Administration.                                              12:58

16  Q    So you're authorized to be armed.

17  A    Correct.

18  Q    Carry a badge.

19  A    Correct.

20  Q    Make arrests.                                           12:58

21  A    Yes.

22  Q    At the conclusion of your interview with Mr. Weemer, did

23  you prepare any kind of a written report?

24  A    I did.

25  Q    Now, would this have been in accordance with the practices  12:58
```

1    and procedures established at the Secret Service?

2    A    Yes.

3    Q    And this particular report, do you have a copy of it, by

4    chance?

5    A    I do not.                                                    12:58

6    Q    Can you give us kind of a thumbnail of what is normally

7    included in one of these reports?

8    A    Yes.

9         The report would include biographical information

10   about the examinee that we tested.  It would include a portion   12:59

11   that states that they were given a pre-test examination and

12   whether they provided any information in the pre-test

13   examination.  It would include the fact that we then

14   administered the polygraph examination.  It would include the

15   questions that we asked of the particular examinee.  It would    12:59

16   include our determination of whether there was deception

17   indicated or whether there was not deception indicated.

18        And then if we actually complete the polygraph

19   examination from pre-test to in-test to post-test, it would

20   include whether there were any admissions or confessions made    12:59

21   in the post-test and if there was deception indicated.

22   Q    Is there any block on there that allows you to form or

23   advise an opinion as to whether or not any kind of action

24   should be taken?

25   A    No.                                                         12:59

1    Q    But it does require you to at least state your opinion as

2    to whether or not any misconduct or criminality was uncovered.

3    A    Not an opinion; it would just merely state the facts of

4    the information that we gathered during the test.

5    Q    Now, based on your experience and training, at the          01:00

6    conclusion of your interview with Mr. Weemer, you felt that

7    what you learned was significant enough to contact and discuss

8    this with the agent chief there in St. Louis.

9    A    Correct.

10   Q    And, obviously, with that agent you discussed the          01:00

11   circumstances that you had uncovered during the interview.

12   A    Yes.

13   Q    Did he advise you at any particular point in time any

14   further steps that you needed to take?

15        Did he, for example, advise you to go ahead and cease      01:00

16   conducting the polygraph; that no actual polygraph should be

17   conducted?  Did he provide any input to you as to what you

18   should do next?

19   A    No.  The Secret Service Special Agent in charge in the

20   St. Louis field office did not provide that information; that   01:01

21   information would have been provided by my supervisor in

22   polygraph headquarters in Washington, D.C.

23   Q    While you were there, you said you made contact with that

24   individual.

25   A    Yes.                                                        01:01

1   Q     Did that individual provide you advice?

2   A     Yes.

3   Q     Can you recall for us what that was specifically?

4   A     The advice was to discontinue testing for that day.

5   Q     Okay.                                                      01:01

6          Was Mr. Weemer the only one that you had up to bat

7   that day as far as polygraphs?

8   A     Yes.

9   Q     So to your knowledge, did you have any communications or

10  discussions outside of that St. Louis office and outside of the   01:01

11  individual that you talked to in Washington, D.C. regarding

12  Mr. Weemer's revelation?

13  A     I personally did not.

14  Q     Today, have you ever been asked or requested to provide a

15  copy of that report that came from Mr. Weemer's polygraph?        01:01

16  A     I have not.  The procedure is that we send that report

17  into our polygraph headquarters and they retain a copy of it;

18  so any copies that would have been distributed would have had

19  to come from the Secret Service polygraph headquarters.

20  Q     Has anybody asked you to review the transcript?             01:02

21  A     Yes.

22  Q     And how long ago did you do that?

23  A     I reviewed a portion of the transcript this morning.

24  Q     Okay.

25          Have you been asked to review the entire 80 pages of     01:02

1   the interview?

2   A      Yes.

3   Q      And how long ago did you do that?

4   A      Perhaps two months ago; a month or two ago.

5          **THE COURT:**   I'm very sorry to interrupt you.  It's          01:02

6   1:00 o'clock and we need to change out our court reporter.  So

7   we're going to take a three-minute recess before you get into

8   the transcript questions.

9          (Morning proceedings concluded;

10          afternoon proceedings were reported

11          by Mark Schweitzer.)

12

13

14

15

16

17                       CERTIFICATE

18

19   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
20   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
21   conformance with the regulations of the Judicial Conference of
     the United States.

22

23   _____          _____
     THERESA A. LANZA, CSR, RPR                         Date
24   Federal Official Court Reporter

25

Tuesday, August 19, 2008                    Trial Day 1, A.M. Session